SEMIANNUAL

# REPORT TO THE CONGRESS

OCTOBER 1, 1988 — MARCH 31, 1989

Department of Health and Human Services
Richard P. Kusserow
Inspector General

OFFICE OF INSPECTOR GENERAL

# APPENDIX D

## INVESTIGATIVE RECEIVABLES OCTOBER 1988 THROUGH MARCH 1989

This schedule represents the dollar amount of fines, savings, restitutions, settlements and recoveries determined through judicial or administrative processes in support of OIG investigative findings. These figures include both actual and ordered recoupments for the Treasury of the United States, the Social Security and Medicare trust funds and departmental programs victimized by fraud and abuse. Receivables of $39.3 million are reported for this period.

**Civil Monetary Penalties and Settlements:**

| | |
|---|---|
| • Hospital had related-party dealings with vendors. | $1,490,300 |
| • Physicians billed for psychotherapy services performed by nonphysician employees who were not supervised or directed by physicians. | 654,000 |
| • Cardiologists billed for services not covered by Medicare. | 440,000 |
| • DME supplier billed individual home services for people residing in a nursing home. | 200,000 |
| • DME supply company billed sales and rentals to nursing home patients as if they lived in their own homes. | 187,700 |
| • Pharmacist billed for dispensing more supplies and items than he bought or had available. | 158,700 |
| • Otolaryngologist billed for services not rendered. | 154,000 |
| • Physician billed both Medicare and Black Lung programs for same services. | 125,000 |
| • Cardiologists billed for services not covered by Medicare. | 125,000 |
| • Anesthesiology corporation forged signature of nonaffiliated doctor for payment of services. | 122,000 |

| | |
|---|---|
| • Anesthesiologist billed for more time units than actually performed. | 100,000 |
| **Fines and Restitutions:** | |
| • New Jersey rheumatologist falsified research data and results. | 2,000,000 |
| • Hospital official embezzled Pennsylvania hospital funds. | 459,000 |
| • Michigan woman misrepresented herself as a physical therapist in billing Medicare. | 246,800 |
| • Owner and operator of Tennessee home health agency used family members' names on payroll and fictitious nurse visit reports. | 241,500 |
| • Parents misrepresented circumstances in applications to Texas day care center. | 127,100 |
| • Woman in California used false names and SSNs to obtain SSI payments. | 120,000 |
| • Former vice president of national health maintenance organization conspired in preenrollment, false claims scheme. | 100,200 |
| **Recoveries:** | |
| • West Virginia Department of Human Services used illegal basis to claim matching Medicaid funds. | 5,524,000 |
| • Psychiatric care company in Kansas claimed treatments in nursing home as hospital services. | 111,200[1] |
| **Other Receivables Which Did Not Meet the $100,000 Threshold for Individual Reporting:** | $26,613,500 |

[1]Includes some fines and restitutions.

# Semiannual Report

April 1, 1994 - September 30, 1994

## Office of Inspector General

June Gibbs Brown
Inspector General

# FOREWORD

I am pleased to present this semiannual report of the Department of Health and Human Services (HHS) Office of Inspector General (OIG) describing our accomplishments during the 6-month period ending September 30, 1994.

Since becoming HHS Inspector General almost 1 year ago, I have been impressed with the breadth of OIG's mission and immensely proud of its achievements. The HHS is one of the few Government agencies that touches all Americans, whether they are Medicare beneficiaries, patients benefitting from HHS-sponsored biomedical research, consumers of food or drugs, Head Start children or recipients of social services. Even with the imminent establishment of the Social Security Administration (SSA) as an independent agency, HHS and its programs will still impact the lives of most Americans.

Fiscal Year (FY) 1994 has been a time of great challenges. Our continuing resource constraints demand that we direct our activities with great care while streamlining our work force and expenditures. This is a challenge all Government agencies are facing, and we take it very seriously.

