doubled in 3 years, despite a drop in the number of beneficiaries using these supplies. The OIG found that questionable billing practices may account for almost half of incontinence allowances in 1993. A policy change proposed by HCFA will probably address these practices by clarifying covered services and providing a mechanism to link incontinence accessory supplies to prosthetic devices.

In the second inspection, information obtained from nursing homes and beneficiaries led OIG to conclude that some suppliers engage in questionable marketing practices; beneficiaries may be receiving unnecessary or noncovered supplies; and some suppliers present nursing homes with false or misleading information about Medicare coverage for these items.

As a result of these studies, OIG plans to initiate an audit to determine if any overpayments are involved. Additionally, OIG will undertake a national investigation of questionable practices engaged in by specific suppliers of incontinence supplies. (OEI-03-94-00772; OEI-03-94-00770)

## Durable Medical Equipment Billed during Nursing Facility Stays

Performance Measure

Federal law provides that DME may be billed to Part B of the Medicare program only if the equipment is provided in the beneficiary's residence. The law specifies that a SNF cannot be considered a residence. Claims for DME and other items covered under Medicare Part B are now processed by four regional carriers.

The OIG determined that approximately $8.9 million in 1991 and $10.8 million in 1992 were incorrectly allowed for DME billed during SNF stays. Ninety-nine percent of DME bills submitted by suppliers for patients in Part A SNF stays showed the location as "home" or "other". Most of the incorrect equipment billings during a SNF stay represented items prescribed for use prior to, or after, a skilled stay. Further, OIG found that approximately half the patients in its sample were not discharged to their homes, meaning that incorrect payments for equipment might have continued.

To minimize the opportunity for incorrect DME payments, OIG recommended that HCFA: improve the "place of service" coding system used by suppliers; ensure that the carriers instruct suppliers of their responsibility for determining the beneficiary location before billing for Part B equipment; and assess the effectiveness of the DME regional carriers' processes. (OEI-06-92-00860)

## Fraud Involving Durable Medical Equipment Suppliers

The DME industry has consistently suffered from waves of fraudulent schemes in which Medicare or Medicaid is billed for equipment never delivered, higher-cost equipment than

that actually delivered, totally unnecessary equipment or supplies, or equipment delivered in a different State from that billed in order to obtain higher reimbursement. Two years ago, HCFA published new regulations addressing reimbursement problems that have recurred over the years, especially those created by telemarketing and carrier shopping. It is hoped that consolidation of claims processing into four regional jurisdictions, as specified in the regulations, will resolve many of these problems. In the meantime, OIG continues to obtain settlements and convictions of unscrupulous suppliers for schemes perpetrated before the regulations were published, as shown in the following examples:

- An Illinois DME company and its president agreed to a $68,000 settlement of allegations of billing Medicare for supplies not provided, falsifying physicians' signatures on medical necessity forms, adding and whiting out information on the forms, and substituting equipment of a lesser type than that billed. A former employee had filed a qui tam action against the company. During the investigation, the company vice president who actually ran its operations fled to Iraq. The settlement included proceeds from the sale of the vice president's home and other assets, and an additional amount from the president, the DME company and a related company of which he was also president, for a total payment of $122,000.

- In New York, two of the three owners of a DME company were sentenced for Medicare fraud. One was sentenced to 3 years in prison with 30 months suspended on the condition that he serve 6 months consisting of 60 consecutive weekends. He was also ordered to comply with an agreement to repay $900,000 for false billings for transcutaneous electrical nerve stimulator units and kits. The second owner, who cooperated with the Government, was sentenced to 24 months probation and ordered to pay a $100 special assessment. He has already paid $500,000 to Medicare and $600,000 to the Internal Revenue Service. The third owner was sentenced to prison earlier. All three owners pled guilty to Medicare fraud and income tax evasion.

- In Georgia, the owner of a DME company was sentenced to 200 hours of community service and 5 years probation. The owner also was ordered to pay $5,444 in restitution for causing Medicaid to be billed for more expensive ostomy supplies than were provided, and for rebilling denied claims — using changed dates of service — until they were paid. A CMP agreement is pending.

- A California woman who was part owner and manager of two separate medical supply companies was excluded from the Medicare and Medicaid programs for 10 years after her conviction for participation in a scheme

wherein she billed the Medi-Cal program for incontinence products that were never ordered or delivered. She solicited business from Medi-Cal patients and then accepted payment for the delivery of their Medi-Cal stickers. Medical supplies that were returned to the companies or not accepted by the Medi-Cal beneficiaries were billed to the program as if delivered. Other products which were not delivered or were returned or placed in warehouses were delivered or sold to other customers, resulting in double billing the program for the same products. The woman also employed sales people to pay Medi-Cal patients for their stickers which were then used by program providers to bill the Medi-Cal program.

## Health Care Antifraud Project

The Secretary of the Department of Health and Human Services is authorized to engage in demonstration projects to test improved methods of investigating fraud in the Medicare and Medicaid programs. Using this authority, OIG and HCFA have joined in a project to develop an innovative approach to preventing and detecting fraud and abuse in two rapidly growing sectors of the health care industry: home health agencies and nursing homes, and ancillary services and supplies for each. The Secretary has included this project as part of the Department's Reinvention of Government initiative.

The project is designed to bring together the talents and expertise of a wide range of Federal and State officials, and concentrate their combined energies on fraud and abuse in home health agencies and nursing homes. A multidisciplinary team of auditors, program managers, evaluators, utilization review experts, investigators and advocates are focusing on fraud in five States which represent a major share of Medicare and Medicaid expenditures and beneficiaries: California, Florida, Illinois, New York and Texas. The project is targeting several specific schemes and activities, including: false billing schemes and kickbacks involving providers, including durable medical supply companies; patient abuse and substandard medical services to long-term care patients; claims for items, services and visits not provided, not provided as claimed, not medically necessary or not authorized by a physician; and claims submitted to Medicare and Medicaid for the same items or service.

