IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STEPHEN S. ADAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 90-162C |
| | ) | and consolidated cases |
| THE UNITED STATES, | ) | (Judge Bush) |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(1) of the rules of this Court, defendant submits these proposed findings of uncontroverted fact.

1. The mission of the Department of Health and Human Services ("HHS") is to "enhance the health and well-being of Americans by providing for effective health and human services and by fostering strong, sustained advances in the sciences, underlying medicine, public health and social services." HHS Performance and Accountability Report FY 2005, *available at* http://www.hhs.gov/of/reports/account/acct05/sect1managdiscuss.html. HHS's mission between and including 1987-1995 was not materially different than its current mission. United States Government Manuals from the relevant time period state, "[t]he Secretary of HHS advises the President on health, welfare, and income security plans, policies and programs of the Federal Government. The Secretary directs [HHS] staff in carrying out the approved programs and activities of [HHS]. . ." See, e.g., Def. App. 72-76.

2. From February 16, 1987 to approximately November 7, 1989, the mission statement of HHS's Office of Inspector General ("OIG") read as follows:

> The Office of Inspector General, under the general supervision of the Inspector General and the Secretary, is responsible for:
>
> A. Conducting and supervising audits and investigations relating to programs and operations of the Department;
>
> B. Maintaining security programs designed to protect government property, sensitive information, and personnel;
>
> C. Providing leadership and coordination for, and recommending policies and corrective actions concerning, activities designed to:

> (1) Promote economy and efficiency in the administration of, and
>
> (2) Prevent and detect fraud and abuse in, the Department's programs and operation;
>
> D. Providing a means for keeping the Secretary and the Congress fully and currently informed about problems and deficiencies relating to the administration of such programs and operations, and the need for corrective action; and
>
> E. Imposing sanctions against providers of health care under Medicare and Medicaid who commit certain prohibited acts.

Statement of Organization, Functions and Delegations of Authority; Office of Inspector General, 50 Fed. Reg. 45488 (Oct. 31, 1985). From approximately November 7, 1989 to beyond 1995, the mission of HHS's OIG was to promote "economy, efficiency and effectiveness [of HHS] through the elimination of waste, abuse and fraud." Office of Inspector General; Statement of Organization, Functions and Delegations of Authority, 54 Fed. Reg. 46775 (Nov. 7, 1989). This was done in part by "[c]onducting and supervising audits, investigations, inspections and evaluations relating to HHS programs and operations." Id.

3. The investigative activities of HHS's OIG involved "allegations of criminal activities perpetrated by providers of services, program participants, contractors, grantees, and private individuals as well as [HHS] employees and others involving programs funded by [HHS] and [HHS] operations." Def. App. 50, 58.

4. Furthermore, the "primary functions of the [Criminal Investigations Division of HHS's OIG] are to conduct and direct criminal investigations of alleged or suspected violations of the criminal laws of the United States relating to the programs and operations of [HHS]." Id.

5. A typical GS-1811-12 or GS-1811-13 criminal investigator who worked for HHS's OIG during the period from February 16, 1987 through September 30, 1995 spent over 50 percent of his or her time investigating fraud involving HHS programs. Id. at 66-68.

6. During the period from February 16, 1987 through September 30, 1995, the type of work and duties performed by typical GS-1811-12 or GS-1811-13 criminal investigators within HHS's OIG did not vary significantly in the aggregate from year to year, except that, with

limited exceptions, after March 30, 1995, GS-1811-12 or GS-1811-13 criminal investigators no longer investigated Social Security fraud. Id. at 66.

7. During the period from February 16, 1987 through March 30, 1995, a typical GS-1811-12 or GS-1811-13 criminal investigator in HHS's OIG spent approximately 40-45 percent of his or her time investigating Medicare or Medicaid fraud. Id.

8. The vast majority of Medicare and Medicaid fraud consisted of doctors, hospitals or others in the medical field falsely obtaining or misappropriating Medicare benefits. Id. at 66-67; see also Def. App. 84, 107-110.

9. Medicare and Medicaid fraud may have also consisted of health care companies and professionals paying kickbacks to other professionals and companies for Medicare and Medicaid referrals. Id. at 67; see also Def. App. 85, 111-12.

10. Another common type of Medicare or Medicaid fraud HHS's OIG investigated was fraudulent schemes in which Medicare or Medicaid was billed for durable medical equipment that was never delivered, higher cost equipment than was actually delivered, totally unnecessary equipment or supplies or equipment delivered in a different state than billed in order to obtain higher reimbursement. Id. at 91-92, 113-15.

11. During the period from February 16, 1987 through March 30, 1995, a typical GS-1811-12 or GS-1811-13 criminal investigator in HHS's OIG spent approximately 40-45 percent of his or her time investigating Social Security fraud. Id. at 67. About half of this time was spent investigating people fraudulently obtaining Social Security and Supplemental Security Income benefits. Id.; see also Def. App. 80-83, 116-21. The other half of this time was spent assisting other agencies and law enforcement authorities in investigating crimes involving the fraudulent use of Social Security numbers ("SSNs"). Id.; see also Def. App. 79-80, 122-23.

