IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STEPHEN S. ADAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 90-162C |
| | ) | and consolidated cases |
| THE UNITED STATES, | ) | (Judge Bush) |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(1) of the rules of this Court, defendant submits these proposed findings of uncontroverted fact.

1. The mission of the Department of Housing and Urban Development ("HUD") is to "increase homeownership, support community development and increase access to affordable housing free from discrimination." HUD's Mission, *available at* http://www.hud.gov/library/bookshelf12/hudmission.cfm. HUD's mission during the period 1987-1994 was not materially different than its current mission. United States Government Manuals from the relevant time period state that HUD "is the principal Federal agency responsible for programs concerned with the Nation's housing needs, fair housing opportunities, and improvement and development of the Nation's communities." See, e.g., Def. App. 77, 82; see also Def. App. 72.

2. During the period February 1987 through October 1994, the function of HUD's Office of Inspector General ("OIG") was defined as follows: "The function of the OIG is to conduct and supervise audits and investigations relating to HUD programs and activities. The audits and investigations are designed to determine the efficiency and effectiveness of HUD's programs and to prevent and detect fraud and abuse. The OIG is also charged with the

responsibility of keeping the Secretary and the Congress fully and currently informed about problems and deficiencies relating to the operation of HUD programs and the necessity for and progress of corrective action." Organizations, Functions, and Delegations of Authority; Availability of Information to the Public; Production in Response to Subpoenas or Demands of Courts or Other Authorities, 57 Fed. Reg. 2225 (Jan. 21, 1992); Organizations, Functions and Delegations of Authority, 49 Fed. Reg. 11161 (Mar. 26, 1984); see also 73-74, 79, 84.

3. The investigative office of HUD's OIG was "primarily responsible for investigating alleged violations of Federal criminal statutes involving fraud and corruption relative to [HUD's] programs." Def. App. 52, 56.

4. During the period February 1987 through approximately February 1994, approximately 98% of a typical GS-1811-12 or GS-1811-13 criminal investigator's time was spent investigating or leading investigations into fraud upon HUD programs, such as HUD's Single Family Mortgage Insurance Program, Multifamily Mortgage Insurance Program and Rental Assistance Program. Id. at 47.

5. Examples of the types of fraud GS-1811-12 and GS-1811-13 criminal investigators investigated are false statements, embezzlement, bribery and kickbacks. Id. at 47, 92, 111. False statement cases consisted primarily of grantees making false statements in order to fraudulently obtain grant money from the various HUD programs. See, e.g., id. at 86-90,115-19. Embezzlement cases consisted mainly of grantees diverting HUD program money for a purpose other than what was authorized by the grant. See, e.g., id. "Kickback" cases consisted largely of people accepting money in exchange for HUD funded loans or grants. See, e.g., id. at 124.

6. GS-1811-12 and GS-1811-13 criminal investigators were the senior investigators in HUD's OIG and typically handled the most complex cases in the office, such as, multifamily program cases, bribery cases and cases with multiple defendants. Id. at 47, 60.

7. The other approximate 2% of a typical GS-1811-12 or GS-1811-13 criminal investigator's time during the period February 1987 through approximately February 1994 was spent investigating misconduct by HUD employees. Id. at 47.

8. In February 1994, Operation Safe Home was announced. Id. at 47, 122. Operation Safe Home focused upon three major types of wrongdoing that undermine HUD programs: (a) violent crime in public and assisted housing; (b) fraud in public housing administration; and (c) equity skimming in multifamily insured housing. Id.

9. The only part of Operation Safe Home that was a new investigative focus for HUD's OIG was combating violent crime in public and assisted housing. Id. at 47. HUD's OIG assisted Federal, state and local law enforcement in protecting HUD's interest in providing safe public housing for HUD's program beneficiaries. Id. For example, GS-1811-12 and GS-1811-13 criminal investigators worked with Federal, state and local law enforcement officers to investigate gangs and other drug and gun rings in an effort to prosecute their leaders. Id. at 62.

10. Violent crime in public and assisted housing undermines HUD's goal or providing "decent, safe, and sanitary housing to needy Americans." Id. at 122.

11. After Operation Safe Home started in February 1994, some GS-1811-12 or GS-1811-13 criminal investigators for HUD's OIG spent a majority of their time working on cases involving violent crime in public and assisted housing, while others continued to spend the majority of their time investigating fraud upon HUD programs. Id. at 47-48.

12. During the period from February 1987 through October 1994, the typical day-to-day duties of GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG varied depending upon what type of case they were working on. Id. at 48. However, most GS-1811-12 and GS-1811-13 investigators in HUD's OIG spent the majority of their time engaged in typical law enforcement duties such as planning and/or leading investigations, collecting and reviewing evidence, conducting surveillance and interviewing witnesses. Id. at 48, 60-62.

