IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STEPHEN S. ADAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 90-162C |
| | ) | and consolidated cases |
| THE UNITED STATES, | ) | (Judge Bush) |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT REGARDING HHS CRIMINAL INVESTIGATORS**

Pursuant to Rule 56(h)(2) of the rules of this Court, Plaintiffs respond to Defendant's proposed findings of uncontroverted fact as follows:

1. The mission of the Department of Health and Human Services ("HHS") is to "enhance the health and well-being of Americans by providing for effective health and human services and by fostering strong, sustained advances in the sciences, underlying medicine, public health and social services." HHS Performance and Accountability Report FY 2005, *available at* http://www.hhs.gov/of/reports/account/acct05/sect1managdiscuss.html. HHS's mission between and including 1987-1995 was not materially different than its current mission. United States Government Manuals from the relevant time period state, "[t]he Secretary of HHS advises the President on health, welfare, and income security plans, policies and programs of the Federal Government. The Secretary directs [HHS] staff in carrying out the approved programs and activities of [HHS]. . ." See, e.g., Def. HHS App. at 72-76.[1]

[1] Plaintiffs adopt the following convention to clarify and abbreviate the references:

(a) "Pl. HHS App." refers to the Appendix to Plaintiffs' Cross-Motion and Opposition To Defendant's Motion For Partial Summary Judgment for the HHS criminal investigators;
(b) "Pl. HHS Statement of Fact" refers to Plaintiffs' Proposed Finding of Uncontroverted Fact to support its Cross-Motion and Opposition To Defendant's Motion for Partial Summary

Plaintiffs do not dispute that Defendant has explained a part of the mission of HHS. Pl. Statement of HHS Fact sets forth a more complete and accurate definition. Pl. HHS Statement of Fact ¶¶ 11-12. Plaintiffs object to the description of the role of the Secretary of HHS, as it does not describe the mission of the agency but rather the job of the Secretary.

2. From February 16, 1987 to approximately November 7, 1989, the mission statement of HHS's Office of Inspector General ("OIG") read as follows:

> The Office of Inspector General, under the general supervision of the Inspector General and the Secretary, is responsible for:
>
> A. Conducting and supervising audits and investigations relating to programs and operations of the Department;
>
> B. Maintaining security programs designed to protect government property, sensitive information, and personnel;
>
> C. Providing leadership and coordination for, and recommending policies and corrective actions concerning, activities designed to:
>
> > (1) Promote economy and efficiency in the administration of, and
> >
> > (2) Prevent and detect fraud and abuse in, the Department's programs and operation;
>
> D. Providing a means for keeping the Secretary and the Congress fully and currently informed about problems and deficiencies relating to the administration of such programs and operations, and the need for corrective action; and
>
> E. Imposing sanctions against providers of health care under Medicare and

---

Judgment for the HHS criminal investigators;

(c) "Def. HHS App." refers to the Appendix to Defendant's Motion for Partial Summary Judgment for the HHS criminal investigators;

(d) "Def. HHS Statement of Fact" refers to Defendant's Proposed Findings of Uncontroverted Fact to support its Motion for Partial Summary Judgment for the HHS criminal investigators.

Medicaid who commit certain prohibited acts.

Statement of Organization, Functions and Delegations of Authority; Office of Inspector General, 50 Fed. Reg. 45488 (Oct. 31, 1985). From approximately November 7, 1989 to beyond 1995, the mission of HHS's OIG was to promote "economy, efficiency and effectiveness [of HHS] through the elimination of waste, abuse and fraud." Office of Inspector General; Statement of Organization, Functions and Delegations of Authority, 54 Fed. Reg. 46775 (Nov. 7, 1989). This was done in part by "[c]onducting and supervising audits, investigations, inspections and evaluations relating to HHS programs and operations." Id.

Plaintiffs agree with these facts but would add that the OIG fulfills the mission of HHS "by promoting high quality, cost-effective health care and human services, improved access to health care for all Americans, and the integrity of the Social Security and Medicare trust funds." Pl. HHS Statement of Fact ¶ 13; Pl. HHS App. at 166.

3. The investigative activities of HHS's OIG involved "allegations of criminal activities perpetrated by providers of services, program participants, contractors, grantees, and private individuals as well as [HHS] employees and others involving programs funded by [HHS] and [HHS] operations." Def. HHS App. at 50, 58.

Plaintiffs agree that this fact is undisputed.

4. Furthermore, the "primary functions of the [Criminal Investigations Division of HHS's OIG] are to conduct and direct criminal investigations of alleged or suspected violations of the criminal laws of the United States relating to the programs and operations of [HHS]." Id.

