IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN ADAMS, et al.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 90-162-C<br>and Consolidated Cases<br>(Judge Lynn J. Bush) |

NOTICE TO TAKE DEPOSITION
UPON ORAL EXAMINATION

TO: Defendant and Its Counsel of Record

Notice is hereby given pursuant to Rule 30 of the United States Court of Federal Claims requesting that the defendant produce for deposition Michael Little, the Deputy Inspector General for Investigations within the Department of Health and Human Services Office of the Inspector General. Such deposition will commence at 10:00 a.m. on February 2, 2007, at the law offices of James & Hoffman, P.C., 1101 17th Street, N.W., Suite 510, Washington, D.C. 20036 and will continue day-to-day thereafter until completed.

Respectfully submitted,

OF COUNSEL:
Linda Lipsett

Jules Bernstein
Bernstein & Lipsett

1920 L Street, N.W., Suite 303
Washington, D.C. 20036
(202) 296-1798

Edgar N. James
James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036
(202) 496-0500

Attorneys for Plaintiffs

Dated: 1/28/07

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 23rd day of January 2007, I caused two copies of plaintiffs' Notice to Take Deposition Upon Oral Examination to be placed in first class, postage prepaid United States mail and transmitted by e-mail transmission addressed as follows:

William Rayel, Esq.
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L. Street, NW, Room 12100
Washington, D.C. 20530
Phone: (202) 616-0302
Fax: (202) 307-0972
William.rayel@usdoj.gov

Edgar N. James

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------- X

STEPHEN ADAMS, et al., ) Case No. 90-162-C
Plaintiffs, ) and consolidated
vs. ) cases
UNITED STATES OF AMERICA, )
Defendant. ) Pages 1-28

------------------------------- X

DEPOSITION OF MICHAEL LITTLE

Wednesday, January 31, 2007

Washington, D.C.

ORIGINAL

Reported by: Sara A. Watt

Job No. 179039

descriptions and said, okay, I can look at this line and this is what these people do. And it took us until 1998 to get that clarified.

Accordingly, I would show you your declaration of Michael Little, which was executed on 21st of December, 2006. And I direct your attention to paragraph 19.

MR. JAMES: Do you need copies?

MR. RAYEL: No.

MR. WILSON: No, I have a copy.

BY MR. JAMES:

Q. And what I would like to show you are the documents to which you refer. And they are what were two documents that were marked and attached by Mr. Rayel, they were Exhibit A and Exhibit B to the declaration of Alcine, A-L-C-I-N-E, Pike.

And Exhibit A was a position description that is denominated by the agency as SPD-804 for GS-12 criminal investigators. It's a 1987 position description. And SPD-805, which was attached as Exhibit B to the declaration of Alcine Pike. And I just want to give you a copy of PD-804 and PD-805

for you to look at. That's 804 and 805.
Now, you've reviewed these, as I understand, in connection with your declaration.
A. Yes, I have.
Q. And when you say they're an accurate reflection of the duties that the criminal investigator performs on a day-to-day basis, what do you mean by that?
A. What I mean is that the duties listed in these job descriptions are duties and skills that the agent would need to use on a daily basis to perform their job. They had to have the ability and knowledge to do all of the above or all of the listed responsibilities.
Q. But in terms of the duties that are listed, obtain search warrants, as opposed to prepare a management implication report, are you suggesting that they did all the duties in that PD every day?
A. No, I'm not.
Q. Could you just -- rather than having me testify, could you just clarify? I think what

you're saying about a PD is it's the range of duties that a person might do in the course of their work as a GS-12.

A. Exactly. They had to have the ability and talent and knowledge to do those, that range of responsibilities, and to be called upon to do them at any time as the case progressed and as the case required.

Q. But you can't look at this PD and say this duty is what they did for a particular pay period or a particular year. It's a range of duties, some of which they did regularly, some of which they might not do regularly, correct?

A. Exactly, correct.

Q. That's not a trick question. I'm just trying to -- again, your lawyers think I'm paranoid. But I just want to make it clear rather than have a judge rely on -- go through the PD and say, well, this is what they did on a day-to-day basis on each and every page, each and every paragraph.

