perience is required at GS-7 and the movement is from a one-grade interval series to a two-grade interval series. It is possible, of course, for an individual who is assigned to an Investigative Assistant, GS-1802-6, position to qualify for an Investigator, GS-1810-7 position on the basis of other kinds of specialized experience or education. For example, a person who is an Investigative Assistant, GS-1802-6, and has an appropriate bachelor's degree and a year of graduate work would probably meet the specialized experience requirement for GS-1810-7.

## (18)11 *(4-16-82)* 0338
## Criminal Investigating Series GS-1811

## (18)11.1 *(4-16-82)* 0338
## Single Agency Qualification Standard, GS-5/15

CRIMINAL INVESTIGATOR AND SUPERVISORY CRIMINAL INVESTIGATOR

GS-5/15

Treasury Enforcement Agent

(Department of the Treasury)

DESCRIPTION OF WORK

Treasury Enforcement Agents investigate criminal violations of Federal laws within the enforcement jurisdiction of the Department of the Treasury and conduct certain noncriminal investigations relating to the functions of the Department. Investigations involve surveillance, participation in raids, interviewing witnesses, interrogating suspects, searching for physical evidence and clues; seizures of contraband, equipment and vehicles; securing and serving search warrants; making arrests; inspecting records and documents, etc. The duties of the positions require the ability to recognize and develop evidence for orderly presentation to U.S. Attorneys and other legal officers; the ability to meet and confer with persons in all walks of life; the ability to testify effectively in court; the ability to prepare detailed written reports; proficiency in the use of firearms; skill in unarmed defense; and the exercise of judgment, resourcefulness and initiative. Some undercover phases of the work require that the agent live and associate with known criminals for varying periods of time.

The duties frequently require irregular unscheduled hours, and involve personal risks, exposure to all kinds of weather, arduous physical exertion under rigorous and unusual environmental conditions, and considerable travel. Persons selected may be stationed anywhere in the United States.

TYPES OF POSITIONS

Positions covered are:

*Bureau of Customs: U.S. Customs Service: Special Agents* conduct investigations relative to the prevention and detection of fraud affecting Customs revenue through under-evaluation of merchandise; smuggling of merchandise and contraband into or out of the United States; neutrality act violations involving illegal shipment of arms; allegations of suspected criminal violations involving Customs employees; and other Custom matters.

*Internal Revenue Service:* (a) *Special Agents (Criminal Investigation Division)* conduct investigations of alleged criminal violations of Federal tax law particularly those relating to income and wagering or gaming devices; make recommendations with respect to criminal prosecution and the assertion of Civil penalties against taxpayers; prepare comprehensive documented technical reports, including accounting analyses and summaries; and assist the United States Attorney in the preparation of the case during the trial. (b) *Inspectors (IRS—Internal Security)* conduct investigations of charges against Internal Revenue Service employees involving alleged or suspected criminal violations of sections of the Internal Revenue Code, violations of the Criminal Code or other Criminal Statutes, and character and security investigations of prospective employees of the Internal Revenue Service. Also conduct investigations of non-Service persons when their actions may affect the integrity of the Service or the safety of Service personnel.

*U.S. Secret Service: Special Agents* conduct investigations of violations of laws relating to the counterfeiting or forgery of the currency, obligations and securities of the United States and foreign governments and investigations in connection with other laws administered by the Department of the Treasury or as directed by the Secretary; protect the President and Vice President of the United States and their immediate families; former Presidents; their wives or widows; visiting foreign dignitaries and others.

*Bureau of Alcohol, Tobacco and Firearms: Special Agents* conduct investigations of violations of the Federal laws relating to explosives, firearms, illicit liquor, and tobacco. These investigations are designed to prevent and solve bombings; to detect illegal interstate transportation of explosives and firearms, and to control the illegal possession of these items by the criminal element. Also enforced are various laws governing possession of machine guns, destructive devices, and other weapons subject to registration. Special Agents work to prevent or detect illicit traffic in liquor or tobacco products and the diversion of raw materials to use in illicit production of distilled spirits.

# Federal Register

4–23–04
Vol. 69 No. 79

Friday
Apr. 23, 2004

Pages 21941–22376

HeinOnline -- 69 Fed. Reg. I 2004

not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities."

The Department does not believe that eliminating the 20-percent rule from the new standard test contravenes Congress' intent. By adding the 40-percent language in 1961, Congress intended that the 20-percent limitation in the "long" tests would not be used to prohibit employers from applying the exemption to retail and service employees, even if they spent more than 20 percent of their time in nonexempt work. Thus, this statutory language is a limitation on the Department's authority to define certain employees as *nonexempt*—not a Congressional declaration that the Department can never reconsider the 20-percent limitation. Congress could have imposed the 20-percent rule on all employees in 1961, but it did not. In fact, the primary duty approach of the final regulations was first adopted by the Department as part of the "short" tests in 1949. When Congress amended the FLSA in 1961, the primary duty tests were in effect and did not contain mandatory percentage limitations on nonexempt work. *See* 29 CFR 541.103 (50 percent is "rule of thumb"); *Jones*, 2003 WL 21699882, at *3 (the 50-percent "rule of thumb" is not dispositive). Congress did not act to abrogate the primary duty tests, and the Department believes that the "short" duties tests are in no way inconsistent with section 13(a)(1) of the Act.

In reaching its regulatory decisions, the Department is mindful of its obligations under the delegated statutory authority applicable in this situation, and other laws and Executive Orders that apply to the regulatory process, to define and delimit the "white collar" exemption criteria in ways that reduce unnecessary burdens (*e.g.*, the Paperwork Reduction Act, the Regulatory Flexibility Act, the Unfunded Mandates Reform Act, and Executive Orders 12866, 13272, and 13132). Under currently applicable guidelines, implementation of regulatory standards should, to the maximum extent possible within the limits of controlling statutory authority and intent, strike an appropriate balance and be compatible with existing recordkeeping and other prudent business practices, not unduly disruptive of them. Regulatory standards should also strive to apply plain, coherent, and unambiguous terminology that is easily understandable to everyone affected by the rules. Consequently, the Department has decided to adopt the proposed restructuring of the regulations into separate subparts containing standard tests under each category of the exemption, which do not include the former "long" test requirements that require calculating the 20-percent (or 40-percent in retail or service establishments) limits on the amount of time devoted to nonexempt tasks.

*Subpart A, General Regulations*

Proposed Subpart A included several general, introductory provisions scattered throughout the existing regulations. Proposed section 541.0 combined an introductory statement from existing section 541.99 and information currently located at section 541.5b regarding the application of the equal pay provisions in section 6(d) of the FLSA to employees exempt from the minimum wage and overtime provisions of the FLSA under section 13(a)(1). Proposed section 541.0 also provided new language to reflect legislative changes to the FLSA regarding computer employees and information regarding the new organizational structure of the proposed regulations. Proposed section 541.1 provided definitions of "Act" and "Administrator" from their current location in section 541.0. Finally, proposed section 541.2 provided a general statement that job titles alone are insufficient to establish the exempt status of an employee. This fundamental concept, equally applicable to all the exemption categories, currently appears in section 541.201(b) of the existing regulations regarding administrative employees.

The Department received few comments on these general regulations. Thus, Subpart A is adopted as proposed, except for the addition of a new section 541.3 entitled "Scope of the section 13(a)(1) exemptions" and a new section 541.4 entitled "Other laws and collective bargaining agreements." The Department adds these new sections in response to public commentary which evidenced general confusion, especially among employees, regarding the scope of the exemptions and the impact of these regulations on state laws and collective bargaining agreements.

The subsection 541.3(a) clarifies that the section 13(a)(1) exemptions and the Part 541 regulations do not apply to manual laborers or other "blue collar" workers who "perform work involving repetitive operations with their hands, physical skill and energy." Such employees "gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required of exempt learned professional employees such as medical doctors, architects and archeologists. Thus, for example, non-management production-line employees and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers and laborers are entitled to minimum wage and overtime premium pay under the Fair Labor Standards Act, and are not exempt under the regulations in this part no matter how highly paid they might be."

The new § 541.3(a) responds to comments revealing a fundamental misunderstanding of the scope and application of the Part 541 regulations among employees and employee representatives. To ensure employees understand their rights, the new subsection 541.3(a) clearly states that manual laborers and other "blue collar" workers cannot qualify for exemption under section 13(a)(1) of the FLSA. The description of a "blue collar" worker as an employee performing "work involving repetitive operations with their hands, physical skill and energy" was derived from a standard dictionary definition of the word "manual." *See, e.g., Adam* v. *United States*, 26 Cl. Ct. 782, 792–93 (1992) ("dictionary definition of 'manual' is, 'requiring or using physical skill and energy' "). The illustrative list of such "blue collar" occupations included in this subsection is the same language included in the proposed and final section 541.601 on highly compensated employees.

