exemption, not all work in other staff functions meet the administrative exemption. The claimant did not perform a support function of substantial importance to the organizations serviced as envisioned in the FLSA. While his work entailed the application of specialized subject-matter knowledge; i.e., a breadth and depth of investigative techniques, he did not perform support or other staff services as discussed under (a)(1). Rather than advising DSS management on program matters, representing DSS on management and/or program matters with customer agencies, he conducted fact-finding background investigations as discussed previously. Therefore, we find that the claimant's work does not meet criterion (a)(2).

Criterion (a)(3) involves substantial participation in the executive or administrative functions of a management official.

Work involving participation in the functions of a management official includes employees, such as secretaries and administrative assistants, who participate in portions of the managerial or administrative functions of a supervisor whose scope of responsibility precludes personally attending to all aspects of the work. To support exemption, such assistants must have knowledge of the policies, plans, and views of the supervisor and must be delegated and exercise substantial authority to act for the supervisor. The claimant did not perform this type of work. Therefore, we find that the claimant's work did not meet criterion (a)(3).

Based on the preceding analysis, the claimant's work did not meet the primary duty test.

*Nonmanual duty test*

The nonmanual work test is met when the employee performs office or other predominantly nonmanual work which meets either criterion (b)(1) or (b)(2).

Criterion (b)(1) covers work that is intellectual and varied in nature.

Work of an intellectual nature requires general intellectual abilities, such as perceptiveness, analytical reasoning, perspective, and judgment applied to a variety of subject matter fields, or work involving mental processes which involve substantial judgment based on considering, selecting, adapting, and applying principles to numerous variables. The employee cannot rely on standardized procedures, or precedents, but must recognize and evaluate the effect of a continual variety of conditions or requirements in selecting, adapting or innovating techniques and procedures, interpreting findings, and selecting and recommending the best alternative from among a broad range of possible actions.

According to the claimant, and corroborated by his supervisor, most of the claimant's work was based on standardized procedures or precedents. For example, the investigation manual contained specific coverage requirements depending on the type of clearance, e.g., seven years' coverage for top secret. The manual provided a decision logic table for secret clearances to determine the scope of investigation necessary to respond to negative information, e.g., what action to take depending on the nature of the arrest or conviction. While the claimant was required to remain aware of changing conditions and interpreting findings, e.g., identifying leads and issues to explore by piecing together the information gathered, his selected courses of action were driven by established case coverage standards. The work was performed within the confines of well-established techniques and did not require or permit selecting, adapting, and

applying principles. While requiring the application of a high degree of skill and knowledge, the claimant had little discretion or opportunity to adapt or innovate techniques and procedures. The claimant's work does not meet criterion (b)(1).

Criterion (b)(2) covers work of a specialized or technical nature that requires considerable specialized training, experience, and knowledge.

Work meeting criterion (b)(2) requires specialized knowledge of a complex subject matter and of the principles, techniques, practices and procedures associated with that subject-matter field. This knowledge characteristically is acquired through considerable on-the-job training and experience in the specialized subject-matter field, as distinguished from professional knowledge characteristically acquired through specialized academic training.

The claimant's work required knowledge of personnel investigation and related laws, rules, and regulations; and knowledge of investigative techniques and procedures. This knowledge and skill was applied to the full range of PSIs, and highly sensitive special investigations. The in-depth practical knowledge required to perform the full range of work would typically come from several years of on-the-job training and experience. Accordingly, we find the position meets criterion (b)(2).

*Discretion and independent judgment test*

Work meeting this test (criterion (c)) requires the employee to frequently exercise discretion and independent judgment, under only general supervision, in performing the normal day-to-day work. Discretion and independent judgment means work that involves comparing and evaluating possible courses of conduct, interpreting results or implications, and independently taking action or making a decision after considering the various possibilities. However, firm commitments or final decisions are not necessary to support exemption. The "decisions" made as a result of the exercise of independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decisions are subject to review, and that on occasion the decisions are revised or reversed after review, does not mean that the employee is not exercising discretion and independent judgment of the level required for exemption.

Work reflective of discretion and independent judgment must meet the three following criteria: (1) The work must be sufficiently complex and varied so as to customarily and regularly require discretion and independent judgment in determining the approaches and techniques to be used, and in evaluating results. This precludes exempting an employee who performs work primarily requiring skill in applying standardized techniques or knowledge of established procedures, precedents, or other guidelines which specifically govern the employee's action; (2) The employee must have the authority to make such determinations during the course of assignments. This precludes exempting trainees who are in a line of work which requires discretion but who have not been given authority to decide discretionary matters independently; and (3) The decisions made independently must be significant. The term "significant" is not so restrictive as to include only the kinds of decisions made by employees who formulate policies or exercise broad commitment authority. However, the term does not extend to the kinds of decisions that affect only the procedural details of the employee's own work, or to such matters as deciding whether a situation does or does not conform to clearly applicable criteria. The exercise of discretion and independent judgment involves interpreting results or implications, and

independently taking action or making a decision after considering the various possibilities. Decisions made as the result of independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decisions are subject to review, and may be revised or reversed, does not mean an employee is not exercising discretion.

The claimant worked independently. However, he did not have the opportunity to exercise independent judgment in terms of analyzing and interpreting the situation, considering a variety of possibilities, and then deciding what should be done. Instead, he applied approved procedures and techniques and had limited discretion within those approved procedures, e.g., obtaining a sufficient number and quality of sources to meet coverage requirements, information sufficient for an adjudicator to reach a conclusion on derogatory and discrepant issues. The decisions he made were not significant within the meaning of the regulation in that they affected the procedural details of his work, e.g., how to balance work on the multiple investigations assigned at any time. As discussed previously, the work performed by the claimant involved the use of skills and the application of known standards or established procedures, as distinguished from work requiring the exercise of discretion and independent judgment. Therefore, the claimant's work fails to meet criterion (c).

*Criterion (d)*

In addition to the primary duty criterion, GS employees in positions classified at the GS-5 or GS-6 grade level must spend 80 percent or more of the work time in a representative work week on administrative functions and work that is an essential part of those functions. Because the claimant's position was classified above these grade levels, this criterion does not apply to the claimant's work.

The administrative exemption criteria are not met.

**Decision on FLSA Coverage**

Based on the above analysis, the claimant's position did not meet the criteria for executive, administrative, or professional exemption and is, therefore, properly covered by the overtime provisions of the FLSA.

*Willful violation*

The claimant asks that we determine whether his back pay should extend for two or three years. The latter is applicable to situations in which the employing agency willfully violated the FLSA. 5 CFR 551.104 defines "willful violation" specifically as follows:

> *Willful violation means a violation in circumstances where the agency knew that its conduct was prohibited by the Act or showed reckless disregard of the requirements of the Act. All of the facts and circumstances surrounding the violation are taken into account in determining whether a violation was willful.*

Clearly, not all violations of the FLSA are willful as this term is defined in the regulations. There is no question that the agency erred in the exempt status of the claimant. However, error alone does not reach the level of willful violation as defined in the regulations. A finding of

willful violation requires that either the agency knew that its conduct was prohibited or showed reckless disregard of the requirements of the FLSA. The regulation further instructs that the full circumstances surrounding the violation must be taken into account.

