and procedures for an internal quality assurance system to provide reasonable assurance that applicable laws, regulations, policies, procedures, standards and other requirements are followed in all audit activities performed by, or on behalf of, the Department, and conducts quality assurance studies to ensure that the policies and procedures are implemented by each Office of Audit Services component and are functioning as intended. It evaluates audit work, including performing quality control reviews of audit reports. It develops and monitors audit work plans. It tracks, monitors, and report on audit resolution, including follow up per OMB Circular A-50.

2. It plans, develops, and coordinates advanced techniques to carry out the functions of the Office of Audit Services. It coordinates the OIG information resources management function including computer software and hardware acquisition and maintenance. It manages the Office of Audit Services information system.

*C. Health Care Financing Audits.*

This office is directed by the Assistant Inspector General for Health Care Financing Audits who also serves as the Audit Director for the Health Care Financing Administration (HCFA). The office conducts audits of HCFA program operations and oversees nationwide the audits of the Medicare and Medicaid programs, their contracts, and providers of services and products. It maintains an internal quality assurance system, including periodic quality control reviews, to provide reasonable assurance that applicable laws, regulations, policies, procedures, standards and other requirements are followed in all HCFA audit activities performed by, or on behalf of, the Department.

*D. Social Security Audits*

This office is directed by the Assistant Inspector General for Social Security Audits who also serves as Audit Director for the Social Security Administration. The office conducts as well as oversees nationwide the audits of the Social Security Administration's Retirement, Survivors and Disability Insurance programs; the Supplemental Security Income program; the Black Lung program; as well as the operation and administration of the entire agency. It maintains an internal quality assurance system, including periodic quality control reviews, to provide reasonable assurance that applicable laws, regulations, policies, procedures, standards and other requirements are followed in all Social Security audit activities performed by, or on behalf of, the Department.

*E. Human, Family, and Departmental Services Audits*

This office is directed by the Assistant Inspector General for Human, Family, and Departmental Services Audits who also serves as the Audit Director for the Family Support Administration (FSA), the Office of Human Development Services (HDS) and the Office of the Secretary (OS). The office conducts and oversees audits of the operations and programs of the FSA, the HDS and the OS, including statewide cost allocation plans. It maintains an internal quality assurance system, including periodic quality control reviews, to provide reasonable assurance that applicable laws, regulations, policies, procedures, standards and other requirements are followed in all FSA, HDS and OS audit activities performed by, or on behalf of, the Department.

*F. Public Health Service Audits*

This office is directed by the Assistant Inspector General for Public Health Service Audits who also serves as the Audit Director for the Public Health Service. The office conducts and oversees audits of the programs and activities of the Public Health Service, including the Food and Drug Administration, the National Institutes of Health, the Health Resources and Services Administration, the Alcohol, Drug Abuse, and Mental Health Administration, the Centers for Disease Control, the Agency for Toxic Substances and Disease Registry, the Indian Health Service, and the Surgeon General as well as those colleges, universities and non-profit organizations that receive research grants from the Federal Government. It maintains an internal quality assurance system, including periodic quality control review, to provide reasonable assurance that applicable laws, regulations, policies, procedures, standards and other requirements are followed in all Public Health Service audit activities performed by, or on behalf of, the Department.

Section AFJ.00 Office of Investigations and Enforcement (OIE) -- Mission

The Office of Investigations and Enforcement is responsible for conducting and coordinating investigative activities related to fraud, waste, abuse and mismanagement in HHS programs and operations, including wrongdoing by applicants, grantees, or contractors, or by HHS employees in the performance of their official duties. It serves as OIG liaison to the Department of Justice on all matters relating to investigations of HHS programs and personnel, and reports to the Attorney General when the OIG has reasonable grounds to believe Federal criminal law has been violated. It works with other investigative agencies and organizations on special projects and assignments. In support of its mission, the office carries out and maintains an internal quality assurance system. The system includes quality assessment studies and quality control reviews of OIE processes and products to ensure that policies and procedures are effective; are followed; and are functioning as intended.

Section AFJ.10 Office of Investigations and Enforcement -- Organization

The Office of Investigations and Enforcement comprises the following components:

A. Immediate Office.

B. Criminal Investigations.

C. Civil and Administrative Remedies.

D. Investigations Policy and Oversight.

Section AFJ.20 Office of Investigations and Enforcement -- Functions

*A. Immediate Office of the Deputy Inspector General for Investigations and Enforcement*

This office is directed by the Deputy Inspector General for Investigations and Enforcement who is responsible for the functions designated in the law for the position, Assistant Inspector General for Investigations. The Deputy Inspector General for Investigations and Enforcement supervises the Assistant Inspectors General who head the OIE offices described below.

The Deputy Inspector General for Investigations and Enforcement is responsible to the Inspector General for carrying out the investigative mission of the OIG and for leading and providing general supervision to the OIG investigative component. The Immediate Office coordinates quality assurance studies to ensure that applicable laws, regulations, policies, procedures, standards and other requirements are followed in all investigative activities performed by, or on behalf of, the Department.

*B. Criminal Investigations*

This office is directed by the Assistant Inspector General for Criminal Investigations who supervises a headquarters policy and review staff and the Regional Inspectors General for Investigations who carry out investigative activities in their assigned geographic areas.

1. The headquarters staff assists the Deputy Inspector General for Investigations and Enforcement to establish investigative priorities, to evaluate the progress of investigations, and to report to the Inspector General on the effectiveness of investigative efforts. It develops and implements investigative techniques, programs, guidelines and policies. It provides programmatic expertise and issues information on new programs, procedures, regulations and statutes. It directs and coordinates the investigative field offices.

2. The headquarters staff reviews completed reports of investigations to ensure accuracy and compliance with guidelines. It issues the reports to pertinent agencies, management officials and the Secretary and recommends appropriate debarment actions, administrative sanctions, civil money penalties and other civil actions, or prosecution under criminal law. It identifies systemic and programmatic vulnerabilities in the Department's operations and makes recommendations for change to the appropriate mangers.

3. The field offices conduct investigations of allegations of fraud, waste, abuse, mismanagement and violations of standards of conduct and other investigative matters within the jurisdiction of the OIG. They coordinate investigations and confer with HHS operating divisions, staff divisions, OIG counterparts and other investigative and law enforcement agencies. They prepare investigative and management improvement reports.

*C. Civil and Administrative Remedies*

This office is directed by the Assistant Inspector General for Civil and Administrative Remedies.

