UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al.,<br>Plaintiffs,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | Case No. 90-162C<br>and consolidated cases<br>(Judge Bush) |

**DECLARATION OF RAYMOND H. BLACKWELL**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on January 20, 1985, as a GS-13. I retired from HHS OI on January 3, 2001. I retired as a GS-13.

2. I filed my claim on March 31, 1995, so I was a GS-13 criminal investigator with HHS at all times pertinent to this action. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

3. Prior to being hired at HHS, I had worked as a criminal investigator with the Naval Investigative Service ("NIS," later called the Naval Criminal Investigative Service) from February 9, 1976, until I resigned on Jan 19, 1985 as a GS-12. I attended the Naval Investigative Service Basic Agent Academy in Suitland, Maryland in 1976.

4. At HHS during the relevant time frame, I worked in the Orlando Florida Sub-Office which reported to the Atlanta Regional Office, which had responsibility for conducting criminal investigations in all HHS programs within a much large geographic region. In my office, we had two criminal investigators and one supervisor.

5. The OIG at HHS during the relevant time frame consisted of three separate entities in addition to the immediate office of the Inspector General and the Principal Deputy Inspector General, the OI, the Office of Audit ("OA"), which consisted of a much larger staff of auditors, and the Office of Evaluation and Inspection ("OEI"), which conducted surveys and analyses of HHS programs.

6. I frequently obtained referrals and leads from Medicare carriers and Intermediaries such as Blue Cross and Blue Shield, the Social Security Administration and various personnel in their local offices, the Medicare fraud Hotline, auditors within the OA, confidential informants, competitors of Medicare providers, the FBI, other federal and state law enforcement agencies, developments from other agent's ongoing investigations, and my own investigations. The United States Secret Service ("USSS") frequently and commonly sought out our help, because USSS agents worked on fraud investigations and needed help with credit card fraud and other kinds of fraud involving the use of bogus Social Security numbers.

7. While HHS OI has several criminal and civil penalty statutes that are part of its mission to enforce, the choice of which statutes to enforce is made by the federal prosecutors. Federal prosecutors typically chose to apply the general federal statutes criminalizing mail and wire fraud, conspiracy, false statements, false claims, kickbacks and other criminal statutes of general applicability to the cases I brought to them. While most of the cases that I worked on

were handled by federal prosecutors, occasionally I would work with a state prosecutor on Social Security program case.

8. During the relevant time period, I was first issued a .38 caliber revolver by HHS, and I was later issued a Sig Sauer 9 mm semi-automatic pistol. I was also issued the same hollow-point ammunition used by the Secret Service. I was regularly trained in the operation of these weapons and required to qualify in their use every three months.

9. I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government, from sifting through garbage for evidence, handling confidential informants and drafting investigation reports and presenting cases to federal prosecutors. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, bank statements and other data of consequence to the investigation. At times I conducted electronic monitoring and other covert surveillance. I conducted interviews of witnesses and subjects, obtained signed and sworn statements, prepared interview reports and comprehensive investigative case reports. I assisted Federal prosecutors in the drafting of indictments, criminal informations, grand jury and trial subpoenas which I was also required to serve. I served search warrants and made arrests. I regularly testified as a government witness before grand juries and at trials.

10. I have read Position Descriptions 804 for GS-12 criminal investigators and 805 for GS-13 criminal investigators that were attached to the Declaration of Alcine Pike in this case, and I have read the Declaration of Michael Little. While these old and generic Position Descriptions describe a range of functions that a criminal investigator may perform at that grade, they do not describe by any means the duties actually performed at any time let alone on a day to day basis. They do accurately state that, at the higher grades, agents generally handle more

complex investigations and with less supervision. Some of the functions I performed regularly, such as complex investigations, some I performed only on occasion and some not at all. I specifically remember on only one occasion that I submitted a Management Implication Report ("MIR") to my supervisor and that had to do with Oxygen Concentrators. I certainly didn't do everything mentioned in the Position Description for a GS-13 on a regular basis.

11. During the relevant time period, I investigated fraud in various HHS programs, primarily Medicare and I also worked on a number of fraud investigations involving Social Security programs. In doing so, I usually worked with criminal investigators from the FBI, IRS, DCIS, USSS, other IG offices, and state and local law enforcement officers. These Medicare investigations involved primarily billing for services not rendered and this included various other forms of medical fraud against the Medicare Program. The Social Security investigations involved primarily disability fraud, program fraud and credit card fraud.

12. During the relevant time period, I participated in several large investigations involving Medicare providers involved in Medicare fraud. One dealt with a disbarred attorney who took the identify of a deceased doctor from whom he had rented a room while living in Pennsylvania. The lawyer effectively assumed the identity of the deceased physician in Florida. He billed Medicare and Medicaid for a couple of years until Diversion Investigators from the Drug Enforcement Agency ("DEA") determined that the real physician was deceased. The lawyer was subsequently indicted for Medicare fraud, arrested, pled guilty and sentenced to federal prison. I conducted extensive review of medical documents, interviewed many witnesses to include former patients and other physicians he had worked for, conducted surveillance, assisted in the preparation the federal indictment and testified before a Federal Grand Jury

regarding this matter. I was involved in the arrest of subject. This was a joint investigation with the FBI and State of Florida's Medicaid Fraud Unit within its state attorney general's office.

13. I spent several years investigating another matter within the relevant time frame even though the criminal conviction occurred in June 1996. This case involved the investigation of the owner of a large private ambulance company in Duval County, Florida who was fraudulently billing Medicare in excess of approximately $2 million each year. I conducted interviews of former ambulance drivers/paramedics, reviewed original business documents such as ambulance trip tickets from the ambulance company, and matched them against copies submitted by the ambulance company to Medicare, interviewed patients and conducted numerous surveillances of ambulance runs throughout Duval County Florida. I assisted the preparation of the federal indictment of subject for Medicare fraud, testified before a federal grand jury and, following indictment, assisted in the arrest of subject. The subject of this fraud investigation went to trial. I served all trial subpoenas and scheduled all witnesses. I was the case agent for the government and testified as the summary witness. The trial lasted approximately four weeks. This person was subsequently convicted of Medicare and mail fraud and sentenced to federal prison. I worked on this case alone.