At the same time, FY 1994 has been a year of noteworthy successes. Our total savings surpassed $8 billion, which represents $80 in savings for each dollar invested in OIG and $6.4 million in savings per OIG employee. Our accomplishments included a record $379 million settlement of criminal fines, civil damages and penalties for fraud and kickbacks by a health care corporation; reviews of the National Institutes of Health's oversight of inventions arising from extramural research; audits of administrative costs charged to the Medicare program; and a series of studies of the SSA representative payee process.

To leverage our limited resources, we continue to coordinate our activities with a number of outside entities, especially in the health care area. Working with the Department of Justice, the Federal Bureau of Investigation and the HHS Office of General Counsel, we are developing a "voluntary disclosure" program to offer certain federally-funded health care providers incentives to disclose any fraud and abuse they discover within their companies. We are also embarking on a Federal/State partnership with State auditors to provide broader audit coverage of significant Medicaid issues.

# Semiannual Report

# Office of Inspector General

October 1, 1994 - March 31, 1995

June Gibbs Brown
Inspector General

HHS-OIG 1228

# FOREWORD

I am pleased to present this semiannual report of the Department of Health and Human Services (HHS) Office of Inspector General (OIG) describing our accomplishments during the 6-month period ending March 31, 1995.

In the first half of Fiscal Year (FY) 1995, we have been part of several pivotal changes. As of March 31, 1995, the Social Security Administration (SSA) became an independent agency with its own OIG formed of staff from the HHS OIG. In the next reporting period, SSA OIG will report its own accomplishments. Under the provisions of the Social Security Independence and Program Improvements Act of 1994, and at the request of Commissioner Shirley Chater, (while continuing as HHS Inspector General) I will serve as interim Inspector General of SSA until an Inspector General is nominated and confirmed. It is a pleasure to work with Commissioner Chater and her excellent staff, and I commend all of the outstanding accomplishments by both HHS and SSA staff in the transition to an independent SSA.

Within HHS OIG, we are continuing to streamline our operations while maintaining our vigorous pursuit of fraud, waste and abuse. As examples of our streamlining efforts, we completed early-out and buyout programs targeted at reducing management positions (Senior Executive Service through General Schedule-13) and closed 17 out of 65 field offices. The OIG also reduced administrative costs by increasing teleconferencing to conduct audit conferences and report reviews, making more efficient use of other electronic communications, pursuing more cost-effective in-house training and redesigning basic work processes.

Under Secretary Shalala's leadership, we have launched a major program integrity project, "Operation Restore Trust," with the Health Care Financing Administration, Administration on Aging, Department of Justice, State Medicaid Fraud Control Units and others working against health care fraud. Its purpose is to model an approach for attacking health care fraud through focused intergovernmental teams. We will target our initial partnership efforts to investigations, audits, evaluations and administrative sanctions in home health agencies and nursing homes, two industries we have identified as particularly vulnerable to fraud and abuse. The ultimate objective is to protect the integrity, quality and access of our health care programs.

proposal audits, OIG is offering it to all PROs. The OIG believes that it could be most useful as an up-front control over the quality of PRO bid proposals, and has recommended that HCFA incorporate its use in the RFP process. Also, OIG recommended that HCFA develop a systematic approach for monitoring PROs' corrective actions on internal control deficiencies. The HCFA agreed with OIG's recommendations, and will include the Proposal Guidance Book in future RFPs. Of note is that the benefit of OIG's proposal guidance approach was recognized with the Secretary's Continuous Improvement Program Award. (CIN: A-03-93-03001)

## Criminal Fraud

The most common fraud investigated by OIG against health care providers is the filing of false claims or statements in connection with the Medicare and Medicaid programs, as illustrated in the following cases:

- As the result of a joint undercover investigation by OIG and the Federal Bureau of Investigation, five persons involved in a Medicare and Medicaid fraud scheme were given jail sentences. Four, including the owner of two vascular testing clinics and a DME company as well as three of her employees, were ordered to make restitution totaling more than $2 million to Medicare and $243,500 to Medicaid. They also received jail sentences ranging from 21 to 51 months. The four had paid individuals to submit to an extensive battery of diagnostic tests which were placed in Medicare and Medicaid patient files and for which they filed for more than $4 million in claims. They also paid a carrier contract employee to pass on to them carrier records. The contract employee was sentenced to 12 months in jail.