The project is the first in which health care providers are offered the opportunity to voluntarily disclose to the Government evidence of fraud in their home health agencies and nursing homes. Through self-disclosure they may minimize the cost and disruption of an investigation, negotiate a monetary settlement in lieu of prosecution, and possibly avoid exclusion from Medicare and Medicaid program participation when appropriate. The project is to take 2 years for completion and evaluation. If it proves to be both effective and efficient, other areas may be singled out for similar treatment.

electronically to financial institutions for correction. In response to the draft report, SSA concurred with OIG's recommendations and began implementation. (CIN: A-06-93-00002)

## Field Office and 800 Number Coordination

In October 1988, SSA established a national 800 number service and converted its local teleservice centers (TSCs) to the national system. The advent of the national 800 service precipitated the creation of a new public contact component within SSA; however, the evolution of 800 service has not been without its problems.

In a study of the factors affecting coordination between SSA field offices and TSCs, and the resulting impact on the public, OIG concluded that most field office and 800 number employees were dedicated to their jobs and to improving public service. However, OIG found that the relationship between field offices and TSCs was adversely affected by the lack of clearly integrated processes for serving the public through the 800 number. Moreover, some SSA policies, processes and procedures generated multiple public contacts that increased workloads to the detriment of good public service. In addition, many employees expressed the belief that a more user-friendly computer system would improve coordination, reduce errors and improve efficiency.

The OIG recommended that SSA integrate 800 number and field office processes; reexamine its training strategy and develop a line of responsibility that cuts across all components to ensure that agencywide training needs are met; better control and reduce workloads by eliminating unnecessary administrative messages and holding 800 number employees accountable for completing certain calls within their scope of duties; and more effectively obtain and consider employee feedback in its systems modernization initiative. The SSA agreed with all of the findings and recommendations. (OEI-05-92-00040)

## Social Security Fraud

Eighty-six persons were convicted and sentenced during this reporting period for defrauding the OASI program or the DI program. The OASI convictions frequently involved relatives or representative payees converting to their own use Social Security benefits intended for others, including those mistakenly sent to deceased beneficiaries, as shown in the following examples:

- In Texas, a man and his wife were ordered to make restitution of $974,300 after being convicted of conspiracy to defraud SSA, mail fraud and use of a false SSN. The man faked his own death in a fiery automobile accident as part of an insurance fraud scheme, and the woman applied for and received Social Security survivors benefits. The man was caught when he tried to find work under a false SSN. He was sentenced to 48 months in prison, and she to 30 months.

- In Louisiana, a woman was sentenced to 5 years probation for filing falsely for spouse's insurance benefits. She was ordered to serve home confinement for the first 6 months, submit copies of any Government assistance filings and attend mental health treatment at the discretion of the probation office. In 1991, she and her husband filed for DI benefits for themselves and their children on the basis of the husband's entitlement. According to their applications they were separated but not divorced, and the children were the husband's stepchildren. Investigation showed that they were divorced in February 1986, that the woman remarried in March 1986, that she was again divorced in June 1987, and that she remarried again in 1990. After her divorce from her first husband, she also told the Air Force that she was still married to him in order to get dependent identification cards for herself and her children. The husband, who is retired from the Air Force, is still under investigation. About $28,000 in unmerited benefits was paid. No restitution was ordered from the woman because of her lack of assets.

- Two persons were sentenced in Massachusetts for their part in the theft and negotiation of Social Security benefits checks. The checks were stolen in a series of postal vehicle break-ins. Although many of the 20 checks stolen were destroyed before negotiation, most of the remainder were negotiated through a beauty shop owned by the pair. One person was sentenced to 5 months in prison and 36 months supervision, with special conditions including prohibition against owning a dangerous weapon, provision of financial information and drug testing when required. The second person received the same sentence, without the jail term but with alcohol testing and participation in drug and mental health programs added. Each was fined $1,000. The two individuals who committed the break-ins were sentenced earlier, and a pretrial diversion is being negotiated with the wife of one of them.

- In Pennsylvania, a woman was sentenced for misusing Social Security survivor benefits intended for her two nieces, from 1979 until 1986. The woman did not report to SSA that the children had not been in her care since 1979, and she fraudulently received benefits totaling $38,840. Before her sentencing, one of the nieces advised the judge in a prepared statement that the children were mentally and physically abused by their aunt, and that the State put them in foster care in 1979. The woman denied the abuse allegations, stating that she loved and took care of her nieces although they did things that made her "crazy." She was sentenced to 5 years probation and ordered to pay restitution to be determined by the probation department

and to serve 200 hours of community service. She was also ordered to undergo psychological counseling and to pay $184 in court costs.

- In Illinois, a woman who was representative payee for disability benefits for her husband and their children was sentenced for making false statements to SSA. In 1985, the woman applied for disability benefits on behalf of her husband, stating that he was mentally ill, trying to burn down the house, hiding under the crawl space, refusing to sign forms and failing to recognize her. She became representative payee on the basis of her statements and telephone confirmation by a neighbor, whom investigators subsequently were unable to locate. In December 1988, the husband, who had been working as an independent contractor for a trucking company, applied for disability benefits after becoming unable to work because of diabetically related kidney failure. He discovered for the first time that his wife, from whom he had separated several years before, was receiving benefits on his behalf. The total overpayment was approximately $42,000. The woman was sentenced to 6 months home confinement, 3 years supervised release and 300 hours of community service. Restitution was not ordered because of indigence.

The type of fraud most commonly committed against the DI program is concealing work activities while collecting benefits, as indicated in the following examples:

- In Michigan, the vice president of a music company was sentenced to 21 months in prison for telling Government agencies he was not working while he collected benefits. Investigation showed he had received more than $100,000 while working at the music company. He was ordered to repay $19,000 to SSA, $43,566 to the Railroad Retirement Board and $81,400 to the Department of Labor.

- A California man operated a sports merchandise and memorabilia mail order company from his residence while collecting both DI and SSI benefits. He advertised his business in newspapers where customers placed orders and sent checks, but he never sent the orders or the money back. He was sentenced to 5 months in a halfway house, 5 months home detention, 3 years probation and 300 hours of community service. He also had to make restitution of $35,000 and pay a $200 assessment fee.

- Another California man was found to have two different employers and worked full time under his wife's SSN since 1988 while receiving DI benefits. He was allowed to enter a pretrial diversion program for 18 months on condition that he pay restitution of $24,700 to SSA.