12. In the Social Security Administration's ("SSA") OIG's May 1999 Management Advisory Report, entitled "Using Social Security Numbers to Commit Fraud," the Social Security Administration OIG stated that its "audits and investigations have clearly identified that the integrity of [SSA's] enumeration process materially impacts on fraud, waste, and abuse at

SSA."[1] Id. at 129. For example, when people fraudulently obtain and misuse SSNs and these SSNs are reported to employers, the SSA must expend additional effort in administering its "suspense file," which keeps track of the earnings for employees whose SSN's do not match SSA's records.[2] Id. at 134. In addition, the May 1999 report by SSA's OIG recognized that "[i]n addressing the issue of SSN fraud, SSA expends significant resources . . . to hire, train, and retain personnel who must spend a portion of every day working on issues related to SSN fraud." Id. at 135. Furthermore, in this report, SSA's OIG also noted that "SSA recognized that the public's confidence in its stewardship of [SSA] programs is undermined when individuals succeed in abusing [SSA] systems." Id. at 131.

13. During the period from February 16, 1987 through March 30, 1995, a typical GS-1811-12 or GS-1811-13 criminal investigator in HHS's OIG spent approximately 5-15 percent of his or her time investigating other types of crimes involving HHS programs. Id. at 67. Some examples include people fraudulently obtaining welfare payments or misusing HHS program grants. Id.; see also Def. App. 86-87, 93, 124-26.

14. During the period from February 16, 1987 through March 30, 1995, a typical GS-1811-12 or GS-1811-13 criminal investigator in HHS's OIG spent approximately 5 percent of his or her time investigating HHS employee misconduct. Id.; see also Def. App. 78, 127.

15. On or about March 31, 1995, the SSA became an independent agency with its own OIG. Id. at 106. Therefore, with limited exceptions for certain cases in progress, after March 30, 1995, criminal investigators in HHS's OIG did not investigate Social Security fraud. Id. at 68. As such, during the period from March 31, 1995 through September 30, 1995, a typical GS-1811-12 or GS-1811-13 criminal investigator in HHS's OIG spent approximately 80-85 percent of his or her time investigating Medicare and Medicaid fraud, approximately 10-15

[1] SSA was a part of HHS between and including February 16,1987 through March 30, 1995, but became a separate agency, with its own OIG, on March 31, 1995. Id. at 67, 106.

[2] The "suspense file" has been in place since approximately 1937. Id. at 137-38.

percent of his or her time investigating other types of crimes involving at HHS programs and approximately 3-5 percent of his or her time investigating employee misconduct. Id. at 67-68.

16. Between and including February 16, 1987 through September 30, 1995, the typical day-to-day duties of GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG varied depending upon what type of case they were working on. Id. at 68. However, most GS-1811-12 and GS-1811-13 investigators in HHS's OIG spent the majority of their time engaged in typical law enforcement duties such as planning investigations, collecting and reviewing evidence, interviewing witnesses and conducting surveillance. Id. at 51-53, 59-62, 68.

17. Collecting evidence usually consisted of reviewing paperwork and occasionally executing search warrants. Id. at 68. Executing search warrants consisted of approximately 1-2 percent of a typical GS-1811-12 or GS-1811-13 criminal investigator's time. Id.

18. Other duties consisted of initiating contact with federal state and local officials, preparing interim and comprehensive final investigative reports, providing advice and assistance to the Department of Justice and United States Attorneys in preparing cases to present before grand juries and at trial and testifying before grand juries and at trial. Id. at 51-53, 59-62, 68.

19. GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG were provided very little supervision. Id. at 53, 62, 68-69. GS-1811-13 investigators generated their own cases through various contacts. Id. at 68. GS-1811-12 investigators generated approximately half of their cases on their own while the other half were assigned to them. Id.

20. GS-1811-12 and GS-1811-13 investigators usually started, operated and closed cases with minimal supervision. Id. at 68-69. Both GS-1811-12 and GS-1811-13 investigators were expected to handle nearly every aspect of the case without the help of a supervisor. Id.

21. Only in special situations would a GS-1811-12 or GS-1811-13 investigator need approval from a supervisor to perform a task. Id. at 69. Examples include consensual monitoring (wiring a witness) and wiretaps. Id.

22. Day-to-day decisions such as what witnesses to interview, upon whom to conduct surveillance, when to involve other law enforcement personnel, etc. were handled by the GS-1811-12 or GS-1811-13 investigator without approval of a supervisor. Id.

23. For GS-1811-12 criminal investigators in HHS's OIG, their completed work was reviewed "for accomplishment of overall objectives of assigned duties and responsibilities and adherence to policy, regulatory requirements, quality of written work, case documentation and timeliness." Id. at 54. For GS-1811-13 criminal investigators in HHS's OIG, "[r]eview of work [was] in the form of discussions at certain critical points." Id. at 62.

24. In the course of planning and conducting investigations, GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG altered plans in their investigation when necessary, without the consent of their supervisor. Id. at 69. For example, an investigator may plan on interviewing persons X, Y and Z one day, but after interviewing X, an investigator may determine that interviewing B and C next would be more useful. Id.