13. For fraud investigations, collecting evidence consisted predominantly of reviewing paperwork. Id. at 48, 60. For violent crime investigations, evidence was usually collected through warrants or informants, surveillance and purchasing contraband. Id. at 48, 62.

14. Other duties consisted of initiating contact with Federal, state and local officials, preparing investigative reports, providing advice and assistance to the Department of Justice and United States Attorneys in preparing cases to present before grand juries and at trial and testifying before grand juries and at trial. Id. at 48, 60.

15. A typical GS-1811-12 or GS-1811-13 criminal investigator for HUD's OIG exercised significant discretion in his or her day-to-day activities. Id.

16. Supervisors of GS-1811-12 criminal investigators provided only "general technical and administrative direction." Id. at 53. Their work was "reviewed for adequacy and from the standpoint of adherence to policy and exercise of sound judgment." Id. GS-1811-13 criminal investigators in HUD's OIG typically received "only generalized instructions and guidance." Id. at 58.

17. GS-1811-12 criminal investigators in HUD's OIG had "wide latitude for individual judgment, initiative and resourcefulness." Id. at 54. Furthermore, although many investigations were conducted jointly with, or under the supervision of, a higher grade criminal investigator, GS-1811-12 criminal investigators in HUD's OIG were "required to exercise sound judgment as situations develop, requiring immediate on-the-spot action where it is not possible to consult" with his or her supervisor. Id.

18. GS-1811-13 criminal investigators had "a wide latitude in planning and conducting" investigations, Id. at 58, often led teams of criminal investigators and had discretion to add other professional and technical personnel to their teams, such as architects, engineers, construction analysts and appraisers. Id. at 57.

19. The investigators had the responsibility of identifying subjects, witnesses and coordinating their cases with law enforcement agencies and prosecutors. Id. at 48. GS-1811-12 and GS-1811-13 criminal investigators for HUD's OIG made decisions such as who to interview, when to interview the witness or subject, when and where to conduct surveillance, etc. and kept their supervisors informed of these decisions and the status of the cases. Id. at 48-49.

20. GS-1811-12 and GS-1811-13 criminal investigators did not need supervisory approval for most day-to-day activities. Id. at 49. GS-1811-12 and GS-1811-13 criminal investigators only needed approval of a supervisor for certain things, such as deputization, subpoenas or warrants and anything that involved a potential safety hazard for the investigator, such as late night surveillance in a dangerous area. Id. at 61.

21. Every time a GS-1811-12 or GS-1811-13 criminal investigator in HUD's OIG interviewed a witness, he or she assessed the credibility of that witness and determined what additional questions to ask based upon previous answers in the same interview. Id. at 49, 61.

22. In reviewing evidence, GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG determined which pieces of evidence would prove a case against a suspect or prove exculpatory for the suspect and adjusted their investigations accordingly. Id. GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG had almost complete discretion to follow a case wherever the evidence led them. Id.

23. In conducting surveillance, GS-1811-12 and GS-1811-13 criminal investigators made decisions as to when they had seen or heard what they needed to see or hear or when it was unlikely that they would obtain the visual or audio evidence they were seeking. Id. at 63.

24. In investigating violent crime, GS-1811-12 and GS-1811-13 criminal investigators had considerable discretion. Id. at 62. As in a fraud investigation, the investigators were free to follow the case wherever the evidence led them and needed to assess the credibility of all witnesses they interviewed. Id.

25. GS-1811-12 criminal investigators in HUD's OIG needed to be "thoroughly familiar with the various programs of [HUD], the Labor Standards Act, and the Davis-Bacon Act, as well as the various Federal criminal statutes relating to fraud and corruption, viz bribery, theft or vandalism of Government property, conflict of interest, [and] fraud against the Government." Id. at 52.

26. GS-1811-13 criminal investigators in HUD's OIG must have knowledge of "admissibility of evidence, rules of criminal procedure and constitutional rights" and that they "must be constantly aware of and follow closely the implications of precedent court decisions." Id. at 57-58.

27. Both GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG must possess an extensive knowledge of generally accepted investigative principles, techniques, methods and procedures. Id. at 49, 63.

28. During the period April 1, 1987 through September 30, 1994, investigations by HUD's OIG resulted in approximately $200 million dollars in savings, recoveries, fines and cost efficiencies. Id. at 91, 94, 96, 98, 100, 102, 104, 106, 108, 110, 113, 120, 125, 127. This amounts to millions of dollars each year during the period 1987 through 1994, as well as significant indictments and convictions. Id. at 50.

29. On October 30, 1994, all GS-1811 criminal investigators in HUD's OIG started receiving availability pay under the Law Enforcement Availability Pay Act of 1994 at the same time. Id. at 46, 67-69.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s/ Jeanne E. Davidson
by Bryant G. Snee

JEANNE E. DAVIDSON
Acting Director

/s/ Shalom Brilliant

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-7561

Attorneys for Defendant

OF COUNSEL:
Michael J. Dierberg
William P. Rayel
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

February 26, 2007