Plaintiffs agree that these are the functions of the Division for which Plaintiffs worked.

5. A typical GS-1811-12 or GS-1811-13 criminal investigator who worked for

HHS's OIG during the period from February 16, 1987 through September 30, 1995 spent over 50 percent of his or her time investigating fraud involving HHS programs. Id. at 66-68.

Plaintiffs agree that this fact is undisputed and add that Defendant's statements of fact that follow this particular paragraph demonstrate that Plaintiffs spent almost 100 percent of their time on such matters. See Paragraphs 7, 11 and 13, *infra*.

6. During the period from February 16, 1987 through September 30, 1995, the type of work and duties performed by typical GS-1811-12 or GS-1811-13 criminal investigators within HHS's OIG did not vary significantly in the aggregate from year to year, except that, with limited exceptions, after March 30, 1995, GS-1811-12 or GS-1811-13 criminal investigators no longer investigated Social Security fraud. Id. at 66.

Plaintiffs agree that this fact is undisputed; however, a number of criminal investigations affected by Defendant's motion transferred on March 31, 1995, to the newly created Social Security Administration ("SSA") where they performed the same work as before albeit exclusively on SSA related fraud. See Declarations of Plaintiffs, Volume II of Pl. HHS App. at 193-411.

7. During the period from February 16, 1987 through March 30, 1995, a typical GS-1811-12 or GS-1811-13 criminal investigator in HHS's OIG spent approximately 40-45 percent of his or her time investigating Medicare or Medicaid fraud. Id.

Plaintiffs do not dispute this fact but would add a non-material comment that the Plaintiffs in this case generally spent more than 40-45 percent of their time on Medicare and Medicaid fraud. See Declarations of Plaintiffs, Volume II of Pl. HHS App. at 193-411.

8. The vast majority of Medicare and Medicaid fraud consisted of doctors, hospitals

or others in the medical field falsely obtaining or misappropriating Medicare benefits. Id. at 66-67; see also Def. HHS App. at 84, 107-110.

Plaintiffs agree that this fact is undisputed.

9. Medicare and Medicaid fraud may have also consisted of health care companies and professionals paying kickbacks to other professionals and companies for Medicare and Medicaid referrals. Id. at 67; see also Def. HHS App. at 85, 111-12.

Plaintiffs agree that this fact is undisputed.

10. Another common type of Medicare or Medicaid fraud HHS's OIG investigated was fraudulent schemes in which Medicare or Medicaid was billed for durable medical equipment that was never delivered, higher cost equipment than was actually delivered, totally unnecessary equipment or supplies or equipment delivered in a different state than billed in order to obtain higher reimbursement. Id. at 91-92, 113-15.

Plaintiffs agree that this fact is undisputed.

11. During the period from February 16, 1987 through March 30, 1995, a typical GS-1811-12 or GS-1811-13 criminal investigator in HHS's OIG spent approximately 40-45 percent of his or her time investigating Social Security fraud. Id. at 67. About half of this time was spent investigating people fraudulently obtaining Social Security and Supplemental Security Income benefits. Id.; see also Def. HHS App. at 80-83, 116-21. The other half of this time was spent assisting other agencies and law enforcement authorities in investigating crimes involving the fraudulent use of Social Security numbers ("SSNs"). Id.; see also Def. HHS App. at 79-80, 122-23.

Plaintiffs do not dispute this fact but add a non-material comment that the Plaintiffs in this case who were transferred to SSA on March 31, 1995, generally spent more than 40-45 percent of their time on Social Security fraud and the criminal investigators who did not transfer to SSA generally spent less time on Social Security fraud investigations. See Declarations of Plaintiffs, Volume II of Pl. HHS App. at 193-411.

12. In the Social Security Administration's ("SSA") OIG's May 1999 Management Advisory Report, entitled "Using Social Security Numbers to Commit Fraud," the Social Security Administration OIG stated that its "audits and investigations have clearly identified that the integrity of [SSA's] enumeration process materially impacts on fraud, waste, and abuse at SSA."[2] Id. at 129. For example, when people fraudulently obtain and misuse SSNs and these SSNs are reported to employers, the SSA must expend additional effort in administering its "suspense file," which keeps track of the earnings for employees whose SSN's do not match SSA's records.[3] Id. at 134. In addition, the May 1999 report by SSA's OIG recognized that "[i]n addressing the issue of SSN fraud, SSA expends significant resources . . . to hire, train, and retain personnel who must spend a portion of every day working on issues related to SSN fraud." Id. at 135. Furthermore, in this report, SSA's OIG also noted that "SSA recognized that the public's confidence in its stewardship of [SSA] programs is undermined when individuals succeed in abusing [SSA] systems." Id. at 131.