Okay. In your declaration you estimate

the percentage of time that criminal investigators spent on various matters. And if you sum up the criminal investigative duties and look at what you have -- you have, for example, paragraph 10, you say criminal investigators spend approximately 80 to 85 percent of their time, I'm talking about investigators, plural, investigating Medicare/Medicaid fraud -- strike that. Let me go back to the pre-Social Security split.

If you look at number 6, you have criminal investigators, this is prior to March 30, 1995, when we know that Social Security was separated from HHS and had its own IG. You say 40 to 45 percent of the time on Medicare/Medicaid; paragraph 7 is 40 to 45 percent on Social Security; and paragraph 8 is 5 to 15 percent on other crimes.

Is it fair to say you add that up, that 85 to 100 percent of criminal investigator's time is spent investigating criminal activity?

A. Correct.

Q. And one of the points I wanted to make in this case, and again I don't think you disagree, is

that criminal investigative work that your people did during that period of time and continue until today, is the same kind of criminal investigative work that other federal criminal investigators would engage in.

Is that a fair statement?

A. That our criminal investigative work is essentially the same as work engaged in by other criminal investigators throughout the federal government, correct.

Q. And, again, I think we agree on that, but I want to make clear that there's nothing different about an OIG HHS criminal investigators versus say somebody at the Secret Service. They may be focused on different statutes they're enforcing, but in terms of warrants, going through documents, the basic investigative work would be the same?

A. Correct.

Q. Now, I understand that -- indeed, let me go one step further than that. At IRS or Customs they're collecting money and trying to make sure the government's not defrauded.

The function of HHS, is it not that you're trying to prevent people defrauding money that's being allocated or spent by HHS? You're trying to make sure there's not fraud in the money going out from the department?

A. Right.

Q. And tell me about the FBI's overlap, overlapping jurisdiction with HHS OIG. I believe at HUD they have concurrent jurisdiction.

Is that the case with HHS?

A. Correct. My understanding is that the FBI has overall jurisdiction over virtually any Title 18 violation. That could cover any department in government.

HHS investigators have responsibility for those programs and entities funded by or operated by the Department of Health and Human Services.

Q. Let me ask you about that. And I want to get into the manual that your counsel probably showed you and I introduced last time.

As to Title 18, I understand that your criminal investigators and the FBI, they're

investigating the same kinds of statutory offenses. But as to Title 42, is that exclusively HHS IG or does the FBI also investigate those? Kickbacks, for example.

A. The FBI can investigate those violations as well.

Q. And what does it mean when your agent's manual at HHS says that the criminal investigators in OI have primary jurisdiction over certain Title 42 violations?

A. Well, Title 42 is the statute that covers the HHS, some of the HHS programs that we have the primary responsibility for the investigation, audit, and, you know, review of.

Q. But your people are not doing audits?

A. No.

Q. But when -- I'm looking at the agents' manual. I'm not going to mark it for identification or as an exhibit unless we have a dispute about it.

It says the OI has primary investigative jurisdiction over violations to Title 42. What

does that mean?

A. May I see it?

Q. I'll mark it. It's a page out of the agents' manual. I'm not trying to trick you.

I'm just trying to see, is it your understanding that your criminal investigators have primary jurisdiction in some sense over certain criminal statutes of the agency?

A. Uh-huh, correct.

Q. What does that mean, "primary"? Does that mean you take the lead on all those? How does the Bureau interact?

A. It doesn't mean that we take the lead on all those. What that means is that those titles are applicable to the Department of Health and Human Services, very much the same way Title 26 is applicable to the Internal Revenue Service.

And we have primary jurisdiction on those because our job is as the law enforcement entity within the Department of Health and Human Services, and the Deputy Inspector General for Investigations is the department's liaison with the Department of

Justice on criminal matters involving the Department of Health and Human Services.

Q. Is there a memorandum of understanding with the FBI, I know there is with HUD, for example, on how you work and then obligation to call them when investigation is started? Is there an MOU?

A. There has been an MOU with the FBI for many years.

Q. Is it in place now? Do you know whether it was in place --

A. It would have been in place back then.

Q. That's my only question.

And what did -- what did -- do you recall what it requires, what kind of coordination between the two agencies?