Section 541.3(b)(1) provides that the section 13(a)(1) exemptions and these regulations also do not apply to "police officers, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole or probation officers, park rangers, fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation

or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or similar work.'' Final subsection 541.3(b)(2) provides that such employees do not qualify as exempt executive employees because their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof as required under section 541.100. Thus, for example, "a police officer or fire fighter whose primary duty is to investigate crimes or fight fires is not exempt under section 13(a)(1) of the Act merely because the police officer or fire fighter also directs the work of other employees in the conduct of an investigation or fighting a fire.'' Final subsection 541.3(b)(3) provides that such employees do not qualify as exempt administrative employees because their primary duty is not the performance of work directly related to the management or general business operations of the employer or the employer's customers as required under section 541.200. Final subsection 541.3(b)(4) provides that such employees do not qualify as exempt learned professionals because their primary duty is not the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction or the performance of work requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor as required under section 541.300. Final subsection 541.3(b)(4) also states that "although some police officers, fire fighters, paramedics, emergency medical technicians and similar employees have college degrees, a specialized academic degree is not a standard prerequisite for employment in such occupations.''

This new subsection 541.3(b) responds to commenters, most notably the Fraternal Order of Police, expressing concerns about the impact of the proposed regulations on police officers, fire fighters, paramedics, emergency medical technicians (EMTs) and other first responders. The current regulations do not explicitly address the exempt status of police officers, fire fighters, paramedics or EMTs. This silence in the current regulations has resulted in significant federal court litigation to determine whether such employees meet the requirements for exemption as executive, administrative or professional employees.

Most of the courts facing this issue have held that police officers, fire fighters, paramedics and EMTs and similar employees are not exempt because they usually cannot meet the requirements for exemption as executive or administrative employees. In *Department of Labor* v. *City of Sapulpa, Oklahoma*, 30 F.3d 1285, 1288 (10th Cir. 1994), for example, the court held that fire department captains were not exempt executives because they were not in charge of most fire scenes; had no authority to call additional personnel to a fire scene; did not set work schedules; participated in all the routine manual station duties such as sweeping and mopping floors, washing dishes and cleaning bathrooms; and did not earn much more than the employees they allegedly supervised. In *Reich* v. *State of New York*, 3 F.3d 581, 585–87 (2nd Cir. 1993), *cert. denied*, 510 U.S. 1163 (1994), the court granted overtime pay to police investigators whose duties included investigating crime scenes, gathering evidence, interviewing witnesses, interrogating and fingerprinting suspects, making arrests, conducting surveillance, obtaining search warrants, and testifying in court. The court held that such police officers are not exempt administrative employees because their primary duty is conducting investigations, not administering the affairs of the department itself. *See also Bratt* v. *County of Los Angeles*, 912 F.2d 1066, 1068–70 (9th Cir. 1990) (probation officers who conduct investigations and make recommendations to the court regarding sentencing are not exempt administrative employees), *cert. denied*, 498 U.S. 1086 (1991); *Mulverhill* v. *State of New York*, 1994 WL 263594 (N.D.N.Y. 1994) (investigators of environmental crimes who carry firearms, patrol a sector of the state and conduct covert surveillance, and rangers who prevent and suppress forest fires, are not exempt administrative employees).

Similarly, federal courts have held that police officers, paramedics, EMTs, and similar employees are not exempt professionals because they do not perform work in a "field of science or learning'' requiring knowledge "customarily acquired by a prolonged course of specialized intellectual instruction'' as required under the current and final section 541.301 of the regulations. The paramedic plaintiffs in *Vela* v. *City of Houston*, 276 F.3d 659, 674–676 (5th Cir. 2001), for example, were required to complete 880 hours of classroom training, clinical experience and a field internship. The EMT plaintiffs were required to complete 200 hours of classroom training, clinical experience and a field internship. The court held that the paramedics and EMTs were not exempt professionals because they were not required to have a college degree. *See also Dybach* v. *State of Florida Department of Corrections*, 942 F.2d 1562, 1564–65 (11th Cir. 1991) (probation officer held not exempt professional because the required college degree could be in any field—"'nuclear physics, or * * * corrections, or * * * physical education or basket weaving'''—not in a specialized field); *Fraternal Order of Police, Lodge 3* v. *Baltimore City Police Department*, 1996 WL 1187049 (D. Md. 1996) (police sergeants and lieutenants held not exempt professionals, even though some possessed college degrees, because college degrees were not required for the positions); *Quirk* v. *Baltimore County, Maryland*, 895 F. Supp. 773, 784–86 (D. Md. 1995) (certified paramedics required to have a high school education and less than a year of specialized training are not exempt professionals).

The Department has no intention of departing from this established case law. Rather, for the first time, the Department intends to make clear in these revisions to the Part 541 regulations that such police officers, fire fighters, paramedics, EMTs and other first responders are entitled to overtime pay. Police sergeants, for example, are entitled to overtime pay even if they direct the work of other police officers because their primary duty is not management or directly related to management or general business operations; neither do they work in a field of science or learning where a specialized academic degree is a standard prerequisite for employment.[7]

Finally, such police officers, fire fighters, paramedics, EMTs and other public safety employees also cannot qualify as exempt under the highly compensated test in final section 541.601. As discussed below, final section 541.601(b) provides that the highly compensated test "applies only to employees whose primary duty includes performing office or non-manual work.'' Federal courts have recognized that

[7] In addition to the case law and comments cited above, when drafting this new section, the Department also looked to the definitions of "fire protection activities'' and "law enforcement activities'' contained in Sections 3(y) and 7(k) of the FLSA, and their implementing regulations at 29 CFR 553.210 and 553.211, which allow public agencies to pay overtime to fire and law enforcement employees based on a 7 to 28 day period, rather than the 40-hour workweek. These sections do not govern exempt status under section 13(a)(1) and, thus, are illustrative but not determinative of duties performed by nonexempt fire and law enforcement employees. *See* 29 CFR 553.216.

HeinOnline -- 69 Fed. Reg. 22129 2004

such public safety employees do not perform "office or non-manual" work. *Adam* v. *United States*, 26 Cl. Ct. at 792–93, for example, involved border patrol agents who spent a significant amount of time in the field, wore "uniforms and black work boots," and used "a handgun, a baton, night-vision goggles, and binoculars." Their work required "frequent and recurring walking and running over rough terrain, stooping, bending, crawling in restricted areas such as culverts, climbing fences and freight car ladders, and protecting one's self and others from physical attacks." Their work also involved "high speed pursuits, boarding moving trains and vessels, and physical threat while detaining and arresting illegal aliens, smugglers, and other criminal elements." The court held that these border patrol agents are not exempt from the FLSA overtime requirements, stating that the "level of physical effort required in the environment described plainly cannot be characterized as 'office or other predominately nonmanual work.' A dictionary definition of 'manual' is, 'requiring or using physical skill and energy.' * * * Non-manual work, therefore, would not call for significant use of physical skill or energy. Certainly, the agents' job duties do not fit that definition." *See also, Roney* v. *United States*, 790 F. Supp. 23, 25 (D.D.C. 1992) (Deputy U.S. Marshal entitled to overtime pay where position requires "'physical strength and stamina to perform such activities as long periods of surveillance, pursuing and restraining suspects, carrying heavy equipment'" and the employee "'may be subject to physical attack, including the use of lethal weapons'") (citation omitted).