In the instant case, DSS' exemption determination was based on a decision issued by OPM as discussed previously. Therefore, we also find that the agency acted in good faith and did not recklessly disregard the requirements of the Act. Therefore, we find the agency's actions do not meet the criteria for willful violation as defined in 5 CFR 551.104.

**Decision**

The claimant's work is nonexempt; i.e., covered by the overtime provisions of the FLSA. Therefore, the claimant is entitled to compensation for all overtime hours worked at the FLSA overtime rate.

The agency states:

> If OPM overrules its decision or revises 5 C.F.R. [sic] 551.206, there should be no retroactive effect. *See generally Ackinclose v. Palm Beach County, Florida,* 845 F. 2d 931, 932-936 (11th Cir. 1988). (In the case of *Garcia v. San Antonio Metropolitan Authority* (1985) the US Supreme Court overruled its own decision, *National League of Cities v. Usery* (1976) (1976). For reasons analogous to this FLSA issue, the 11th Circuit refused to apply the *Garcia* decision retroactively).

Under 29 U.S.C. § 216, Federal courts have substantial discretion in fashioning remedies for violations of the FLSA. Unlike the courts, OPM's administrative claims process derives its remedy authority from the Back Pay Act, codified as 5 U.S.C. § 5596. It is well settled that "[t]he starting point for interpretation of a statute is the language of the statute itself," and "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S. Ct. 1570, 1575 (1990), *citing Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S. Ct. 2051, 2056 (1980). According to the plain language in 5 U.S.C. § 5596, there is no provision to modify or waive its retroactive effect.

The claim was received by OPM on June 2, 2006. The claimant can receive back pay only for two years prior to that date, less the back pay and interest from OPM received for FLSA overtime performed within the claim period. 5 CFR 550.806 also states that the claimant is owed interest on the back pay. The agency must follow the compliance requirements on page ii of this decision.

A

# OFFICE OF INSPECTOR GENERAL

## Office of Audit

## Staff on Board

## FY 1989

| As of PPE | FTP | Other | Total | Net Increase (Decrease) |
|---|---|---|---|---|
| 10/01/88* | 651 | 11 | 662 | 0 |
| 10/08/88 | 649 | 10 | 659 | (3) |
| 10/22/88 | 651 | 13 | 664 | 2 |
| 11/05/88 | 655 | 9 | 664 | 2 |
| 11/19/88 | 654 | 9 | 663 | 1 |
| 12/03/88 | 657 | 8 | 665 | 3 |
| 12/17/88 | 663 | 10 | 673 | 11 |
| 12/31/88 | 687 | 14 | 701 | 39 |
| 01/14/89 | 703 | 13 | 716 | 54 |
| 01/28/89 | 709 | 12 | 721 | 59 |
| 02/11/89 | 709 | 12 | 721 | 59 |
| 02/25/89 | 710 | 11 | 721 | 59 |
| 03/11/89 | 708 | 12 | 720 | 58 |
| 03/25/89 | 715 | 9 | 724 | 62 |
| 4/08/89 | 715 | 11 | 726 | 64 |
| 04/22/89 | 717 | 11 | 728 | 66 |
| 05/06/89 | 717 | 11 | 728 | 66 |
| 05/20/89 | 713 | 11 | 724 | 62 |
| 06/03/89 | 713 | 13 | 726 | 64 |
| 06/17/89 | 717 | 14 | 731 | 69 |
| 06/30/89 | 722 | 14 | 736 | 74 |
| 07/15/89 | 723 | 15 | 738 | 76 |
| 07/29/89 | 737 | 16 | 753 | 91 |
| 08/12/89 | 742 | 16 | 758 | 96 |
| 08/26/89 | 746 | 10 | 756 | 94 |
| 09/09/89 | 750 | 9 | 759 | 97 |
| 09/23/89 | 755 | 9 | 764 | 102 |
| 09/30/89 | 758 | 9 | 767 | 105 |

### Analysis of Change

| | |
|---|---|
| New Hires (H) | 207 |
| Separations(L) | (97) |
| LWOP(P-1,P-2) | (5) |
| Total | 105 |

* Beginning of FY 89

A

# OFFICE OF INSPECTOR GENERAL

## Office of Audit Services

## Staff on Board

## FY 1990

| As of PPE | FTP | Other | Total | Net Increase (Decrease) |
|---|---|---|---|---|
| 10/01/89* | 758 | 9 | 767 | 0 |
| 10/07/89 | 759 | 9 | 768 | 1 |
| 10/21/89 | 761 | 9 | 770 | 3 |
| 11/04/89 | 759 | 9 | 768 | 1 |
| 11/18/89 | 760 | 6 | 766 | (1) |
| 12/02/89 | 760 | 6 | 766 | (1) |
| 12/16/89 | 759 | 6 | 765 | (2) |
| 12/30/89 | 748 | 9 | 757 | (10) |
| 01/13/90 | 747 | 11 | 758 | (9) |
| 01/27/90 | 746 | 9 | 755 | (12) |
| 02/10/90 | 751 | 9 | 760 | (7) |
| 02/24/90 | 752 | 8 | 760 | (7) |
| 03/10/90 | 750 | 8 | 758 | (9) |
| 03/24/90 | 747 | 5 | 752 | (15) |
| 04/07/90 | 746 | 5 | 751 | (16) |
| 04/21/90 | 745 | 5 | 750 | (17) |
| 05/04/90 | 747 | 5 | 752 | (15) |
| 05/19/90 | 749 | 7 | 756 | (11) |
| 06/02/90 | 752 | 7 | 759 | (8) |
| 06/16/90 | 761 | 7 | 768 | 1 |
| 06/30/90 | 769 | 10 | 779 | 12 |
| 07/14/90 | 780 | 10 | 790 | 23 |
| 07/28/90 | 782 | 10 | 792 | 25 |
| 08/11/90 | 787 | 9 | 796 | 29 |
| 08/25/90 | 787 | 7 | 794 | 27 |
| 09/08/90 | 789 | 7 | 796 | 29 |
| 09/22/90 | 788 | 6 | 794 | 27 |
| 09/29/90** | 788 | 6 | 794 | ✓ 7 |
| 10/06/90 | ~~79~~ ✓ 786 | 6 | 79 ✓ | (✓) |

### Analysis of Change

| | | |
|---|---|---|
| New Hires (H) | 100 | 0 |
| Separations (L) | (71) | ✓ |
| LWOP (P-1, P-2) | (2) | |
| Total | 27 | ✓ |