1. The office provides policy guidance and technical expertise to the Department, other Federal agencies, carriers, intermediaries, providers and private organizations on civil fraud laws and regulations, penalties, sanctions and other remedies. It maintains liaison with the Department of Justice on the civil fraud aspects of health care and other HHS investigations.

2. The office coordinates and/or helps investigative matters arising under the Program Fraud Civil Remedies Act, the Civil Monetary Penalties Law, and Public Law 100-93, including alleged misconduct by health care entities and others under Medicare, Medicaid, maternal and child health, and social services block grant laws. It assists the Department of Justice to investigate and evaluate civil fraud lawsuits brought under the qui tam provisions of the Federal False Claims Act and related statutes.

3. The office directs and coordinates medical reviews on civil money penalty and exclusion cases to ensure that findings and conclusions are correct and supported by medical records. It evaluates and adjudicates proposals to exclude individuals and/or entities from participation in health care programs. It conducts administrative reviews on proposed exclusions and provides written reports incident to the reviews. It negotiates, implements and monitors settlement agreements and exclusion requirements and, in cases of default, implements penalty provisions. It assists in investigations related to request for reinstatement by excluded individuals and entities, conducts administrative reviews in accordance with regulations, and adjudicates the requests for reinstatement. It maintains indices of sanctioned individuals and entitles and prepare reports of sanction and penalty activities for distribution.

*D. Investigations Policy and Oversight*

This office is directed by the Assistant Inspector General for Investigations Policy and Oversight who leads outreach activities to State and local investigative agencies, and the general management functions of the Office of Investigations and Enforcement.

1. The office oversees State Medicaid fraud control units and is responsible for certifying and recertifying these units and for auditing their Federal funding. The office provides pertinent information from HHS records to assist Federal, State and local investigative agencies to detect, investigate and prosecute fraud. It manages the HHS Hotline to receive complaints and allegations of fraud, waste and abuse, and to refer the information for investigation, audit, program review, or other appropriate action. It coordinates with the GAO hotline and hotlines from other agencies.

2. The office maintains investigative files for OIE headquarters and an automated data and management information system used by all OIE managers and investigators. It provides technical expertise on computer applications for investigations and coordinates and approves investigative computer matches with other agencies.

3. The office develops general management policy for the OIE. It develops and issues instructional media on detecting wrongdoing and on investigating and processing cases. The office reviews proposed legislation, regulations, policies and procedures to identify vulnerabilities and recommends modification where appropriate. It reviews investigative files in response to Privacy and Freedom of Information Act requests. It plans, develops, implements and evaluates all levels of employee training for investigations, management, support skills and other functions. It coordinates general management processes; e.g., compiles reports on the budget, on awards and on other personnel matters for OIE as a whole; implements policies and procedures published in the OIG Administrative Manual; and processes procurement requests and other service related actions.

Section AFE.00 Office of Evaluation and Inspections (OEI) -- Mission

The Office of Evaluation and Inspections is responsible for conducting inspections of HHS programs, operations and processes to identify vulnerabilities, to prevent and detect misconduct, and to promote economy, efficiency and

effectiveness in HHS programs and operations. In support of its mission, the office carries out and maintains an internal quality assurance system. The system includes quality assessment studies and quality control reviews of OEI processes and products to ensure that policies and procedures are effective; are followed; and are functioning as intended.

Section AFE.10 Office of Evaluation and Inspections -- Organization

The Office of Evaluation and Inspections comprises the Immediate Office and the Analysis and Inspections component.

Section AFE.20 Office of Evaluation and Inspections -- Functions

*A. Immediate Office of the Deputy Inspector Gerneral for Evaluation and Inspections*

The office is directed by the Deputy Inspector General for Evaluation and Inspections who is responsible to the Inspector General for Analysis and Inspections. The Immediate Office carries out OEI's mission in headquarters.

1. The office develops OEI's evaluation and inspections policies, procedures and standards. It assesses the quality of inspections to ensure compliance with policies and procedures. It manages OEI's human and financial resources. It develops and monitors OEI's management information systems.

2. The office manages OEI's work planning process and reviews legislative, regulatory and program proposals for vulnerabilities to fraud, waste and mismanagement. It develops evaluative techniques and coordinates projects with other OIG and departmental components. It conducts inspection of HHS programs and recommends changes to improve efficiency and effectiveness. It provides programmatic expertise and issues information on new programs, procedures, regulations and statutes to OEI regional offices. It maintains liaison with other components in the Department; follows up on implementation of corrective action recommendations; evaluates the actions taken to resolve problems and vulnerabilities identified; and provides additional data or corrective action options, where appropriate.

*B. Analysis and Inspections*

This office is directed by the Assistant Inspector General for Analysis and Inspections who supervises the Regional Inspectors General for Evaluation and Inspections who carry out OEI's mission and activities in assigned geographic areas. The office evaluates HHS programs and produces the results in inspection reprots. It conducts data and trend analyses of major HHS initiatives to determine the effects of current policies and practice on program efficiency and effectiveness. It recommends changes in program policies, regulations and law to improve efficiency and effectiveness, and to prevent fraud, abuse, waste and mismanagement. It analyzes existing policies to evaluate options for future policy, regulatory and legislative improvements.

Dated: October 27, 1989.

Louis W. Sullivan,

Secretary.

[FR Doc. 89-26156 Filed 11-6-89; 8:45 am]

BILLING CODE 4150-04-M

# Semiannual Report

April 1, 1992 - September 30, 1992

## Office of Inspector General

## STATUTORY AND ADMINISTRATIVE RESPONSIBILITIES

The Inspector General Act of 1978 (Public Law 95-452), as amended, sets forth specific requirements for semiannual reports to be made to the Secretary for transmittal to the Congress. A selection of other statutory and administrative reporting and enforcement responsibilities and authorities are listed below:

### AUDIT AND MANAGEMENT REVIEW RESPONSIBILITIES AND OFFICE OF MANAGEMENT AND BUDGET CIRCULARS

| | |
|---|---|
| P.L. 96-304 | Supplemental Appropriations and Rescissions Act of 1980 |
| P.L. 96-510 | Comprehensive Environmental Response, Compensation and Liability Act |
| P.L. 97-255 | Federal Managers' Financial Integrity Act |
| P.L. 97-365 | Debt Collection Act of 1982 |
| P.L. 98-502 | Single Audit Act of 1984 |
| P.L. 99-499 | Superfund Amendments and Reauthorization Act of 1986 |
| P.L. 100-504 | Inspector General Act Amendments of 1988 |
| P.L. 101-121 | Governmentwide Restrictions on Lobbying |
| P.L. 101-576 | Chief Financial Officers Act of 1990 |