14. During my entire career as a criminal investigator with OI, I have conducted only one investigation of an HHS employee but none during the relevant time period. This investigation involved a SSA claims representative who was indicted in 1990 for theft of government monies from SSA. The employee pled guilty and was sentenced to 2 years probation. The employee was also fired.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 1/5/2007

Raymond Blackwell
Raymond Blackwell

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al.,<br>Plaintiffs,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | Case No. 90-162C<br>and consolidated cases<br>(Judge Bush) |

**DECLARATION OF E. MICHAEL CALLAN**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on June 21, 1987, as a GS-12. Prior to being hired at HHS, I had worked as a criminal investigator with the Secret Service.

2. I was a GS-12 with the HHS OIG OI until March 31, 1995, when I transferred to the Social Security Administration, where I also served as a GS-12 criminal investigator. On October 27, 1996, I was promoted to GS-13, a position I continue to hold today.

3. I filed my case on March 1, 1990. I was treated by both agencies as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

4. At HHS OIG OI during the relevant time frame, I worked in the Cincinnati Sub-Office of the Chicago Regional Office, which had responsibility for conducting criminal investigations in Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin.

5. During my tenure at HHS, the OIG consisted of three major entities, the OI, the Office of Audit ("OA"), which consisted of a much larger staff of auditors, and the Office of Evaluation and Inspections ("OEI"), which conducted evaluations of HHS programs. The OIG at HHS also had other divisions, such as the Office of General Counsel and the Special Investigative Unit, which were located in Washington DC.

6. I frequently obtained referrals from Social Security offices, criminal investigators in other agencies, including the FBI, Secret Service, INS, and state and local law enforcement, members of the public, HHS program recipients, Medicare providers, other health care providers, developments from my or other agents' ongoing investigations and referrals from other HHS program staff.

7. As an OPM series 1811 criminal investigator with HHS OIG OI, I was responsible for conducting criminal investigations of alleged or suspected criminal violations of Title 42, including sections 408 (Social Security Fraud), 1320a-7b (Medicare/Medicaid Fraud) and 1382a (Supplemental Security Income Fraud).

8. As an OPM series 1811 criminal investigator with HHS OIG OI, I was also responsible for conducting criminal investigations of alleged or suspected criminal violations of the general criminal laws of the United States relating to the programs and operations of HHS. In this capacity, I was responsible for investigating alleged or

suspected violations of general criminal statutes such as 18 U.S.C. §§ 287 (False Claims), 371 (Conspiracy), 495 (Counterfeiting And Forgery), 641 (Theft Of Public Money Or Property), 666 (Theft Of Federal Funds), 1001 (False Statements), 1028 (Fraudulent Identification Documents), 1341 (Mail Fraud), 1505 (Obstruction Of Agency Proceeding), 1510 (Obstruction Of Criminal Investigation), and 1516 (Obstruction Of A Federal Audit).

9. If I believed a case was worthy of prosecution, I would first take it to the United States Attorney's Office ("USAO"). If the USAO was not interested in the case, I would usually take it to a state or local prosecutor.

10. The choice of which particular criminal statutes to apply in any individual case selected for prosecution was made by those state or federal prosecutors. Federal prosecutors often chose to apply the general federal statutes criminalizing mail and wire fraud, conspiracy, false statements, false claims, and other criminal statutes of general applicability to the cases I brought to them as well as statutes governing Social Security and/or health care fraud in particular.

11. I was first issued a .38 caliber revolver by HHS, and I was later issued a 9 mm. semi-automatic pistol. I was regularly trained in the operation of these weapons and required to qualify in their use on a quarterly basis. I was also trained in defensive tactics quarterly.

12. During the relevant time period, I investigated fraud in various HHS programs, primarily Social Security. In doing so, I usually worked with criminal investigators from other law enforcement agencies such as the FBI, INS, IRS, Secret Service, other IG offices, and state and local police. These fraud investigations involved,

claims for Social Security benefits by beneficiaries who were not entitled to them or by persons other than the proper beneficiary, the creation and/or use of forged or stolen Social Security cards, identity theft, or numbers and many other types of fraud.

13. During the relevant time period, I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government, from physically searching for evidence and interviewing subjects to drafting investigation reports and presenting cases to federal prosecutors. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. At times I conducted electronic monitoring and other covert surveillance and worked with confidential informants and undercover operatives. I conducted interviews of witnesses and subjects, obtained signed and sworn statements, prepared interview reports and comprehensive investigative case reports. I assisted Federal prosecutors in the drafting of indictments, criminal informations, grand jury and trial subpoenas which I was also required to serve. I regularly testified as a government witness before grand juries and at trials.

14. I have read Position Descriptions 804 for GS-12 criminal investigators and 805 for GS-13 criminal investigators that were attached to the Declaration of Alcine Pike in this case, and I have read the Declaration of Michael Little. While these old and generic Position Descriptions describe a range of functions that a criminal investigator may perform at that grade, they do not describe by any means the duties actually performed at any time let alone on a day to day basis. They do accurately state that, at the higher grades, agents generally handle more complex investigations and with less supervision. Some of the functions I performed regularly, such as complex

investigations, some I performed only on occasion and some not at all. For example, I do not believe that I wrote or submitted a Management Incident Report ("MIR") during my career with HHS.

15. The day-to-day criminal investigative activities I engaged in while at HHS were very similar to the criminal investigative activities I engaged in as a criminal investigator with the Secret Service.