- A State-owned hospital in Iowa agreed to repay Medicare $521,170 for overbilling for services. During a separate anesthesiology investigation, an allegation was made that the hospital was billing for ventilation management although this service should have been included in the global fee. Investigation showed that the hospital was billing for ventilation management for all intensive care patients, regardless of whether they received this service. The hospital claimed to have understood from the carrier's medical director that it could bill for Medicare and private insurers in the same fashion.

- In California, a superior court judge turned down a proposal that a convicted ophthalmologist be permitted to spend a year performing eye surgery in an impoverished country, and ordered him to begin serving his 16-month prison sentence. In December 1991, the ophthalmologist was convicted in State court on 36 counts of grand theft for billing Medicare for services he did not perform. His scheme involved intentionally causing astigmatism by

sewing a stitch too tightly in patients undergoing cataract surgery. When the patients returned complaining of vision problems, he cut the stitch and normal vision returned. The stitch-cutting was billed to Medicare as a $2,000 corneal transplant. During a 4-year period, he billed Medicare more than $1.3 million for over 680 eye operations. Free on bond during an appeal, he lost his appeal earlier this year. In a rare prison sentencing of a physician in State court for Medicare fraud, he also was fined $350,000, assessed a penalty of $280,000 and ordered to pay $56,000 in restitution.

- The former owner of an Oklahoma ambulance company was sentenced to a year and a day in Federal prison and 2 years supervised probation for Medicare and Medicaid fraud. Over a 2-year period, the woman and her husband defrauded the programs of $370,000 in false billings. They submitted bills for ambulance trips for dialysis patients that they claimed were not ambulatory, but surveillance cameras caught several of the patients walking to and from the ambulances with little or no assistance. Because of the couple's financial condition, the woman was ordered to pay restitution of only $926 and a special assessment of $250. Her husband pled guilty earlier and was sentenced to 3 years probation and ordered to pay $113 in court costs. The ambulance company has gone out of business.

- In Texas, a laboratory owner was sentenced to 3 months in prison, followed by 90 days in home confinement and 3 years supervised probation for fraudulent Medicare billing. The man operated a mobile clinic which offered free screenings for senior citizens. He or one of his employees would obtain their Medicare numbers and bill the program for unnecessary tests or tests not performed. He was ordered to pay restitution of $265,110 and a special assessment of $50.

- An Ohio dentist was sentenced to 1 1/2 years confinement, to be served consecutively, on 15 counts of selling controlled drugs to patients. He was fined $2,500 on each count, for a total fine of $37,500. The confinement period was suspended to time served and he was put on indefinite probation not to exceed 5 years. This case was developed from Project Pharm-Div, a joint OIG and Cincinnati police department undercover operation. The project is aimed at identifying and prosecuting individuals involved in the abuse of pharmaceutical drugs, fraud against Medicare and Medicaid, and various frauds involving the misuse of Social Security numbers. To date 16 individuals and entities have been prosecuted in Federal or State courts as a result of the project.

- In Ohio, a physician was sentenced on the basis of a negotiated plea whereby he had agreed to cooperate with the Government in exchange for dismissal of charges under pretrial diversions for his sister/employee, and for his corporation. During a 4-year period, he billed Medicare more than $1.5 million and was paid $560,000, over 60 percent of which was for laboratory services supposedly performed in-house. A carrier utilization review showed he billed as much as 600 percent more than his peers in some areas. He was accused of billing Medicare, the Civilian Health Medical Program of the Uniformed Services, and private insurers for laboratory services not performed or not medically necessary, double billing and money laundering. His sister had been charged with offering a witness a bribe for refusing to cooperate with an OIG agent. He was sentenced to 1 year of confinement, 3 months to be served in prison, 3 months in a halfway house and 6 months in monitored home confinement, after which he will serve 3 years probation. He was ordered to make restitution of $37,000. The sentence was reduced because of his substantial assistance to the Government. Negotiations are continuing toward a settlement of pending civil damages.