- In Iowa, a man was sentenced to prison and ordered to repay $40,300 he obtained by working as a truck driver and back hoe operator collecting DI benefits. The man worked under a false SSN he obtained in the name of his deceased brother. The man's prison sentence was reduced from 14 to 6 months because he cooperated with the Federal Bureau of Investigation in numerous drug cases. Moreover, although his benefits were terminated because of his conviction, he was able to convince a judge that he suffered from a low intelligence quotient and claustrophobia. The judge overturned SSA's termination and the man's benefits will resume after he serves his prison term for defrauding the very same program.

## Identifying Disabled Beneficiaries Working under Other Social Security Numbers

The SSA records wages of workers by using SSNs reported by employers. Current controls used by SSA to detect work activity for disabled beneficiaries include the earnings enforcement processes, which compare wages reported by employers to wages reported by beneficiaries. When the SSNs used by employers differ from those issued and recorded by SSA, these processes do not detect work activity by individuals receiving DI or SSI payments. The use of different SSNs may occur intentionally as a result of beneficiaries' trying to hide income, or unintentionally as a result of reporting errors by beneficiaries or employers.

The OIG used a computer program which matched names and mailing addresses of 10 percent of 7.5 million disabled individuals receiving DI or SSI payments to all earnings processed by SSA in 1991 that had not been posted to individuals' earnings records. Through this means, OIG identified eight cases where the names and addresses of the disabled beneficiaries on SSA's benefits records matched the names and addresses of the wage earners. Seven of the eight cases resulted in investigations for potential fraud and/or correction of the earnings records. One employer reporting error affected the earnings records of 188 individuals with wages totaling $1.8 million.

The OIG recommended that SSA implement a computer matching system similar to the one used for this review. The SSA agreed that a computer matching program would enhance its existing controls and is examining the feasibility of performing this program. (CIN: A-13-92-00235)

## Disability Research Demonstration Program

Performance Measure

Since 1980, the Congress and SSA have initiated several efforts to improve the disability programs and reduce the drain on disability program funds. One of the efforts was the research demonstration program (RDP), SSA's largest continuous research demonstration effort.

The OIG recommended that SSA provide referral and monitoring agencies with updated listings of all drug addict and alcoholic recipients in their States; take appropriate steps to see that field offices act promptly on referral and monitoring agency reports on recipients' treatment status; send a special notice to all drug addicts' and alcoholics' payees reminding them of the treatment requirement for their recipients and clarifying their reporting responsibilities regarding that treatment; clarifying the role of Alcoholics Anonymous and Narcotics Anonymous in the drug addicts and alcoholics program; and establishing procedures to assure that new payees are properly informed about the unique requirements which apply to drug addicts and alcoholics. The SSA agreed with OIG's recommendations. (OEI-02-94-00110)

## Supplemental Security Income Fraud

Similar to "regular" Social Security fraud, SSI fraud also often entails illegal conversion of deceased or other beneficiary checks. On occasion it involves concealment of resources to obtain or retain eligibility for benefits.

- In Ohio, a woman signed an agreement to pay $40,000 in settlement of charges that she had failed to report her marriage and family income and property while receiving SSI benefits. She was not prosecuted criminally because of her health and family situation, but she had to pay $7,000 at once and $100 a month thereafter.

- A California man who concealed his spouse's income while receiving SSI and retirement benefits, as well as a veteran's non-service-connected pension, was ordered to make restitution of $46,600. He also was sentenced to 2 years probation. He had fraudulently filed for spousal retirement benefits under a duplicate SSN. The judge granted a motion to allow SSA to garnish his own retirement benefits to recover the SSI loss.

- A woman in Ohio who had been a representative payee for an SSI beneficiary failed to report her death and fraudulently received $4,100. After she failed to respond to SSA's attempts to resolve the matter, a default judgment of $12,300 was found against her, and the United States Attorney's office proceeded with collection.

- In Indiana, a woman applied for and received SSI benefits for her seriously ill infant. Within a month after application, she began working full time but failed to notify SSA. As a result, she was overpaid $9,670 over 3 years. She was sentenced to 3 years probation and ordered to make restitution of $1,800.

On the West Coast, the results of two projects involving SSI fraud in Asian immigrant communities were turned over to SSA for in-depth review of eligibility.

- During this reporting period, a Vietnamese interpreter who assisted ineligible refugees to obtain SSI was sentenced in Washington State to 5 years in prison and ordered to make restitution of $795,000 to SSI and the State welfare program. He helped refugees fake depression, suicidal tendencies, headaches supposedly resulting from beatings and imprisonment by the Communists, and delayed stress syndrome. He usually charged a refugee half of the first SSI check issued, which averaged about $3,200. One other interpreter, two State welfare employees and two beneficiaries were successfully prosecuted. Over 150 names were turned over to SSA for case review.

- A similar project in California resulted in the referral of 75 Southeast Asian SSI beneficiaries to SSA for review. By the end of this reporting period, 50 reviews had been completed and 26 persons had been removed from the benefit rolls.

## Time and Attendance Reporting Practices at Hearing Offices

In a review of time and attendance recording and reporting practices in six regions, OIG determined that the Office of Hearings and Appeals (OHA) needs to strengthen procedures to improve the effectiveness of internal controls. The OIG recommended that internal controls be reinforced in the following areas: supervisory oversight; timekeepers' completion and processing of records; and employees' recording and certification of records. Each regional chief administrative law judge (RCALJ) concurred with recommendations made in the regional reports and initiated or agreed to initiate corrective actions.

The OIG further recommended that the Associate Commissioner, OHA, reemphasize to supervisors the importance of their role in authorizing, reviewing and certifying time and attendance documents for their employees; to timekeepers their responsibilities in handling, completing and processing time and attendance records; and to employees their responsibilities in complying with time and attendance policies and procedures. The OIG also proposed that the Associate Commissioner, OHA, schedule training for all timekeepers who have not attended formal training on their time and attendance responsibilities and follow up on corrective actions that the six RCALJs agreed to take. The SSA concurred with each of the findings and recommendations. (CIN: A-01-93-02008)

## Travel Performed by Administrative Law Judges

At the request of the Senate Committee on Governmental Affairs, OIG evaluated the procedures used by OHA to authorize and assign travel of ALJs hearing Social Security

disability cases. The OIG found that OHA's established travel procedures were intended to ensure that travel performed in conjunction with hearing disability cases was conducted in a cost-effective manner and assigned equitably among ALJs. Although it appeared that OHA had generally established adequate procedures to authorize and assign travel in connection with hearing disability cases, OIG identified improvements that could be made in the implementation of these procedures.