25. A GS-1811-12 or GS-1811-13 criminal investigator had discretion to expand or contract the scope of an investigation as he or she conducted the investigation. Id.

26. Every time a GS-1811-12 or GS-1811-13 criminal investigator in HHS's OIG interviewed a witness, he or she assessed the credibility of that witness and determined what additional questions to ask based upon previous answers in the same interview. Id.

27. In reviewing evidence, GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG determined which pieces of evidence would prove a case against a suspect or prove exculpatory for the suspect and adjusted their investigations accordingly. Id.

28. During the period from February 16, 1987 through September 30, 1995, most surveillance conducted by these investigators was done through personal viewing and audio surveillance. Id. at 70.

29. In conducting surveillance, GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG made decisions as to when they had seen or heard what they needed to see or hear or when it was unlikely that they would obtain the visual or audio evidence they were seeking. Id.

30. GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG had almost complete discretion to follow a case wherever the evidence led them. Id.; see also Def. App. 53-54 (GS-1811-12 criminal investigators in HHS's OIG had to perform their duties "with a high degree of personal responsibility for sound judgment and decisions."); Def. App. 62 (a GS-1811-13 criminal investigators job requires an "extremely high degree of ingenuity and initiative and expertise.").

31. A GS-1811-12 criminal investigator in HHS's OIG was required to:

> possess an extensive knowledge of generally accepted investigative principles, techniques, methods and procedures and a knowledge of the laws of evidence, the rules of criminal procedure, and precedent court decisions concerning admissibility of evidence, constitutional rights, search and seizure and related issues; the ability to recognize, develop and present evidence that reconstructs events, sequences, and time elements and establishes relationships, responsibilities, legal liabilities, conflicts of interest, in a manner that meets requirements for presentation in various legal hearings and court proceedings; and skill in applying the techniques required in performing such duties as maintaining surveillance, performing undercover work, and advising and assisting the U.S. Attorney in and out of court.

Id. at 62, 70.

32. A GS-1811-12 criminal investigator in HHS's OIG was also required to be "thoroughly familiar with the many varied and complex [HHS] programs and operations; and have a comprehensive knowledge of laws, policies, regulations, directives, procedures, and instructions governing, affecting and pertaining to [HHS's] activities." Id.

33. Similarly, a GS-1811-13 criminal investigator in HHS's OIG was required to:

> possess an expert knowledge of generally accepted investigative principles, techniques, methods and procedures and a high degree of knowledge and expertise with respect to the laws of evidence, the rules of criminal procedure, and expertise with respect to precedent court decisions concerning admissibility of evidence, constitutional rights, search and seizure and related issues; the ability to recognize, develop and present evidence that reconstructs events, sequences, and time elements and establishes relationships, responsibilities, legal liabilities, conflicts of interest, in a manner that meets requirements for presentation in various legal hearings and court proceedings; and skill in applying the techniques required in performing such duties as maintaining surveillance, performing

> undercover work, and advising and assisting the U.S. Attorney in and out of court.

Id. at 63, 70.

34. A GS-1811-13 criminal investigator in HHS's OIG was also required to be "thoroughly familiar with the many varied and complex [HHS] programs and operations; and have a comprehensive knowledge of laws, policies, regulations, directives, procedures, and instructions governing, affecting and pertaining to [HHS's] activities." Id.

35. GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG obtained this knowledge and skill through the Federal Law Enforcement Training Center and years of on the job experience. Id. at 70.

36. Between and including the years 1987-1995, investigations by HHS's OIG resulted in millions of dollars each year in fines, savings, restitutions, settlements and recoveries for the Treasury of the United States, the Social Security and Medicare trust funds and HHS programs victimized by fraud and abuse. Id.

37. From April 1, 1987 through March 31, 1988, investigations by HHS's OIG resulted in $68 million in fines, savings, restitutions, settlements and recoveries for the Treasury of the United States, the Social Security and Medicare trust funds, HHS programs and other entities victimized by fraud and abuse. Id. at 88-89, 94-95.

38. From April 1, 1988 through March 31, 1989, investigations by HHS's OIG resulted in $74.4 million in fines, savings, restitutions, settlements and recoveries for the Treasury of the United States, the Social Security and Medicare trust funds and HHS programs victimized by fraud and abuse. Id. at 97-99, 101-02.

39. In 1994, an investigation by HHS's OIG resulted in a $379 million settlement against a health care corporation. Id. at 104.

40. By September 1995, all GS-1811 criminal investigators in HHS's OIG received LEAP pay and were thus ineligible for FLSA overtime pay. Pay Administration; Premium Pay, 64 Fed. Reg. 4517, 4517 (Jan. 29, 1999); 29 U.S.C. § 213(a)(16).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s/ David M. Cohen

DAVID M. COHEN
Director

/s/ Shalom Brilliant

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-7561

Attorneys for Defendant

OF COUNSEL:
Michael J. Dierberg
William P. Rayel
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

December 22, 2006