---

[2] SSA was a part of HHS between and including February 16,1987 through March 30, 1995, but became a separate agency, with its own OIG, on March 31, 1995. Id. at 67, 106.

[3] The "suspense file" has been in place since approximately 1937. Id. at 137-38.

Plaintiffs do not dispute these facts; however, they are mostly related to the larger administrative structure within the SSA's OIG. OIG criminal investigators uncovered numerous examples of fraud and reported these to the SSA, which has a staff to make the necessary corrections to the SSA record keeping systems. Pl. HHS App. at 55, 160.

13. During the period from February 16, 1987 through March 30, 1995, a typical GS-1811-12 or GS-1811-13 criminal investigator in HHS's OIG spent approximately 5-15 percent of his or her time investigating other types of crimes involving HHS programs. Id. at 67. Some examples include people fraudulently obtaining welfare payments or misusing HHS program grants. Id.; see also Def. HHS App. at 86-87, 93, 124-26.

Plaintiffs agree that these facts are undisputed.

14. During the period from February 16, 1987 through March 30, 1995, a typical GS-1811-12 or GS-1811-13 criminal investigator in HHS's OIG spent approximately 5 percent of his or her time investigating HHS employee misconduct. Id.; see also Def. HHS App. at 78, 127.

Plaintiffs do not dispute this fact except to add that these cases involved criminal conduct or allegations of criminal conduct. See Declarations of Plaintiffs, Volume II of Pl. HHS App. at 193-411.

15. On or about March 31, 1995, the SSA became an independent agency with its own OIG. Id. at 106. Therefore, with limited exceptions for certain cases in progress, after March 30, 1995, criminal investigators in HHS's OIG did not investigate Social Security fraud. Id. at 68. As such, during the period from March 31, 1995 through September 30, 1995, a typical GS-1811-12 or GS-1811-13 criminal investigator in HHS's OIG spent approximately 80-85

percent of his or her time investigating Medicare and Medicaid fraud, approximately 10-15 percent of his or her time investigating other types of crimes involving at HHS programs and approximately 3-5 percent of his or her time investigating employee misconduct. Id. at 67-68.

Plaintiffs agree that these facts are undisputed with the qualification set forth in Paragraph 14.

16. Between and including February 16, 1987 through September 30, 1995, the typical day-to-day duties of GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG varied depending upon what type of case they were working on. Id. at 68. However, most GS-1811-12 and GS-1811-13 investigators in HHS's OIG spent the majority of their time engaged in typical law enforcement duties such as planning investigations, collecting and reviewing evidence, interviewing witnesses and conducting surveillance. Id. at 51-53, 59-62, 68.

Plaintiffs agree that they spent the vast majority of their time conducting such work. See Declarations of Plaintiffs, Volume II of Pl. HHS App. at 193-411.

17. Collecting evidence usually consisted of reviewing paperwork and occasionally executing search warrants. Id. at 68. Executing search warrants consisted of approximately 1-2 percent of a typical GS-1811-12 or GS-1811-13 criminal investigator's time. Id.

Plaintiffs agree that collecting evidence usually consisted of reviewing paperwork from a wide variety of sources. Plaintiffs assert that the time spent executing search warrants varies significantly by investigation but Plaintiffs do not believe their dispute with the estimate is material.

18. Other duties consisted of initiating contact with federal state and local officials,

preparing interim and comprehensive final investigative reports, providing advice and assistance to the Department of Justice and United States Attorneys in preparing cases to present before grand juries and at trial and testifying before grand juries and at trial. Id. at 51-53, 59-62, 68.

Plaintiffs agree that they worked with a wide range of criminal investigators and other investigators from various state and federal agencies and that they performed the same work for federal attorneys as other criminal investigators. See Declarations of Plaintiffs, Volume II of Pl. HHS App. at 193-411.

19. GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG were provided very little supervision. Id. at 53, 62, 68-69. GS-1811-13 investigators generated their own cases through various contacts. Id. at 68. GS-1811-12 investigators generated approximately half of their cases on their own while the other half were assigned to them. Id.

Plaintiffs agree that, at the GS-1811-12 and GS-1811-13 grades, they generally worked with little supervision. Plaintiffs do not dispute the characterization of how cases are obtained except to add a non-material point of clarification that both GS-12 and GS-13 criminal investigators are frequently assigned cases. Pl. HHS App. at 211.

20. GS-1811-12 and GS-1811-13 investigators usually started, operated and closed cases with minimal supervision. Id. at 68-69. Both GS-1811-12 and GS-1811-13 investigators were expected to handle nearly every aspect of the case without the help of a supervisor. Id.