A. Again, it goes back many years. It would have required our department to contact the FBI in certain situations. One specifically listed would be where a departmental employee was culpably involved in a criminal offense, we needed to contact the Department of Justice or the FBI to

statement?
A. Yes.
Q. Is it fair to say that 11s and lower generally have closer supervision?
A. That is correct.
Q. And one of the things I noticed in looking at your agency in the relevant time period is that unlike criminal investigative agencies such as the Bureau, the IRS, Customs, that routinely had 25 percent AUO, I frequently see a lesser amount of AUO.
Is that your recollection, that AUO was sometimes capped at HHS?
A. That is correct.
Q. And was that for budgetary reasons?
A. Yes.
Q. And is it your understanding that criminal investigators generally worked whatever they had to work to get their job done, regardless of the cap?
A. A criminal investigator generally would work until their job was finished, correct.

(Deposition resumed at 1:17 p.m.)

BY MR. JAMES:

Q. Savoy Exhibit Number 4. And this is a book -- I'm sure you know Frank Cioffi, C-I-O-F-F-I, this is from him.

Are you aware of this book?

A. Yes, I am.

Q. And would this be -- is this something that's given to criminal investigators in the Office of Investigation?

A. Yes.

Q. And why is it given to them?

A. For two reasons: To help them understand potential offenses and what could be charged; and also to provide to assistant U.S. Attorneys around the country that they dealt with to help them understand what charges could be brought in particular health care investigations, or health care or other HHS investigations.

Q. Now, in here are some Title 42 provisions and Title 18 provisions. Is it not fair to say that the choice of which statute to enforce is

ultimately up to the prosecutor?

A. Correct.

Q. So while a criminal investigator might be investigating criminal conduct under a variety of statutes, it's ultimately up to the federal or state prosecutor to decide what to charge someone with?

A. Correct.

Q. Let me show you what's been marked as Savoy Exhibit Number 5. And ask you if this is a document with which you're familiar.

MR. WILSON: That was never marked as an exhibit.

MR. JAMES: It was not, because she had not ever seen it.

THE REPORTER: It was marked and then withdrawn.

MR. JAMES: Mark it as Exhibit Number to this depo would be?

THE REPORTER: 2 to this depo.

(Exhibit 2
marked for identification.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------- x

STEPHEN ADAMS, et al., ) Case No.

Plaintiffs, ) 90-162-C and

vs. ) consolidated cases

UNITED STATES OF AMERICA, )

Defendant. ) Pages 1-42

-------------------------------- x

DEPOSITION OF LORA SAVOY

Thursday, January 25, 2007

Washington, D.C.

ORIGINAL

Reported by: Sara A. Watt

Job No. 178916

of the case. But what I really want to get at is the structure of the IG office and the work of the IG people.

MR. JAMES: And I want to mark as deposition Exhibit 1 the deposition notice, which you have. I have an extra copy if you want it.

(Plaintiff's Exhibit 1 marked for identification.)

BY MR. JAMES:

Q. And, Ms. Savoy, this deposition notice asked for the agency, HHS, to designate somebody who could talk about the structure, the work -- the organization, work, and staffing of the Office of Inspector General, really from '88 until availability pay began at HHS and Social Security on September 17th, 1995.

And I understand you've been designated to testify about those issues; is that correct?

A. Uh-huh, yes, sir.

Q. And what is your -- what gives you the qualification to address these issues? What's your background?

A. Well, currently I'm the director, administrative operations division. Excuse me, Administrative Services Division, Office of Management and Policy, for the OIG.

Q. I'm sorry, you lost me. Director of administrative?

A. Administrative Services Division.

Q. Services division.

A. Office of Management and Policy, Office of Inspector General. The Office of Management and Policy is responsible for administrative matters for the OIG as a whole.

Q. Okay. I'm going to get into that, because when I went through, one of the minor bits of confusion, it's not really material to the case but I want still want to straighten it out, is titles changed over time in the IG's office.

A. Yes, they did.

Q. When did you begin with the IG?

A. I started with the IG in 1982.

Q. What was your position then?

A. At that point I was a clerk, came in,

MR. WILSON: This is an exact copy of what you have.

BY MR. JAMES:

Q. This is not a game, I understand.

Go ahead and tell me what you -- I'm looking at these for the first time.