Federal courts have found high-level police and fire officials to be exempt executive or administrative employees only if, in addition to satisfying the other pertinent requirements, such as directing the work of two or more other full time employees as required for the executive exemption, their primary duty is performing managerial tasks such as evaluating personnel performance; enforcing and imposing penalties for violations of the rules and regulations; making recommendations as to hiring, promotion, discipline or termination; coordinating and implementing training programs; maintaining company payroll and personnel records; handling community complaints, including determining whether to refer such complaints to internal affairs for further investigation; preparing budgets and controlling expenditures; ensuring operational readiness through supervision and inspection of personnel, equipment and quarters; deciding how and where to allocate personnel; managing the distribution of equipment; maintaining inventory of property and supplies; and directing operations at crime, fire or accident scenes, including deciding whether additional personnel or equipment is needed. *See, e.g., West* v. *Anne Arundel County, Maryland*, 137 F.3d 752 (4th Cir.) (EMT captains and lieutenants), *cert. denied*, 525 U.S. 1048 (1998); *Smith* v. *City of Jackson, Mississippi*, 954 F.2d 296 (5th Cir. 1992) (fire chiefs); *Masters* v. *City of Huntington*, 800 F. Supp. 363 (S.D.W. Va. 1992) (fire deputy chiefs and captains); *Simmons* v. *City of Fort Worth, Texas*, 805 F. Supp. 419 (N.D. Tex. 1992) (fire deputy and district chiefs); *Keller* v. *City of Columbus, Indiana*, 778 F. Supp. 1480 (S.D. Ind. 1991) (fire captains and lieutenants). Another important fact considered in at least one case is that exempt police and fire executives generally are not dispatched to calls, but rather have discretion to determine whether and where their assistance is needed. *See, e.g., Anderson* v. *City of Cleveland, Tennessee*, 90 F. Supp.2d 906, 909 (E.D. Tenn. 2000) (police lieutenants "monitor the radio in order to keep tabs on their men and determine where their assistance is needed").[8]

A new section 541.4 highlights that the FLSA establishes a minimum standard that may be exceeded, but cannot be waived or reduced. *See Brooklyn Savings Bank* v. *O'Neil*, 324 U.S. 697, 706 (1945). Section 18 of the FLSA states that employers must comply "with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum * * * or a maximum workweek lower than the maximum workweek established under the Act." 29 U.S.C. 218. Similarly, employers, on their own initiative or in collective bargaining negotiations with a labor union, are not precluded by the FLSA from providing a wage higher than the statutory minimum, a shorter workweek than provided by the FLSA, or a higher overtime premium (double time, for example) than provided by the FLSA. *See, e.g., Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 739 (1981) ("In contrast to the Labor Management Relations Act, which was designed to minimize industrial strife and to improve working conditions by encouraging employees to promote their interests collectively, the FLSA was designed to give specific minimum protections to individual workers and to ensure that each employee covered by the Act would receive '[a] fair day's pay for a fair day's work' and would be protected from 'the evil of overwork as well as underpay.'") (citation omitted); *NLRB* v. *R & H Coal Co.*, 992 F.2d 46 (4th Cir. 1993) (purpose of FLSA is to guarantee minimum level of compensation to workers, regardless of outcome of bargaining process; by contrast, purpose of National Labor Relations Act is to facilitate collective bargaining process and ensure that its outcome is enforced). Thus, the new section 541.4 states: "The Fair Labor Standards Act provides minimum standards that may be exceeded, but cannot be waived or reduced. Employers must comply, for example, with any Federal, State or municipal laws, regulations or ordinances establishing a higher minimum wage or lower maximum workweek than those established under the Act. Similarly, employers, on their own initiative or under a collective bargaining agreement with a labor union, are not precluded by the Act from providing a wage higher than the statutory minimum, a shorter workweek than the statutory maximum, or a higher overtime premium (double time, for example) than provided by the Act. While collective bargaining agreements cannot waive or reduce the Act's protections, nothing in the Act or the regulations in this part relieves employers from their contractual obligations under collective bargaining agreements."

*Subpart B, Executive Employees*

Section 541.100 General Rule for Executive Employees

The Department's proposal streamlined the existing regulations by adopting a single standard duties test in proposed section 541.100. The proposed standard duties test provided that an exempt executive employee must: have a primary duty of managing the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; customarily and regularly direct the work of two or more other employees; and have the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other

[8] Some police officers, fire fighters, paramedics and EMTs treated as exempt executives under the current regulations may be entitled to overtime under the final rule because of the additional requirement in the standard duties test that an exempt executive must have the authority to "hire or fire" other employees or make recommendations given particular weight on hiring, firing, advancement, promotion or other change of status.

HeinOnline -- 69 Fed. Reg. 22130 2004

Section 541.201 Directly Related to Management or General Business Operations

The proposed section 541.201 defined the phrase "related to the management or general business operations" as referring "to the type of work performed by the employee" and requiring that the exempt administrative employee "perform work related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product." The proposal also provided examples of the types of work that generally relate to management or general business operations, including work in areas such as tax, finance, accounting, auditing, quality control, advertising, marketing, research, safety and health, personnel management, human resources, labor relations, and others. Finally, the proposal stated that an employee also may qualify for the administrative exemption if the "employee performs work related to the management or general business operations of the employer's customers," such as employees acting as advisers and consultants to their employer's clients or customers.

The Department made two changes in the final subsection 541.201(a). *First*, for the reasons discussed above, the final rule reinserts the word "directly" throughout this section. Some commenters argue that the deletion of the word "directly" from the existing regulations would allow the exemption for an employee whose duties relate only indirectly or tangentially to administrative functions. The Department did not intend any substantive change by deletion of the word "directly" in the proposal, and thus has reinserted this term to ensure that the administrative duties test is not interpreted as allowing the exemption to apply to employees whose primary duty is only remotely or tangentially related to exempt work. *Second*, the words "retail or service establishment" have been reinserted from the current rule in the phrase: "as distinguished, for example, from working on a manufacturing production line or selling a product *in a retail or service establishment*." This addition returns the regulatory text more closely to the current section 541.205(a): "as distinguished from 'production' or, in a retail or service establishment, 'sales' work." Commenters state that deletion of the words "retail or service establishment" could be interpreted as denying the administrative exemption to any employee engaged in any sales, advertising, marketing or promotional activities. Because no such categorical change was intended, or is supported by current case law, the Department has restored the language from the current regulations. *See, e.g., Reich* v. *John Alden Life Insurance Co.*, 126 F.3d 1, 9–10 (1st Cir. 1997) (promoting sales in the insurance industry is exempt administrative work). The Department also notes that this phrase begins with the words "for example." This final phrase in section 541.201(a) provides non-exclusive examples. Thus, the concern of commenters such as the Rudy, Exelrod & Zieff law firm that the reference to "working on a manufacturing production line" suggests that "working on what might be termed a 'white collar production line' is different from working on a manufacturing production line for purposes of the exemption" is unfounded.

The primary focus of most comments on subsection 541.201(a) dealt with the so-called 'production versus staff' dichotomy. The preamble to the proposal stated that the Department intended "to reduce the emphasis on the so-called "production versus staff" dichotomy in distinguishing between exempt and nonexempt workers, while retaining the concept that an exempt administrative employee must be engaged in work related to the management or general business operations of the employer or of the employer's customers."

Many commenters, including the Society for Human Resource Management (SHRM), the FLSA Reform Coalition, the National Association of Manufacturers (NAM), the U.S. Chamber of Commerce (Chamber), the HR Policy Association, the Morgan, Lewis & Bockius law firm and the Fisher & Phillips law firm, strongly support the proposal's intended diminution of the production versus staff dichotomy, which they believe has little value in today's service-oriented economy. For example, the Chamber states that the dichotomy "does not fit in today's workplace" because the "decline in manufacturing and the rise in the service and information industries has rendered the production dichotomy an artifact of a different age." SHRM "applauds the Department's elimination of much of the 'production v. staff' language" but also "recognizes that the production versus staff in some circumstances can be a helpful aid in determining whether an employee fits under the administrative exemptions and, therefore, supports the proposed language. * * * This language strikes a proper balance between retaining this concept and ensuring that it is not so strictly construed so as to deny the exemption to an employee who should be exempt." Similarly, NAM supports the proposed rule's attempt to "reduce the emphasis on the production versus staff dichotomy."

However, many of these commenters believe that the proposal did not go far enough, and that the final rule should strive to eliminate the dichotomy entirely. For example, the FLSA Reform Coalition states that the dichotomy should be eliminated by allowing an employee to qualify for the exemption either by performing work related to management or general business operations, or by doing any work that includes the exercise of discretion and independent judgment: "Thus, even if the employee's work could arguably be characterized as "production," he or she would nonetheless be an exempt administrative employee if his or her job is a responsible, non-manual one that includes the exercise of 'discretion and independent judgment.' " Similarly, the HR Policy Association recommends that the Department "eliminate the production dichotomy from the administrative exemption" because the confusion it causes is too great and it is difficult to apply with uniformity. The Fisher & Phillips law firm also states that the Department should "eliminate the 'dichotomy' altogether."

The primary focus of these comments was the last sentence in proposed subsection (a), which states that the administrative exemption does not apply if an employee is "working on manufacturing production line or selling a product." Numerous commenters ask for clarification about the scope and meaning of the statement. For example, the Morgan, Lewis & Bockius law firm requests clarification that not all sales work is excluded from exemption, such as advertising, marketing and promotional activities, and for confirmation that some individuals who work on a production line, such as a safety and health administrator or quality control specialist, may still be exempt. The U.S. Chamber of Commerce also states that the Department should "revisit its approach, especially with regard to treatment of employees who may be involved in some aspect of sales," and should clarify that sales work is not inherently inconsistent with exempt work. The HR Policy Association recommends that the Department delete the "working on a manufacturing production line or selling a product" phrase, or else clarify its meaning either in the regulations or this preamble.