* Beginning of FY 90
** End of FY 90

A

# OFFICE OF INSPECTOR GENERAL

## Office of Audit Services

## Staff on Board

## FY 1991

| As of PPE | FTP | Other | Total | Net Increase (Decrease) |
|---|---|---|---|---|
| 10/01/90* | 788 | 6 | 794 | 0 |
| 10/06/90 | 786 | 6 | 792 | (2) |
| 10/20/90 | 782 | 6 | 788 | (6) |
| 11/03/90 | 782 | 6 | 788 | (6) |
| 11/17/90 | 780 | 6 | 786 | (8) |
| 12/01/90 | 771 | 6 | 777 | (17) |
| 12/15/90 | 771 | 7 | 778 | (16) |
| 12/29/90 | 771 | 7 | 778 | (16) |
| 01/12/91 | 767 | 7 | 774 | (20) |
| 01/26/91 | 764 | 7 | 771 | (23) |
| 02/09/91 | 764 | 7 | 771 | (23) |
| 02/23/91 | 768 | 7 | 775 | (19) |
| 03/09/91 | 767 | 7 | 774 | (20) |
| 03/23/91 | 775 | 7 | 782 | (12) |
| 04/06/91 | 777 | 7 | 784 | (10) |
| 04/20/91 | 781 | 7 | 788 | (6) |
| 05/04/91 | 783 | 6 | 789 | (5) |
| 05/18/91 | 776 | 5 | 781 | (13) |
| 06/01/91 | 777 | 4 | 781 | (13) |
| 06/15/91 | 780 | 5 | 785 | (9) |
| 06/29/91 | 784 | 7 | 791 | (3) |
| 07/13/91 | 792 | 8 | 800 | 6 |
| 07/27/91 | 791 | 8 | 799 | 5 |
| 08/10/91 | 793 | 6 | 799 | 5 |
| 08/24/91 | 801 | 4 | 805 | 11 |
| 09/07/91 | 811 | 3 | 814 | 20 |
| 09/21/91 | 814 | 3 | 817 | 23 |
| 09/30/91 | 814 | 3 | 817 | 23 |

### Analysis of Change

| | |
|---|---|
| New Hires (H) | 101 |
| Separations(L) | (75) |
| LWOP(P-1,P-2) | (3) |
| Total | 23 |

* Beginning of FY 91

A

# OFFICE OF INSPECTOR GENERAL

## Office of Audit Services

## Staff on Board

## FY 1992

| As of PPE | FTP | Other | Total | Net Increase (Decrease) |
|---|---|---|---|---|
| 10/01/91* | 814 | 3 | 817 | 0 |
| 10/05/91 | 808 | 2 | 810 | (7) |
| 10/19/91 | 806 | 2 | 808 | (9) |
| 11/02/91 | 804 | 3 | 807 | (10) |
| 11/16/91 | 803 | 3 | 806 | (11) |
| 11/30/91 | 802 | 3 | 805 | (12) |
| 12/14/91 | 802 | 3 | 805 | (12) |
| 12/28/91 | 801 | 3 | 804 | (13) |
| 01/11/92 | 794 | 3 | 797 | (20) |
| 01/25/92 | 792 | 3 | 795 | (22) |
| 02/08/92 | 793 | 3 | 796 | (21) |
| 02/22/92 | 791 | 3 | 794 | (23) |
| 03/07/92 | 788 | 3 | 791 | (26) |
| 03/21/92 | 783 | 3 | 786 | (31) |
| 04/04/92 | 781 | 3 | 784 | (33) |
| 04/18/92 | 779 | 3 | 782 | (35) |
| 05/02/92 | 779 | 3 | 782 | (35) |
| 05/16/92 | 779 | 3 | 782 | (35) |
| 05/30/92 | 776 | 3 | 779 | (38) |
| 06/13/92 | 776 | 3 | 779 | (38) |
| 06/27/92 | 775 | 3 | 778 | (39) |
| 07/11/92 | 773 | 3 | 776 | (41) |
| 07/25/92 | 772 | 3 | 775 | (42) |
| 08/08/92 | 771 | 3 | 774 | (43) |
| 08/22/92 | 770 | 3 | 773 | (44) |
| 09/05/92 | 769 | 3 | 772 | (45) |
| 09/19/92 | 768 | 3 | 771 | (46) |
| 09/30/92 | 768 | 3 | 771 | (46) |

### Analysis of Change

| | |
|---|---|
| New Hires (H) | 4 |
| Separations(L) | (50) |
| LWOP(P-1,P-2) | 0 |
| Total | (46) |

* Beginning of FY 92

OFFICE OF AUDIT SERVICES
PERSONNEL STATUS REPORT
January 2, 1993

STATUS1

| OFFICE | 1992 FTE CEILING | ON BOARD STRENGTH 12/26/92 | COMMITTED HIRES 12/17-1/15/93 | TRANSFERS WITHIN OAS + | - | NET | HIRES PENDING | KNOWN LOSSES 12/27-02/27/93 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **Headquarters** | | | | | | | | | |
| IO | 16 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| APO | 18 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 17 |
| TOTAL HQ | 34 | 31 | 0 | 0 | 0 | 0 | 0 | 0 | 31 |
| **Assistant Inspectors General** | | | | | | | | | |
| AFMA | 10 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| AFMA-NEAR | 31 | 28 | 0 | 0 | 0 | 0 | 0 | 2 | 26 |
| SSA | 39 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 40 |
| HCFA | 40 | 40 | 0 | 0 | 0 | 0 | 0 | 1 | 39 |
| HFDS | 27 | 22 | 0 | 0 | 0 | 0 | 0 | 1 | 21 |
| PHS-Parklawn | 35 | 26 | 0 | 1 | 0 | 1 | 0 | 0 | 27 |
| PHS-Atlanta | 6 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| T l AIG's | 188 | 169 | 0 | 1 | 0 | 1 | 0 | 4 | 166 |
| **Regions** | | | | | | | | | |
| I | 61 | 62 | 0 | 0 | 0 | 0 | 0 | 0 | 62 |
| II | 67 | 70 | 0 | 0 | 0 | 0 | 0 | 1 | 69 |
| III | 61 | 60 | 0 | 0 | 0 | 0 | 0 | 1 | 59 |
| IV | 80 | 83 | 0 | 0 | 0 | 0 | 0 | 1 | 82 |
| V | 78 | 83 | 0 | 0 | 0 | 0 | 0 | 1 | 82 |
| VI | 63 | 64 | 0 | 0 | 0 | 0 | 0 | 1 | 63 |
| VII | 66 | 63 | 0 | 0 | 1 | -1 | 0 | 0 | 62 |
| IX | 80 | 81 | 0 | 0 | 0 | 0 | 0 | 0 | 81 |
| Total Region | 556 | 566 | 0 | 0 | 1 | -1 | 0 | 5 | 560 |
| GRAND TOTAL | 778 | 766 | 0 | 1 | 1 | 0 | 0 | 9 | 757 |

| | |
|---|---|
| On Board | 766 |
| Committed Hires | 0 |
| | 766 |
| Hires Pending | 0 |
| | 766 |
| Losses | 9 |
| | 757 |