Office of Management and Budget Circulars:

| | |
|---|---|
| A- 21 | Cost Principles for Educational Institutions |
| A- 25 | User Charges |
| A- 50 | Audit Follow-up |
| A- 70 | Policies and Guidelines for Federal Credit Programs |
| A- 73 | Audit of Federal Operations and Programs |
| A- 76 | Performance of Commercial Activities |
| A- 87 | Cost Principles for State and Local Governments |
| A- 88 | Indirect Cost Rates, Audit, and Audit Follow-up at Educational Institutions |
| A-102 | Uniform Administrative Requirements for Assistance to State and Local Governments |
| A-110 | Uniform Administrative Requirements for Grants and Other Agreements with Institutions of Higher Education, Hospitals, and Other Nonprofit Organizations |
| A-120 | Advisory and Assistance Services |
| A-122 | Cost Principles for Nonprofit Organizations |
| A-123 | Internal Controls |
| A-127 | Financial Management Systems |
| A-128 | Audits of State and Local Governments |
| A-129 | Managing Federal Credit Programs |
| A-133 | Audits of Institutions of Higher Education and Other Nonprofit Institutions |

General Accounting Office "Government Auditing Standards"

### CRIMINAL AND CIVIL INVESTIGATIVE AUTHORITIES

Criminal investigative authorities include:

| | |
|---|---|
| Title 5, | United States Code, section 552a(i) |
| Title 18, | United States Code, sections on crime and criminal procedures as they pertain to OIG's oversight of departmental programs and employee misconduct |
| Title 26, | United States Code, section 7213 |
| Title 42, | United States Code, sections 261, 263a(l), 274e, 290dd-3, 300w-8, 300x-8, 406, 408, 707, 1320a-7b, 1320b-10 and 1383(d), the Social Security and Public Health Service Acts |

Civil and administrative investigative authorities include over 75 civil monetary penalty and exclusion authorities such as those at:

| | |
|---|---|
| Title 31, | United States Code, section 3801, et seq., the Program Fraud Civil Remedies Act |
| Title 42, | United States Code, sections 1320a-7, 1320c-5, 1395l, 1395m, 1395u, 1395dd and 1396b, the Social Security Act |

# FOREWORD

We are pleased to submit this semiannual report of the Office of Inspector General (OIG), U.S. Department of Health and Human Services (HHS), as required by the Inspector General Act of 1978 (Public Law 95-452), as amended. We wish to thank the Department's managers and the Members of the Congress whose continued assistance has helped us to realize our accomplishments.

The OIG works to protect the integrity of departmental programs and the health and welfare of the beneficiaries of those programs. For Fiscal Year (FY) 1992, the HHS budget reached $545 billion, an increase of $60 billion over FY 1991, and the FY 1993 budget is estimated at $585 billion. At the same time, the OIG budget has remained essentially level since FY 1990. While we are proud of our accomplishments under these conditions, we cannot continue the same high level of activity with a declining level of resources.

In recognition of the Department's responsibility to meet the important social goals and pressing health needs of the American public, the Secretary has set specific objectives and established program directions for the operating divisions designed to achieve those objectives. The OIG's activities support those goals by promoting high quality, cost-effective health care and human services, improved access to health care for all Americans, and the integrity of the Social Security and Medicare trust funds. In addition, OIG is focusing particular attention on improving financial systems within the Department, and accelerating the development and auditing of financial statements pursuant to the Chief Financial Officers Act. The OIG will expand its financial statement audit activity in FY 1993 by initiating the audit work that will allow us by FY 1995 to complete a full audit of the Health Care Financing Administration's (HCFA's) Financial Statement.

The OIG's work covers all the operating divisions of the Department. Each operating division is covered in a separate chapter in this report:

- The HCFA administers the Medicare and Medicaid programs.
- The Social Security Administration manages the Nation's Retirement, Survivors and Disability Insurance program, the Supplemental Security Income program and Part B of the Special Benefits to Disabled Coal Miners (Black Lung) program.
- The Public Health Service promotes biomedical research, disease cure and prevention, and the safety and efficacy of marketed food, drugs and medical devices; measures the impact of toxic waste sites on health; and conducts other activities designed to ensure the general health and safety of American citizens.

- The Administration on Children and Families (ACF) provides Federal direction and funding for State-administered programs designed to promote stability, economic security, responsibility and self-support for the Nation's families and administers a variety of programs that provide social services to American children, families, older Americans, Native Americans and the Nation's developmentally disabled. Included in the chapter on ACF is the Administration on Aging, which serves as an advocate for older persons within the Department and with other agencies at the national level.

The OIG is comprised of three components - the Office of Audit Services, the Office of Investigations, and the Office of Evaluation and Inspections. A complete listing of OIG audit and inspection reports is being furnished to the Congress under separate cover. Copies are available upon request.

Bryan B. Mitchell
Principal Deputy Inspector General

# Semiannual Report

# Office of Inspector General

October 1, 1993 - March 31, 1994

June Gibbs Brown
Inspector General

HHS-OIG 980

## STATUTORY AND ADMINISTRATIVE RESPONSIBILITIES

ıe Inspector General Act of 1978 (Public Law 95-452), as amended, sets forth specific requirements for semiannual ports to be made to the Secretary for transmittal to the Congress. A selection of other statutory and administrative porting and enforcement responsibilities and authorities are listed below:

### AUDIT AND MANAGEMENT REVIEW RESPONSIBILITIES AND OFFICE OF MANAGEMENT AND BUDGET CIRCULARS

L. 96-304 Supplemental Appropriations and Rescissions Act of 1980
L. 96-510 Comprehensive Environmental Response, Compensation and Liability Act
L. 97-255 Federal Managers' Financial Integrity Act
L. 97-365 Debt Collection Act of 1982
L. 98-502 Single Audit Act of 1984
L. 99-499 Superfund Amendments and Reauthorization Act of 1986
L. 100-504 Inspector General Act Amendments of 1988
L. 101-121 Governmentwide Restrictions on Lobbying
L. 101-576 Chief Financial Officers Act of 1990
L. 102-486 Energy Policy Act of 1992

ffice of Management and Budget Circulars:

A- 21 Cost Principles for Educational Institutions
A- 25 User Charges
A- 50 Audit Follow-up
A- 70 Policies and Guidelines for Federal Credit Programs
A- 73 Audit of Federal Operations and Programs
A- 76 Performance of Commercial Activities
A- 87 Cost Principles for State and Local Governments
A- 88 Indirect Cost Rates, Audit, and Audit Follow-up at Educational Institutions
A-102 Uniform Administrative Requirements for Assistance to State and Local Governments
A-110 Uniform Administrative Requirements for Grants and Other Agreements with Institutions of Higher Education, Hospitals, and Other Nonprofit Organizations
A-122 Cost Principles for Nonprofit Organizations
A-123 Internal Controls
A-127 Financial Management Systems
A-128 Audits of State and Local Governments
A-129 Managing Federal Credit Programs
A-133 Audits of Institutions of Higher Education and Other Nonprofit Institutions

eneral Accounting Office "Government Auditing Standards"

### CRIMINAL AND CIVIL INVESTIGATIVE AUTHORITIES

riminal investigative authorities include:

itle 5, United States Code, section 552a(i)
itle 18, United States Code, sections on crime and criminal procedures as they pertain to OIG's oversight of departmental programs and employee misconduct
itle 26, United States Code, section 7213
itle 42, United States Code, sections 261, 263a(l), 274e, 290dd-3, 300w-8, 300x-8, 406, 408, 707, 1320a-7b, 1320b-10 and 1383(d), the Social Security and Public Health Service Acts

ivil and administrative investigative authorities include over 75 civil monetary penalty and xclusion authorities such as those at:

itle 31, United States Code, section 3801, et seq., the Program Fraud Civil Remedies Act
itle 42, United States Code, sections 1320a-7, 1320a-7a, 1320c-5, 1395l, 1395m, 1395u, 1395dd and 139[illegible]

# FOREWORD

I am pleased to present my first semiannual report as Inspector General at the Department of Health and Human Services (HHS). In my first months at HHS, I have come to appreciate first-hand both the expanse of the Department's programs and the Office of Inspector General's (OIG) deserved reputation for excellence in fulfilling its mission.

The OIG has a responsibility to protect the integrity of HHS programs and the health and welfare of the beneficiaries of those programs. Given the Department's size and scope, this is a broad mandate. Outlays for the more than 300 HHS programs are expected to exceed $632 billion in Fiscal Year 1994, accounting for over one-third of the budget of the United States. Moreover, the Department's programs impact the well-being and quality of life of virtually every U.S. citizen.

The OIG's impact in dollars alone has been impressive. Between 1981 and 1993, $57 billion in savings, fines, settlements, restitutions and receivables resulted from OIG activities and implementation of our recommendations. This represents an increase from $4 saved for every OIG dollar spent in 1981 to $61 saved for every OIG dollar appropriated in 1993. Despite dwindling resources, I am committed to continuing this solid return to the American taxpayers.

Two of this Administration's top policy initiatives (health care and welfare reform) will, if enacted, have a profound impact on the way health care and welfare are financed and delivered, as well as create new challenges for OIG. We are working with agency managers to build in sufficient safeguards and controls to prevent and detect fraud, waste and abuse and to assure a high quality of service delivery to the programs' beneficiaries.

In a joint effort with the Department of Justice, we have established the Executive Level Health Care Fraud Policy Group to identify important health care fraud initiatives. Moreover, HHS OIG is forming partnerships with State auditors and program evaluators to analyze issues that affect both the Medicare and Medicaid programs. We are also working to optimize coordination with other OIGs, particularly those with responsibilities in the health care area.

As in Government as a whole, we have begun to streamline our own operations and management structure to minimize costs and ensure that the greatest proportion of our resources is concentrated on the investigations, audits and inspections through which we carry out our mandate. We are implementing new review and investigative methodologies to perform our work. Along with strategic priority setting and staff deployment, these

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

# PERFORMANCE AND ACCOUNTABILITY REPORT



Fiscal Year

**2005**

## INTRODUCTION



The Department of Health and Human Services (HHS) is the principal Federal agency responsible for protecting the health of all Americans and providing essential human services, especially for those who are least able to help themselves. Encompassing hundreds of programs, HHS is the Nation's largest health insurer and the U.S. Government's largest grant-making agency.

The HHS FY 2005 Performance and Accountability Report (PAR) is produced pursuant to the Reports Consolidation Act of 2000 and discusses the Department's accomplishments, issues, and initiatives during fiscal year (FY) 2005 (October 1, 2004, through September 30, 2005). The financial section of this report (Section III) also includes comparative results for FY 2004.

The PAR contains a high level overview of:

- The Department's purposes, programs, accomplishments, and challenges;
- The nature of resources entrusted to HHS; and
- HHS' management of and accountability for those resources.

This is HHS' fourth PAR, and tenth annual report prepared pursuant to the Chief Financial Officers Act, as amended. In this report to the Department's "stockholders," the American public, HHS explains how its funds are used to benefit the American people. HHS also provides this information to a wide array of decision makers, including the Office of Management and Budget (OMB) and the Congress.

This report is designed to provide a complete, accurate, and useful understanding of HHS. HHS' component Operating Divisions (OPDIVs) also issue OPDIV-specific reports, which provide more detailed program and financial information. These and other reports can be found at the individual OPDIV's respective websites (see HHS Agency Descriptions and Highlights later in this document).





## OVERVIEW

The Department of Health and Human Services (HHS) manages over 300 programs. It is one of the largest Federal agencies, the Nation's largest health insurer, and the Federal Government's largest grant-making agency. The HHS mission is to protect and promote the health and well-being of all Americans while providing world-class leadership in the areas of biomedical research, public health, and social services. HHS programs impact all Americans on a daily basis, through direct services and funding, scientific advances, and educational information that allow people to choose better health care options, medicine, and even food. Through numerous grants and other financing arrangements with both public and private service providers, HHS is committed to improving overall health and human service outcomes and the economic independence of individuals and families throughout the United States.

In FY 2004, HHS published an updated Strategic Plan, which outlines the HHS strategic direction over the next 5 years. The eight strategic goals in the plan guide HHS for FY 2004 - FY 2009 in accomplishing its' mission of protecting and improving the health and well-being of the American public. These eight goals provide a focus point for HHS program investments and serve as a framework for the measures that track the Department's overall performance. The Office of the Secretary is responsible for providing overall policy guidance and direction to the Operating Divisions (OPDIVs) to help achieve the Department's strategic goals.