16. During the relevant time period, I participated in a number of significant investigations. For example, I participated in an investigation known as "Project Refund" along with criminal investigators from the Secret Service and IRS. This case involved inmates at an Ohio prison who filed false Federal and State income tax returns, using false Social Security numbers to fraudulently obtain refunds in excess of $200,000. Ultimately, this case resulted in criminal convictions against more than 20 people and the seizure of a house, land, cars, motorcycles and boats.

17. During my career as a criminal investigator with OI, I spent very little time investigating cases where the subject was an employee of HHS. I do not specifically recall working on any such cases during the relevant time period, and I would estimate that I worked on only a handful of such cases over my career at HHS OIG OI.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 3/15/07

E. Michael Callan

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 90-162C<br>and consolidated cases<br>(Judge Bush) |

**DECLARATION OF ROBERT W. CAPUTO**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on September 24, 1989 as a GS-11, Step 6. Prior to my employment at the OI of HHS, I was a criminal investigator with the United States Customs Service ("USCS") and left as a GS-12, Step 1.

2. On July 14, 1991, I was promoted to GS-12, Step 3. I filed my case on May 20, 1994, and I was a GS-12 at all times relevant to this case. I retired as a GS-13 criminal investigator on April 29, 2006. I was treated by the Agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

3. At HHS during the relevant time frame, I worked in the San Diego Sub-Office, which is now called a Field Office. We had responsibility for the surrounding San Diego and Imperial. We occasionally assisted the regional office when requested to do so in Orange and Los Angeles counties and surrounding counties.

4. The OIG at HHS during the relevant time frame consisted of three separate entities in addition to the immediate offices of the Inspector General and the Principal Duty Inspector General: the OI, the Office of Audit ("OA"), which consisted of a much larger staff of auditors, and the Office of Evaluation and Inspection ("OEI"), which conducted surveys and analyses of HHS programs.

5. During the relevant time period, I was first issued a .38 caliber revolver by HHS, and I was later issued a 9 mm. semi-automatic pistol. I was regularly trained in the operation of these weapons and required to qualify in their use every three months. Indeed, my firearms training at HHS was far more extensive that the training I received at USCS.

6. I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government and my criminal investigative work for the OI at HHS was not materially different than my work as a criminal investigator at USCS. I searched for evidence and gathered information to draft investigation reports and presented cases to federal prosecutors. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the

investigation. At times I conducted electronic monitoring and other covert surveillance. I conducted interviews of witnesses and subjects, obtained signed and sworn statements, and prepared interview reports and comprehensive investigative case reports. I assisted Federal prosecutors in the drafting of indictments, criminal informations, and grand jury and trial subpoenas which I was also required to serve. I regularly testified as a government witness before grand juries and at trials.

7. I have read Position Descriptions 804 for GS-12 criminal investigators and 805 for GS-13 criminal investigators that were attached to the Declaration of Alcine Pike in this case, and I have read the Declaration of Michael Little. While these old and generic Position Descriptions describe a range of functions that a criminal investigator may perform at that grade, they do not describe by any means the duties actually performed at any time let alone on a day to day basis. They do accurately state that, at the higher grades, agents generally handle more complex investigations and with less supervision. Some of the functions I performed regularly, such as complex investigations, some I performed only on occasion and some not at all. On rare occasions I arranged for the participation of auditors in the development of financial evidence, utilized the services of forensic labs, coordinated with agents in other regions and obtained mail covers. The Position Descriptions contained other specific activities that we did not perform. I do not recall preparing a MIR. These were rarely completed by HHS agents I associated with.

8. During the relevant time period, I investigated fraud in various HHS programs, including Social Security until it was separated in March 1995. I estimate that about 80 percent

of my cases involved HHS programs and about 20 percent involved Social Security related issues. All of the cases I worked on were handled by federal prosecutors, although, on occasion, I assisted state fraud investigators with the service of warrants.

9. During the relevant time period, I specifically recall one very large healthcare fraud case involving a corrupt ophthalmologist who was conducting unnecessary surgeries. I was the case agent and worked with agents from the Defense Criminal Investigative Service ("DCIS") and a state Medicaid fraud investigator who was undercover. This investigation went to trail and the doctor was convicted on all 132 counts.

10. I worked frequently with criminal investigators from the Federal Bureau of Investigation ("FBI"), the Defense Criminal Investigative Service ("DCIS"), the United States Secret Service ("USSS"), and occasionally diversion investigators and criminal investigators from the Drug Enforcement Agency ("DEA"). I also worked with state law enforcement officials as well as the state Bureau of Narcotics.

11. During the relevant time period, I cannot recall working on any cases that involved HHS employee misconduct.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 2/19/07

Robert W. Caputo

Robert W. Caputo

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF FRANK S. CIOFFI**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") formerly known as the Department of Health Education and Welfare, in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on June 4, 1978 as a GS-7. On February 5, 1984, I was promoted to GS-13. Prior to being hired at HHS, I had worked for the U.S. Department of Transportation, the Federal Aviation Administration, and as an Airport Police Officer at National Airport in Washington, D.C.

2. I was a GS-13 with the HHS OIG OI until March 30, 1995, when I transferred to the Social Security Administration ("SSA") in the Office of Investigations of the Office of the Inspector General. I was a GS-13 until January 19, 1997; however, the SSA criminal

investigators were converted to Availability Pay and removed from coverage under the FLSA on September 17, 1995.

3. I filed my case on April 13, 1995, when I was a GS-13 with the HHS OIG. Accordingly, I was a GS-13 criminal investigator at HHS and later at SSA at all relevant times. I was treated by both agencies as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

4. At HHS during the relevant time frame, I worked in the Tampa Sub-Office of the Atlanta Field Office, which had responsibility for conducting criminal investigations in the Middle, Northern and Southern Federal Judicial Districts within the State of Florida.