- In Michigan, a pharmacy and its former office manager were sentenced for Medicare and Medicaid fraud. The pharmacy was ordered to make restitution of $22,700, while the office manager had to pay $25,000 plus $500 in court costs. He was also sentenced to 1 year in prison. They had billed for urinary incontinence and decubitus ulcer kits which were neither related to the patients' conditions nor medically necessary. They also billed for greater quantities than delivered. The office manager was suspended from program participation in 1988 for 5 years because of a racketeering charge involving illegal drugs, and he was office manager of the pharmacy while under suspension. He has since set up several new businesses in Florida.

- The owner/operator of a retail optical store in New York was sentenced for submitting false Medicare claims. From January 1989 until June 1993 Medicare paid him $237,000, of which $180,000 was overpayment. He billed for eyeglasses not provided or misrepresented services to receive payment when none would have been allowed. He also discussed kickback arrangements with another optical dealer. When confronted by agents, he made a complete written statement admitting his fraudulent activities. He was sentenced to 6 months probation and ordered to repay $24,000. A civil prosecution is underway for the remainder of the fraudulent amount.

- In Virginia, the twelfth and final person was sentenced in a scheme in which Traveler's Insurance employees issued Medicare checks to friends who forged and cashed them. The woman was sentenced to 4 months home confinement and 3 years probation. She was ordered to pay a $2,000 fine, a $150 special assessment and restitution of $11,101 for the two Medicare checks she cashed. Those previously sentenced in the case included two Traveler's employees, a top manager of an international beverage company, a former deputy sheriff and the chief buyer for a drugstore chain. The embezzlement involved 56 Medicare checks totaling $250,000.

- A Wyoming woman was sentenced after pleading guilty to making false statements to Medicaid. As office manager for an optical store, the woman altered patient records and physicians' prescriptions to charge Medicaid for tinted, ultraviolet and scratch-resistant lenses that were not medically necessary. She also failed to honor the company's warranty policy, charging Medicaid for replacement glasses when something went wrong with a pair of eyeglasses. She was sentenced to 18 months probation and 180 hours of community service, with a fine of $50. The optical company repaid $27,900 to Medicaid rather than risk civil action.

- In Indiana, a registered nurse was sentenced to 10 months home detention, 4 years probation and 192 hours of community service, and ordered to pay $10,000 in restitution for submitting false reports of skilled nursing visits to the home health agency for which she worked. The result was that the agency submitted the reports to Medicare, which then overreimbursed about $100,000. Noting that the nurse had been convicted in 1975 of mail fraud and in 1993 of theft from patients' homes, the judge ordered her not to be involved in any home-bound nursing care.

- A New York physician was sentenced to a total of 84 months imprisonment and fined $25,000, to be paid immediately along with a $50 assessment for each of 5 counts of mail fraud, 1 count of arson and 2 counts of witness tampering. The OIG was originally requested by the Bureau of Alcohol, Tobacco and Firearms to disprove the physician's alibi for his whereabouts during a burglary several days before his office was burned, as well as find out where he had fled. During the investigation, OIG found the physician in West Virginia, disproved his alibi, and found evidence of 48 instances in which he submitted duplicate bills to two Medicare carriers as well. Although he was not indicted on Medicare charges, the judge used the information in determining his sentence.

1993, the Assistant United States Attorney filed a civil suit under the False Claims Act, which has finally been settled.