The OIG recommended that the chief ALJ reemphasize to RCALJs and hearing office ALJs the importance of: taking advantage of opportunities to maximize the cost-effectiveness of travel to balance disability caseloads by encouraging ALJs to take trips of 2 weeks or more; and rotating travel among ALJs to more equitably distribute the responsibility of hearing travel dockets and the opportunity to travel. The SSA concurred with OIG's findings and recommendations. (CIN: A-01-93-02004)

## Fraudulent Social Security Numbers

One of OIG's most important responsibilities is protection of the SSN enumeration system. In addition to misuse of SSNs to obtain undeserved program benefits, attempts to compromise the application process are relatively common, as shown in the following examples:

- In Texas, a man was sentenced to 43 months in prison and fined $110,000 after being allowed to plead guilty to conspiracy, SSN misuse, mail fraud and passport fraud in exchange for testimony in the murder-for-hire trial of a female acquaintance. He helped the woman flee prosecution by using the SSN of his deceased cousin. At the request of the State Department, OIG traced the SSN to the south of France, where the woman was arrested and deported. The man was arrested later while trying to enter the country from Mexico. Although the woman was convicted of the murder-for-hire, she was not given the death penalty because of the terms of her extradition.

- A widely known organized crime figure in New York was sentenced to 168 months in prison and 2 years supervised release after conviction on charges related to Social Security fraud. The man engineered a "no-show" job scheme for his son, whereby the son padded his Social Security account and later received unemployment benefits from a job he never actually held. The father was later convicted of bookmaking and racketeering as well. His son was sentenced earlier to 30 months in prison, and ordered to repay $3,620 and a special assessment of $50.

- Four persons were sentenced in Ohio for their part in a scheme involving inmates of a correctional institution, SSN fraud and illegal income tax refunds. The inmates went through prison files for names and SSNs and

used the skills taught in the prison print shop to manufacture false income tax forms. They filled out the forms with the false names and SSNs, and had tax refunds sent to friends, relatives and business acquaintances. Federal and State refunds totaled more than $200,000. One individual was sentenced to 90 months in jail, a second to 12 months (3 suspended), a third to 41 months (11 suspended) and a fourth to 2 years probation. Total fines, assessments and restitution ordered amounted to $3,750.

- In Texas, a woman was sentenced to prison once more for credit card and SSN fraud after receiving early release from convictions for similar offenses. The woman was convicted of credit card fraud in 1986 and 1989. The condition for her early release from prison was that she was not, in any manner, to obtain credit or credit cards or accounts. A few months after her release, she proceeded to use her younger daughter's SSN to obtain credit cards and to establish credit so she could purchase assets such as automobiles. After indictment and a psychiatric evaluation in which she was found competent, she pled guilty and was sentenced to 2 years in jail, followed by 3 years supervised probation.

- In 1992, a man who posed as a psychologist and was hired by an Indian Health Service clinic, was sentenced to 21 months in prison for assuming a fraudulent identity. The investigation disclosed that earlier he had been commissioned by the Public Health Service to work in a Federal prison in Georgia, but he had been terminated because of questionable credentials. In both instances he used the identity of an individual who died in 1984. After being released from jail, the man went to live with his twin brother in St. Louis. There he misused SSNs to gain credit and perpetrate bank fraud, but claimed his brother had done it. He pled guilty after handwriting analysis showed he was the one who had filed a false application. His probation was revoked and he was ordered to serve an additional 10 months in prison, to be followed by 2 years probation.

underscored the need for managers and decision-makers to know how well Government is working. The PHS, as early as 1990, issued guidance through the Assistant Secretary for Health requiring that its agencies perform program evaluations which identify program outcomes.

The OIG found that the numerous evaluations of its programs and activities performed by PHS each year provide useful information but do not necessarily measure program results. The OIG believes that current PHS systems, with some reorganization and redirection, could better produce information needed to measure performance.

The OIG recommended that PHS create annual performance plans and reports which include program goals and the measurement of program performance against these goals to meet the mandate of GPRA; increase the number of evaluations which meet the Assistant Secretary for Health's guidance by establishing objective, measurable criteria for evaluating program necessity, productivity and duplication in accordance with program objectives; and develop procedures and training to ensure that program performance evaluations are integrated into the program planning, legislative planning and budgets systems in accordance with the Assistant Secretary for Health's 1990 guidance. In its comments to the draft report, PHS agreed with these recommendations and reported that it has initiated corrective action to implement them. (CIN: A-01-93-01514)

## Fraud and Abuse of Grant Funds

The embezzlement of money is particularly egregious when the funds were intended to help people in extremely difficult circumstances. The following cases concluded during this period were in this category:

- In Oklahoma, the former chairperson of the Ponca Tribe was sentenced to 12 months in prison and ordered to make restitution of $19,000 to the tribe. After IHS made a $140,670 electronic overpayment in grant funds for alcohol rehabilitation, the woman had the money transferred to the general account. She then had the tribal secretary-treasurer write checks to her for nonrelated expenses and to other individuals who would cash them and give her the money. The secretary-treasurer was sentenced earlier to 6 months home detention and 2 years probation, and ordered to pay restitution of $250.

- The former director of an alcohol rehabilitation program funded by IHS in South Dakota was sentenced for embezzling money from the program. She was fined $250, ordered to pay $4,512 in restitution, and sentenced to 3 years probation.

In previous studies, OIG found that State IEVS practices and levels of matching success and efficiency varied considerably. Nevertheless, the most promising approach to improving the cost-effectiveness of matching systems seemed to be through the initiative and experimentation of individual States. For this reason, OIG decided to compile the information gathered from its reviews of State practices in an easy to read reference document and share it among the States and Federal agencies. The OIG hopes thereby to stimulate discussions within and among State and Federal agencies as they exchange views and attempt to improve computerized eligibility verification. (OEI-06-92-00081; OEI-06-92-00082)

## Welfare Fraud

Welfare assistance provided under the AFDC, Medicaid, Food Stamp and general assistance programs is based on State determinations of eligibility. As a result, welfare fraud is usually perpetrated by providing false information about one's circumstances, such as claiming a nonexistent dependent child or concealing income which would render the applicant ineligible. Suspected fraud is discovered through a variety of mechanisms, ranging from disclosure by a disgruntled acquaintance or relative to computer matches of welfare lists against worker's compensation rolls or income tax returns.