Plaintiffs do not dispute this statement; however, Plaintiffs have a non-material objection to the statement insofar as it ignores the role of the state or federal prosecutor who usually oversaw the work of the criminal investigator at various points in the case. Pl. HHS App. at, e.g., 212.

21. Only in special situations would a GS-1811-12 or GS-1811-13 investigator need approval from a supervisor to perform a task. Id. at 69. Examples include consensual monitoring (wiring a witness) and wiretaps. Id.

Plaintiffs do not dispute this fact, but add a non-material point of clarification in that it neglects to add that criminal investigators were required to obtain supervisory approval for consensual and nonconsensual monitoring, mail cover and the payment of funds to informants. Pl. HHS App. at 212.

22. Day-to-day decisions such as what witnesses to interview, upon whom to conduct surveillance, when to involve other law enforcement personnel, etc. were handled by the GS-1811-12 or GS-1811-13 investigator without approval of a supervisor. Id.

Plaintiffs agree that these facts are undisputed but only at the GS-12 and GS-13 level.

23. For GS-1811-12 criminal investigators in HHS's OIG, their completed work was reviewed "for accomplishment of overall objectives of assigned duties and responsibilities and adherence to policy, regulatory requirements, quality of written work, case documentation and timeliness." Id. at 54. For GS-1811-13 criminal investigators in HHS's OIG, "[r]eview of work [was] in the form of discussions at certain critical points." Id. at 62.

Plaintiffs agree that these facts are undisputed but only at the GS-12 and GS-13 level. Defendant's own witness testified that GS-11 and lower grade criminal investigators have more supervision. Pl. HHS App. at 14.

24. In the course of planning and conducting investigations, GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG altered plans in their investigation when necessary, without the consent of their supervisor. Id. at 69. For example, an investigator may

plan on interviewing persons X, Y and Z one day, but after interviewing X, an investigator may determine that interviewing B and C next would be more useful. Id.

Plaintiffs agree that these facts are undisputed but only at the GS-12 and GS-13 level.

25. A GS-1811-12 or GS-1811-13 criminal investigator had discretion to expand or contract the scope of an investigation as he or she conducted the investigation. Id.

Plaintiffs do not dispute this statement; however, Plaintiffs have a non-material objection to the statement insofar as it ignores the role of the state or federal prosecutor who usually oversaw the work of the criminal investigator at various points in the case. Pl. HHS App. at, e.g., 212.

26. Every time a GS-1811-12 or GS-1811-13 criminal investigator in HHS's OIG interviewed a witness, he or she assessed the credibility of that witness and determined what additional questions to ask based upon previous answers in the same interview. Id.

Plaintiffs agree that this fact is undisputed.

27. In reviewing evidence, GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG determined which pieces of evidence would prove a case against a suspect or prove exculpatory for the suspect and adjusted their investigations accordingly. Id.

Plaintiffs do not dispute this statement; however, Plaintiffs have a non-material objection to the statement insofar as it ignores the role of the state or federal prosecutor who usually oversaw the work of the criminal investigator at various points in the case. Pl. HHS App. at, e.g., 212.

28. During the period from February 16, 1987 through September 30, 1995, most

surveillance conducted by these investigators was done through personal viewing and audio surveillance. Id. at 70.

Plaintiffs agree that this fact is undisputed.

29. In conducting surveillance, GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG made decisions as to when they had seen or heard what they needed to see or hear or when it was unlikely that they would obtain the visual or audio evidence they were seeking. Id.

Plaintiffs agree that this fact is undisputed.

30. GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG had almost complete discretion to follow a case wherever the evidence led them. Id.; see also Def. HHS App. at 53-54 (GS-1811-12 criminal investigators in HHS's OIG had to perform their duties "with a high degree of personal responsibility for sound judgment and decisions."); Def. HHS App. at 62 (a GS-1811-13 criminal investigators job requires an "extremely high degree of ingenuity and initiative and expertise.").

Plaintiffs do not dispute this statement; however, Plaintiffs have a non-material objection to the statement insofar as it ignores the role of the state or federal prosecutor who usually oversaw the work of the criminal investigator at various points in the case. Pl. HHS App. at, e.g., 212.

31. A GS-1811-12 criminal investigator in HHS's OIG was required to:

> possess an extensive knowledge of generally accepted investigative principles, techniques, methods and procedures and a knowledge of the laws of evidence, the rules of criminal procedure, and precedent court decisions concerning admissibility of evidence, constitutional rights, search and seizure and related issues; the ability to recognize, develop and present evidence that reconstructs events, sequences, and time elements and establishes relationships, responsibilities, legal liabilities, conflicts of

> interest, in a manner that meets requirements for presentation in various legal hearings and court proceedings; and skill in applying the techniques required in performing such duties as maintaining surveillance, performing undercover work, and advising and assisting the U.S. Attorney in and out of court.