A. Would you like an explanation of what these charts --

Q. I sure would.

A. Okay. The Office of Investigations does a monthly staffing report. And that's what this is a copy --

MR. JAMES: Let me stop for the minute. Do we want to mark these? Do you have copies, we can introduce these?

MR. WILSON: I have only that copy for our witness and the copy for you.

MR. JAMES: I can make more copies. Why don't we mark this as Plaintiff's Exhibit 2.

(Plaintiff's Exhibit 2
marked for identification.)

BY MR. JAMES:

Q. Thank you. We have Plaintiff's Exhibit 2. There's no pagination. But go ahead and walk us through these.

A. What these are, are the cover pages of a larger report that's a monthly staffing report that basically lists the number of 1811s. You'll see the first box goes by 1811s, professional, and support. And it goes by region, and then some of the headquarters divisions.

And then the next box goes into the grade levels and full-time, part-time, and so on. So if you --

Q. Let me just stop you for a minute. So it's Boston, New York, Philadelphia, Atlanta, Chicago. What's DAL?

A. Dallas.

Q. Dallas, Denver, San Francisco. What's WFO?

A. Washington Field Office.

Q. AIGI?

A. Assistant Inspector General for Investigations.

Q. That would be in the headquarters office?
A. That's the immediate office.
Q. And what is CID?
A. Criminal Investigations Division.
Q. And CAD?
A. I would have to refer back to that. I think it's Civil Administrative Division, but --
Q. Okay. And Office of Investigations, total, is I assume what OITO means?
A. Uh-huh.
Q. And then what does that next number mean?
A. Percentage of the total.
Q. Percentage of total --
A. Staff.
Q. -- staff in the Office of Investigations?
A. Right. If you look, it was -- I'm sorry, but the light's a little dim in here. It's 283 total investigators, of which that represented I guess that's 63 or 83.
Q. Of the total office?
A. Right, uh-huh.
Q. Okay. Now, what I don't understand is I

thought all the criminal investigators were criminal investigators.

Is CID different from the other offices or is there a division -- explain to me what CID means.

A. I would have to refer back to the functional statement which should have the criminal administrative -- or Civil Administrative Division in it, to be able to give you their duties.

Q. Let's come back to that.

MR. WILSON: That information appears in the Federal Register statements that were provided, a description of what each of those offices is, one of those separate components of the Office of Investigations.

MR. JAMES: Let's go off the record for a minute.

(Discussion off the record at 10:16 a.m.)

(Deposition resumed at 10:17 a.m.)

MR. JAMES: Let's go back on the record.

What I'm trying to get at is we have 283 criminal investigators in the Office of

Investigations, but only 12 are listed in the Criminal Investigation Division. I'm trying to figure out what I'm missing. But, yeah, if you want to explain to me, go ahead.

MR. WILSON: Well --

MR. RAYEL: Can we go off the record for a second?

(Discussion off the record at 10:17 a.m.)

(Deposition resumed at 10:18 a.m.)

BY MR. JAMES:

Q. Let's go back on the record.

What I'm trying to get at is within the Office of Investigations there are several units underneath it. I'm trying to figure out what the Criminal Investigation Division does.

A. It may be -- the Criminal Investigation Division is the CID. I apologize if I heard you incorrectly.

Each of the regional office locations reports through the CID. So each of the agents that are listed for each of the regional offices would be included under Criminal Investigations

Division. Should clarify that, that regional offices report through that division.

Q. Okay. That's my confusion. Because -- and let me just explain it. When I look at all the criminal investigators and I only see 12 in CID, one safe assumption might be that they're not part of CID.

But you're saying they do report through CID?

A. The 12 are the headquarters investigators that work in the headquarters division.

Q. Is it fair to say that the people in the field are considered part of CID?

A. Yes, sir.

Q. Thank you. That explains, that helps me.

Now, one of the things, the terminology when I talk to agents is confused, is Boston -- it's on your first page. Take any one of these cities.

Are they sub offices, field offices, regional offices? What was the terminology in the early '90s, if you recall now? Or what do you call

them?

A. I would have to say that the Boston regional office is what is reflected on that chart, of which there would be field offices underneath of them.

Q. You call them field offices, the offices underneath the regional office?

A. Yes, sir.

Q. Not material to this case, it's just every agency calls them different things. I'm just trying to get -- when I say somebody worked at a particular office, I've got the right characterization of the office. Okay.