HeinOnline -- 69 Fed. Reg. 22140 2004

A large number of commenters have the opposite view about the "production versus staff" dichotomy, stating that minimizing or deleting the dichotomy would deprive the administrative exemption of its meaning. Such commenters, including the AFL–CIO, the National Treasury Employees Union, the American Federation of State, County and Municipal Employees, the Rudy, Exelrod & Zieff law firm, the National Employment Lawyers Association, the American Federation of Television and Radio Artists, the National Partnership for Women and Families and the Stoll, Stoll, Berne Lokting & Shlachter law firm, believe that the courts have found the dichotomy to be a useful and appropriate tool in analyzing workers in a broad variety of non-manufacturing contexts. They oppose any indication that the Department is minimizing the dichotomy.

For example, the AFL–CIO notes that the 1949 Weiss report explained that the phrase "directly related to management policies or general business operations" describes those activities "relating to the administrative as distinguished from the 'production' operations of a business." Similarly, the 1940 Stein Report described administrative exempt employees as "those who can be described as staff rather than line employees, or functional rather than departmental heads." The AFL–CIO quotes *Reich* v. *New York*, 3 F.3d 581, 588 (2nd Cir. 1993), *cert. denied*, 510 U.S. 1163 (1994), stating that the dichotomy "has repeatedly proven useful to courts in a variety of non-manufacturing settings," and cites a number of court decisions applying the dichotomy in a variety of government and service sector contexts. The National Treasury Employees Union states that the "distinction which the Department would so casually discard is a key tool to help identify the specific class of office workers that Congress intended to exempt: support staff contributing to business operations and management. It is imperative to keep this narrow focus rather than blur the distinction between support staff and line workers * * *." The Rudy, Exelrod & Zieff law firm notes that, prior to 1940, the Department did not separately define the administrative exemption from the executive exemption, because the Department recognized that the administrative exemption "was intended to cover no more than a small subclass of 'executive' employees." The firm states that the 1940 Stein Report concluded that the employees whom the administrative exemption was intended to cover had "functional rather than departmental authority," meaning they did not "give orders to individuals." The firm argues that nothing in the modern workplace, involving production of services instead of manufactured goods, makes it improper to continue to draw the line between employees who help to administer an employer's general business operations and those employees whose duties are related to the day-to-day production of the goods or services the employer sells.

Commenters, thus, have very different perspectives about how the Department should approach the "production versus staff" dichotomy and apply it to the modern workplace. Except as stated above, we have not adopted any of the commenters' suggestions for substantial changes to the primary duty standard in section 541.201(a). The Department believes that our proposal struck the proper balance on the "production versus staff" dichotomy. We do not believe that it is appropriate to eliminate the concept entirely from the administrative exemption, but neither do we believe that the dichotomy has ever been or should be a dispositive test for exemption. The Department believes that the dichotomy is still a relevant and useful tool in appropriate cases to identify employees who should be excluded from the exemption. As the Department recognized in the 1949 Weiss Report at 63, this exemption is intended to be limited to those employees whose duties relate "to the administrative as distinguished from the 'production' operations of a business." Thus, it relates to employees whose work involves servicing the business itself—employees who "can be described as staff rather than line employees, or as functional rather than departmental heads." 1940 Stein Report at 27. The 1940 Stein Report further described the exemption as being limited to employees who have "miscellaneous policy-making or policy-executing responsibilities" but who do not give orders to other employees. 1940 Stein Report at 4. Based on these principles, the Department provided in proposed section 541.201(a) that the administrative exemption covers only employees performing a particular type of work—work related to assisting with the running or servicing of the business. The examples the Department provided in proposed section 541.201(b) were intended to identify departments or subdivisions that generally fit this rule.

The Department's view that the "production versus staff" dichotomy has always been illustrative—but not dispositive—of exempt status is supported by federal case law. In *Bothell* v. *Phase Metrics*, Inc., 299 F.3d 1120 (9th Cir. 2002), for example, the Ninth Circuit found the dichotomy "useful only to the extent that it helps clarify the phrase 'work directly related to the management policies or general business operations.' " *Id.* at 1126 (citation omitted). The court further stated:

> The other pertinent cases from our sister circuits similarly regard the administration/production dichotomy as but one piece of the larger inquiry, recognizing that a court must 'construe the statutes and applicable regulations as a whole.' Indeed, some cases analyze the primary duty test without referencing the § 541.205(a) dichotomy at all. This approach is sometimes appropriate because, as we have said, the dichotomy is but one analytical tool, to be used only to the extent that it clarifies the analysis. Only when work falls 'squarely on the production side of the line,' has the administration/production dichotomy been determinative.
>
> * * * * *
>
> Moreover, the distinction should only be employed as a tool toward answering the ultimate question, whether work is 'directly related to management policies or general business operations,' not as an end in itself.

*Id.* at 1127 (citations omitted). *See, e.g., Piscione* v. *Ernst & Young, L.L.P.*, 171 F.3d 527, 538–39 (7th Cir. 1999) (even though the employee "produced" some reports and filings, and such work might be viewed as production work, the work was directly related to the management or general business operations); *Spinden* v. *GS Roofing Products Co.*, 94 F.3d 421, 428 (8th Cir. 1996) (employee held administratively exempt despite the fact that he "produced" certain specific outputs), *cert. denied*, 520 U.S. 1120 (1997).

The final regulation is consistent with the Ninth Circuit's approach in *Phase Metrics:* the "production versus staff" dichotomy is "one analytical tool" that should be used "toward answering the ultimate question," and is only determinative if the work "falls squarely on the production side of the line."

As noted above, proposed section 541.201(b) provided an illustrative list of the types of functional areas or departments, including accounting, auditing, marketing, human resources and public relations, typically administrative in nature. The commenters generally found this illustrative list to be accurate and helpful. For example, the FLSA Reform Coalition states that it supported the Department's efforts to clarify the administrative exemption by "focusing on the function performed by the employee and providing examples of exempt, administrative functions." The AFL–CIO comments that the list includes areas "which are clearly

HeinOnline -- 69 Fed. Reg. 22141 2004

encompassed within the servicing functions of a business, and which substantially overlap with the servicing examples set forth in current section 541.205(b)." The U.S. Chamber of Commerce also notes that the list is similar to the examples in the existing regulations and agrees that all of the areas listed in the proposed regulation "are proper illustrations of exempt administrative work." Some commenters suggest a variety of additional areas of work that should be added to the illustrative list. However, the National Treasury Employees Union cautions against exempting workers based upon their job area or title. Other commenters similarly suggest that the Department should include fewer categories in the list, because employees doing routine work may be misperceived as exempt simply because they work in an area like marketing, human resources, or research.

In light of these comments, we have added the language, "but is not limited to," to emphasize that the list is intended only to be illustrative. It is not intended as a complete listing of exempt areas. Nor is it intended as a listing of specific jobs; rather, it is a list of functional areas or departments that generally relate to management and general business operations of an employer or an employer's customers, although each case must be examined individually. Within such areas or departments, it is still necessary to analyze the level or nature of the work (*i.e.*, does the employee exercise discretion and independent judgment as to matters of significance) in order to assess whether the administrative exemption applies. Commenters recommend the inclusion of several areas that we think are appropriate as additional examples of areas that generally relate to management and general business operations. Therefore, we are adding computer network, internet and database administration; legal and regulatory compliance; and budgeting to the illustrative list.

Finally, proposed section 541.201(c) provided that employees who perform work related to the management or general business operations of the employer's customers, such as advisers and consultants, also may qualify for the administrative exemption. The proposed rule included language from existing sections 541.2(a)(2) and 541.205(d), and no substantive changes were intended. The commenters express few substantive concerns with this provision. A small number of commenters suggest that the regulation should provide that the employer's customer could be an individual, while commenter Karen Dulaney Smith urges the Department to insert the word 'business' to clarify that the exemption does not apply to "individuals, whose "business" is purely personal." The Department has not made either change. Nothing in the existing or final regulations precludes the exemption because the customer is an individual, rather than a business, as long as the work relates to management or general business operations. As stated by commenter Smith, the exemption does not apply when the individual's 'business' is purely personal, but providing expert advice to a small business owner or a sole proprietor regarding management and general business operations, for example, is an administrative function. The 1949 Weiss Report stated that the administrative exemption should not be read to exclude "employees whose duties relate directly to the management policies or to the general business operations of their employers' customers. For example, many bona fide administrative employees perform important functions as advisors and consultants but are employed by a concern engaged in furnishing such services for a fee * * *. Such employees, if they meet the other requirements of the regulations, should qualify for exemption regardless of whether the management policies or general business operations to which their work is directly related are those of the employers' clients or customers, or those of their employer." 1949 Weiss Report at 65. Weiss also noted that a consultant employed by a firm of consultants is exempt if the employee's "work consists primarily of analyzing, and recommending changes in, the business operations of his employer's client." 1949 Weiss Report at 56. This provision is meant to place work done for a client or customer on the same footing as work done for the employer directly, regardless of whether the client is a sole proprietor or a Fortune 500 company, as long as the work relates to "management or general business operations."