A

# OFFICE OF INSPECTOR GENERAL

## Office of Audit Services

### Staff on Board

### FY 1993

| As of PPE | FTP | Other | Total | Net Increase (Decrease) |
|---|---|---|---|---|
| 10/01/92* | 768 | 3 | 771 | 0 |
| 10/03/92 | 767 | 3 | 770 | (1) |
| 10/17/92 | 767 | 3 | 770 | (1) |
| 10/31/92 | 765 | 3 | 768 | (3) |
| 11/14/92 | 764 | 3 | 767 | (4) |
| 11/28/92 | 763 | 3 | 766 | (5) |
| 12/12/92 | 763 | 3 | 766 | (5) |
| 12/26/92 | 763 | 3 | 766 | (5) |
| 01/09/93 | 761 | 3 | 764 | (7) |
| 01/23/93 | 757 | 3 | 760 | (11) |
| 02/06/93 | 753 | 3 | 756 | (15) |
| 02/20/93 | 752 | 4 | 756 | (15) |
| 03/06/93 | 749 | 4 | 753 | (18) |
| 03/20/93 | 749 | 4 | 753 | (18) |
| 04/03/93 | 748 | 4 | 752 | (19) |
| 04/17/93 | 747 | 4 | 751 | (20) |
| 05/01/93 | 746 | 4 | 750 | (21) |
| 05/15/93 | 745 | 4 | 749 | (22) |
| 05/29/93 | 745 | 4 | 749 | (22) |
| 06/12/93 | 742 | 4 | 746 | (25) |
| 06/26/93 | 741 | 4 | 745 | (26) |
| 07/10/93 | 737 | 4 | 741 | (30) |
| 07/24/93 | 735 | 4 | 739 | (32) |
| 08/07/93 | 734 | 4 | 738 | (33) |
| 08/21/93 | 733 | 4 | 737 | (34) |
| 09/04/93 | 732 | 4 | 736 | (35) |
| 09/18/93 | 731 | 4 | 735 | (36) |
| 09/30/93 | 731 | 4 | 735 | (36) |

### Analysis of Change

| | |
|---|---|
| New Hires (H) | 0 |
| Separations(L) | (36) |
| Total | (36) |

* Beginning of FY 93

A-1

OFFICE OF INSPECTOR GENERAL

Office of Audit Services

Staff on Board

FY 94

| As of PPE | PP | FTP | Other | Total | Increase (Decrease) Current PP + | - | Net | Cumulative Change |
|---|---|---|---|---|---|---|---|---|
| 10/01/93 | 0 | 731 | 4 | 735 | | | 0 | 0 |
| 10/02/93 | 21 | 729 | 4 | 733 | 0 | 2 | -2 | (2) |
| 10/16/93 | 22 | 726 | 4 | 730 | 1 | 4 | -3 | (5) |
| 10/30/93 | 23 | 724 | 4 | 728 | 0 | 2 | -2 | (7) |
| 11/13/93 | 24 | 724 | 4 | 728 | 1 | 1 | 0 | (7) |
| 11/27/93 | 25 | 724 | 4 | 728 | 1 | 1 | 0 | (7) |
| 12/11/93 | 26 | 724 | 4 | 728 | 0 | 0 | 0 | (7) |
| 12/25/93 | 1 | 724 | 4 | 728 | 4 | 4 | 0 | (7) |
| 01/08/94 | 2 | 722 | 4 | 726 | 1 | 3 | -2 | (9) |
| 01/22/94 | 3 | 721 | 4 | 725 | 0 | 1 | -1 | (10) |
| 02/05/94 | 4 | 721 | 4 | 725 | 0 | 0 | 0 | (10) |
| 02/19/94 | 5 | 720 | 4 | 724 | 4 | 5 | -1 | (11) |
| 03/05/94 | 6 | 720 | 4 | 724 | 0 | 0 | 0 | (11) |
| 03/19/94 | 7 | 719 | 4 | 723 | 0 | 1 | -1 | (12) |
| 04/02/94 | 8 | 716 | 4 | 720 | 0 | 3 | -3 | (15) |
| 04/16/94 | 9 | 716 | 4 | 720 | 8 | 8 | 0 | (15) |
| 04/30/94 | 10 | 717 | 4 | 721 | 1 | 0 | 1 | (14) |
| 05/14/94 | 11 | 713 | 4 | 717 | 0 | 4 | -4 | (18) |
| 05/28/94 | 12 | 710 | 4 | 714 | 1 | 4 | -3 | (21) |
| 06/11/94 | 13 | 709 | 4 | 713 | 4 | 5 | -1 | (22) |
| 06/25/94 | 14 | 709 | 4 | 713 | 0 | 0 | 0 | (22) |
| 07/09/94 | 15 | 709 | 4 | 713 | 1 | 1 | 0 | (22) |
| 07/23/94 | 16 | 709 | 5 | 714 | 12 | 11 | 1 | (21) |
| 08/06/94 | 17 | 703 | 5 | 708 | 0 | 6 | -6 | (27) |
| 08/20/94 | 18 | 694 | 5 | 699 | 2 | 11 | -9 | (36) |
| 09/03/94 | 19 | 685 | 5 | 690 | 1 | 10 | -9 | (45) |
| 09/17/94 | 20 | 680 | 5 | 685 | 0 | 5 | -5 | (50) |
| 09/30/94 | 21 | 673 | 6 | 679 | 0 | 6 | -6 | (56) |
| Less:Transfers between Regions/Divisions (N) | | | | | (36) | (36) | | |
| Total | | | | | 6 | 62 | -56 | |

Analysis of Change

| | |
|---|---|
| New Hires (H) | 6 |
| Separations (L) | (62) |
| Total | (56) |