The strategic goals, performance goals, and program results reflect the combined commitment and effort of HHS programs, and their state, local, Federal, Tribal and non-government partners. These program partners will spend the overwhelming majority of the funds expended for HHS programs in FY 2005 to better the lives of all Americans. A copy of the updated HHS Strategic Plan for FY 2004 - FY 2009 is available at http://aspe.hhs.gov/hhsplan/.

**Data and Performance Measurement**

Sound information and data are essential to fulfilling the HHS mission of enhancing the health and well-being of every American. Information provided is the main ingredient to success for every HHS performance measure. Whether providing for effective health and human services, or fostering sustained advances in the sciences or public health system, reliable information is an essential tool used in planning, measuring results, and making sound decisions. Accordingly, the Department plays an essential role in producing the necessary data for program decision making, both as a direct producer and a partner in data collection with the states, grantees, and other governmental agencies. The HHS Data Council maintains a directory of all the major data systems supported by HHS OPDIVs, and all surveys on its website (http://aspe.hhs.gov/datacncl/index.shtml.) These data systems support most of the performance measurement objectives within HHS programs, as well as various broad health and social outcome indicators.

HHS' programs and OPDIVs rely upon accurate data in program management, policy decision making, and intervention development. The Government Performance and Results Act of 1993 (GPRA) emphasizes the importance of data for decision making and creates an incentive for staff throughout HHS to refine the Department's data systems. HHS programs work extensively with partners in state, local, and Tribal governments; grantees; and Medicare contractors in program implementation and data collection to help meet these standards. The Department continuously identifies system enhancements that improve the timeliness, completeness, and accuracy of data and enables employees to implement more sophisticated performance measures.

HHS has taken a number of steps to address key data needs in a coordinated fashion, promote a HHS-wide strategy on data issues, and strengthen the Department's ability to work in collaboration with private sector entities, state and local governments, and other partners. The HHS Data Council serves as the principal senior level internal forum on data policy, and serves as the focal point for HHS data policy initiatives. Currently, the Data Council and its working groups are focusing efforts on the following:

Excerpted from: http://www.ssa.gov/history/ssa/ssa2000chapter1.html

# SSA History

## History of SSA 1993-2000

### Chapter 1: Introduction

It is fitting that in the final year of the Clinton Administration, Social Security celebrated its 65th anniversary. Sixty-five years ago, President Franklin D. Roosevelt signed the Social Security Act into law, insuring in his words, *"The security of home, the security of livelihood and the security of social insurance."* He was a true visionary and his actions in creating Social Security – along with creation of the rest of the New Deal, helped move this country out of the Great Depression.

And President William J. Clinton has not only assured the viability of this great program, but has built on the solid foundation that FDR laid. It's also ironic that this program, which is an integral part of the very fabric of our nation, thrives today in a time of economic prosperity, proving that Social Security is a timeless program, serving the American people well in all types of economic environments. The Social Security program has become the most successful, most popular domestic program in the nation's history.

This Administrative History is a testament to that legacy by providing a comprehensive picture of SSA's efforts during the Clinton Administration in administering the Social Security programs. What follows highlights the major issues, significant events, and organizational changes at the Social Security Administration (SSA) during the past eight years. Because of their significance, information about the establishment of SSA as an Independent Agency and the long-term

solvency of the Social Security program are presented as separate chapters.

During the eight years, SSA made great strides in addressing the priorities established by its Commissioners: educating the public about the value of the Social Security program and its long-term challenges, as well as its role in personal, financial planning; assuring program integrity; providing responsive service to the public; improving the administration of its Disability and Supplemental Security Income programs; strengthening its long-range planning and policy making processes; and investing in its employees.

This Administrative History will hopefully be of interest to historians, biographers and scholars from many disciplines. It provides a narrative compiled from the viewpoint of people who were actively involved in administering the Agency's policy initiatives. In addition, a detailed chronology of major SSA events that occurred between 1993 and 2000 is included as Exhibit 1.

# PROGRAM IMPACT

SSA administers one of the largest and most complex Federal Government programs. The Agency provides social insurance coverage to more than 153 million workers, the self-employed and their families. The Old Age and Survivors Insurance (OASI) and the Disability Insurance (DI) programs (commonly known as Social Security) are based in Title II of the Social Security Act. More than 48 million persons received monthly Social Security benefits, totaling in excess of $33 billion in June 2000. [1] Of these, more than 31.5 million were retired persons and their family members, but Social Security is also much more than just a retirement program. More than seven million family members of deceased workers and approximately 6.6 million disabled workers and their dependents received monthly Social Security benefits. The Social Security program is, in fact, an intergenerational compact that has become America's family protection plan.

Because of these programs, people in this country are doing much better economically. For example, since 1959, the poverty rate among elderly Social Security beneficiaries has declined by 72 percent, from 35.2 percent in 1959 to 9.7 percent in 1999, largely due to Social Security benefits. [2]

**Program Management**

**SSA's Mission**

**"To promote the economic security of the nation's people through compassionate and vigilant leadership in shaping and managing America's Social Security programs."**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN ADAMS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 90-162C<br>and consolidated cases<br>(Judge Lynn J. Bush) |

**DECLARATION OF EDGAR JAMES**

Edgar James, counsel for plaintiffs in this case, declares as follows:

1. Among the plaintiffs in this consolidated case are approximately 45 plaintiffs who were GS-12 and/or GS-13 criminal investigators who worked for the Criminal Investigative Division of the Office of Investigations at the Department of Health and Human Services ("HHS") during the time period dating from the three years prior to the particular plaintiff's filing of a claim in this case. In addition to these plaintiffs, some plaintiffs in this case worked as GS-9 and/or GS-11 grade level criminal investigators during the relevant time period and their claims for that time have not been litigated or settled.

2. Some of these HHS criminal investigators transferred to the newly created Social Security Administration ("SSA") on March 30, 1995.

3. In any event, both groups of criminal investigators were subject to the FLSA until September 17, 1995, when both HHS and SSA came under a new pay system for criminal investigators known as Law Enforcement Availability Pay ("LEAP"). By statute, the conversion of the criminal investigators to LEAP eliminated coverage under

the Fair Labor Standards Act.