5. I frequently obtained referrals and reports of fraudulent activity from representatives of Blue Cross and Blue Shield, SSA employees, referrals from the OIG auditors, referrals from criminal investigators with the FBI and other law enforcement agencies, tips from members of the public, developments from other agents' ongoing investigations, and referrals from HHS program staff and from developments in other cases which I was assigned. As a practical matter, however, cases are frequently assigned to both GS-12 and GS-13 criminal investigators.

6. During the relevant time period, HHS OIG criminal investigators were given a summary of the principal criminal statutes that we were charged with enforcing. My copy of the Digest of Applicable Statutes, Department of Health and Human Services, Office of Inspector General, Office of Investigations, for our use during that time period is attached to the deposition of an HHS witness. A copy of another publication on Social Security fraud issued to us in September 1992, SSA Fraud Awareness Guide, Office of Inspector General, Office of Investigations, U.S. Department of Health and Human Services, is attached as Exhibit A.

7. As HHS OI criminal investigators, we investigated violations of several HHS statutes peculiar to the Department's mission. These statutes included 42 U.S.C. § 408, covering Social Security fraud, 42 U.S.C. § 1320a-7a, a civil monetary penalties provision for certain other kinds of fraud, 42 U.S.C. § 1320a-7b, Medicare and Medicaid fraud rules including the anti-kickback provisions, and 42 U.S.C. § 1383a, Supplemental Security Income fraud.

8. As a criminal investigator with HHS OIG OI, I was also responsible for conducting criminal investigations of alleged or suspected criminal violations of the general criminal laws relating to the programs and operations of HHS. These statutes included 18 U.S.C. §§ 287 (False Claims), 371 (Conspiracy), 495 (Counterfeiting And Forgery), 641 (Theft Of Public Money Or Property), 666 (Theft Of Federal Funds), 1001 (False Statements), 1028 (Fraudulent Identification Documents), 1341 (Mail Fraud), 1505 (Obstruction Of Agency Proceeding), 1510 (Obstruction Of Criminal Investigation), and 1516 (Obstruction Of A Federal Audit).

9. The choice of which criminal statutes to enforce is made by the state and federal prosecutors. Federal prosecutors typically chose to apply the general federal statutes criminalizing mail and wire fraud, conspiracy, false statements, false claims, and other criminal statutes of general applicability. While criminal investigators at the GS-12 and GS-13 grade typically have significant discretion in their investigations, the prosecutors often provide direction to the investigator as the case progresses. And investigators had to obtain supervisory approval for consensual and nonconsensual monitoring, mail cover and the payment of funds to informants. Lower grade investigators were more closely supervised.

10. During the relevant time period, I was issued a Smith & Wesson Model 19 .357 caliber revolver with a 2.5 inch barrel by HHS. I was also issued the same hollow-point

ammunition used by the Secret Service. I was regularly trained in the operation of this and other law enforcement weapons, and required to qualify and demonstrate my proficiency every three months.

11. During the relevant time period, I performed the entire range of criminal investigative duties performed by other criminal investigators for the federal government with whom I worked, from sifting through garbage dumpsters for evidence and developing informants to gathering information and drafting investigation reports, as well as presenting cases to federal prosecutors and federal grand juries. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. At times I conducted electronic monitoring and other covert surveillance, and ran confidential informants and undercover operatives. I conducted interviews of witnesses and subjects, obtained signed and sworn statements, prepared interview reports and comprehensive investigative case reports. I assisted federal prosecutors in the drafting of indictments, criminal informations, grand jury and trial subpoenas which I was also required to serve. I regularly testified as a government witness before grand juries and at trials.

12. I have read Position Descriptions 804 for GS-12 criminal investigators and 805 for GS-13 criminal investigators that were attached to the Declaration of Alcine Pike in this case, and I have read the Declaration of Michael Little. While these old and generic Position Descriptions describe a range of functions that a criminal investigator may perform at that grade, they do not describe by any means the duties actually performed at any time let alone on a day to day basis. They do accurately state that, at the higher grades, agents generally handle more complex investigations and with less supervision. Some of the functions I performed regularly, such as complex investigations, some I performed only on occasion and some not at all.

13. For example, on a regular basis, I interviewed complainants, witnesses, and custodians of records, collected verbal, documentary and physical evidence, and prepared reports memorializing my activities. In addition, I reviewed and analyzed documents and prepared spreadsheets to identify fraudulent patterns and trends. On a less regular basis, I drafted requests for subpoenas and affidavits for search warrants; with appropriate approvals I monitored and oversaw consensual and non-consensual conversations. While I was always alert to systemic weaknesses or vulnerabilities in HHS programs, my case assignments would not always present issues that would rise to the level of being reported as a Management Implication Report ("MIR") or Fraud Alert. Another example is that at no time during my HHS career did I request or participate in an investigation that involved a wiretap. And while we technically had the responsibility of providing protection to the Secretary of HHS and I attended "protection duty" training conducted by the U. S Secret Service during my HHS career, I only participated in one protection assignment.

14. In general, the Position Descriptions overstate the degree to which a GS-12 or GS-13 criminal investigator has "thorough familiarity" or "expert knowledge" of all of the more than 300 HHS programs. The Position Descriptions also overstate the extent to which the criminal investigators follow legal developments. The position descriptions attempt to make a distinction between the GS-12 and GS-13 investigator based on whether he is "thoroughly familiar" or an "expert." The grade difference really depends on the complexity of the investigation and the degree to which the investigator is free from supervision and not whether he is "thoroughly familiar" versus an "expert" with respect to certain matters.

15. During the relevant time period, I investigated fraud in various HHS programs, primarily the Medicare Program. In doing so, I usually worked with criminal investigators from

the FBI, IRS, Secret Service, Immigration and Naturalization Service, Border Patrol, U.S Customs Service, other IG offices, and state and local law enforcement officers. These fraud investigations involved the theft of government funds, false charges for medical services not rendered or provided, the misuse of Social Security account numbers, identity theft, and other attempts to defraud the government. HHS OI shares jurisdiction over its investigations with the FBI, whose agents conduct many of the same investigations as we do.