## Kickbacks

Many businesses engage in referrals to meet the needs of customers or clients for expertise, services or items which are not part of their own regular operations or products. The medical profession relies heavily upon referrals because of the myriad specialties and technologies associated with health care. If referrals of Medicare or Medicaid patients are made in exchange for anything of value, however, both the giver and receiver may violate the Federal anti-kickback statute. They also may directly or indirectly increase Medicare and Medicaid costs.

Over the years, more than 700 convictions, judgments and settlements have been obtained as a result of OIG investigations of violations of the anti-kickback statute. The following cases are examples of some of those concluded during this reporting period:

- A home infusion company agreed to pay $500,000 to reimburse the Government for damages to Medicare and for the cost of investigation, to avoid action against it for certain business practices it used with physicians. At the same time, the Government filed suit and obtained a consent decree that permanently enjoins the company from engaging in improper financial arrangements with referring physicians. The company used several business arrangements to induce physician referrals, including offering restricted stock for physicians in infusion centers the company managed and otherwise tying their profits to referrals to the company.

- In Texas, the president of a DME company, one of his partners, the former company manager and the owner of a nursing home became the last of seven persons sentenced for Medicare fraud involving false billings and kickbacks. The president was sentenced to 33 months in prison and 3 years probation, while his partner was sentenced to 150 days home detention and 5 years probation. The manager was sentenced to 5 years probation and 180 days home detention. They had participated in a scheme in which the company billed Medicare for body jackets when it really provided seat pads. The seat pads were manufactured in Mexico for $50 each, but Medicare was billed $800. Over a 2-year period, the company billed Medicare more than $1.6 million, which the company officials were ordered by the court to repay. The nursing home owner accepted bribes from the owner of the DME company for permitting his company to supply ostomy and feeder supplies to a nursing home he and his wife owned. The DME company owner purchased $500,000 in life insurance policies for the couple in exchange for being allowed to supply the nursing home. The nursing home

owner was sentenced to 5 years probation and 120 days home confinement, fined $10,000 and ordered to pay a $50 assessment.

- A pharmaceutical company agreed to pay $450,000 in settlement of civil and administrative claims that it defrauded the Medicare program. The company created a "grant-in-aid" research program which offered physicians kickbacks in the form of grants in exchange for performing small-scale studies of its antibiotic. From 1986 to 1991, the physicians were paid fees of $500 to $2,500 to treat patients with the company's antibiotic. Investigation showed that in most cases the research performed by the physicians was not of scientific value. In addition, some physicians never completed the research but received full payment from the pharmaceutical company. The company instituted a corporate integrity program to ensure adherence to high ethical standards of business conduct.

- The administrator and the marketing representative of a Kansas psychiatric hospital were convicted and sentenced for paying an employee counselor with the Postal Service for patient referrals. The administrator was sentenced to 34 months in a Federal penitentiary, assessed $1,550 and fined $6,430. The marketing representative was imprisoned for 30 months, assessed $1,550 and fined $53,430. Over an 18-month period, they paid the employee counselor approximately $50,000 for referring Texas postal workers or their family members to the hospital. The hospital received more than $650,000 in Federal employee benefits payments while these patients were in treatment. The counselor was sentenced to 2 years probation because of his cooperation in the case. He was fined $2,500 and terminated from his 14-year employment with the Postal Service. The case was a spin-off of a nationwide investigation of the hospital's parent company, which earlier resulted in a $379 million CMP settlement.

- A West Virginia physician agreed to pay $1.25 million in penalties, restitution and investigative costs to resolve allegations of violations of the Federal anti-kickback statute and fraudulent billing of Medicare, Medicaid, the Railroad Retirement Board, and the Civilian Health and Medical Program of the Uniformed Services. The physician also paid half of a $230,000 settlement on behalf of another physician involved, agreed to a 10-year exclusion from all federally funded health care programs and promised to sell his medical practice within 90 days to a nonaffiliated third party. The physician had submitted a large number of false Medicare claims for unnecessary surgery, and had treated patients for glaucoma and cataracts when they did not have these conditions. The hospital with which he had a kickback arrangement signed a civil settlement earlier.