The following cases are examples of some of OIG's activities in the area of welfare fraud:

- In New York, a woman who used fake baptismal certificates and other false documents to create 15 fictitious families was sentenced to 3 years in jail, to be followed by 3 years parole. The woman illegally received $450,000 in benefits from the AFDC, food stamp and Medicaid programs under at least 15 different aliases and for 73 children (including 11 sets of twins). At the peak of her activity in late 1990 and early 1991, she was simultaneously collecting benefits under 8 aliases and for 46 children. She was barred from applying to the welfare program for at least 6 months after her release, and ordered to repay $50,000.

- A Texas woman receiving AFDC benefits failed to inform the State agency that she was also receiving Social Security child's benefits. The woman was placed on a deferred adjudication and ordered to pay $3,740 in restitution and fines.

- In Massachusetts, a woman was overpaid $59,370 in AFDC, Medicaid and Food Stamp benefits because she failed to disclose earned and unearned income to the State welfare department. She was sentenced to 6 months probation and ordered to make full restitution.

- Welfare fraud projects conducted in two counties in Ohio, where OIG works with State and local officials to identify individuals defrauding these programs, yielded 17 convictions during this period. One project has resulted in a total of 33 convictions to date, and the other 19.

The Department makes grants available to community action groups to assist low income individuals with weatherization and other energy-efficiency improvements designed to reduce their heating bills. Successful actions were completed in two cases of fraud in this Low Income Home Energy Assistance Program (LIHEAP).

- The former manager of a community council that served several rural counties in Minnesota was sentenced to 15 months confinement and 3 years supervisory release for preparing fictitious invoices for home improvement work by companies created by five other defendants, who submitted the invoices for work only partially or never done. The manager then approved checks for the invoices, and the other defendants paid him kickbacks of close to 60 percent. Two of the five other defendants were sentenced to 4 months confinement, and the remainder to home detention or probation. Among the six, the restitution ordered totaled $157,450.

- In New Jersey, two more persons were placed on a pretrial diversion program in a scheme in which county employees paid LIHEAP funds to themselves and others under fictitious names and Social Security numbers, concealing their incomes. Thus far, 17 persons have pled guilty or entered a pretrial diversion program, and a total of $79,000 has been ordered in restitution. Another defendant died during the course of the investigation.

## Refugee Employability Services

The OIG found that California's procedures for contracting with counties for refugee employability services should be improved to ensure that funds made available for specific time periods match the need for services during those periods. The audit concentrated on Los Angeles County, where it was found that $2.3 million of the $7.8 million provided for the audit period remained unused at the end of the period.

Further, significant and widespread problems were found in case file documentation supporting eligibility, training participation, job placement and delivery of services. Deficiencies noted included unexplained and questionable alteration of records; incomplete records; documents with inconsistent information which differed from information elsewhere in case files; and forms attesting to attendance, services and other activities that were frequently signed and dated in advance. The conditions occurred to such an extent that

## Employee Fraud and Misconduct

The OIG has oversight responsibility for the investigation of allegations of Department employee wrongdoing where it affects internal programs. Most of the thousands of persons employed full time by HHS are dedicated, honest civil servants. Occasionally, however, individuals violate their fiduciary responsibilities as illustrated in the following cases:

- In California, a former administrative officer with the Public Health Service (PHS) was sentenced for illegally converting frequent flyer mileage credits, earned on Government business, for personal use or for friends and family members. The man was sentenced to 36 months probation and fined $1,000. As a condition of his guilty plea, before the sentencing he reimbursed PHS $30,413 that he had converted to personal use. In addition, he voluntarily turned over to PHS 28 frequent flyer award cheques, the equivalent of seven round-trip tickets for PHS employees from San Francisco to Washington, D.C..

- A former service representative in a New York Social Security Administration (SSA) office was sentenced after pleading guilty to fraud. She admitted obtaining mothers' maiden names of various Social Security number (SSN) holders and selling them to a Nigerian credit card ring. The ring tricked banks into sending replacement credit cards to mail drops and then elicited the password on the accounts by knowing the depositors' mothers' maiden names. The OIG developed a program enabling it to establish that she was the only person who had accessed those SSNs on specific dates and times. She was sentenced to 2 years probation and ordered to pay a $50 assessment.

- In California, a former Social Security benefits authorizer was sentenced to 3 years probation and ordered to pay restitution of $1,298, perform 200 hours of community service, and pay a special assessment of $50. The woman also lost her retirement and other benefits. She used her position to create a false record that generated checks to a forger. The forger was convicted earlier and sent to prison.

- A development clerk in a New Jersey SSA office applied for and cashed replacement salary checks after she had received and cashed her original checks. She was placed on a pretrial diversion program and ordered to pay restitution of $970.

OFFICE OF
THE INSPECTOR GENERAL

SOCIAL SECURITY ADMINISTRATION

# USING SOCIAL SECURITY NUMBERS TO COMMIT FRAUD

May 1999 A-08-99-42002

# MANAGEMENT ADVISORY REPORT

# EXECUTIVE SUMMARY

The objective of this management advisory report is to inform Social Security Administration (SSA) officials of certain trends identified during the Office of the Inspector General's (OIG) current audit and investigative work involving the fraudulent use of Social Security numbers (SSN). Also, we will present specific recommendations that we believe SSA should consider to buttress the Agency's "Zero Tolerance for Fraud" initiative. The issue of identity fraud is a rising national concern. In response, Congress enacted the *Identity Theft and Assumption Deterrence Act of 1998*, which made identity theft a Federal crime, punishable by substantial penalties.

During our audits and investigations, we have identified cases in which SSNs were obtained using fraudulent documentation. Once obtained, these SSNs were often used to commit identity fraud. We currently have an audit underway entitled, *Review of SSA's Procedures for Verifying Evidentiary Documents Submitted with Original SSN Applications* (CIN: A-08-98-41009), in which we are examining SSA's enumeration policies and procedures. We will issue a separate report to address specific findings resulting from the audit once the assignment has been completed. However, we believe that some of the preliminary results related to SSN fraud warrant the immediate attention of SSA management.