Id. at 62, 70.

Plaintiffs agree that this fact is undisputed.

32. A GS-1811-12 criminal investigator in HHS's OIG was also required to be "thoroughly familiar with the many varied and complex [HHS] programs and operations; and have a comprehensive knowledge of laws, policies, regulations, directives, procedures, and instructions governing, affecting and pertaining to [HHS's] activities." Id.

Plaintiffs dispute this alleged non-material fact insofar is it overstates the familiarity of criminal investigators with HHS programs and case law developments. There are over 300 HHS programs, and, while criminal investigators are generally aware of them, they acquire that more thorough familiarity in the context of a particular investigation. Pl. HHS App. at 214.

33. Similarly, a GS-1811-13 criminal investigator in HHS's OIG was required to:

> possess an expert knowledge of generally accepted investigative principles, techniques, methods and procedures and a high degree of knowledge and expertise with respect to the laws of evidence, the rules of criminal procedure, and expertise with respect to precedent court decisions concerning admissibility of evidence, constitutional rights, search and seizure and related issues; the ability to recognize, develop and present evidence that reconstructs events, sequences, and time elements and establishes relationships, responsibilities, legal liabilities, conflicts of interest, in a manner that meets requirements for presentation in various legal hearings and court proceedings; and skill in applying the techniques required in performing such duties as maintaining surveillance, performing undercover work, and advising and assisting the U.S. Attorney in and out of court.

Id. at 63, 70.

Plaintiffs only dispute this alleged non-material fact to the extent that it uses the word "expert." Pl. HHS App. at 214.

34. A GS-1811-13 criminal investigator in HHS's OIG was also required to be "thoroughly familiar with the many varied and complex [HHS] programs and operations; and have a comprehensive knowledge of laws, policies, regulations, directives, procedures, and instructions governing, affecting and pertaining to [HHS's] activities." Id.

Plaintiffs adopt their response to Paragraph 32, *supra*.

35. GS-1811-12 and GS-1811-13 criminal investigators in HHS's OIG obtained this knowledge and skill through the Federal Law Enforcement Training Center and years of on the job experience. Id. at 70.

Plaintiffs agree that this fact is undisputed.

36. Between and including the years 1987-1995, investigations by HHS's OIG resulted in millions of dollars each year in fines, savings, restitutions, settlements and recoveries for the Treasury of the United States, the Social Security and Medicare trust funds and HHS programs victimized by fraud and abuse. Id.

Plaintiffs agree that this fact is undisputed.

37. From April 1, 1987 through March 31, 1988, investigations by HHS's OIG resulted in $68 million in fines, savings, restitutions, settlements and recoveries for the Treasury of the United States, the Social Security and Medicare trust funds, HHS programs and other entities victimized by fraud and abuse. Id. at 88-89, 94-95.

Plaintiffs agree that this fact is undisputed.

38. From April 1, 1988 through March 31, 1989, investigations by HHS's OIG

resulted in $74.4 million in fines, savings, restitutions, settlements and recoveries for the Treasury of the United States, the Social Security and Medicare trust funds and HHS programs victimized by fraud and abuse. Id. at 97-99, 101-02.

Plaintiffs agree that this fact is undisputed.

39. In 1994, an investigation by HHS's OIG resulted in a $379 million settlement against a health care corporation. Id. at 104.

Plaintiffs agree that this fact is undisputed.

40. By September 1995, all GS-1811 criminal investigators in HHS's OIG received LEAP pay and were thus ineligible for FLSA overtime pay. Pay Administration; Premium Pay, 64 Fed. Reg. 4517, 4517 (Jan. 29, 1999); 29 U.S.C. § 213(a)(16).

Plaintiffs dispute this fact, as Plaintiffs at HHS and Plaintiffs at SSA were not converted to LEAP by September 1995 but on September 17, 1995. Pl. HHS App. at, e.g., 270.

Respectfully submitted,

/s/ Jules Bernstein

OF COUNSEL:
Linda Lipsett

Jules Bernstein
Bernstein & Lipsett, P.C.
1920 L Street, N.W., Suite 303
Washington, D.C. 20036
(202) 296-1798
(202) 296-7220 facsimile

Counsel of Record

/s/ Edgar James

Edgar James
Sean Bajkowski
James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036
(202) 496-0500
(202) 496-0555 facsimile

Of Counsel

Dated: March 28, 2007