Now, your next chart, you meant the employees on duty by grade, breaks out the number of people by grade, without reference to what their particular job series is.

A. Correct.

Q. Okay. And page 1 is up through 1987. Let me just see if they're all the same thing. I think these charts change.

A. Actually, the first page, if I can just

clarify, is for the month -- well, from August 30th through September of that year. So you had used "through," "up through." It's just for that snapshot.

Q. Correct. And the last page of that collection of documents is through September 30th, 1995. Tell me whether you know, presumably Social Security is gone by this point in time?

A. Yes, sir.

Q. And -- okay. And I have to assume that it's safe, if I go back to March or an April time period, I'm going to see how many criminal investigators have left. That would probably give me a good understanding how many got transferred to Social Security, if you have a hundred down from one quarter to the next?

A. (Nods head up and down.)

Q. You have to say something.

A. Yes, yes, it would show you that.

Q. Okay. The -- let me just go -- now, I have in that Exhibit Number 2, I have one, two, three -- I have nine pages. Behind those nine

pages or following after those nine pages is a document that says Office of Evaluation and Inspections, staffing report.

Do you understand what this document is?

A. What this is, is the Office of Evaluation and Inspections, which is a component of the OIG's staffing, as of that period of time of '95, just specifically that component.

Q. That particular office?

A. Uh-huh.

Q. Okay. We'll get to that.

Next page says FTE component allocations, the next two pages. The first one goes from 1990 to 2002. The second page, the same document but different date, goes from 1994 to 2004.

Could you explain to me what this shows?

A. Specifically the second page or both pages?

Q. Both. I believe the headings are the -- the headings are the same, just different years.

A. These documents were included in a transition book that included a lot of information.

It shows the FTE component allocation for the whole OIG for those years, those fiscal years.

Q. FTE meaning in our terms?

A. Full-time equivalent positions.

Q. Now, could you walk me across the top, these acronyms that you all know but that I don't?

A. The first one is the Office of Audit Services. The second one is Office of Investigations. The third is Office of Evaluation and Inspections. The fourth one, I would prefer to defer back to the functional statement.

Q. I'm sorry, OEC?

A. OEC. Again, I'd have to refer back on that one, I'm not sure.

Q. Okay.

A. Do you want me to continue?

Q. Correct, please.

A. The next one is the Office of Counsel to Inspector General. The next column is Executive Management. And then a column for Reserve. And then actual usage.

Q. What does actual usage mean?

A. Actual usage is how much of the FTE was actually used in that fiscal year compared to their allocated FTE.

Q. How many slots they had, is what you're saying, as opposed to how many were filled?

A. The very last column is how many slots they had. The actual usage is how much was actually used or estimated to be used in that year, depending upon the date of this. So for instance, the first, 1990, they used 1,402, but they had a ceiling of 1,415.

Q. 13 unfulfilled slots is what you're saying?

A. Correct.

Q. Okay. That's helpful. Thank you.

MR. JAMES: I trust you don't need copies of this?

MR. WILSON: No, I have it. That's a copy for you.

THE WITNESS: Do you want me to amend the column I wasn't sure of?

BY MR. JAMES:

Q. Please.

A. It's the Office of Enforcement and Compliance.

Q. Okay. Let's take a little time and have you just explain what each of these offices does, or if you know, or cite me back to the Federal Register. The Federal Registers are dated, they're 1985. There's some more current, but they're generally amendments and deletions.

A. Right.

Q. Sorry, '89. '89 is the most current.

MR. WILSON: There should be a '96.

MR. JAMES: '96 is beyond the time period.

MR. WILSON: Right, but it just shows you what was amended at the tail end of the time period. There's also a 1990, I believe, but it's just a minor correction.

MR. JAMES: Yes, it's just additions and deletions.

BY MR. JAMES:

Q. But let me just ask you, unless Will

objects, '96 is a reflection of what had been occurring or is it what is about to occur?

A. It would be what is about to occur in most cases. The functional statement is done in advance.

Q. Okay. So I'm really looking at the prior Federal Registers to figure out the structure of the office, okay.

I'm sorry OAS was what?