Section 541.202 Discretion and Independent Judgment (Proposed "Position of Responsibility")

As discussed above, the Department has decided to eliminate the proposed "position of responsibility" requirement. Thus, the final rule deletes proposed section 541.202 defining "position of responsibility," proposed section 541.203 defining "substantial importance," and proposed section 541.204 defining "high level of skill or training." Instead, the final rule reinserts the "discretion and independent judgment" requirement, and defines that term at final section 541.202. Some of the language in proposed sections 541.203 and 541.204 was retained from the existing regulations and also appears in the final regulations as described below. The language from proposed section 541.204 regarding the use of manuals has been moved to a new section in Subpart H, Definitions and Miscellaneous Provisions, and is discussed under that subpart.

The Department continues to believe, as most commenters confirm, that the current discretion and independent judgment standard has caused confusion and unnecessary litigation. Even in the 1949 Weiss Report, the Department recognized that the "discretion and independent judgment" standard was somewhat subjective, and the difficulty of applying the standard consistently has increased with the passing decades. As evidenced by the increasing court litigation, it has become progressively more difficult to apply the standard with the creation of many new jobs that did not exist 50 years ago. Nonetheless, the vast majority of commenters express concern that abandoning the "discretion and independent judgment" standard entirely would create even more uncertainty and litigation. We also recognize the benefit of retaining the standard in some form so as not to jettison completely decades of federal court decisions and agency opinion letters.

Accordingly, while retaining this standard from the existing regulations, final section 541.202 clarifies the definition of discretion and independent judgment to reflect existing federal case law and to eliminate outdated and confusing language in the existing interpretive guidelines. The Department intends the final rule to clarify the existing standard and to make the standard easier to understand and apply to the 21st Century workplace.

Final section 541.202(a) thus restates the requirement that the exempt administrative employee's primary duty must "include" the exercise of discretion and independent judgment and includes the general definition of this term, taken word-for-word from the existing interpretive guideline at subsection 541.207(a): "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." The requirement that the primary duty must "include" the

HeinOnline -- 69 Fed. Reg. 22142 2004

resulting from the *deminimis* differences in the standard duties tests compared to the current short duties tests (see the discussions presented below).

2.2 Impact of the Final Duties Test for Executive Employees

Although some commenters asserted the proposed duties test for executive employees would reduce overtime protection for workers, as discussed in the preamble above and shown in Table 2–2, the final standard duties test for executives, like the proposed duties test, is stronger than the current short duties test because it incorporates an additional requirement taken from the current long duties test: An exempt executive must have authority to hire or fire other employees, or the exempt executive's suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees must be given particular weight. The final rule also returns to the language in the current rule "whose primary duty" is management, instead of the proposed rule's "with a primary duty" of management.

Because of these changes, the Department concludes the standard duties test for executive employees in the proposed and final regulations is more protective than the current short test and some workers may gain overtime protection. However, this number is too small to estimate quantitatively given the data limitations presented below in Chapter 3.

TABLE 2–2.—COMPARING THE DUTIES TEST FOR EXECUTIVE EMPLOYEES

| Salary level | Current short test $250 per week | Final standard test $455 per week |
|---|---|---|
| Duties | Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and<br>Who customarily and regularly directs the work of two or more other employees. | Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;<br>Who customarily and regularly directs the work of two or more other employees; and<br>Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. |

2.3 Impact of the Final Duties Tests for Administrative Employees

The proposed duties tests for administrative employees generated a significant number of comments. As discussed in the preamble above, the final rule's duties test for administrative employees is significantly different than the test contained in the proposed rule. In drafting the final language, the Department sought to avoid introducing new terms (such as "position of responsibility") that generated confusion in the comments on the proposal and to retain terms (such as "primary duty," "discretion and independent judgment" and "general business operations") that are used in the current rule and have been clarified by court decisions and opinion letters. The final regulatory text also requires that the discretion and independent judgment must be exercised "with respect to matters of significance," language that appears only in the current interpretive guidelines and not the existing regulatory text.

As Table 2–3 indicates, the standard duties test for administrative employees in the final rule is very similar, if not functionally identical, to the current short duties test when the current interpretive guidelines are taken into account as would be appropriate. Based on the significant changes the Department made in the final rule to return the administrative duties test to the structure in the current rule, the Department has concluded that the standard duties test for administrative employees in the final rule is as protective as the current short test. Therefore, the Department has determined that very few, if any, workers will lose their right to overtime as a result of updating the current short test with the final standard duties test. However, this number is too small to estimate quantitatively given the data limitations presented below in Chapter 3.

TABLE 2–3.—COMPARING THE DUTIES TEST FOR ADMINISTRATIVE EMPLOYEES

| Salary level | Current short test $250 per week | Final standard test $455 per week |
|---|---|---|
| Duties | Whose primary duty consists of the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers; and<br>Which includes work requiring the exercise of discretion and independent judgment. | Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and<br>Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. |

2.4 The Impact of the Final Duties Tests for Learned Professional Employees

For reasons discussed in the preamble above, the final standard duties test for the learned professional exemption was modified from the proposed test to track the current rule's primary duty test and to restructure the proposed rule's reference to acquiring advanced knowledge through other means such as an equivalent combination of intellectual instruction and work experience so that it is consistent with the current regulation. As the preamble explains, the Department did not intend to depart from the current rule's educational requirements for the

learned professional exemption. Accordingly, the final rule clarifies that, just as under the current primary duty test, an employee must meet all three requirements of the test in order to be exempt—the primary duty must be performing work that requires advanced knowledge; the knowledge must be in a field of science or learning; and the knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction. The final rule also expands on each of those three components, using language from the current rule. For example, an employee's "work requiring advanced knowledge" must include work requiring the consistent exercise of discretion and judgment (see Table 2–4). The final standard duties test for learned professionals also adds language from the current long test in section 541.301(b) by defining work requiring advanced knowledge as work that is "predominantly intellectual in character" as distinguished from the "performance of routine mental, manual, mechanical or physical work." These revisions clarify that the final rule is at least as protective as current rule.

TABLE 2–4.—COMPARING THE DUTIES TEST FOR PROFESSIONAL EMPLOYEES

| Salary level | Current short test $250 per week | Final standard test $455 per week |
|---|---|---|
| Duties | Whose primary duty consists of the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study; and<br>Which includes work requiring the consistent exercise of discretion and judgment; or<br>Whose primary duty consists of the performance of work requiring invention, imagination, or talent in a recognized field of artistic endeavor. | Whose primary duty is the performance of work requiring knowledge of an advanced type (defined as work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment) in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or<br>Whose primary duty is the performance of work requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor. |

Other commenters expressed concern the proposed duties test for learned professionals would result in many workers in some occupations (*e.g.*, Licensed Practical Nurses, dental assistants, and cooks) losing overtime protection. Although most of the specific concerns raised by these comments were addressed by the Department's modifications to the proposed rule's professional duties test, discussed above, the Department notes the final rule clarifies a number of occupations. For example, Licensed Practical Nurses could not be classified as learned professionals because, unlike Registered Nurses, the possession of a specialized advanced academic degree is not a standard prerequisite for entry into that occupation. Therefore, the Department has determined very few, if any, workers will lose overtime protection as a result of updating the current short duties tests with the final standard duties test for learned professionals. However, this number is too small to estimate quantitatively given the data limitations presented below in Chapter 3.

2.5 The Impact of the Final Duties Test for Creative Professional Employees

As discussed in the preamble above, the comments stating the proposed revisions weakened the current duties tests illustrate the confusion and misunderstanding that surrounds the current short duties test for artistic professionals. The Department considers the language in the final rule to be a restatement of the artistic primary duty test in the current short test (see Table 2–4). Further, the final rule reflects current case law regarding the creative professional exemption for journalists while recognizing, as the current regulations do, that the duties of employees referred to as journalists vary along a wide spectrum from the nonexempt to the exempt (29 CFR 541.302(f)). Therefore, the Department considers the language in the final rule for creative professionals to be as protective as the current short test and that few, if any, creative professionals will lose overtime protection as the result of the revisions. However, this number is too small to estimate quantitatively given the data limitations presented below in Chapter 3.

2.6 The Impact of the Final Duties Tests for Teachers and the Practice of Law or Medicine

As discussed above in the preamble, contrary to the assertions made by some commenters, the proposed and final rule merely restate the current exclusions from the salary requirements and do not change the existing exemption criteria for teachers in educational establishments and licensed practitioners of law and medicine. The Department concludes these provisions in the final rule are not likely to result in any additional teachers in educational establishments, or licensed practitioners of law or medicine losing overtime protections compared to the current regulations.