OFFICE OF AUDIT SERVICES
PERSONNEL STATUS REPORT
January 17, 1996

STATUS1

| OFFICE | 1995 FTE* CEILING | ON BOARD STRENGTH 12/23/95 | COMMITTED HIRES 12/24-01/06/96 | TRANSFERS WITHIN OAS + | - | NET | HIRES PENDING | KNOWN LOSSES 12/24-02/03/96 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **Headquarters** | | | | | | | | | |
| IO | 12 | 12 | 0 | 1 | 0 | 1 | 0 | 0 | 13 |
| APO | 15 | 13 | 0 | 0 | 1 | -1 | 0 | 0 | 12 |
| TOTAL HQ | 27 | 25 | 0 | 1 | 1 | 0 | 0 | 0 | 25 |
| **Assistant Inspectors General** | | | | | | | | | |
| AFMA | 14 | 12 | 0 | 1 | 0 | 1 | 0 | 0 | 13 |
| AFMA-NEAR | 23 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| SSA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HCFA | 31 | 27 | 1 | 0 | 1 | -1 | 0 | 0 | 27 |
| ACFA | 22 | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 19 |
| PHS | 30 | 24 | 0 | 0 | 0 | 0 | 0 | 1 | 23 |
| Total AIG's | 120 | 102 | 1 | 1 | 1 | 0 | 0 | 1 | 102 |
| **Regions** | | | | | | | | | |
| I | 52 | 48 | 0 | 0 | 0 | 0 | 0 | 0 | 48 |
| II | 58 | 58 | 0 | 0 | 0 | 0 | 0 | 0 | 58 |
| III | 51 | 41 | 0 | 0 | 0 | 0 | 0 | 0 | 41 |
| IV | 67 | 66 | 0 | 0 | 0 | 0 | 0 | 0 | 66 |
| V | 67 | 60 | 0 | 0 | 0 | 0 | 0 | 0 | 60 |
| VI | 54 | 49 | 0 | 0 | 0 | 0 | 0 | 0 | 49 |
| VII | 51 | 44 | 0 | 0 | 0 | 0 | 0 | 1 | 43 |
| IX | 64 | 56 | 0 | 0 | 0 | 0 | 0 | 0 | 56 |
| Total Region | 464 | 422 | 0 | 0 | 0 | 0 | 0 | 1 | 421 |
| GRAND TOTAL | 611 | 549 | 1 | 2 | 2 | 0 | 0 | 2 | 548 |

| | |
|---|---|
| On Board | 549 |
| Committed Hires | 1 |
| | 550 |
| Hires Pending | 0 |
| | 550 |
| Losses Pending | 2 |
| | 548 |

*After SSA Break-out.

Subject: INVESTIGATIVE AUTHORITY

1-10-00 Purpose
10 Statutory Authority
20 Violations of Title 42, U.S. Code
30 Violations of Title 18, U.S. Code
40 Violations of Title 31, U.S. Code
50 Privacy Act Violations - Title 5, U.S. Code
60 Oaths and Affirmations
70 Questions

1-10-00 PURPOSE

A. This chapter explains the basic investigative authority of the Office of Investigations (OI), relating such authority to statutory provisions.

B. Subsequent chapters explain policies and procedures flowing from the authorities explained in this chapter.

1-10-10 STATUTORY AUTHORITY

-- A. The OI has the authority under Public Law 95-452 to supervise, conduct and provide policy direction for investigations relating to the programs and operations of the Department of Health and Human Services (HHS).

B. The scope of such authority includes criminal and noncriminal matters, whether or not HHS personnel are involved.

-- C. Such authority is codified in Title 5 of the U.S. Code (USC). (See 5 USC Appendix 3.)

-- D. The statements of OI jurisdiction given below are based on the authority given in 5 USC Appendix 3.

1-10-20 VIOLATIONS OF TITLE 42, U.S. CODE

The OI has primary investigative jurisdiction over violations of title 42, including the civil monetary penalties provisions (42 USC 1320 a-7a), as such provisions relate specifically to HHS programs and operations.

1-10-30 VIOLATIONS OF TITLE 18, U.S. CODE

The OI has concurrent investigative jurisdiction with other Federal agencies where violations of title 18 involve HHS programs or operations.

1-10-40 VIOLATIONS OF TITLE 31, U.S. CODE

The OI has authority to investigate civil complaints within the purview of title 31 where such matters involve HHS programs or operations.

1-10-50 PRIVACY ACT VIOLATIONS - TITLE 5, U.S. CODE

A. The OI has the authority to investigate suspected violations of the Privacy Act (5 USC 552a) where such matters involve HHS programs or operations.

B. Where the matter involves suspected illegal disclosure of information and it is not clear whether the information disclosed was part of a system of records as defined in the Privacy Act, and/or whether its disclosure would constitute a violation of the penal provisions of the Privacy Act, the matter will be referred through appropriate supervisory channels to the Office of the General Counsel, Inspector General Division, for a preliminary determination.

-- 1-10-60 OATHS AND AFFIRMATIONS

The OI investigators have the authority to administer oaths and affirmations in connection with an investigation.

A. Explicit authority is given in 5 USC Appendix 3, section 6 (a)(5).

B. General authority is given in 5 USC 303.

1-10-70 QUESTIONS

Any questions concerning OI investigative authority should be addressed to Criminal Investigations Division Headquarters.

Office of
Inspector
General

Office of
Investigations

# SSA Fraud Awareness Guide

U.S. Department of Health and Human Services

September 1992

## Introduction

This SSA Fraud Awareness Guide was prepared by the Office of Investigations (OI), Office of Inspector General, for use by employees of the Social Security Administration (SSA). The guide is a digest of information found in the Program Operations Manual System (POMS). This booklet describes the elements of a criminal violation, tells how to identify possible violations in SSA benefit programs, and instructs the SSA employee on methods of documenting the crime and referring the matter to OI for criminal investigation.

This guide is intended as a supplemental tool and is not intended to replace or supersede any related instructions issued by the SSA.

Any questions concerning this material may be directed to the local OI office.

# Table of Contents

Page

Elements of SSA Program Violations . . . . . . . . . 1

Other Legal Factors . . . . . . . . . . . . . . . . . . . . . . 3

Types of Benefit Fraud:

Title II:

Retirement . . . . . . . . . . . . . . . . . . . . . . . 4

Survivor's . . . . . . . . . . . . . . . . . . . . . . . . 5

Disability . . . . . . . . . . . . . . . . . . . . . . . . 5

Title XVI:

Aged . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Blind/Disabled . . . . . . . . . . . . . . . . . . . . 6

Frauds Which Affect Titles II and XVI . . . . . . . 7

Detecting Violations . . . . . . . . . . . . . . . . . . . . 8

Tips on Developing Potential Fraud Cases . . . . . . . . . . . . . . . . . . . . . . . . . 9

Optional Reporting of Fraud Cases . . . . . . . . . . 11

Weakening Factors . . . . . . . . . . . . . . . . . . . . . 12

Types of Employee Violations . . . . . . . . . . . . . 13

## Elements of Social Security Program Violations

For an act to be considered a criminal violation against a Social Security Administration (SSA) benefit program, we must establish that the act was *material* to eligibility or payment amount, and that the act was done *knowingly*, *willfully*, and *with intent to defraud*. If any one of these elements is missing in a case, then the act is not a criminal violation. Following is an explanation of these elements. They are also covered in POMS section **GN04105.005B**.

### Material

A false statement, false representation, or deceitful withholding of information is *material* where there is an obligation to disclose the truth, and where the deceit is significant and would:

- influence payment of benefits not authorized by the Social Security Act
- influence SSA in determining rights to payments, or
- lead to the improper issuance of Social Security number (SSN) cards or other documents.