4. Among the plaintiffs in this consolidated case are approximately 10 plaintiffs who were GS-12 and/or GS-13 criminal investigators who worked for the Office of Investigations at the Department of Housing and Urban Development ("HUD") during the time period dating from the thee years prior to the particular plaintiff's filing of a claim in this case until October 30, 1994, when they ceased to be covered by the Fair Labor Standards Act ("FLSA") and came under the pay system known as Law Enforcement Availability Pay ("LEAP").

5. A number of these plaintiffs have received or are about to receive back pay pursuant to the FLSA during the time that they were employed as GS-9 through GS-13 criminal investigators at the Internal Revenue Service, the United States Customs Service, the Drug Enforcement Administration, the United States Secret Service, and/or the Bureau of Alcohol, Tobacco and Firearms.

**DECLARATION PURSUANT TO 28 U.S.C. § 1746**

I declare that the foregoing is true and correct based on personal knowledge under penalty of perjury.

Date: 3/15/07

Edgar N. James

## STATUTORY AND REGULATORY INDEX

**Fair Labor Standards Act, 29 U.S.C. § 201 et seq.**

* * *

**§ 203. Definitions**

**As used in this chapter --**

* * *

(b) "Commerce" means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof.

(c) "State" means any State of the United States or the District of Columbia or any Territory or possession of the United States.

(d) "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

(e)(1) Except as provided in paragraphs (2), (3), and (4) the term "employee" means any individual employed by an employer.

(2) In the case of an individual employed by a public agency, such term means --

(A) any individual employed by the Government of the United States --

(i) as a civilian in the military departments (as defined in section 102 of Title 5),

(ii) in any executive agency (as defined in section 105 of such title),

* * *

(s) "Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise which has employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and which --

* * *

(6) is an activity of a public agency.

* * *

The employees or an enterprise which is a public agency shall for purposes of this subsection be deemed to be employees engaged in commerce, or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce.

* * *

(x) "Public agency" means the Government of the United States; the government of a State or political subdivision thereof; any agency of the United States (including the United States Postal Service and Postal Rate Commission), a State, or a political subdivision of a State; or any interstate governmental agency.

* * *

**§ 204. Administration**

* * *

**(f) Employees of Library of Congress; administration of provisions by Office of Personnel Management**

. . . Notwithstanding any other provision of this chapter, or any other law, the Director of the Office of Personnel Management is authorized to administer the provisions of this chapter with respect to any individual employed by the United States (other than an individual employed in the Library of Congress, United States Postal Service, Postal Rate Commission, or the Tennessee Valley Authority). Nothing in this subsection shall be construed to affect the right of an employee to bring an action for unpaid minimum wages, or unpaid overtime compensation, and liquidated damages under section 216(b) of this title.

* * *

**§ 207. Maximum Hours**

**(a) Employees engaged in interstate commerce; additional applicability to employees pursuant to subsequent amendatory provisions.**

(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

* * *

**(k) Employment by public agency engaged in fire protection or law enforcement activities.**

No public agency shall be deemed to have violated subsection (a) of this section with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities (including security personnel in correction institutions) if --

(1) in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975; or

(2) in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his work period as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1) bears to 28 days, compensation at a rate not less than one and one-half times the regular rate at which he is employed.

* * *

**§ 213. Exemptions**

**(a) Minimum wage and maximum hour requirements**

The provisions of sections 206 (except subsection (d) in the case of paragraph (1) of this subsection) and section 207 of this title shall not apply with respect to --

(1) any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of subchapter II of chapter 5 of Title 5 . . .) . . . .

**(b) Maximum hour requirements**

The provisions of section 207 of this title shall not apply with respect to –

(30) a criminal investigator who is paid availability pay under section 5545a of Title 5.

* * *

**§ 216. Penalties**

* * *

**(b) Damages; right of action; attorney's fees and costs; termination of right of action**

Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action . . . .

* * *

**§ 255. Statute of limitations.**

Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended [29 U.S.C.A. § 201 et seq.], the Walsh-Healey act [41 U.S.C. § 35 et seq.], or the Bacon-Davis Act [40 U.S.C.A. § 276a et seq.] --

(a) if the cause of action accrues on or after May 14, 1947 -- may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued; . . .

* * *

**§ 259. Reliance in future on administrative rulings, etc.**

(a) In any action or proceeding based on any act or omission on or after May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended [29 U.S.C.A. § 201 et seq.], the Walsh-Healey Act [41 U.S.C.A. § 35 et seq.],

or the Bacon-Davis Act [40 U.S.C.A. § 276a et seq.], if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

(b) The agency referred to in subsection (a) of this section shall be --

(1) in the case of the Fair Labor Standards Act of 1938, as amended [29 U.S.C.A. § 201 et seq.] -- the Administrator of the Wage and Hour Division of the Department of Labor;

* * *

**§ 260. Liquidated damages.**

In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages under the Fair Labor Standards Act of 1938, as amended [29 U.S.C.A. § 201 et seq.], if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

**Law Enforcement Availability Pay of 1994, 5 U.S.C. § 5545a**

**§ 5545a. Availability pay for criminal investigators.**

(a) For purposes of this section –

(1) the term "available" refers to the availability of a criminal investigator and means that an investigator shall be considered generally and reasonably accessible by the agency employing such investigator to perform unscheduled duty based on the needs of an agency;

(2) the term "criminal investigator" means a law enforcement officer as defined under section 5541(3) (other than an officer occupying a position under title II of Public Law 99-399) who is required to –

(A) Possess a knowledge of investigative techniques, laws of evidence, rules of criminal procedure, and precedent court decisions concerning admissibility of evidence, constitutional rights, search and seizure, and related issues;

(B) recognize, develop, and present evidence that reconstructs events, sequences and time elements for presentation in various legal hearings and court proceedings;

(C) demonstrate skills in applying surveillance techniques, undercover work, and advising and assisting the United States Attorney in and out of court;

(D) demonstrate the ability to apply the full range of knowledge, skills, and abilities necessary for cases which are complex and unfold over a long period of time (as distinguished from certain other occupations that require the use of some investigative techniques in short-term situations that may end in arrest or detention);

(E) possess knowledge of criminal laws and Federal rules of procedure which apply to cases involving crimes against the United States, including –

(i) knowledge of the elements of a crime;

(ii) evidence required to prove the crime;

(iii) decisions involving arrest authority;

(iv) methods of criminal operations; and

(v) availability of detection devices; and

(F) possess the ability to follow leads that indicate a crime will be committed rather than initiate an investigation after a crime is committed;

(3) the term "unscheduled duty" means hours of duty a criminal investigator works, or is determined to be available for work, that are not –

(A) part of the 40 hours in the basic work week of the investigator; or

(B) overtime hours paid under section 5542; and

(4) the term "regular work day" means each day in the investigator's basic work week during which the investigator works at least 4 horus that are not overtime horus paid under section 5542 or hours considered part of section 5545a.