16. During the relevant time period, I participated in several large investigations. For example, I, along with the FBI, investigated a number of doctors operating a medical center and lab testing facility in South Florida. They were billing Medicare for services that were never provided, and this investigation resulted in several convictions.

17. During my career as a criminal investigator with OI, I did not conduct any administrative investigations of HHS employees. To the contrary, it was made clear to me by my supervisors that such investigations should only be conducted by supervisory personnel within other offices at HHS.

18. Occasionally, I would conduct a criminal investigation that involved, among others, HHS employees. One such investigation involved the sale of non-public Social Security Administration records and National Crime Information Center ("NCIC") histories. The joint HHS and FBI investigation resulted in the indictment and conviction of twenty three individuals and one corporation. Of those convicted, five were SSA employees, four were law enforcement officers and fourteen were private investigators.

19. Copies of several commendations that I received for my work as a law enforcement officer in the OI of HHS are attached as Exhibit B.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: Dec. 23, 2006

Frank Cioffi
Frank Cioffi

# EXHIBIT A

Office of Inspector General

Office of Investigations

# SSA Fraud Awareness Guide

U.S. Department of Health and Human Services

September 1992

# Introduction

This SSA Fraud Awareness Guide was prepared by the Office of Investigations (OI), Office of Inspector General, for use by employees of the Social Security Administration (SSA). The guide is a digest of information found in the Program Operations Manual System (POMS). This booklet describes the elements of a criminal violation, tells how to identify possible violations in SSA benefit programs, and instructs the SSA employee on methods of documenting the crime and referring the matter to OI for criminal investigation.

This guide is intended as a supplemental tool and is not intended to replace or supersede any related instructions issued by the SSA.

Any questions concerning this material may be directed to the local OI office.

# Table of Contents

Page

Elements of SSA Program Violations . . . . . . . . . 1

Other Legal Factors . . . . . . . . . . . . . . . . . . . . . . 3

Types of Benefit Fraud:

Title II:

Retirement . . . . . . . . . . . . . . . . . . . . . . . 4

Survivor's . . . . . . . . . . . . . . . . . . . . . . . . 5

Disability . . . . . . . . . . . . . . . . . . . . . . . . 5

Title XVI:

Aged . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Blind/Disabled . . . . . . . . . . . . . . . . . . . . 6

Frauds Which Affect Titles II and XVI . . . . . . . 7

Detecting Violations . . . . . . . . . . . . . . . . . . . . 8

Tips on Developing Potential Fraud Cases . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Optional Reporting of Fraud Cases . . . . . . . . . . 11

Weakening Factors . . . . . . . . . . . . . . . . . . . . . 12

Types of Employee Violations . . . . . . . . . . . . . . 13

## Elements of Social Security Program Violations

For an act to be considered a criminal violation against a Social Security Administration (SSA) benefit program, we must establish that the act was *material* to eligibility or payment amount, and that the act was done *knowingly*, *willfully*, and *with intent to defraud*. If any one of these elements is missing in a case, then the act is not a criminal violation. Following is an explanation of these elements. They are also covered in POMS section **GN04105.005B**.

### Material

A false statement, false representation, or deceitful withholding of information is *material* where there is an obligation to disclose the truth, and where the deceit is significant and would:

- influence payment of benefits not authorized by the Social Security Act
- influence SSA in determining rights to payments, or
- lead to the improper issuance of Social Security number (SSN) cards or other documents.

### Knowingly

*Knowingly* is that state of mind which exists when a person knows he/she cannot lawfully do a particular act, but nevertheless does it.

## Elements of Social Security Program Violations (cont'd.)

### Willfully

*Willfully* is voluntarily, purposefully, deliberately, and intentionally, as opposed to accidentally, inadvertently, or carelessly; i.e., having knowledge of the existence of a legal obligation and the intent to evade that obligation

### Intent To Defraud

*Intent to defraud* is an intentional deception or misrepresentation which the individual knows to be false or which he/she does not believe to be true, but makes knowing that the deception could result in some unauthorized benefit to himself/herself or some other person (synonymous with "fraudulently").

***Note:*** SSA should contact the Office of Investigations Field Office (OIFO) for questions arising in specific cases.



## Other Legal Factors

### Statute of Limitations

There must be an indictment or information filed with the courts within 5 years from the date of the offense.

### Venue

With few exceptions, a criminal case must be tried in the judicial district where the violation occurred.

## Types of Benefit Fraud

Each program administered by SSA, and each type of benefit within the program, presents its own vulnerabilities. Each is, therefore, susceptible to particular types of fraudulent activities.

Following is an analysis by program and benefit type of various frauds you may encounter.

TITLE II

## Retirement Benefits

**Questionable Retirement**
Usually self-employed individuals or corporate directors, who attempt to hide their work by claiming it is being done by someone else, usually a family member.

**False Proof of Age**
Submitted by an applicant in an attempt to obtain a higher benefit amount or earlier month of entitlement.

**Falsified Earnings Record**
Often involves an individual working and using a family member's SSN to gain insured status or increase benefit amounts. Frequently involves foreign-born individuals or non-covered government workers.



TITLE II (cont'd.)

## Survivor's Benefits

**Non-existent Auxiliaries**
Falsified birth certificates presented to obtain benefits.

**Relationships**
Falsified marriages, or the concealment of divorces or marriages.

**False Proof of Age**
Submitted by an applicant in an attempt to obtain a higher benefit amount or earlier month of entitlement.

## Disability Benefits

**Failure to Report Work Activity**
Involves a disability beneficiary who returns to work and does not report it. The most prosecutable cases are those where the beneficiary makes an effort to prevent SSA from finding out about his work by using a different name and/or SSN.