The issue of identity fraud is a new and emerging area. In the past, resources have not been devoted to this issue because our staff worked in areas that provided a visible cost benefit to SSA and the trust funds. Since SSA became an independent Agency in 1995, the SSA Fraud Hotline has recorded a steady increase in SSN misuse allegations. Although we acknowledge that much of this growth can be attributed to an increase in staff available to answer and respond to Hotline calls, we believe this trend is also related to the emergence of identity fraud. Additionally, OIG audits and investigations have clearly identified that the integrity of the Agency's enumeration process materially impacts on fraud, waste, and abuse at SSA.

## RESULTS OF REVIEW

Congress and other Federal agencies have noted that the SSN is an integral part of the identity fraud crime. The importance placed on SSNs in today's society provides a tempting motive for many unscrupulous individuals to fraudulently acquire a SSN and use it for illegal purposes. For example, one individual and his associates obtained 1,120 SSNs for nonexistent children using fraudulent birth certificates. Some of the "identities" acquired through this scheme were used to defraud credit card companies of approximately $30 million. Additionally, during an ongoing audit, we identified 1,447 addresses at which almost 33,000 SSNs were sent during a 7-month period (an

average of almost 23 cards to each address). Our preliminary analysis of 3,500 SSNs that were sent to 90 of these addresses has disclosed numerous cases in which SSNs were obtained using fraudulent documentation.

Occurrences of identity fraud that were investigated by the U.S. Secret Service resulted in losses by victimized individuals and institutions of approximately $745 million in Fiscal Year (FY) 1997. This figure increased from $442 million in FY 1995. We recognize that the responsibility for controlling this trend cannot and should not fall solely on SSA. Nevertheless, we believe that the Agency needs to evaluate whether it can do more to ensure the security and integrity of its enumeration function. SSA has a difficult balancing act to perform in providing "World-Class Service" and enforcing its "Zero Tolerance for Fraud" goals. However, in light of the proliferation of SSN fraud cases and the concerns of both Congress and the American public, we believe that SSA should consider the implementation of more security measures, recognizing that these steps may impact customer service. We are aware that impacting customer service with increased security measures represents a difficult choice for SSA; however, in our view, the proliferation of identity fraud crimes warrants this approach.

Our report includes descriptions of selected SSN fraud cases, which OIG investigated and subsequently referred to the Department of Justice for prosecution. Additionally, we have included observations noted during other audits and investigations regarding the use of SSNs to commit identity fraud. We believe these cases provide an exceptional learning opportunity for SSA and should serve as a catalyst for changes essential to ensuring the integrity of the Agency's enumeration responsibility.

## CONCLUSIONS AND RECOMMENDATIONS

We believe that SSA must make both philosophical and procedural changes to ensure the integrity of its enumeration function. Most importantly, we believe that SSA should make it clear through its policies and performance measures that fraud prevention measures should never be circumvented to satisfy customer service demands. Further, we recommend that SSA:

- Incorporate preventive controls in its Modernized Enumeration System (MES) that address certain disturbing circumstances noted in our investigations.
- Require verification from the issuing State when an out-of-State birth certificate is presented as evidence for a SSN application.
- Continue its efforts to have the Immigration and Naturalization Service (INS) and the State Department collect and verify enumeration information for aliens. However, if an alien chooses to visit a SSA field office (FO) to apply for his or her SSN, require the SSA FO to obtain independent verification of the alien's documentation before approving the SSN application.

## AGENCY COMMENTS

In its response, SSA recognized that the public's confidence in its stewardship of Agency programs is undermined when individuals succeed in abusing Agency systems. Additionally, the Agency acknowledged that instances of identity and noncitizen fraud have a significant societal impact. To address specific recommendations outlined in our report, SSA detailed numerous ongoing and future initiatives that it believed would correct identified weaknesses and reduce the possibility that similar cases of fraudulent SSN attainment will recur.

As stated in our first recommendation, the Agency plans to issue a reminder to FO personnel regarding the importance of adhering to fraud prevention procedures, irrespective of customer service demands. Additionally, SSA plans to review current public relations vehicles and explore opportunities to reemphasize to the public the importance of fraud prevention activities.

In responding to our second recommendation that SSA incorporate certain preventative controls in MES, the Agency cited three initiatives. SSA referred to provisions of the Taxpayer Relief Act of 1997, which the Agency believes will deter individuals from obtaining SSNs for nonexistent children. SSA stated that it will work with the OIG to target potential fraudulent activity when multiple SSNs are sent to the same address. Finally, SSA recently began using a new version of one integrity software program that, among other features, "alerts" the applicable FO any time four or more SSN cards are sent to the same address in a 5-week period.

In response to our third recommendation concerning independent verification of out-of-State birth certificates presented as evidence for SSN applications, SSA asserted that this action would be impractical for the public and SSA FOs. Instead, the Agency stated that it hoped to obtain on-line access to State vital records data at sometime in the future.

To address recommendation four, SSA plans to continue its efforts to have INS and the State Department collect enumeration information for noncitizens. In response to recommendation five, that SSA require independent verification of alien evidentiary documents when noncitizens apply for SSNs at FOs, the Agency stated that it would continue to be vigilant to guard against fraudulent documents and would work with INS in attempting to shorten the verification process.

SSA also provided technical comments that were considered and incorporated, where appropriate, in this final report. The full text of SSA's comments is included in Appendix A.

## OIG RESPONSE

We acknowledge the steps SSA has taken and contemplated in attempting to combat SSN fraud and believe that the Agency's response and planned actions adequately

address two of our recommendations (recommendations 1 and 4). Nevertheless, we believe the ongoing or planned initiatives SSA cited to address the remaining three recommendations (recommendations 2, 3, and 5) do not effectively respond to our goal of **preventing** the fraudulent attainment of SSNs.

Although the initiatives SSA described in response to our recommendation that SSA implement preventive controls in MES (recommendation 2) have merit, they appear to concentrate on the **detection** of fraud after it has already occurred. Unfortunately, once an SSN has been issued, SSA has little ability to prevent or curtail the use of that SSN in committing further fraud. Therefore, we believe that SSA must hold itself accountable for preventing SSNs from being obtained through fraudulent means. As suggested in our recommendation, we believe the Agency's initiatives should focus on front-end controls within MES that will preclude the issuance of SSNs in certain defined circumstances.