A. Office of Audit Services.

Q. And tell me about the Office of Audit Services. Is it -- do you know what those people do?

A. I would refer back to the functional statement for specific. It's much more drawn out, but the bottom line is that they conduct audits of the departmental programs.

Q. Have you ever worked with the auditors in the Office of Audit Services?

A. In an administrative role. I have not dealt with direct auditing.

Q. It's fair to say from your numbers that

there are significantly more auditors than there are criminal investigators?

A. Yes, sir.

Q. And again within this Office of Investigations, your second column, you're including support and professional personnel in there?

A. Yes. All columns include all staff for the particular component.

Q. Okay. Are you aware of the Chief Financial Officers Act of 1990?

A. Not with certainty that I could answer a question.

Q. Are you aware that that was passed in 1990 and gave the office of audit significantly more responsibility for auditing HHS trust funds?

A. No.

Q. You're not?

A. Not in that -- can't respond to that.

Q. Do you know how many HHS trust funds there are?

A. No, sir.

various other series during the years in question.

Q. Okay. So during the relevant time period, which is '88 through September 17th, '95, you have a significant staff in the Office of Evaluations and Inspections.

At some point it was called the Office of Analysis and Inspections. Is that what it's called now?

A. No.

Q. Do you recall it ever being called that?

A. The Office of Analysis and Inspections?

Q. Yeah.

A. There are some organizational charts that I believe you have that you will notice that underneath the deputy there is a box for the Office of Analysis and Inspections.

MR. JAMES: Let's mark this as Plaintiff's Exhibit Number 3.

(Plaintiff's Exhibit 3 marked for identification.)

MR. WILSON: We have copies of that. It's at the very front.

BY MR. JAMES:

Q. Would you identify Exhibit Number 3?

A. These are organizational charts for the Office of Inspector General for the period dated November of '89.

Q. And the charts behind the first page, what are they?

A. They're additional organizational charts that have different dates. The second chart, which doesn't have a date, but it does have in the bottom the file name which appears to be a 1991. Then the next --

Q. And you believe that the --

A. Yes, I believe that that is a date that it was done, which would indicate it was a '91 org chart.

Q. Okay.

A. The next chart is dated '95, as is the following. And the last chart is dated 1996.

Q. Let me just take the first page. It has the Inspector General. It has Mr. Wilson's office immediately under that, the General Counsel.

Could you just walk through that third line of Principal Deputy IG and Audit Services, Investigations?

A. That line is the line that annotates the deputies for the Office of Inspector General. The first box is the Principal Deputy Inspector General. And under him, the Management and Policy Office.

The next box over is the Deputy Inspector General for Audit Services, and then the five different groups that report to the deputy of audit services.

Q. You lost me on the five, because it crossed lines.

A. Underneath, if you look --

Q. I see, I'm sorry. There's no line drawn between the Office of Management and Policy and Public Health Services.

So underneath Audit Services there's audit policy and oversight; health care finance audit; Social Security audits; human, family and department service audits; and Public Health

Service audits.

And is that organized because those are the principal programs of HHS, they're broken into five operating components?

A. I believe those are the five primary areas of auditing. As you know, there are many, many programs of the department, I think over 300, but they may be focused in those major areas.

Q. And moving to the next one, the Deputy Attorney General for Investigation and Enforcement, correct -- tell me if I'm incorrectly characterizing the facts of your testimony.

The criminal investigations is where the criminal investigators, they report to that branch?

A. Yes.

Q. All right. Who's under the civil and administrative remedies? Who works there? Worked there.

A. I would have to defer back to the functional statement on that.

Q. Well, it tells what they did, but do you know who works there, what type of people work in

there, what they do?

A. No, sir.

Q. But if I look at the Federal Register I could find that out?

A. Uh-huh, uh-huh.

Q. Okay. Investigations, policy and oversight. Do you know who those people are?

A. Those tend to be the administrative area, such as the training individuals, the policy individuals, the administrative budget area would be in that office.

Q. And the next block on the right is Deputy Inspector General, Evaluations and Inspections.

Those are the people you showed me in the FTE chart?

A. Uh-huh.

Q. I think that's all I need to do with that.

Do you know anything about the training of law enforcement personnel during this period of time, what training they received?

A. During that point of time, no, I do not.