2.7 The Impact of the Final Duties Tests for Computer Employees

Based on the comments received and for reasons discussed in the preamble above, several revisions were made in the final rule to align the current regulatory text with the specific standards adopted by Congress in 1996 for the computer employee exemption in section 13(a)(17) of the Act. As shown in Table 2–5, the Department considers the duties tests in the final regulations for computer employees to be functionally identical to those in the current regulations (section 541.303(b)) and statute (29 U.S.C. 213(a)(17)). Therefore, the Department concludes that it is unlikely that any additional employees will lose overtime protection as a result of the final duties tests for computer employees as compared to current law.

TABLE 2–5.—THE DUTIES TESTS FOR COMPUTER EMPLOYEES IN THE CURRENT AND FINAL REGULATIONS

| Salary | Current short test $250 per week | Section 13(a)(17) $27.63 an hour | Final standard test $455 per week or $27.63 an hour |
|---|---|---|---|
| Duties | Employed as a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker in the computer software field (as provided in 541.303).<br>Primary duty of performing work requiring theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering; and<br>Whose work requires the consistent exercise of discretion and judgment. | Employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is<br>(A) application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional applications;<br>(B) design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;<br>(C) design, documentation, testing, creation or modification of computer programs related to machine operating systems; or<br>(D) a combination of duties described in (A), (B) and (C), the performance of which requires the same level of skills. | The exemptions apply only to a computer employee whose primary duty consists of:<br>(1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;<br>(2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;<br>(3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or<br>(4) A combination of the aforementioned duties, the performance of which requires the same level of skills. |

2.8 The Impact of the Final Duties Tests for Outside Sales Employees

As discussed in the preamble above, the Department has determined that the application of the proposed primary duty test to the outside sales exemption is preferable to the 20 percent tolerance test. Utilization of the explicit primary duty concept also provides a consistent approach between the structure of the outside sales exemption and the exemptions for executive, administrative, and professional employees. Moreover, any potential issues under the final rule are addressed by the objective criteria and factors for determining an employee's primary duty that are contained in section 541.700. Therefore, the Department concludes that few, if any, employees would lose overtime protection as a result of the final revisions to the duties tests for outside sales employees. However, this number is too small to estimate quantitatively given the data limitations presented below in Chapter 3.

2.9 The Impact of the Final Rule on Police Officers, Fire Fighters, Paramedics, and Other First Responders

As discussed in the preamble above, the final rule expressly provides that the section 13(a)(1) exemptions do not apply to police officers, fire fighters, paramedics, emergency medical technicians (EMTs), and other first responders "regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work." Most courts have held that such workers generally are non-exempt because they typically do not perform the duties that are required for the executive or administrative exemption. Similarly, federal courts have held that police officers, paramedics, EMTs, and similar employees are not exempt professionals because they do not perform work requiring knowledge of an advanced type in a "field of science or learning" requiring knowledge "customarily acquired by a prolonged course of specialized intellectual instruction" as required under the current and final rules. The Department has no intention of departing from this established case law. Moreover, some police officers, firefighters, paramedics and EMTs treated as exempt executives under the current regulations may be entitled to overtime under the final rule because of the additional requirement in the standard duties test not found in the current short test that an exempt executive must have the authority to "hire or fire" other employees or make recommendations given particular weight on hiring, firing, advancement, promotion or other change of status. Therefore, the Department concludes that the executive duties tests for police officers, fire fighters, paramedics, EMTs, or other first responders in the final rule is more stringent than the current short tests and some such workers may actually gain overtime protection. However, this number is too small to estimate quantitatively given the data limitations presented below in Chapter 3.

2.10 The Impact of the Final Highly Compensated Test

Some employees earning $100,000 or more per year could lose overtime protection because of the less stringent duties test applicable to these employees under the highly compensated test adopted in the final regulations. However, the number of highly compensated employees earning $100,000 or more per year who could lose protection is relatively small—approximately 107,000 (see Chapter 4). Taking into account the differences in regional wage levels, the highly compensated test has been set high enough to avoid exempting employees who are likely to be otherwise entitled to overtime protection. Adopting a $100,000 salary level for the highly compensated test, increased from the proposed $65,000 level, will result in far fewer workers being reclassified as exempt compared to the proposed rule. Moreover, in the Department's enforcement experience, most salaried

MEMORANDUM OF UNDERSTANDING
BETWEEN THE FEDERAL BUREAU OF
INVESTIGATION AND THE OFFICE OF INSPECTOR GENERAL
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

This memorandum constitutes an agreement voluntarily entered into between the Office of Inspector General (OIG), U.S. Department of Health and Human Services (HHS), and the Federal Bureau of Investigation (FBI), Department of Justice.

A. PURPOSE

The purpose of this agreement is to establish policy for the FBI and the OIG for HHS with regard to the referral and investigation of matters of mutual interest.

B. APPLICABLE AUTHORITY

Public Law 94-505 established the Office of Inspector General in HHS, with statutory authority to conduct investigations relating to programs and operations of that Department.

The FBI derives its criminal investigative jurisdiction from Titles 18 and 28 of the United States Code, the Code of Federal Regulations and through the Attorney General of the United States.

Section 535 of Title 28, United States Code, sets forth the FBI's authority to investigate violations of Title 18 involving Government officers and employees. Further, this statute also imposes upon every Department and Agency head of the Executive Branch of the Government a duty to report expeditiously to the Attorney General any information, allegations, or complaints relating to possible violations of Title 18 involving officers or employees of the Government unless the responsibility to perform the investigation of that violation is, by law, specifically assigned otherwise.

C. POLICY

This memorandum acknowledges the role of the FBI in investigating criminal violations of Federal law and the statutory authority of the Inspector General to also investigate and report on criminal matters which involve the programs and operations of HHS.

MEMORANDUM OF UNDERSTANDING
OIG, HHS, and FBI

The purpose of this memorandum is to assure efficient and effective utilization of investigative resources in the investigation of allegations falling in concurrent areas of responsibility. To that end it is recognized that the efforts of the FBI will be directed at the investigation of criminal activity which involves HHS programs and functions, either referred by the OIG or initiated by the FBI.

The efforts of the OIG will be directed at the detection and prevention of fraud, waste and inefficiency and the conduct, supervision and coordination of OIG audits, criminal and civil investigations, and administrative inquiries relating to the programs, operations, and personnel of HHS.

D. RESPONSIBILITIES OF THE OIG

1. The OIG will refer to the FBI upon receipt specific allegations of bribery, attempted bribery, and other specific, significant allegations of fraud/corruption which culpably involve U.S. Government employees acting in their official capacity. OIG will continue to investigate those conflict of interest matters that arise in the context of ongoing investigations on other matters, or when the OIG is involved with another federal law enforcement agency in a joint investigation.

2. The OIG will refer to the FBI upon receipt all information pertaining to the element generally known as "organized crime" related matters, including both traditional (La Cosa Nostra) and nontraditional organizations whether or not the matter is considered prosecutable.

3. The OIG may investigate all other criminal matters arising from and pertaining to HHS programs, functions and personnel. In particular, the OIG will be responsible for investigating alleged criminal violations of the following HHS program statutes:

a. The Social Security Act (42 U.S.C. 406, 408, 707, 1383(d) (2), 1383a, 1395nn, and 1396h);

b. The Public Health Service Act (42 U.S.C. 261, 263a(h), 271, 300w-8, 300x-8, and 300y-10);

c. The Federal Food, Drug and Cosmetic Act (21 U.S.C. 331, 333);

d. Certain other statutes (26 U.S.C. 7213, 5 U.S.C. 552a(i), 21 U.S.C. 1175, 42 U.S.C. 1395ss and 42 U.S.C. 4582(f); and

e. Any other statute which pertains to program-specific crimes in the context of HHS programs.

4. The OIG will refer to the FBI those criminal matters which require resources or expertise not available within OIG. In cases involving major incidents and/or widespread or ongoing criminal activity where the OIG proceeds alone with an investigation, the OIG will notify FBI Headquarters of this fact.

5. The OIG will investigate noncriminal administrative and civil matters arising from and pertaining to HHS programs, functions and personnel. In particular, the OIG will have exclusive responsibility for investigation of civil fraud cases under section 1128A of the Social Security Act.

6. The OIG will be responsible for providing federal assistance to State investigative activities in the Medicaid program pursuant to sections 1903(a) (6), 1903(b) (3), and 1903(q) of the Social Security Act.

7. To the extent possible, the OIG will provide assistance to the FBI in the form of technical expertise, upon request.

8. The OIG will be the point of liaison functions between HHS and the FBI and will be responsible for the security, control and dissemination of FBI reports, or other communications written and oral. The OIG and the FBI will abide by the "third party rule" in regard to FBI and HHS documents respectively, i.e., the OIG and the FBI will obtain approval from the other prior to releasing documents originating with the other.