### Knowingly

*Knowingly* is that state of mind which exists when a person knows he/she cannnot lawfully do a particular act, but nevertheless does it.

## Elements of Social Security Program Violations (cont'd.)

**Willfully**

*Willfully* is voluntarily, purposefully, deliberately, and intentionally, as opposed to accidentally, inadvertently, or carelessly; i.e., having knowledge of the existence of a legal obligation and the intent to evade that obligation

**Intent To Defraud**

*Intent to defraud* is an intentional deception or misrepresentation which the individual knows to be false or which he/she does not believe to be true, but makes knowing that the deception could result in some unauthorized benefit to himself/herself or some other person (synonymous with "fraudulently").

***Note:*** SSA should contact the Office of Investigations Field Office (OIFO) for questions arising in specific cases.



## Other Legal Factors

**Statute of Limitations**

There must be an indictment or information filed with the courts within 5 years from the date of the offense.

**Venue**

With few exceptions, a criminal case must be tried in the judicial district where the violation occurred.

## Types of Benefit Fraud

Each program administered by SSA, and each type of benefit within the program, presents its own vulnerabilities. Each is, therefore, susceptible to particular types of fraudulent activities.

Following is an analysis by program and benefit type of various frauds you may encounter.

TITLE II

## Retirement Benefits

**Questionable Retirement**
Usually self-employed individuals or corporate directors, who attempt to hide their work by claiming it is being done by someone else, usually a family member.

**False Proof of Age**
Submitted by an applicant in an attempt to obtain a higher benefit amount or earlier month of entitlement.

**Falsified Earnings Record**
Often involves an individual working and using a family member's SSN to gain insured status or increase benefit amounts. Frequently involves foreign-born individuals or non-covered government workers.



TITLE II (cont'd.)

## Survivor's Benefits

**Non-existent Auxiliaries**
Falsified birth certificates presented to obtain benefits.

**Relationships**
Falsified marriages, or the concealment of divorces or marriages.

**False Proof of Age**
Submitted by an applicant in an attempt to obtain a higher benefit amount or earlier month of entitlement.

## Disability Benefits

**Failure to Report Work Activity**
Involves a disability beneficiary who returns to work and does not report it. The most prosecutable cases are those where the beneficiary makes an effort to prevent SSA from finding out about his work by using a different name and/or SSN.

**Falsified Earnings Record**
Often involves an individual working and using a family member's SSN to gain insured status or increase benefit amounts. Frequently involves foreign-born individuals or non-covered government workers.

**Fake Disability**
Allegations that the beneficiary is not really disabled. Very difficult to prove, especially when disability decision is based on a contracted consultative examination. Could involve the applicant's own physician providing a false diagnosis to SSA.

## Aged

**Falsified Proof of Age (Applicant not yet age 65)**
Presents counterfeit birth/baptism certificate, assumes the identity of someone else over 65, or alters own documents.

**False Statements re: Income/Resources**
Conceals or fails to disclose income/resources over the allowable limits.

**False Proof of Alien Status/Citizenship**
Presents fraudulent immigration or naturalization documents.

## Blind/disabled

**False Proof of Alien Status/Citizenship**
Presents fraudulent immigration or naturalization documents.

**Fake Disability**
Allegations that the beneficiary is not really disabled. Very difficult to prove, especially when disability decision is based on a contracted consultative examination. Could involve the applicant's own physician providing a false diagnosis to SSA.

**Failure to Report Work Activity**
Involves a disability beneficiary who returns to work and does not report it. The most prosecutable cases are those where the beneficiary makes an effort to prevent SSA from finding out about his work by using a different name and/or SSN.

**False Statements re: Income/Resources**
Conceals or fails to disclose income/resources over the allowable limits.





**Death of Beneficiary/Recipient**
In all benefit programs one of the most frequent types of fraud is failure to report the death of a beneficiary/recipient while continuing to cash benefit checks.

**Representative Payee Misuse**
This, too, cuts across all benefit types and includes any case where the representative payee fails to use the money received to care properly for the beneficiary/recipient. The strongest cases for prosecution involve non-family payees and those where the beneficiary/recipient is not living with the payee.

**Attorney Fee Cases**
Any case where an attorney/representative charges a client for services rendered in excess of the amount approved by SSA, or collects fees directly from a claimant without petitioning for same.

**Multiple Identity Cases**
Involves persons receiving more than one benefit under various identities. Although this does sometimes occur with Title II, it is more frequently discovered under Title XVI.

**Social Security Number Fraud**
Involves submitting false documents to obtain an SSN or misusing an SSN. The SSN misuse does not necessarily have to be related to a benefit payment, e.g. credit fraud, bank fraud, false identification, etc.

## Detecting Violations

Potential violations may be discovered at any point in the claims process or in processing of a posteligibility action.

**Be alert to:**

1. Alterations in documents
   a. Different printing, or typeface, misalignment of text, or nonmatching ink.
   b. Use of white out or photocopies without proper embossed seals or stamps.
   c. Missing sections or documents apparently cut or reconstructed.
2. Computer interfaces which indicate discrepancies with information in file, for example:
   a. Work interfaces
   b. Death matches
   c. IRS alerts
3. Contradictory statements made by the same person.
4. Conflicting statements about the same issue by different people.
5. Late reporting of events affecting eligibility or entitlement to payments.
6. Complaints of being charged for help in getting payments.
7. Statements that disagree with information shown on other documents.
8. Complaints or tips that someone is getting payments for which he or she is not eligible.



## Tips on Developing Potential Fraud Cases

1. On written statements by witnesses or suspects, include the interviewer's (and witnesses', if applicable) name, title and SSA duty station, as well as, the time and date of the interview. Write them legibly and date them. Have the interviewee initial all changes.
2. All written statements should be taken on Form SSA-795.
3. Official documents must be certified by the custodian of record.
4. Do not alter or deface any documents in any manner, such as by encircling, underlining in red, highlighting, etc.
5. Do not remove documents from claim folders.
6. Consider venue, i.e. where were the checks mailed or the payments direct-deposited.
7. Establish a Program Integrity File per POMS **GN 04110.050**
8. Do not promise a witness or informant that their identity will be kept secret.
9. All interviews with subjects suspected of fraud should be conducted in person.
10. When you contact a beneficiary regarding a complaint ask open ended questions such as, "Please declare all of your work since date of entitlement", rather than, "We have a report you are working at the XYZ Company. Are you working there?"
11. Determine if the beneficiary is reporting minimal participation in work. Ask for exact number of hours worked, details as to daily activities, etc.
12. Miranda warnings are not required and should not be given.

13. Before accepting repayment on a fraud case, contact the regional Office of Investigations (OI), Office of Inspector General.
14. Stop-payment actions should be taken as promptly as possible after discussion with OI.
15. Keep OI up-to-date on developments such as death of suspect, suspect jailed or administrative appeal filed.
16. Call OI immediately upon receipt of a phone call or letter from a complainant regarding possible fraud.
17. Keep in mind, that SSA adjudicates and documents, OI investigates and presents for prosecution. The OI may request documentation from SSA to determine entitlement and the amount of any overpayment.