(b) The purpose of this section is to provide premium pay to criminal investigators to ensure the availability of criminal investigators for unscheduled duty in excess of a 40 hour work week based on the needs of the employing agency.

(c) Each criminal investigator shall be paid availability pay as provided under this section. Availability pay shall be paid to ensure the availability of the investigator for unscheduled duty. The investigator is generally responsible for recognizing, without supervision, circumstances

which require the investigator to be on duty or be available for unscheduled duty based on the needs of the agency. Availability pay provided to a criminal investigator for such unscheduled duty shall be paid instead of premium pay provided by other provisions of this subchapter, except premium pay for regularly scheduled overtime work as provided under section 5542, night duty, Sunday duty, and holiday duty.

(d)(1) A criminal investigator shall be paid availability pay, if the average of hours described under paragraph (2)(A) and (B) is equal to or greater than 2 hours.

(2) The hours referred to under paragraph (1) are –

(A) the annual average of unscheduled duty hours worked by the investigator in excess of each regular work day; and

(B) the annual average of unscheduled duty hours such investigator is available to work on each regular work day upon request of the employing agency.

(3) Unscheduled duty hours which are worked by an investigator on days that are not regular work days shall be considered in the calculation of the annual average of unscheduled duty hours worked or available for purposes of certification.

(4) An investigator shall be considered to be available when the investigator cannot reasonably and generally be accessible due to a status or assignment which is the result of an agency direction, order, or approval as provided under subsection (f)(1).

(e)(1) Each criminal investigator receiving availability pay under this section and the appropriate supervisory officer, to be designated by the head of the agency, shall make an annual certification to the head of the agency that the investigator has met, and is expected to meet, the requirements of subsection (d). The head of a law enforcement agency may prescribe regulations necessary to administer this subsection.

(2) Involuntary reduction in pay resulting from a denial of certification under paragraph (1) shall be a reduction in pay for purposes of section 7512(4) of this title.

(f)(1) A criminal investigator who is eligible for availability pay shall receive such pay during any period such investigator is –

(A) attending agency sanctioned training;

(B) on agency approved sick leave or annual leave;

(C) on agency ordered travel status; or

(D) on excused absence with pay for relocation purposes.

(2) Notwithstanding paragraph (1)(A), agencies or departments may provide availability pay to investigators during training which is considered initial, basic training usually provided in the first year of service.

(3) Agencies or departments may provide availability pay to investigators when on excused absence with pay, except as provided in paragraph (1)(D).

(g) Section 5545(c) shall not apply to any criminal investigator who is paid availability pay under this section.

(h) Availability pay under this section shall bee –

(1) 25 percent of the rate of basic pay for the position; and

(2) treated as part of the basic pay for purposes of –

(A) sections 5595(c), 8114(e), 8331(3), 8431, and 8704(c); and

(B) such other purposes as may be expressly provided for by law or as the Office of Personnel Management may by regulation prescribe.

(i) The provisions of subsections (a)-(h) providing for availability pay shall apply to a pilot employed by the United States Customs Service who is a law enforcement officer as defined under section 5541(3). For the purpose of this section, section 5542(d) of this title, and section 13(a)(16) and (b)(30) of the Fair Labor Standards Act of 1938 (29 U.S.C. 213(a)(16) and (b)(30)), such pilot shall be deemed to be a criminal investigator as defined in this section. The Office of Personnel Management may prescribe regulations to carry out this subsection.

(j) Notwithstanding any other provision of this section, any Office of Inspector General which employs fewer than 5 criminal investigators may elect not to cover such criminal investigators under this section.

**HISTORICAL AND STATUTORY NOTES**

**1994 Acts.** Section 633(e) of Pub.L. 103-329 provided that: "The amendments made by this section [enacting this section, amending sections 5542 and 5547 of this title and section 213 of Title 29, Labor, and enacting provisions set out as notes under this section and section 5541 of this title] shall take effect on the first day of the first applicable pay period which begins on or after the later of October 1, 1994, or the 30th day following the date of enactment of this Act [Sept. 30, 1994], except that:

"(1) Criminal investigators, employed in Offices of Inspectors General, who are not receiving administratively uncontrollable overtime compensation or who are receiving such premium pay at a rate less than 25 percent prior to the date of enactment of this Act [Sept. 30, 1994], may implement availability pay at any time prior to September 30, 1995, after which date availability pay as authorized under this section shall be provided to such criminal investigators.

"(2) Criminal investigators, employed by Offices of Inspectors General, who are receiving administratively uncontrollable overtime at a rate less than 25 percent, shall continue to receive this compensation at the same rate or higher until availability pay compensation is provided, which shall be no later than the last pay period ending on or before September 30, 1995."

**5 C.F.R. Ch. 1 (1-1-01 Edition)**

**Subpart A -- General Provisions**

**SOURCE: 62 FR 67244, Dec. 23, 1997, unless otherwise noted.**

**§ 551.101 General.**

(a) The Fair Labor Standards Act of 1938, as amended (referred to as "the Act" or "FLSA"), provides for minimum standards for both wages and overtime entitlement, and delineates administrative procedures by which covered worktime must be compensated. Included in the act are provisions related to child labor, equal pay, and portal-to-portal activities. In addition, the Act exempts specified employees or groups of employees from the application of certain of its provisions. It prescribes penalties for the commission of specifically prohibited acts.

(b) This part contains the regulations, criteria, and conditions that the Office of Personnel Management has prescribed for the administration of the Act. This part supplements and implements the Act, and must be read in conjunction with it.

* * *

**§ 551.102 Authority and administration.**

(a) *Office of Personnel Management.* Section 3(e)(2) of the Act authorizes the application of the provisions of the Act to any person employed by the Government of the United States, as specified in that section. Section 4(f) of the Act authorizes the Office of Personnel Management (OPM) to administer the provisions of the Act. OPM is the administrator of the provisions of the Act with respect to any person employed by an agency, except as specified in paragraphs (b), (c), and (d) of this section.