**Falsified Earnings Record**
Often involves an individual working and using a family member's SSN to gain insured status or increase benefit amounts. Frequently involves foreign-born individuals or non-covered government workers.

**Fake Disability**
Allegations that the beneficiary is not really disabled. Very difficult to prove, especially when disability decision is based on a contracted consultative examination. Could involve the applicant's own physician providing a false diagnosis to SSA.

## Aged

**Falsified Proof of Age (Applicant not yet age 65)**
Presents counterfeit birth/baptism certificate, assumes the identity of someone else over 65, or alters own documents.

**False Statements re: Income/Resources**
Conceals or fails to disclose income/resources over the allowable limits.

**False Proof of Alien Status/Citizenship**
Presents fraudulent immigration or naturalization documents.

## Blind/disabled

**False Proof of Alien Status/Citizenship**
Presents fraudulent immigration or naturalization documents.

**Fake Disability**
Allegations that the beneficiary is not really disabled. Very difficult to prove, especially when disability decision is based on a contracted consultative examination. Could involve the applicant's own physician providing a false diagnosis to SSA.

**Failure to Report Work Activity**
Involves a disability beneficiary who returns to work and does not report it. The most prosecutable cases are those where the beneficiary makes an effort to prevent SSA from finding out about his work by using a different name and/or SSN.

**False Statements re: Income/Resources**
Conceals or fails to disclose income/resources over the allowable limits.





**Death of Beneficiary/Recipient**
In all benefit programs one of the most frequent types of fraud is failure to report the death of a beneficiary/recipient while continuing to cash benefit checks.

**Representative Payee Misuse**
This, too, cuts across all benefit types and includes any case where the representative payee fails to use the money received to care properly for the beneficiary/recipient. The strongest cases for prosecution involve non-family payees and those where the beneficiary/recipient is not living with the payee.

**Attorney Fee Cases**
Any case where an attorney/representative charges a client for services rendered in excess of the amount approved by SSA, or collects fees directly from a claimant without petitioning for same.

**Multiple Identity Cases**
Involves persons receiving more than one benefit under various identities. Although this does sometimes occur with Title II, it is more frequently discovered under Title XVI.

**Social Security Number Fraud**
Involves submitting false documents to obtain an SSN or misusing an SSN. The SSN misuse does not necessarily have to be related to a benefit payment, e.g. credit fraud, bank fraud, false identification, etc.

## Detecting Violations

Potential violations may be discovered at any point in the claims process or in processing of a posteligibility action.

**Be alert to:**

1. Alterations in documents
   a. Different printing, or typeface, misalignment of text, or nonmatching ink.
   b. Use of white out or photocopies without proper embossed seals or stamps.
   c. Missing sections or documents apparently cut or reconstructed.
2. Computer interfaces which indicate discrepancies with information in file, for example:
   a. Work interfaces
   b. Death matches
   c. IRS alerts
3. Contradictory statements made by the same person.
4. Conflicting statements about the same issue by different people.
5. Late reporting of events affecting eligibility or entitlement to payments.
6. Complaints of being charged for help in getting payments.
7. Statements that disagree with information shown on other documents.
8. Complaints or tips that someone is getting payments for which he or she is not eligible.



## Tips on Developing Potential Fraud Cases

1. On written statements by witnesses or suspects, include the interviewer's (and witnesses', if applicable) name, title and SSA duty station, as well as, the time and date of the interview. Write them legibly and date them. Have the interviewee initial all changes.
2. All written statements should be taken on Form SSA-795.
3. Official documents must be certified by the custodian of record.
4. Do not alter or deface any documents in any manner, such as by encircling, underlining in red, highlighting, etc.
5. Do not remove documents from claim folders.
6. Consider venue, i.e. where were the checks mailed or the payments direct-deposited.
7. Establish a Program Integrity File per POMS **GN 04110.050**
8. Do not promise a witness or informant that their identity will be kept secret.
9. All interviews with subjects suspected of fraud should be conducted in person.
10. When you contact a beneficiary regarding a complaint ask open ended questions such as, "Please declare all of your work since date of entitlement", rather than, "We have a report you are working at the XYZ Company. Are you working there?"
11. Determine if the beneficiary is reporting minimal participation in work. Ask for exact number of hours worked, details as to daily activities, etc.
12. Miranda warnings are not required and should not be given.

13. Before accepting repayment on a fraud case, contact the regional Office of Investigations (OI), Office of Inspector General.
14. Stop-payment actions should be taken as promptly as possible after discussion with OI.
15. Keep OI up-to-date on developments such as death of suspect, suspect jailed or administrative appeal filed.
16. Call OI immediately upon receipt of a phone call or letter from a complainant regarding possible fraud.
17. Keep in mind, that SSA adjudicates and documents, OI investigates and presents for prosecution. The OI may request documentation from SSA to determine entitlement and the amount of any overpayment.



## Optional Reporting of Fraud Cases

When any of the following situations are known prior to notifying OI, SSA employees may use their discretion in reporting the case to OI:

1. The only *suspect is dead*.
2. The only *suspect is age 70 or older*.
3. The only *suspect has a terminal illness*.
4. The violation involves a *failure to report a Cost of Living or pension increase*.
5. *No improper payments* are involved in the violation.

However, the following exceptions *must be reported:*

1. Any employee involvement in the fraud
2. *SSN violation.*
3. *Misuse by a representative payee.*
4. *Violation of the attorney (and non-attorney representative) fee regulations.* Remember attorney fee violations must also be reported to the Office of Hearings and Appeals, Special Counsel Staff (POMS **GN 04105.015C**)

Under any circumstances, if the SSA employee believes the case is egregious or warrants special attention they should discuss it with OI.

(See POMS **GN 04110.035** and **GN 04110.010B3)**

**Call OI for any clarification of Optional Reporting**

## Weakening Factors

When one or more of the following factors are present, the likelihood of criminal prosecution is weakened:

- Suspect is elderly
- Suspect is disabled
- Suspect is in prison
- Suspect had good motive
- Suspect is illiterate
- Suspect has language barrier
- Suspect becomes re-entitled because terminating event ends
- Violation detected based on suspect's voluntary report
- Violation not flagrant or aggravated
- Violation did not result in overpayment
- Full repayment or recovery is made
- Amount of overpayment or misused funds does not meet prosecutive guidelines
- Statute of limitations is nearing expiration
- Law has changed so that action no longer carries a criminal penalty
- Close issue of law casts doubt on adverse administrative determination

Under any circumstances, if the SSA employee believes the case is egregious or warrants special attention they should discuss it with OI.

(See POMS **GN 04110.010B3e)**



## Types of Employee Violations

Although employee fraud cases are fairly rare, the most frequent allegations of employee fraud are for:

- Charging money to process valid SSN applications
- Processing fraudulent SSN applications
- Retaining beneficiary refunds for personal use
- Directing benefits to own address/bank account
- Travel voucher fraud
- Disclosing or selling of SSA/SSN information
- Soliciting or receiving bribes

(SSA employee violations are discussed in POMS **GN 04110.040**. Reporting of employee violations is also covered in **GN 04110.045**.)

# EXHIBIT B

DEPARTMENT OF HEALTH & HUMAN SERVICES

Office of the
Regional Director

Region IV
101 Marietta Tower
Atlanta GA 30323

December 18, 1987

Mr. Frank S. Cioffi
Office of Investigations
U.S. Department of Health & Human Services
101 Marietta Tower, Suite 1401
Atlanta, Georgia 30323

Dear Mr. Cioffi:

Permit me, please, this opportunity to express to you my commendations for being selected an "Outstanding Employee of the Year" by the Inspector General, Mr. Richard Kusserow. I know you have received a beautiful plaque to commensurate your selection but I felt compelled to add my thanks for a job well done.

As you know, there were only ten (10) such employees selected nationwide and Region IV had three (3) of those ten. Your selection as one of the three reflects most favorably on you and, indirectly, on the Region. My hat is off to you and to the other two regional employees selected for this most prestigious honor.

Keep up your good work and if there is ever anything I can do to assist you in the performance of your duties, please let me know.

Sincerely,

Walt Davis

Walt Davis
Regional Director

U.S. Depar... ent of Justice

*United States Attorney*
*Middle District of Florida*

500 Zack Street, Suite 400 813/225-7300
Tampa, Florida 33602 FTS/826-7300

September 10, 1990

Meade Farmer
Assistant Regional Inspector
General for Investigations
United States Department of
Health and Human Services
3751 Maguire Boulevard, Suite 271
Orlando, Florida 32803-3011

Re: Commendation of Special Agent Frank Cioffi

Dear ~~Mr. Farmer~~ Meade:

The performance of Special Agent Frank Cioffi during the successful investigation and prosecution of United States v. Osmomedic, Inc. has been brought to my attention. This case involved complex issues of medical necessity, and required interviews of, and testimony by, numerous elderly Medicare beneficiaries. In short, this was a difficult case for any investigator to handle. In all regards, Special Agent Cioffi's performance was outstanding. It was a pleasure for the personnel from my office to work with Mr. Cioffi, and he deserves to be commended for his fine efforts.

Sincerely,

Bob Genzman

ROBERT W. GENZMAN
United States Attorney
Middle District of Florida

cc: Frank Cioffi

**U.S. Department of Justice**

*United States Attorney*
*Middle District of Florida*

*500 Zack Street, Suite 400* *813/225-7300*
*Tampa, Florida 33602* *FTS/826-7300*

August 3, 1992

Richard P. Kusserow
Inspector General
Office of Investigations
P.O. Box 23489
L'enfant Plaza Station
Washington, D.C. 20026-3489

Re: Operation Private Trust United States v. Richard Burton, Scott Strady and Related Cases - Commendation of Special Agents Kyle Ford and Frank Cioffi

Dear Mr. Kusserow:

I would like to take this opportunity to commend Special Agents Kyle Ford and Frank Cioffi for their outstanding efforts in their recent successful prosecution of United States v. Richard Burton and Scott Strady, United States v. Ron Ciancioso; United States v. Joanna Price, et al., United States v. William Pedersen et al., United States v. John Colensanti; United States v. Charles Lasker; United States v. Gail Mullinax, et al. and United States v. Frank Farington. These cases were the pivotal prosecutions in a nation-wide crackdown on Government employees and private investigators who were selling protected Government information for profit. The prosecutions by this office, combined with those filed by the United States Attorney's Office in Newark, New Jersey, brought the practice of selling tax related information and criminal history information in the open market to an abrupt halt. The prosecutors handling this investigation, Assistant United States Attorneys David Reese Jennings and Julie Tingwall, tell me that the success of this investigation and prosecution, not only at this office but on a national level, is the direct result of the hard work and imagination of Special Agent Kyle Ford.

Special Agent Ford brought this investigation to our office in late 1990. Apparently, the practice of selling protected Government information had grown so wide-spread and the perpetrators so bold that those selling the information were actually advertising in brochures and magazines. However, the problem was not in finding the targets, but in figuring out how

D> 8/10/92

to charge them. Special Agent Ford worked diligently with our office and helped to conceive a plan for prosecution that resulted in indictments against 21 defendants across the country. The prosecution, dubbed "Operation Private Trust," was the largest of its kind.

In addition to assisting in the planning and execution of this investigation, Special Agent Ford, along with Special Agent Cioffi, showed exemplary skills in investigating these cases. Without going into particulars, Special Agents Ford and Cioffi twice demonstrated their expertise as interviewers by stepping in and re-interviewing subjects who had already denied any knowledge of any criminal activity. With their relaxed demeanor and thorough understanding of the cases, Special Agents Ford and Cioffi were able to obtain admissions and confessions in each instance.

Although this was a joint effort with other agencies, Special Agent Ford shouldered the primary responsibility of preparing the cases for trial. Special Agent Ford demonstrated an encyclopedic understanding of the facts in this investigation, which proved to be extremely valuable in negotiations. Special Agent Ford's knowledge also helped the prosecution obtain forfeitures of currency from Defendants Burton, Strady, and Ciancioso. This is especially noteworthy in that no other office before or since has been able to obtain forfeitures in this kind of case.

Special Agents Kyle Ford and Frank Cioffi deserve the highest commendation for their consistently superior performance. Thanks to their hard work, our investigation will serve as a model for other offices wishing to prosecute this type of crime. Please offer my thanks to Special Agents Kyle Ford and Frank Cioffi for a job well done.

Sincerely,

Robert W. Genzman

ROBERT W. GENZMAN
United States Attorney

cc: Kyle Ford, Special Agent

Frank Cioffi, Special Agent

DRJ/dv

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 90-162C<br>and consolidated cases<br>(Judge Bush) |

**DECLARATION OF GEORGE M. FIELDS**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I was employed for seven years at the Louisiana Department of Justice, Office of Attorney General prior to my federal employment. I was a commissioned Special Officer by the Louisiana State Police during my entire tenure with the Attorney General's office. As such I was authorized to execute search and arrest warrants and to function as a peace officer in the State of Louisiana.

2. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office

of the Inspector General ("OIG") on September 23, 1990, as a GS-9. On April 3, 1994, I was promoted to GS-13. At no time during my tenure as a Grade 13 was I in a supervisory position.

3. On August 14, 2000 I was promoted to a supervisory special agent position at GS-14 and transferred to the Dallas Regional Office where I remain to this date. I joined this case on January 20, 1995. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

4. At HHS during the relevant time frame, I worked in the Little Rock, Arkansas Sub-Office which had responsibility for conducting criminal investigations in health care fraud and Social Security fraud, violations of 18 U.S.C. 287 and 18 U.S.C. 641 respectively.

5. I frequently obtained referrals of potential health care fraud cases from Arkansas Blue Cross and Blue Shield, the Medicare contractor in Arkansas. Program Specialists there conducted analyses of the billing patterns of Medicare providers and pursued any aberrant cases to a point where they, as non-law enforcement persons, could go no further. They would then refer the case to my office for criminal investigation. Similarly I received referrals of potential healthcare fraud cases from the FBI, with whom I had daily contact with and worked all of my health care cases with jointly. I worked referrals from the Arkansas Attorney General's office involving potential criminal violations of state and Medicaid fraud statutes in effect in Arkansas. I developed cases from several of my own open cases. I received referrals from the OIG Hotline. I received confidential referrals from persons within the health care industry who wished to report potential criminal acts by the employers. The Social Security Administration employs claims representatives who are trained to detect potential fraudulent Social Security applications and payments, and these claims representatives would generally pursue the cases as far as they could and then refer them to my office for criminal investigation.

6. The choice of criminal statutes to enforce is made by the state and federal prosecutors. Federal prosecutors typically chose to apply the general federal statutes concerning mail and wire fraud, conspiracy, false statements, theft of public property, false claims, Medicare fraud, and other criminal statutes of general applicability to the cases I brought to them.

7. During the relevant time period, I was issued a .38 caliber revolver by HHS, and I was later issued a 9 mm. semi-automatic pistol. I was also issued the same hollow-point ammunition used by the Secret Service. I was regularly trained in the operation of these weapons and was required to qualify in their use every three months

8. During the relevant time period, I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government, from writing and executing federal search warrants, maintaining confidential sources, conducting countless hours of surveillance, presenting cases to the United States Attorney's office for prosecutorial consideration, testifying in grand jury proceedings, and serving grand jury subpoenas. I examined seized documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. I conducted consensual electronic monitoring. I conducted interviews of countless witnesses and subjects, obtained signed and sworn statements, and prepared interview reports and comprehensive investigative case reports. I assisted Federal prosecutors in the drafting of indictments, criminal informations, and grand jury and trial subpoenas which I was also required to serve. I regularly testified as a government witness before grand juries.

9. I have read Position Descriptions 804 for GS-12 criminal investigators and 805 for GS-13 criminal investigators that were attached to the Declaration of Alcine Pike in this case,

and I have read the Declaration of Michael Little. While these old and generic Position Descriptions describe a range of functions that a criminal investigator may perform at that grade, they do not describe by any means the duties actually performed at any time let alone on a day to day basis. They do accurately state that, at the higher grades, agents generally handle more complex investigations and with less supervision. Some of the functions I performed regularly, such as complex investigations, some I performed only on occasion and some not at all. I submitted a single MIR during the relevant time period. To say I performed all the duties associated with my position all the time is not correct.

10. During the relevant time period, I investigated fraud in various HHS programs, primarily Medicare fraud and Social Security fraud. In doing so, I worked closely with criminal investigators from the FBI, the Criminal Investigation Division of the IRS, the Secret Service, HUD Office of Inspector General, Defense Criminal Investigative Service, and state and local law enforcement officers. These fraud investigations involved false claims for Medicare and Medicaid services, theft of Social Security benefits, and use of stolen Social Security numbers for identification and credit card applications.

11. During the relevant time period, I ran several large investigations. For example, I, along with the FBI and the Arkansas Attorney General's Medicaid Fraud Unit, investigated an Arkansas company that was paid several million dollars by Medicare for useless "oral care" kits. The company operated in Arkansas, Philadelphia, Michigan, and Florida. The investigation took several months to complete and required trips to countless nursing homes in Arkansas and Michigan by myself and with another FBI agent. We worked in concert with the FBI in Philadelphia and with our OI office there as well. We jointly conducted consensual monitoring