In response to our recommendation that FOs obtain independent verification of out-of-State birth certificates (recommendation 3), SSA described an initiative that is contemplated for future years. Specifically, SSA hopes to gain on-line access to State vital records data so that FOs can verify birth and death records provided by SSA customers. The implementation of this initiative is contingent on obtaining agreements with all of the States and jurisdictions—first for accessing in-State data and then separate agreements so that data can be shared across State lines. While this goal will certainly prove worthy in the future, implementation may be years away. In the meantime, we believe SSA should reconsider our recommendation to independently verify out-of-State birth certificates. Given the reduction in newborn SSN applications processed by FOs as a result of the enumeration-at-birth process and the infrequency that out-of-State birth certificates are presented with SSN applications, we do not believe that this requirement would be impractical.

Finally, in its response, SSA stated that it planned to be vigilant in its efforts to guard against the submission of fraudulent documents by aliens applying for SSNs at FOs. However, the Agency did not agree to require independent verification of alien documents (recommendation 5). We do not support SSA's approach. As evidenced by the cases presented in this report, current SSA procedures have not always been successful in preventing the attainment of SSNs with fraudulent alien documents. We acknowledge SSA's efforts in working with INS to improve and shorten the verification process (e.g., the time lag in INS' Systematic Alien Verification for Entitlements system.) However, we have held our own conversations with INS personnel and believe that the INS system improvements necessary to effect positive changes within SSA's verification process will take years to implement. Again, we believe it is imperative that SSA institute controls to **prevent** the issuance of SSNs based on fraudulent documents. By doing so, the Agency can ensure that it is doing its part to control the growing identity fraud trend. Until such time that alien documents are independently verified by the issuing agencies, we do not believe that SSA can accomplish this goal. Accordingly, we encourage SSA to reconsider our recommendation.

E-1 (treaty trader), P-1 (internationally recognized performer or athlete), and L-1 (intra-company transferee) alien classifications. All of the alien categories claimed by these individuals permit them to work in the United States. However, of the 137 SSNs issued to these addresses in 1997 (the remainder were issued in 1998), only 8 of the individuals (5.8 percent) had any earnings during that year.

## IMPACT OF SSN FRAUD ON SSA PROGRAMS

We recognize that the monetary impact of SSN fraud on SSA's trust funds may not be extensive. All the same, unless measures are taken to reduce the incidences of identify fraud, the impact on SSA program integrity will continue to compound. As described in the following sections, we believe that SSN fraud and SSA's current regulations and policies toward this issue, have resulted in sometimes immeasurable consequences to SSA programs.

### *Conflict Between SSA's Strategic Goals*

We recognize the sensitive balance that SSA must maintain between providing "World-Class Service" to its customers and ensuring enforcement of its "Zero Tolerance for Fraud" commitment. We also acknowledge that the public would not be tolerant if customer service were not a top priority. Nevertheless, we believe that SSA's implementation of these two goals sends contrasting messages to SSA personnel, especially those in FOs.

Although SSA personnel are provided training in fraud prevention and are asked to comply with certain procedures designed to prevent fraud, their performance is often measured in terms of customer service. At some offices we have visited during the course of our audits, FO personnel are extremely alert to the possibility of fraud and take precautions to prevent it from occurring. At many other offices, however, we found that SSA personnel circumvent some procedures in order to reduce the waiting time of customers. For example, we found that some personnel in FOs around the country did not use some of the document verification tools at their disposal (e.g., black lights, INS and Department of Motor Vehicle publications, SAVE) because they did not want the customers to have to wait excessive time periods while they accessed these tools.

In one instance, we found that management at a FO had attempted to implement additional fraud prevention procedures, but were instructed by the regional office to cease this process because it took too long for applicants to receive their SSNs. Specifically, for a period, the FO would not approve original SSN applications for any aliens until they could verify the aliens' INS documents through SAVE. As discussed in previous sections, this process sometimes took 30 to 60 days. Certain refugee assistance organizations and employers complained to the regional office about the length of the process. In response to the complaints, the regional office instructed the FO to discontinue this process. However, we found that one of the refugee

organizations that complained about the process received SSNs on behalf of aliens whose INS documents were not valid. Had the FO been allowed to continue with its process, these SSNs may not have been issued.

We believe that SSA should make it clear through its policies and performance measures that fraud prevention measures should never be circumvented to satisfy customer service. We support the measures taken by the FO and believe that SSA should consider adopting this policy. Given that INS and the State Department will begin collecting SSN information for aliens, we believe that for those aliens who choose to apply for a SSN at a SSA FO, the application should not be approved until their documentation has been validated by the issuing source.

***Benefits Paid Inappropriately***

Frequently, obtaining a SSN is a necessary first step for individuals planning to commit larger crimes. Although providing false information to obtain a SSN might not appear to have an impact on benefit dispensation, it is a "breeder" crime for financial fraud. Accordingly, when examining the crime of identity fraud, one must also analyze the intended purpose(s) for the crime. For example, using a fraudulently-obtained SSN provides individuals the opportunity to obtain SSA benefits for which they are not truly authorized. In one instance, OIG identified a New York resident who created 16 separate identities and obtained Supplemental Security Income benefits for each. As a result, the man collected $561,346 in SSA benefits over an 8-year period. In a second example, an illegal alien used the SSN of another man to work in the United States and subsequently collect disability payments from SSA. Using the other man's identity, the illegal alien collected $246,540 in disability payments over a period of 17 years for which he and his family were not eligible.

We do not have specific figures quantifying the amount of SSA benefits paid to all individuals who have obtained SSNs fraudulently. However, we encourage the Agency to consider the ramifications to SSA's trust funds.

***Suspense File Postings***

The intentional misuse of SSNs by individuals for work purposes has contributed to the enormous growth of SSA's suspense file. When employers file annual wage reports that show workers' names and SSNs that do not match SSA's records, the earnings associated with these individuals are transferred to SSA's suspense file. These earnings stay in the suspense file until employers, employees, and SSA can reconcile the discrepancies. Many of these items are often never resolved. In Calendar Year (CY) 1997, SSA's suspense file contained approximately $240 billion in earnings that had not been properly attributed to the correct individual. SSA estimates that almost 3.5 million items and $20 billion are added to this figure annually.

Although poor employer reporting practices account for many of the wage items transferred to the SSA suspense file, it is believed that many suspense file items have

resulted from the intentional misuse of SSNs by aliens not authorized to work in the United States. Specifically, if aliens provide employers with either 1) a SSN that has never been issued, or 2) a SSN that SSA has already assigned to another individual, the earnings attributed to this alien will be transferred to the suspense file.

When attempting to resolve suspense file items, SSA performs a number of steps, including sending a letter to every employee or employer requesting information explaining the reason for the discrepancy. SSA also sends letters to employers who submit more than 10 percent of their annual wage reports with name and SSN discrepancies. In these letters, SSA describes to employers the importance of providing accurate employee information and details the penalties that may be imposed by the Internal Revenue Service for failing to do so.

Of the 6.5 million employers that report earnings to SSA in a given year, only 3 percent are considered major contributors to the suspense file. In fact, about 47 percent of all suspense items come from three industries: agriculture (17 percent), services (16 percent), and bars/restaurants (14 percent). SSA frequently performs outreach programs to such employers and SSA representatives provide instruction on how to ensure accurate wage reports. Additionally, SSA implemented the EVS program in an attempt to provide employers an avenue to verify employee information before the annual wage-reporting period. Through this program, employers can verify with SSA the SSN and name purported by each employee at the time the individual is hired. If SSA reports a name and SSN discrepancy to the employer, the employee is given the opportunity to remedy the error long before the annual wage report is submitted. If the information provided by the employee proves to be false, the employer has the opportunity to terminate the individual's employment. The EVS program is voluntary and currently used by only a small number of employers.

***SSA Resources Currently Required to Address SSN Fraud***

In addressing the issue of SSN fraud, SSA expends significant resources. For example, SSA expends resources to hire, train, and retain personnel who must spend a portion of every day working on issues related to SSN fraud. These individuals include, OIG investigators, Regional Security personnel, programmers, suspense file analysts, policy writers, public relations representatives, as well as FO employees. Again, the number of employees required to address this issue will compound unless SSA can implement more controls on the front-end to prevent SSN fraud from occurring.

## IMPACT OF IDENTITY FRAUD ON INDIVIDUALS AND ENTITIES EXTERNAL TO SSA

Frequently, national and local news reports illustrate crimes that have been committed using stolen or fraudulent SSNs. These crimes not only affect the Government's ability to administer its laws and programs, but also impacts individual citizens' attempts to receive and maintain satisfactory credit standings, as well as obtain other Government and private benefits. Additionally, identity fraud contributes to significant monetary

# *CONGRESSIONAL RESPONSE REPORT*

## Status of the Social Security Administration's Earnings Suspense File

**A-03-03-23038**

OFFICE OF THE INSPECTOR GENERAL • SOCIAL SECURITY ADMINISTRATION • USA

**NOVEMBER 2002**

# Background

In response to a September 5, 2002 request from the Chairman of the Subcommittee on Social Security, we reviewed the status of the Social Security Administration's (SSA) Earnings Suspense File (ESF) in terms of wages and items and determined the number of items reinstated to earner's accounts from the ESF. The enclosed report contains information related to:

- Wages and items remaining in the ESF since Tax Year (TY) 1937;
- SSA's edit processes designed to remove wages and items from the ESF;
- The volume of wages and items removed from the ESF; and
- SSA's attempts to reduce the size and growth of the ESF.

## ROLE OF THE EARNINGS SUSPENSE FILE

Title II of the Social Security Act requires SSA to maintain records of wage amounts employers pay to individuals. Employers report their employees' wages to SSA at the conclusion of each TY. Wages on those employer reports containing invalid names and/or Social Security numbers (SSN) cannot be posted to an individual's earnings record in SSA's Master Earnings File (MEF).[1] Instead, these wages are placed in the ESF—a repository for unmatched wages.[2] Suspended wages can affect a worker's eligibility for and/or the amount of retirement, disability, or survivor benefits. In addition, when wage reports cannot be matched to the correct individual, both SSA and the employer incur additional administrative costs in their efforts to correct unmatched wage reports.

As of July 2002, the ESF contained approximately 236 million wage items totaling about $374 billion related to TYs 1937 through 2000 (see Figure 1). In TY 2000 alone, 9.6 million items and $49 billion in wages were posted to the ESF. Removal of wage items and their associated dollar value from the ESF only occurs when the wages can be matched and posted to an individual's MEF.

[1] The MEF contains all earnings data reported by employers and self-employed individuals. These data are used to calculate the Social Security benefits due an individual with an earnings record.

[2] SSA is also required to maintain the wages of self-employed individuals and has a separate ESF for these submissions. We are not commenting on the self-employment process in this report.

FIGURE 1: STATUS OF THE EARNINGS SUSPENSE FILE
(Tax Years 1937-2000)




## EARLIER ANALYSIS OF THE ESF

In a March 2001 paper on the ESF,[3] SSA noted that the source of the suspended items can be viewed from various perspectives. For example, nine states accounted for 70 percent of the suspended items—California alone contributed 35 percent—while three industries account for 46 percent of the items. SSA noted that many suspended items involve the agricultural industry, which has transient employees who may not have work authorizations from the Immigration and Naturalization Service (INS). Other high turnover industries, such as fast food, restaurants and other service industries, have similar profiles. Frequent job and residential changes are not uncommon with members of these workforces. These actions complicate name/SSN correction efforts when recontacts are necessary.

We have found similar trends in our reviews. In a 1999 audit,[4] we analyzed SSA's ESF postings for TYs 1993 through 1996 (the most recent data available at the time of our audit) to develop a database of the 100 employers who had the most suspended wage items over a 4-year period. Our audit showed that 84 of the 100 employers experienced increases in the number of suspended *Wage and Tax Statements* (Form W-2) for their employees, including 27 employers with at least a 100-percent increase. Many of the employers are in industries that traditionally rely on low-wage, highly transient workers. Figure 2 shows the distribution, by industry, of these 100 employers.

[3] *SSA Key Initiative Plan and Schedule: Reduce Earnings Suspense File (KI #46)*, March 15, 2001.

[4] *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* (A-03-98-31009), September 1999.