E. RESPONSIBILITIES OF THE FBI

1. The FBI will have the primary role in investigating bribery, attempted bribery and specific allegations of corruption which culpably involve U.S. Government employees. The FBI will respond to allegations of bribery within one workday or less, as appropriate. Consistent with the availability of resources the FBI will assume investigative responsibility for other significant criminal investigative matters referred by the OIG. The FBI will keep the OIG informed of the status of all cases referred by the OIG. The FBI will notify the OIG at the time any matter is declined for prosecution, so that the OIG may proceed to address the matter on a timely basis.

The primary objectives of these FBI investigations will be:

a. To provide evidence leading to the prosecution of individuals believed to have violated Federal criminal statutes;

b. As an ancillary result of a criminal investigation, to provide, through the OIG, information potentially useful to HHS in taking any necessary corrective action for the purpose of averting the recurrence of fraud, waste or inefficiency; and

c. As an ancillary result of a criminal investigation, to provide, through the OIG, information useful to HHS

in taking specific administrative action against HHS employees or other individuals or entities who were involved in the investigation.

2. The FBI maintains the option to investigate any criminal allegations involving HHS programs or functions, which the FBI receives independently. However, in cases where the FBI will need substantial staff assistance from OIG personnel, including OIG auditors, the case may be referred to the OIG.

3. The FBI will notify the OIG, as appropriate, of the initiation of investigations which are predicated on other than an OIG referral.

4. The FBI recognizes the importance of expeditious investigation and reporting in situations where:

a. The subject(s) of the investigation is an HHS employee or is being considered for HHS employment;

b. The subject(s) of the investigation is continuing to do business with HHS;

c. The subject(s) of the investigation is under consideration to receive benefits which would involve HHS.

5. Upon request the FBI will keep the OIG informed of significant developments during the investigation, unless disclosure might endanger the safety of FBI or other personnel, or otherwise have a potentially adverse impact upon the investigation.

6. The FBI will promptly furnish to the OIG a closing letterhead memorandum at the conclusion of an investigation, including a summary of the nature of any judicial action

taken. Prosecutive reports or other pertinent documents will be furnished upon written request.

Unless approved for release to the OIG by the appropriate district court or U.S. Attorney, the FBI will not provide Federal grand jury material. Other sensitive material, the disclosure of which is not deemed to be in the best interest of FBI operations, may likewise be withheld if it might tend to identify informants, confidential sources, or undercover Agents.

7. The FBI will use the OIG as the point of contact with the Department on any investigations pertaining to HHS programs, functions, and personnel.

8. The following services will be provided to the OIG by the FBI:

a. Appropriate name checks;

b. Laboratory examinations;

c. National Crime Information Center inquiries;

d. Appropriate identification record searches;

e. Desired relevant training to OIG personnel, as resources permit;

f. Any other services normally available to Federal investigative agencies.

F. <u>RESPONSIBILITIES CONCERNING JOINT ENDEAVORS BY THE FBI AND OIG</u>

1. The FBI and the OIG may agree to enter into joint investigative endeavors, including undercover operations, in appropriate circumstances. The specific details of

each endeavor, including resources to be committed, the delegation of responsibility, liabilities, etc., will be determined prior to the commencement of these endeavors. While differing circumstances will result in varied arrangements from project to project, certain conditions will always apply:

a. Participating personnel will be supervised by their respective agencies;

b. Only one evidentiary document, such as a record of interview, will be prepared, and a copy will be furnished to the other agency at the time the document is prepared;

c. Any contact with the news media, such as press releases, will be coordinated and agreed to in advance by both the FBI and the OIG;

d. In the case of undercover operations a separate written agreement for each will be required setting forth the responsibilities of both the OIG and the FBI as they pertain to manpower, economic and other resources to be committed and/or other conditions necessitated by the operation. Joint undercover operations will be the responsibility of the FBI, but all major decisions will be made in consultation with the OIG.

2. Close and continuous liaison will be maintained between the OIG and the FBI in an attempt to identify areas that require mutual attention. In this regard, both the OIG and the FBI will designate an appropriate individual to serve as the primary contact in the liaison function.

3. The FBI will have the overall responsibility for the supervision and control of all joint criminal investigations involving HHS employees; however, participating personnel will be supervised by their respective agencies.

G. THIRD PARTIES

Nothing herein shall be binding on investigative agencies not parties to this agreement.

H. REVISIONS OF THIS MEMORANDUM

At any time that either party to this memorandum believes that this memorandum should be modified, both parties agree to consider changes to the memorandum which would improve the working relationship between the parties to this agreement. If the parties to this memorandum are unable to reach agreement on modifications that either party believes are warranted, either party may cancel this agreement effective 30 days after written notice to the other party.

I. AGREEMENT APPROVAL

This agreement becomes effective when approved and signed by both parties.

Oliver B. Revell
ASSISTANT DIRECTOR
CRIMINAL INVESTIGATIVE DIVISION
FEDERAL BUREAU OF INVESTIGATION

Sept. 3, 1982
DATE

INSPECTOR GENERAL
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES

9/3/82
DATE

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT
Washington, DC 20415

Human Capital Leadership
and Merit System
Accountability Division

**Fair Labor Standards Act Decision**
**Under section 4(f) of title 29, United States Code**

| | |
|---|---|
| **Claimant:** | [claimant's name] |
| **Agency classification:** | Investigator<br>GS-1810-12 |
| **Organization:** | [Field Office]<br><br>Defense Security Service<br>Department of Defense<br>[location] |
| **Claim:** | Back pay; Should Have Been Classified as Nonexempt |
| **OPM decision:** | Nonexempt. Due the difference between FLSA and title 5 overtime payment |
| **OPM decision number:** | F-1810-12-02 |

Kevin E. Mahoney
Deputy Associate Director
Center for Merit System Accountability

10-16-06
Date

As provided in section 551.708 of title 5, Code of Federal Regulations (CFR), this decision is binding on all administrative, certifying, payroll, disbursing, and accounting officials of agencies for which the Office of Personnel Management administers the Fair Labor Standards Act (FLSA). The agency should identify all similarly situated current and, to the extent possible, former employees, and ensure that they are treated in a manner consistent with this decision. There is no right of further administrative appeal. This decision is subject to discretionary review only under conditions and time limits specified in 5 CFR 551.708. The claimant has the right to bring action in the appropriate Federal court if dissatisfied with the decision. However, he may do so only if he does not accept back pay. All back pay recipients must sign a waiver of suit when they receive payment.

The agency is to compute the claimant's overtime pay in accordance with the instructions in this decision, and then pay the claimant the amount owed him. The agency must also submit a Standard Form 50 showing that the claimant's exemption status has been changed to comply with this decision. The SF 50 should be sent to this office within 15 workdays of receiving the decision. If the claimant believes that the agency has incorrectly computed the amount owed him, he may file a new FLSA claim with this office.

**Decision sent to:**

[claimant's name and address]

Director for Human Resources
Defense Security Service
1340 Braddock Place
Alexandria, VA 22314-1651

Chief, Classification Appeals
Adjudication Section
Department of Defense
Civilian Personnel Management Service
1400 Key Boulevard, Suite B-200
Arlington, VA 22209-5144

**Introduction**

On June 2, 2006, the Office of Personnel Management (OPM), Division for Human Capital Leadership and Merit System Accountability, Center for Merit System Accountability, [location] Field Services Group, received an FLSA claim from [the claimant]. He currently occupies an Investigator, GS-1810-12, position with OPM's Federal Investigative Services Division, Center for Investigative Programs Operations, [a] Field Office, in [location]. The claimant seeks overtime pay under the FLSA for work he performed prior to March 20, 2005, when he was employed in an Investigator, GS-1810-12, position with the Defense Security Service (DSS), before he and his DSS component were transferred from DSS to OPM. He seeks "all back-pay overtime I am eligible for from DSS, going back as many years as possible." We received the agency administrative report (AAR) on July 26, 2006.

In reaching our FLSA decision, we have carefully reviewed all information furnished by the claimant and his former employing agency, including information developed during telephone interviews on August 4, 2006, with the claimant and his immediate supervisor during the period of the claim, and other information we developed during our fact-finding process.

**General Issues**

The claimant disputes DSS' designation of his position, and the work he performed, as exempt. He believes he performed the same work for DSS as he currently performs for OPM which recently changed his FLSA status from exempt to nonexempt.

In its AAR, DDS asserts it properly exempted the claimant's position based on its analysis of the duties of the position described in a "decision from the OPM FLSA Oversight Division in 2001 (June 26, 2001, Decision No. F-1810-12-1…." The agency indicates the change in FLSA exemption status by OPM has no bearing on this claim since the work assigned to the claimant "may or not be the same as the duties performed for the DSS."

We concur with DSS that we must make exemption determination decisions by comparing the actual duties performed by the claimant to criteria and guidance in FLSA regulations, laws, and guidelines. Therefore, our decision rests upon our analysis of the duties and responsibilities assigned to and performed by the claimant while he was employed by DSS.

**Position Information**

The claimant was assigned to a DSS standard position description (PD) [number]. The major duties are not annotated with percentages of time. Although the PD lists such duties as accompanying Industrial Security Representatives on security review and assistance visits to contractor facilities and participating on planning committees, focus groups, and/or process action teams engaged in developing and recommending new or more efficient methods and techniques for conducting investigations, the claimant performed these duties a small minority of the time. The claimant stated, and the former immediate supervisor confirmed, the claimant spent 95 percent or more of his time conducting personnel security investigations (PSIs). The investigative reports were used by adjudicators within the Department of Defense to make security clearance determinations.

The claimant was responsible for conducting background investigations that relate to varying levels of security clearances. Work typically was assigned geographically primarily based on where the claimant resided. He would review the case coversheet and attached papers to determine the aspects of the subject's life he needed to cover, e.g., residences, educational institutions, and employment. Based on the coverage requirements of the type of investigation, he would determine the functions he needed to perform to obtain necessary information, e.g., record reviews (e.g., police records, divorce records), subject interviews, and reference checks, determining the action necessary to develop the record sufficiently to meet investigative manual guidelines. The claimant then wrote reports of the information found. The reports identified the sources contacted, the type and extent of contact the source had with the subject, going into detail by exception. Information gathered was forwarded to the Personnel Investigations Center (PIC) at [location], and to other field offices for follow-up, e.g., derogatory information, unclaimed residences, unclaimed employment. Once the PIC received information from all investigators who were assigned pieces of a case and was satisfied coverage met established requirements, it forwarded the completed background investigation package to adjudicators who made the security clearance determination.

The work required applying investigative techniques, such as interview techniques, reading body language and facial expressions, various document research techniques, to establish case facts; i.e., "the who, what, where, when and how." He needed to determine whether answers provided were conflicting, and if there has been falsification on the security application. This might lead to a confrontational interview with the subject under investigation when the subject's claim of past, limited drug use was contradicted by other interviews indicating current drug use. If the subject deliberately withheld the information, this might leave him/her vulnerable to coercion and/or blackmail, which could pose a national security threat. Fully developing information was critical for the adjudicator to determine whether the subject could be appropriately placed in a position of public trust.

**Evaluation of FLSA Coverage**

Sections 551.201 and 551.202 of title 5, Code of Federal Regulations, require that an employing agency may designate an employee FLSA exempt only when the agency correctly determines that the employee meets one or more of the exemption criteria. In all exemption determinations, the agency must observe the following principles. Each employee is presumed to be FLSA nonexempt. Exemption criteria must be narrowly construed to apply only to those employees who are clearly within the terms and spirit of the exemption. The burden of proof rests with the agency that asserts the exemption. If there is a reasonable doubt as to whether an employee meets the criteria for exemption, the employee should be designated FLSA nonexempt. There are three exemption categories applicable to Federal employees: executive, administrative, and professional. Neither the claimant nor the agency assert the claimant's work is covered by the executive or professional exemptions and, based on careful review of the record, we concur. Therefore, our analysis is limited to the administrative exemption.

The agency asserts in its rationale for FLSA exemption that the:

> implementing regulations that govern OPM and DOL [Department of Labor] are completely different....The August 19, 2005, opinion letter [cited by OPM in its

> memorandum changing the claimant's FLSA status from exempt to nonexempt] cites the "revised final FLSA regulations under 29 C.F.R. [sic] § 541.203(j)" that specifically finds that public sector investigators do not meet the requirements for the administrative exemption, but the very abbreviated OPM regulation is silent on jobs or job types that should or should not be exempt....It is important to note that the DOL opinion letter is simply that: an opinion letter issued at the request of an unknown individual seeking an official DOL opinion, much like a non-binding private IRS ruling letter....In contrast, OPM's June 26, 2001 Decision No. F-1810-12-1 adjudicated a true case and/or controversy between the DSS and a GS-12 non-supervisory investigator. The duties...did not change in any important way as DSS between the time that the ...Oversight Division decision was issued and the date the employees transferred to OPM....
>
> The OPM June 26, 2001 Decision No. F-1810-12-1 is determinative regarding whether former DSS GS-1810-12 investigators should be re-classified as non-exempt based upon the administrative capacity exemption pursuant to 29 U.S.C. § 213(a)(1), unless OPM revises 5 C.F.R. [sic] § 551.206 by specifically declaring public sector investigators are not-exempt as DOL does with 29 C.F.R. [sic] § 541.203(j), or if OPM reconsiders and overrules Decision No. F-1810-12-1.

Administrative Exemption Criteria

Section 551.206 of 5 CFR contains criteria governing whether the claimant's position should be exempt from the FLSA under the administrative exemption criteria. The position is exempt if it meets administrative exemption criteria (a)(1), (2), or (3), known as the primary duty test, and (b) through (d). We note the agency's argument that OPM's FLSA implementing regulations are separate and distinct from those issued by DOL. We concur. As indicated in *Billings v. United States,* 332 F.3d 1328 (Fed. Cir. 2003):

> Because OPM administers the Fair Labor Standards Act with respect to employees of the federal government [sic], it is the OPM regulations, rather than the Labor Department regulations, that govern the application of the Fair Labor Standards Act to appellants. To be valid, however, the OPM regulation must be consistent with the Labor Department regulation.

Further, *Billings* states:

> Thus, we must first determine whether the OPM interpretation of the statute is reasonable, as well as whether any difference between OPM's interpretation and the Labor Department standard is required to effectuate the consistency of application of the provision to both federal [sic] and non-federal [sic] employees. *See, e.g., Zumerling v. Devine,* 769 F.2d 745, 750 (OPM's guidelines must "harmonize with the statute's 'origin and purpose,' ... as well as with the Secretary of Labor's regulations." (internal citations omitted)).

*Primary duty test*

The primary duty test is met if the work meets criterion (a)(1), (2), or (3).

Criterion (a)(1) deals with work that significantly affects the formulation or execution of management policies or programs.

Work that affects the formulation or execution of management programs and policies recognizes that management policies and programs range from broad national goals expressed in statutes or Executive Orders to specific objectives of a small field office. Employees may actually make policy decisions or participate indirectly, through developing proposals that others act on. Employees who significantly affect the execution of management policies or programs typically are those whose work involves obtaining compliance with such policies by individuals or organizations, both within or outside the Federal Government, or making significant determinations in furthering the operation of programs and accomplishing program objectives. Administrative employees engaged in such work typically perform one or more phases of program management; i.e., planning, developing, promoting, coordinating, controlling, or evaluating operating programs.

The administrative exemption applies to work directly related to assisting with the running or servicing of the agency or its customers. The DSS program functions covered by criterion (a)(1) were vested in other DSS employees engaged in such functions as developing and maintaining the investigator manual and evaluating field office program operations. The claimant was not engaged in formulation or execution of management policies or programs, e.g., evaluating operating programs of the organization. He was not engaged in obtaining compliance with program policies or determining the accomplishment of program objectives. Rather, he was responsible for conducting day-to-day investigative duties leading to the development of complete background investigations for DSS' customers. This work contributed to, but did not significantly affect security clearance and employment decisions since such decisions were made by the security and/or human resources staff of DoD components based on the factual information presented in the claimant's investigative reports which presented facts but did not draw conclusions or recommend actions. Therefore, we find that the claimant's work did not meet criterion (a)(1). Our previous decision cited by DSS failed to properly address the nature of DSS' investigations work and, therefore, must be set aside.

Criterion (a)(2) involves general management or business functions or supporting services of substantial importance to the organization serviced.

In addition to the difficult and complex analytical functions involved in general management, e.g., budgeting or financial management, general management or support services include services ranging from automated data processing to the procurement and distribution of supplies. Support may also entail providing expert advice in a specialized subject-matter field; assuming facets of the overall management function; or, representing management in business functions such as determining the acceptability of goods or services, or authorizing payments. The organizational location does not change service functions into non-exempt production functions. To warrant exemption from the FLSA, such work must involve substantial discretion on matters of enough importance that the employee's actions and decisions have a noticeable impact on the effectiveness of the organization advised, represented, or serviced.

Security functions are, in their broadest sense, staff support functions in that they assist management in making employment and security clearance decisions. However, just as clerical, technician, and blue collar work in a staff supply function fail to meet the administrative