## Optional Reporting of Fraud Cases

When any of the following situations are known prior to notifying OI, SSA employees may use their discretion in reporting the case to OI:

1. The only *suspect is dead*.
2. The only *suspect is age 70 or older*.
3. The only *suspect has a terminal illness*.
4. The violation involves a *failure to report a Cost of Living or pension increase*.
5. *No improper payments* are involved in the violation.

However, the following exceptions *must be reported:*

1. Any employee involvement in the fraud
2. *SSN violation.*
3. *Misuse by a representative payee.*
4. *Violation of the attorney (and non-attorney representative) fee regulations.* Remember attorney fee violations must also be reported to the Office of Hearings and Appeals, Special Counsel Staff (POMS **GN 04105.015C**)

Under any circumstances, if the SSA employee believes the case is egregious or warrants special attention they should discuss it with OI.

(See POMS **GN 04110.035** and **GN 04110.010B3)**

**Call OI for any clarification of Optional Reporting**

## Weakening Factors

When one or more of the following factors are present, the likelihood of criminal prosecution is weakened:

- Suspect is elderly
- Suspect is disabled
- Suspect is in prison
- Suspect had good motive
- Suspect is illiterate
- Suspect has language barrier
- Suspect becomes re-entitled because terminating event ends
- Violation detected based on suspect's voluntary report
- Violation not flagrant or aggravated
- Violation did not result in overpayment
- Full repayment or recovery is made
- Amount of overpayment or misused funds does not meet prosecutive guidelines
- Statute of limitations is nearing expiration
- Law has changed so that action no longer carries a criminal penalty
- Close issue of law casts doubt on adverse administrative determination

Under any circumstances, if the SSA employee believes the case is egregious or warrants special attention they should discuss it with OI.

(See POMS **GN 04110.010B3e)**



## Types of Employee Violations

Although employee fraud cases are fairly rare, the most frequent allegations of employee fraud are for:

- Charging money to process valid SSN applications
- Processing fraudulent SSN applications
- Retaining beneficiary refunds for personal use
- Directing benefits to own address/bank account
- Travel voucher fraud
- Disclosing or selling of SSA/SSN information
- Soliciting or receiving bribes

(SSA employee violations are discussed in POMS **GN 04110.040**. Reporting of employee violations is also covered in **GN 04110.045**.)

LEXSEE 54 FR 46775

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Office of the Secretary

*54 FR 46775*

November 7, 1989

Office of Inspector General; Statement of Organization, Functions and Delegations of Authority

**TEXT:** This Notice amends part A (Office of the Secretary) of the Statement of Organization, Functions and Delegations of Authority for the Department of Health and Human Services (HHS) to reflect certain changes in chapter AF, Office of Inspector General (OIG). Chapter AF was published at *50 FR 45488* and at *51 FR 9894,* March 21, 1986.

The revision flows from the transfer of the statutory basis for the Office of Inspector General from Public Law 94-505 to Public Law 95-452. The transfer was made under the Inspector General Act Amendments of 1988 (Pub. L. 100-504) effective April 17, 1989. This functional statement conforms to and carries out the statutory requirements for operating the Office of Inspector General. While the basic organizational structure of the Office of Inspector General is unchanged, certain units and positions are renamed, and there are minor shifts in reporting relationships. An additional program unit has been delineated, and some small functional units have been transferred; *e.g.,* the information resources management function formerly assigned to the Deputy Inspector General is now under the Deputy Inspector General for Audit Services. The public affairs, congressional liaison and semiannual report functions formerly assigned to the Office of Analysis and Inspections are now under the Assistant Inspector General for Management and Policy. While relatively minor, the changes have been made to assist the organization to accomplish its mission more effectively.

Delete Chapter AF in its entirety and replace with the following:

Section AF.00 Office of Inspector General (OIG) -- Mission

This organization was established by law as an independent and objective oversight unit of the Department to carry out the mission of promoting economy, efficiency and effectiveness through the elimination of waste, abuse and fraud. In furtherance of this mission, the organization engages in a number of activities:

A. Conducting and supervising audits, investigations, inspections and evaluations relating to HHS programs and operations.

B. Identifying systemic weaknesses giving rise to opportunities for fraud and abuse in HHS programs and operations and making recommendations to prevent their recurrence.

C. Leading and coordinating activities to prevent and detect fraud and abuse in HHS programs and operations.

D. Detecting wrongdoers and abusers of HHS programs and beneficiaries so appropriate remedies may be brought to bear.

E. Keeping the Secretary and the Congress fully and currently informed about problems and deficiencies in the administration of such programs and operations and about the need for and progress of corrective action, including imposing sanctions against providers of health care under Medicare and Medicaid who commit certain prohibited acts.

In support of its mission, the Office of Inspector General carries out and maintains an internal quality assurance system, including periodic quality assessment studies and quality control reviews, to provide reasonable assurance that applicable laws, regulations, policies, procedures, standards and other requirements are followed; are effective; and are functioning as intended in OIG operations.

Section AF.10 Office of Inspector General -- Organization

There is at the head of the OIG a statutory Inspector General, appointed by the President and confirmed by the Senate. The Office of Inspector General consists of five organizational units:

A. Immediate Office of the Inspector General (AFA).

B. Office of the Principal Deputy Inspector General (AFA1).

C. Office of Audit Services (AFH).

D. Office of Investigations and Enforcement (AFJ).

E. Office of Evaluation and Inspections (AFE).

Section AF.20 Office of Inspector General -- Functions

The component sections which follow describe the specific functions of the organization.

Section AFA.00 Immediate Office of the Inspector General (OIG) -- Mission

The Inspector General is directly responsible for meeting the statutory mission of the OIG as a whole and for promoting effective OIG internal quality assurance systems, including quality assessment studies and quality control reviews of OIG processes and products.

Section AFA.10 Immediate Office of the Inspector General -- Organization

The Immediate Office comprises the Inspector General and an immediate staff.

Section AFA.20 Immediate Office of the Inspector General -- Functions

As the senior official of the organization, the Inspector General supervises the Deputy Inspectors General who head the major OIG components. The Inspector General is appointed by the President, with the advice and consent of the Senate, and reports to and is under the general supervision of the Secretary or, to the extent such authority is delegated, the Under Secretary, but does not report to and is not subject to supervision by any other officer in the Department. In keeping with the independence intended in the statutory basis for the OIG and its mission, the Inspector General assumes and exercises, through line management, all functional authorities related to the administration and management of the OIG and all mission related authorities stated or implied in the law or delegated directly from the Secretary.

The Inspector General provides executive leadership to the organization and exercises general supervision over the personnel and functions of its major components. The Inspector General determines the budget needs of the OIG, sets OIG policies and priorities, oversees OIG operations and provides reports to the Secretary and the Congress. In this capacity the Inspector General is empowered under the law with general personnel authority, e.g., selection, promotion, assignment, etc., of employees, including members of the senior executive service. The Inspector General delegates related authorities as appropriate.

Section AFA1.00 Office of the Principal Deputy Inspector General (OPDIG) -- Mission

This office is responsible for the reporting and legislative and regulatory review functions required in the law; for formulating and executing the OIG budget; for managing external affairs; and for establishing functional policies for the general management of the OIG. In support of its mission, the office carries out and maintains an internal quality assurance system. The system includes quality assessment studies and quality control reviews of OPDIG processes and products to ensure that policies and procedures are effective; are followed; and are functioning as intended.

Section AFA1.10 Office of the Principal Deputy Inspector General -- Organization

This office comprises the Principal Deputy Inspector General and the Office of Management and Policy.

Section AFA1.20 Office of the Principal Deputy Inspector General -- Functions

*A. Principal Deputy Inspector General.*

This official assists the Inspector General in the management of the OIG, and during the absence of the Inspector General, acts as the Inspector General. The Principal Deputy Inspector General carries out the mission stated in AFA1.00 through the Assistant Inspector General for Management and Policy.

*B. Office of Management and Policy.*

This office is directed by the Assistant Inspector General for Management and Policy.

1. The office conducts and coordinates OIG reviews of existing and proposed legislation and regulations related to HHS programs and operations to identify their impact on economy and efficiency and their potential for fraud and abuse. It develops regulations for publication in the Federal Register and legislative proposals for inclusion in the Department's legislative program. It serves as contact for the press and electronic media and serves as OIG congressional liaison. The office prepares congressional testimony and confers with officials in the Office of the Secretary staff divisions on congressional relations, legislation and public affairs. It develops and publishes OIG newsletters, recruitment brochures and other issuances to announce and promote OIG activities and accomplishments.

2. The office coordinates the development of the OIG long-range strategic plan and the OIG annual work plan. It compiles the Semiannual Report to the Congress and operates the Executive Secretariat. It formulates and oversees the execution of the OIG budget and confers with the Office of the Secretary, the Office of Management and Budget and the Congress on budget issues. It issues quarterly grants to States for Medicaid fraud control units. It conducts management studies and analyses and establishes and coordinates general management policies for the OIG and publishes those policies in the OIG Administrative Manual. It serves as OIG liaison to the Office of the Secretary for Freedom of Information and Privacy Act requests, personnel issues and other administrative policies and practices, and on equal employment opportunity and other civil rights matters. It coordinates internal control reviews for the OIG.

Section AFH.00 Office of Audit Services (OAS) -- Mission

The Office of Audit Services provides policy direction for and conducts and oversees comprehensive audits of HHS programs, operations, grantees and contractors, following generally accepted Government auditing standards (GAGAS), the Single Audit Act of 1984, applicable Office of Management and Budget (OMB) circulars and other legal, regulatory and administrative requirements. It maintains an internal quality assurance system, including periodic quality assessment studies and quality control reviews, to provide reasonable assurance that applicable laws, regulations, policies, procedures, standards and other requirements are followed in all audit activities performed by, or on behalf of, the Department. In furtherance of this mission, the organization engages in a number of activities:

A. The office coordinates and confers with officials of the central Federal management agencies (OMB, the General Accounting Office (GAO), the Office of Personnel Management (OPM) and the Department of the Treasury) on audit matters involving HHS programs and operations. It provides technical assistance to Federal, State and local investigative offices on matters concerning the operation of the Department's programs. It participates in interagency efforts implementing OMB Circulars A-128 and A-110, which call for use of the single audit concept for most external audits. It performs audits of activities administered by other Federal departments, following the system of audit cognizance administered by OMB. It participates in the President's Council on Integrity and Efficiency (PCIE) initiatives and other Governmentwide projects. It works with other OIG components on special assignments and projects. It responds to congressional oversight interests related to audit matters in the Department.

B. The Office of Audit Services helps HHS operating divisions and the Office of the Secretary staff divisions to develop policies to manage grants and procurements and policies to establish indirect cost rates. It performs preaward audits of grant or contract proposals to determine the financial capability of the grantees or contractors and conducts postaward audits.

C. The office reviews legislative, regulatory and policy proposals for audit implications. It recommends improvements in the accountability and integrity features of legislation, regulations and policy. It prepares reports on audits and special studies for the Secretary, heads HHS operating divisions, Regional Directors and others. It gathers data on unresolved audit findings for the statutorily required Semiannual Reports to the Congress and for the Under Secretary as Chairman of the Audit Resolution Council. It conducts follow-up examinations and special analyses of actions taken on previously reported audit findings and recommendations to ensure completeness and propriety.

D. The office decides when audits can or may be performed by audit organizations outside the Department, including those by other Federal or nonfederal governmental agencies, contractors, or public accounting firms. It assures that any audit performed by non-OIG auditors complies with the Government auditing standards established by the Comptroller General of the United States. It evaluates audits performed for the Department by outside organizations.

Section AFH.10 Office of Audit Services -- Organization

The Office of Audit Services comprises the following components:

A. Immediate Office.

B. Audit Policy and Oversight.

C. Health Care Financing Audits.

D. Social Security Audits.

E. Human, Family, and Departmental Services Audits.

F. Public Health Service Audits.

Section AFH.20 Office of Audit Services -- Functions

*A. Immediate Office of the Deputy Inspector General for Audit Services*

This office is directed by the Deputy Inspector General for Audit Services who carries out the functions designated in the law for the position, Assistant Inspector General for Auditing. The Deputy Inspector General for Audit Services is responsible to the Inspector General for carrying out OIG's audit mission and also serves as Audit Director for the Department. This official supervises the Assistant Inspectors General heading OAS offices described below.

The Immediate Office manages the human and financial resources of the Office of Audit Services including developing staffing allocation plans and issuing policy for, coordinating and monitoring all staffing, recruiting and training activities of the office. It maintains a professional development program for Office of Audit Services staff which meets the requirements of Government auditing standards. The office provides liaison with the General Accounting Office. It reviews all replies to GAO reports to ensure they are responsive, properly coordinated and representative of HHS policy and advises the Secretary and other officials about significant findings.

*B. Audit Policy and Oversight*

This office is directed by the Assistant Inspector General for Audit Policy and Oversight who is the principal assistant to the Deputy Inspector General for Audit Services. This official supervises the Regional Inspectors General for Audit Services who carry out audit activities in their assigned geographic areas.

1. The office develops audit policy, procedures, standards, criteria and instructions for all audit activities performed by, on behalf of, or conforming with departmental programs, grants, contracts, or operations, complying with general accepted Government auditing standards and other legal, regulatory and administrative requirements. It develops policy