* * *

**§ 551.103 General principles governing exemptions.**

(a) *Covered.* Any employee of an agency who is not specifically excluded by another statute is covered by the Act. This includes any person who is --

(1) Defined as an employee in section 2105 of title 5, United States Code;

(2) A civilian employee appointed under other appropriate authority; or

(3) Suffered or permitted to work by an agency whether or not formally appointed. . . .

* * *

**§ 551.104 Definitions.**

In this part --

*Act* or *FLSA* means the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 201 *et seq*.).

*Administrative employee* means an employee who meets the criteria in § 551.206.

* * *

*Customarily and regularly* means a frequency which must be greater than occasional but which may be less than constant. For example, the requirement in § 551.205(a)(2) will be met by an employee who normally and recurrently exercises discretion and independent judgment in the day-to-day performance of duties.

* * *

*Management or general business function or supporting service*, as distinguished from production functions, means the work of employees who provide support to line managers.

(1) These employees furnish such support by --

(i) Providing expert advice in specialized subject matter fields, such as that provided by management consultants or systems analysts;

(ii) Assuming facets of the overall management function, such as safety management, personnel management, or budgeting and financial management;

(iii) Representing management in such business functions as negotiating and administering contracts, determining acceptability of goods or services, or authorizing payments; or

(iv) Providing supporting services, such as automated data processing, communications, or procurement and distribution of supplies.

(2) Neither the organizational location nor the number of employees performing identical or similar work changes management or general business functions or supporting services into production functions. The work, however, must involve substantial discretion on matters of enough importance that the employee's actions and decisions have a noticeable impact on the effectiveness of the organization advised, represented, or serviced.

* * *

*Participation in the executive or administrative functions of a management official* means the participation of employees, variously identified as secretaries, administrative or executive assistants, aides, etc., in portions of the managerial or administrative functions of a supervisor whose scope of responsibility precludes personally attending to all aspects of the work. To support exemption, such employees must be delegated and exercise substantial authority to act for the supervisory in the absence of specific instructions or procedures, and take actions which significantly affect the supervisor's effectiveness.

* * *

*Primary duty* typically means the duty that constitutes the major part (over 50 percent) of an employee's work. A duty constituting less than 50 percent of the work may be credited as the primary duty for exemption purposes provided that duty --

(1) Constitutes a substantial, regular part of a position;

(2) Governs the classification and qualification requirements of the position; and

(3) Is clearly exempt work in terms of the basic nature of the work, the frequency with which the employee must exercise discretion and independent judgment, and the significance of the decisions made.

* * *

*Reckless disregard of the requirements of the Act* means failure to make adequate inquire into whether conduct is in compliance with the Act.

* * *

*Statute of limitations* means the time frame within which an FLSA pay claim must be filed, starting from the date the right accrued. All FLSA pay claims filed on or after June 30, 1994, are subject to a 2-year statute of limitations, except in cases of willful violation where the statute of limitations is 3 years.

* * *

*Willful violation* means a violation in circumstances where the agency knew that its conduct was prohibited by the Act or showed reckless disregard of the requirements of the Act. All of the facts and circumstances surrounding the violation are taken into account in determining whether a violation was willful.

**Subpart B -- Exemptions and Exclusions**

**SOURCE: 62 FR 67247, Dec. 23, 1997, unless otherwise noted.**

**§ 551.201 Agency authority.**

The employing agency may designate an employee FLSA exempt only when the agency correctly determines that the employee meets one or more of the exemption criteria of this subpart and such supplemental interpretations or instructions issues by OPM.

**§ 551.202 General principles governing exemptions.**

In all exemption determinations, the agency must observe the following principles:

(a) Each employee is presumed to be FLSA nonexempt unless the employing agency correctly determines that the employee clearly meets one or more of the exemption criteria of this subpart and such supplemental interpretations or instructions issues by OPM.

(b) Exemption criteria must be narrowly construed to apply only to those employees who are clearly within the terms and spirit of the exemption.

(c) The burden of proof rests with the agency that asserts the exemption.

(d) An employee who clearly meets the criteria for exemption must be designated FLSA exempt. If there is a reasonable doubt as to whether an employee meets the criteria for exemption, the employee should be designated FLSA nonexempt.

* * *

**§ 551.206 Administrative exemption criteria.**

An *administrative employee* is an advisor or assistant to management, a representative of management, or a specialist in a management or general business function or supporting service and meets all four of the following criteria:

(a) *Primary duty test.* The primary duty test is met if the employee's work --

(1) Significantly affects the formulation or execution of management policies or programs; or

(2) Involves management or general business functions or supporting services of substantial importance to the organization serviced; or

(3) Involves substantial participation in the executive or administrative functions of a management official.

(b) *Nonmanual work test.* The employee performs office of other predominantly nonmanual work which is --

(1) Intellectual and varied in nature; or

(2) Of a specialized or technical nature that requires considerable special training, experience, and knowledge.

(c) *Discretion and independent judgment test.* The employee frequently exercises discretion and independent judgment, under only general supervision, in performing the normal day-to-day work . . . .

* * *

**29 C.F.R. Part 541 (7-1-1994 Edition)**

**§ 541.205 Directly related to management policies or general business operations.**

(d) Under § 541.2 the "management policies or general business operations" may be those of the employer or the employer's customers. For example, many bona fide administrative employees perform important functions as advisers and consultants but are employed by a concern engaged in furnishing such services for a fee. Typical instances are tax experts, labor relations consultants, financial consultants, systems analysts, or resident buyers. Such employees, if they meet the other requirements of § 541.2, qualify for exemption regardless of whether the management policies or general business operations to which their work is directly related are those of their employer's clients or customers or those of their employer.

* * *

**29 C.F.R. Part 541 (7-1-2005 Edition)**

**§ 541.3 Scope of the section 13(a)(1) exemptions.**

* * *

(b)(1) The section 13(a)(1) exemptions and the regulations in this part also do not apply to police officers, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole or probation officers, park rangers, fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work.

(2) Such employees do not qualify as exempt executive employees because their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof as required under § 541.100. Thus, for example, a police officer or fire fighter whose primary duty is to investigate crimes or fight fires is not exempt under section 13(a)(1) of the Act merely because the police officer or fire fighter also directs the work of other employees in the conduct of an investigation or fighting a fire.

(3) Such employees do not qualify as exempt administrative employees because their primary duty is not the performance of work directly related to the management or general business operations of the employer or the employer's customers as required under § 541.200.

* * *

**§ 541.200 General rule for administrative employees.**

(a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:

* * *

(b) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers . . . .