in the case, interviewed countless witnesses, conducted surveillance, and prepared and executed a multi-site search warrant operation. As a result of our efforts, the owner pled guilty to several counts of health care fraud and was ordered to make restitution to the Medicare Trust Fund of several million dollars.

12. In a Social Security case during the relevant time frame, I learned from the claims representatives at the Social Security Administration that an individual was receiving Social Security disability benefits to which he was not entitled. I obtained a sworn confession from the subject and presented the matter to the United States Attorney's office for prosecution. I assisted that office in preparing a plea agreement for the subject to sign. Sadly, before the subject could sign the agreement, he was killed in a barroom knife fight.

13. During the relevant time period, I assisted the FDA in one of their cases involving an FDA employee at a facility in Arkansas. My assistance was liaison in nature in that I introduced the FDA agent to the United States Attorney's office in Little Rock, Arkansas and helped the FDA agent find and interview the subject. This was the only "employee" case I have ever worked. It was my understanding that HHS employee cases were handled by the HHS component in which the employee was attached. Any cases involving an OIG employee were handled by OIG supervisory personnel brought in from regional offices outside the jurisdiction where the subject resided. It was made clear to me by my supervisors that any such investigations should only be conducted by supervisory personnel.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: Feb 26, 2007

George M. Fields

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF GARY M. HOLST**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on May 4, 1987 as a GS-9 criminal investigator. On January 14, 1990, I became a GS-12 criminal investigator, and, on April 17, 1994, I became a GS-13. Prior to being hired at HHS, I had worked as a police officer and with local law enforcement.

2. I filed my case on October 13, 1995, when I was a GS-13 with the HHS OIG. Accordingly, I was both a GS-12 and a GS-13 criminal investigator during the relevant time period. I filed my case because HHS OI criminal investigators were expected to work as many hours as necessary to get their job done even though our AUO was capped at a lesser percentage than we worked. For example, on one case during the relevant time period involving the Russian mob, I worked far in excess of what would have qualified me for 25 percent AUO, but HHS

would not pay more than a budgeted and lesser percentage of AUO even though the work required a greater amount of overtime. In addition, we were treated as FLSA exempt and not paid for overtime according to the FLSA when we were covered by that statute.

3. At HHS during the relevant time frame, I worked in the St. Louis, Missouri Sub-Office, which was under the supervision of the Denver Regional Office. We were later transferred to the Chicago Regional Office. The Denver Region 8 is essentially the region for which I am the Special Agent in Charge ("SAIC") currently. Denver Region 8 was dissolved and that region was split and part was put under jurisdiction of the Dallas and part under the Chicago Regional Offices. The St. Louis Sub-Office was under the purview of Chicago and my western states were under the purview of the Dallas Regional Office for a time. (In 1999 the Kansas City Regional Office was established as Region 7. Region 7 consists of 11 states and 14 Federal Districts. The states are Missouri, Illinois (Central and Southern Districts), South Dakota, Nebraska, Iowa, Kansas, Colorado, Utah, Wyoming, North Dakota and Montana.) The St. Louis Sub-Office essentially investigated cases in the state of Missouri at the time designated, but under two different regional offices as mentioned above. Before the Social Security split, the St. Louis Sub-Office consisted of three special agents, and a fourth joined the office in 1993.

4. I frequently obtained referrals and reports of fraudulent activity from representatives of Blue Cross and Blue Shield, SSA employees, referrals from the OIG auditors, referrals from criminal investigators with the FBI and other law enforcement agencies, tips from members of the public, developments from other agents' ongoing investigations, and referrals from HHS program staff and from developments in other cases which I was assigned.

5. As HHS OI criminal investigators, we investigated violations of several HHS statutes peculiar to the Department's mission. These statutes included 42 U.S.C. § 408, covering

Social Security fraud, 42 U.S.C. § 1320a-7a, a civil monetary penalties provision for certain other kinds of fraud, 42 U.S.C. § 1320a-7b, Medicare and Medicaid fraud rules including the anti-kickback provisions, and 42 U.S.C. § 1383a, Supplemental Security Income fraud.

6. As a criminal investigator with HHS OIG OI, I was also responsible for conducting criminal investigations of alleged or suspected criminal violations of the general criminal laws relating to the programs and operations of HHS. These statutes included 18 U.S.C. §§ 287 (False Claims), 371 (Conspiracy), 495 (Counterfeiting And Forgery), 641 (Theft Of Public Money Or Property), 666 (Theft Of Federal Funds), 1001 (False Statements), 1028 (Fraudulent Identification Documents), 1341 (Mail Fraud), 1505 (Obstruction Of Agency Proceeding), 1510 (Obstruction Of Criminal Investigation), and 1516 (Obstruction Of A Federal Audit).

7. The choice of which criminal statutes to enforce is made by the state and federal prosecutors. Federal prosecutors typically chose to apply the general federal statutes criminalizing mail and wire fraud, conspiracy, false statements, false claims, and other criminal statutes of general applicability. Federal prosecutors would, however, frequently cite the Social Security fraud statute because it was an easy charge to prove.

8. During the relevant time period, I was issued a Smith & Wesson Model 19 .357 caliber revolver with a 2.5 inch barrel by HHS. I was also issued the same hollow-point ammunition used by the Secret Service. I was regularly trained in the operation of this and other weapons and required to qualify in their use every three months.

9. During the relevant time period, I performed the entire range of criminal investigative duties performed by other criminal investigators for the federal government with whom I worked, from executing search warrants, arrest warrants, service of Grand Jury

subpoenas, developing informants to gathering information and drafting investigation reports, as well as presenting cases to federal prosecutors and federal grand juries. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, billing data, patient data, subject profiles and other data of consequence to the investigation, which were obtained in the aforementioned methods of gathering evidence again by Grand Jury subpoenas and search warrants, interrogation of subjects, interviewing witnesses and composing Reports of Investigations, and presenting cases to the U. S. Attorney's Office and Federal Grand Juries. At times I conducted electronic monitoring and other covert surveillance, and ran confidential informants and undercover operatives. I conducted interviews of witnesses and subjects, obtained signed and sworn statements, and prepared interview reports and comprehensive investigative case reports. I assisted federal prosecutors in the drafting of indictments, criminal informations, and grand jury and trial subpoenas which I was also required to serve. I regularly testified as a government witness before grand juries and at trials.

10. During the relevant time period, I investigated fraud in various HHS programs with a slight majority of my time being spent on healthcare fraud cases. Identity theft was a relatively new crime at the time, and the Social Security fraud statute, 42 U.S.C. § 408, was a particularly powerful tool in criminal investigations. Consequently, we had many requests for assistance with criminal investigations, particularly from agents with the United States Secret Service ("USSS") and the Federal Bureau of Investigation ("FBI"). During the relevant time period, I spent a lot of time testifying before grand juries in connection with Social Security fraud while the USSS investigators were in the field. I investigated a number of cases involving Social Security fraud involving fraudulent claims for disability benefits in which I would conduct surveillance and worked undercover in my capacity, e.g., as a UPS delivery person

wearing a wire and recording the conversation of subjects. Indeed, investigations of various kinds of fraud involving the misuse of Social Security numbers were common. Bank frauds in general were joint cases with the FBI. I also worked extensively with State and local authorities in a multitude of various criminal enterprises on those levels, from fugitive identification to the apprehension of the same. This was also true in working jointly with the Marshall's Service and the Drug Enforcement Administration ("DEA") regarding the above activities. This was true and accurate of the 1994 and 1995 time frame in particular.

11. As indicated, I spent the slight majority of my time investigating various kinds of healthcare fraud. From 1988 through 1993, I spent almost all my time on a case involving Russian immigrants who had moved from California to St. Louis and constructed an elaborate scheme to defraud Medicare. This case involved billing for services that were never rendered and went on for close to five years with agents from the FBI, the Immigration and Naturalization Service ("INS"), the DEA, the Marshall's Service, and other agents from HHS OI as well as state and local law enforcement. Numerous agents from a variety of agencies helped us serve search warrants. The defendants were charged with 45 counts and went to trial. On the second day of trial, the subjects pled subsequent to the issuing and execution of search warrants at three different sites. Two of the accused entered a plea to Social Security fraud, mail and wire fraud, and one escaped to Moscow, was extradited back to the United States for trial, and during the second day of trial entered a plea of guilty. I then started a lengthy process of debriefing the subject over the next year obtaining information that assisted in the prosecution of numerous other Russian mobsters who were bilking our government of significant amounts of ill-gotten gains from the Medicare Trust Fund and numerous bank frauds.

12. I have read Position Descriptions 804 for GS-12 criminal investigators and 805 for GS-13 criminal investigators that were attached to the Declaration of Alcine Pike in this case, and I have read the Declaration of Michael Little. While these old and generic Position Descriptions describe a range of functions that a criminal investigator may perform at that grade, they do not describe by any means the duties actually performed at any time let alone on a day to day basis. They do accurately state that, at the higher grades, agents generally handle more complex investigations and with less supervision. Some of the functions I performed regularly, such as complex investigations, some I performed only on occasion and some not at all. As an example, Management Implication Reports ("MIRs") were part of a process that allowed a criminal investigator, while conducting criminal investigations, to report a weakness in an HHS program that would enhance the possibility that further criminal activity could take place and this MIR, if you will, would allow agencies within HHS to possibly change a procedure so as to create a stopgap measure to prevent future criminal activity and hence loss of taxpayer dollars. In my twenty-year career as an HHS OIG OI Special Agent Criminal Investigator Series 1811, I submitted approximately 10 of these reports consisting of 3-4 type written pages per a plug-in format that would have taken me probably an hour to complete, totaling 10 hours in my 20-year career.

13. During my career as a criminal investigator with OI, I did not conduct any administrative investigations of HHS employees. To the contrary, it was made clear to me by my supervisors that such investigations should only be conducted by supervisory personnel within other offices at HHS. Occasionally, I would conduct a criminal investigation that involved, among others, HHS employees; however, I would estimate that I worked on a criminal case involving an HHS employee with less than 5 percent of my time.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 12/27/2006

Gary Holst

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF JEFFREY KURTZ**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on July 16, 1989, as a GS-11. On July 15, 1990, I was promoted to GS-12. On October 10, 1992, I was promoted to GS-13.

2. I was a GS-13 with the HHS OIG OI until I transferred, along with many HHS OIG OI criminal investigators who predominantly investigated Social Security fraud, to the Social Security Administration ("SSA") on March 31, 1995, the date SSA became independent of HHS. At SSA, I continued to serve as a GS-13 criminal investigator until October 12, 1997, when I was promoted to GS-14 supervisor. During my time as a GS-13 at SSA, the day-to-day criminal investigative activities I engaged in were essentially the same as my day-to-day activities at HHS, although I no longer investigated health care fraud.

3. I filed my case on August 31, 1995. I was treated by both agencies as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

4. At HHS OIG OI during the relevant time frame, I worked in the Memphis Sub-Office of the Atlanta Regional Office, which had responsibility for conducting criminal investigations in Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina and Tennessee.

5. During my tenure at HHS, the OIG consisted of three major entities: the OI, the Office of Audit ("OA"), which consisted of a much larger staff of auditors, and the Office of Evaluation and Inspections ("OEI"), which conducted evaluations of HHS programs. The OIG at HHS also had other divisions, such as the Office of General Counsel and the Special Investigative Unit, which were located in Washington DC.

6. I frequently obtained referrals from Social Security offices, criminal investigators in other agencies, including the FBI, Secret Service, INS, and state and local law enforcement, members of the public, HHS program recipients, developments from my or other agents' ongoing investigations and referrals from other HHS program staff.

6. I frequently obtained referrals from Social Security offices, criminal investigators in other agencies, including the FBI, Secret Service, INS, and state and local law enforcement, members of the public, HHS program recipients, developments from my or other agents' ongoing investigations and referrals from other HHS program staff.

7. As an OPM series 1811 criminal investigator with HHS OIG OI, I was responsible for conducting criminal investigations of alleged or suspected criminal violations of Title 42, including sections 408 (Social Security Fraud), 1320a-7b (Medicare/Medicaid Fraud) and 1382a (Supplemental Security Income Fraud).

8. As an OPM series 1811 criminal investigator with HHS OIG OI, I was also responsible for conducting criminal investigations of alleged or suspected criminal violations of the general criminal laws of the United States relating to the programs and operations of HHS. In this capacity, I was responsible for investigating alleged or suspected violations of general criminal statutes such as 18 U.S.C. §§ 287 (False Claims), 371 (Conspiracy), 495 (Counterfeiting And Forgery), 641 (Theft Of Public Money Or Property), 666 (Theft Of Federal Funds), 1001 (False Statements), 1028 (Fraudulent Identification Documents), 1341 (Mail Fraud), 1505 (Obstruction Of Agency Proceeding), 1510 (Obstruction Of Criminal Investigation), and 1516 (Obstruction Of A Federal Audit). However, I do not recall working a case where any of the last three statutes were charged during my career at HHS OIG OI.

9. If I believed a case was worthy of prosecution, I would first take it to the United States Attorney's Office ("USAO"). If the USAO was not interested in the case, I would sometimes take it to a state or local prosecutor.

10. The choice of which particular criminal statutes to apply in any individual case selected for prosecution was made by those state or federal prosecutors. Federal prosecutors often chose to apply the general federal statutes criminalizing mail and wire fraud, conspiracy, false statements, false claims, forgery and other criminal statutes of general applicability to the cases I brought to them as well as statutes governing health care and/or Social Security fraud in particular.

11. I was issued a Smith & Wesson .357 caliber revolver by HHS. I was regularly trained in the operation of this and other weapons and required to qualify in their use on a quarterly basis. I was also trained in defensive tactics quarterly.

12. Over the course of my career with HHS and later with SSA, I frequently received additional training in law enforcement. This additional training included attending and completing formal courses sponsored by the Law Enforcement Coordinating Committee of the USAO. For example, in 1990 I attended a three-day seminar titled "Hostage Negotiations." A copy of a certificate of training I received for completing another such course, "Search and Seizure & Officer Survival" is attached to this declaration as Exhibit A.

13. During the relevant time period, I investigated fraud in various HHS programs, primarily Social Security. In doing so, I usually worked with criminal

investigators from other law enforcement agencies such as the FBI, INS, IRS, Secret Service, other IG offices, and state and local police. These fraud investigations involved claims for Social Security benefits by beneficiaries who were not entitled to them or by persons other than the proper beneficiary, the creation and/or use of forged or stolen Social Security cards or numbers, the forgery of Social Security checks, identity theft, charges for medical services that were not provided or were not medically necessary, and many other types of fraud.

14. During the relevant time period, I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government, from physically searching for evidence and interviewing subjects to drafting investigation reports and presenting cases to federal prosecutors. For example, I examined documents including invoices, books, records, computer printouts, contracts, and other data of consequence to the investigation. At times I conducted electronic monitoring and other covert surveillance and worked with confidential informants and undercover operatives. I conducted interviews of witnesses and subjects, obtained signed and sworn statements, prepared interview reports and comprehensive investigative case reports. I assisted Federal prosecutors in the drafting of indictments, criminal informations, grand jury and trial subpoenas which I was also required to serve. I regularly testified as a government witness before grand juries and at trials. A copy of a letter from U.S. Attorney Daniel

Clancy and Assistant U. S. Attorney Cam Towers Jones, describing several of my investigative duties and commending my performance of those duties is attached to this Declaration as Exhibit B.

15. I have read Position Descriptions 804 for GS-12 criminal investigators and 805 for GS-13 criminal investigators that were attached to the Declaration of Alcine Pike in this case, and I have read the Declaration of Michael Little. While these old and generic Position Descriptions describe a range of functions that a criminal investigator may perform at that grade, they do not describe by any means the duties actually performed at any time let alone on a day to day basis. They do accurately state that, at the higher grades, agents generally handle more complex investigations and with less supervision. Some of the functions I performed regularly, such as complex investigations, some I performed only on occasion and some not at all. For example, it was quite rare for me to submit a Management Incident Report (MIR). I would frequently submit only one MIR per year, which would take less than one day to prepare and submit. It was also rare for me to work a case involving the misuse of federal grant money. I only recall working on two such cases over the course of my career.

16. During my career as a criminal investigator with OI, I spent very little time investigating cases where the subject was an employee of HHS. I do not specifically recall working on such a case during the relevant time period.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 2-12-07

Jeffrey Kurtz

# EXHIBIT A

# U.S. Department of Justice

## Certificate of Training
*is presented to*

***JEFF KURTZ***

*for successfully completing the training course*

***SEARCH AND SEIZURE***
***&***
***OFFICER SURVIVAL***

*sponsored by the*
*Law Enforcement Coordinating Committee*
*Office of the United States Attorney*

*United States Attorney*

*LECC Coordinator*

***Northern District of Mississippi***
*District*

***July 12-13, 1995***
*Date*

***Tupelo, Mississippi***
*Location*

# EXHIBIT B

U.S. Department of Justice

*United States Attorney*
*Western District of Tennessee*

---

*1026 Federal Office Building*
*Memphis, Tennessee 38103-1898*

September 21, 1993

Mr. Albert A. Hallmark
Regional Inspector General
for Investigations
Department Health and Human Services-OIG
P. O. Box 2288
Atlanta, GA 30301-2288

RE: Special Agent Jeff Kurtz

Dear Mr. Hallmark:

This letter is to commend to you the work of Special Agent Jeff Kurtz. He brought two cases to this office earlier this year and both ended up in trial. He conducted pre-trial interviews of all witnesses, testified at one trial and helped in numerous other ways to assist with the second trial. His assistance was invaluable in obtaining convictions in both cases. His demeanor was at all times professional and his knowledge of the subject was unimpeachable.

You are indeed fortunate to have an agent of such high quality working in your agency.

Sincerely,

DANIEL A. CLANCY
United States Attorney

By: Cam Towers Jones, AUSA
Cam Towers Jones
Assistant United States Attorney

CTJ:mc

HHS/OIG
OFFICE OF INVESTIGATIONS
ATLANTA FIELD OFFICE
SEP 24 1993

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | ) | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF PAUL L. LAVOIE**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with what was then known as the Department of Health, Education and Welfare ("HEW") on April 9, 1979 as a GS-12 criminal investigator. Prior to my employment with HEW, I had worked as a criminal investigator with the Drug Enforcement Administration ("DEA") and its predecessor, the Bureau of Narcotics and Dangerous Drugs, since 1971.

2. I retired as a GS-13 criminal investigator with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on April 1, 2000. Upon retirement, I began employment as a fraud

investigator and financial research analyst with the New Hampshire Department of Justice, Office of the Attorney General, Medicaid Fraud Control Unit.

3. I filed my case on August 31, 1995, and at all times relevant to this case I was a GS-13 criminal investigator with the HHS OI. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

4. From mid-1991 until early 1993, I worked out of the Concord, New Hampshire Sub-Office under the supervision of the HHS OIG OI Regional Office in Boston, Massachusetts. The Boston Regional office had responsibility for all criminal investigations relating to HHS within the six New England states. When I left the Concord Sub-Office, I worked out of the Boston Regional office.

5. I routinely investigated allegations referred to me from a variety of sources, including Medicare carriers such as Blue Cross Blue Shield, from the personnel within various Social Security offices, from auditors within the OIG's Office of Audit ("OA"), other HHS program staff, state and local law enforcement authorities and from members of the general public.

6. While we had primary jurisdiction over a number of statutes peculiar to HHS, the choice of criminal statutes to enforce is made by the state and federal prosecutors. Federal prosecutors typically chose to apply the general federal statutes criminalizing mail and wire fraud, conspiracy, false statements, false claims, and other criminal statutes of general applicability to the cases I brought to them. Prosecutors also used the more specialized statutes relating to healthcare fraud such as Medicare's anti-kickback statute.

7. During the relevant time period, I was first issued a Smith & Wesson 38 caliber revolver by HHS, and I was later issued a Sig Sauer 9 mm semi-automatic pistol. I was regularly trained in the operation of these weapons and required to qualify in their use every three months.

8. During the relevant time period, I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government. These duties included executing search warrants, interviewing subjects and witnesses, testifying in various kinds of criminal proceedings, preparing investigative reports, conducting surveillance, and examining documents including medical records, invoices, books, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. I also assisted prosecutors in the drafting of indictments, criminal informations, and grand jury and trial subpoenas which I was also required to serve. On at least one occasion during the relevant time period, in July 1995, I was a member of the security detail for the Secretary of HHS at the Special Olympics in New Haven, Connecticut.

9. During the relevant time period, I investigated fraud in various HHS programs, primarily Medicare, Medicaid and Social Security. In doing so, I often worked with criminal investigators from the FBI, other IG offices, and state and local law enforcement officers. These fraud investigations involved claims for services that were not provided, the misrepresentation of the nature of the service provided, and a variety of crimes related to Social Security benefits and phony Social Security numbers. The work performed by the criminal investigators from other federal agencies was indistinguishable from the work that I performed.

10. During the 1993 to 1995 time period, I spent much time working a joint investigation with an investigator from the New Hampshire Attorney General's office into fraud involving Social Security information. This investigation resulted in the prosecution and

conviction of two persons who were using this information to generate false payments from, among others, the state courts for jury duty. One of the defendants, a state court clerk, created fraudulent checks. Her husband, who was administrator of a nursing home, used his position to create other fraudulent schemes. A copy of an OI summary of the case is attached as Exhibit A. I also spent time in those years working on a suspected Medicare fraud case involving an ambulance company.

11. In 1995, I participated in several large fraud investigations with agents from the FBI and other law enforcement agencies. I investigated one of the largest kidney dialysis providers in the country in connection with false claims for medical services to the beneficiaries of various federal programs. I was the HHS case agent and spent 5 years on this investigation, which ultimately resulted in the largest health care prosecution and recovery at the time of its resolution. As a result of my work, I later received awards from the United States Attorney for the District of Massachusetts, the HHS IG, and the President's Council on Integrity and Efficiency. A copy of the DOJ award ceremony document is attached as Exhibit B.

12. During my entire career as a criminal investigator with HHS OI, I only worked on one employee case around 1980 and none within the time period relevant to this case.

13. I have attached as Exhibit C a letter of commendation by the United States Attorney for the District of New Hampshire for my work on a Medicare fraud investigation. This letter relates to a case that precedes the relevant time for this case but it is illustrative of my work. In 1992, I handled this case involving false Medicare claims by an audiologist. After working to develop and assist the prosecutors in a lengthy trial, the audiologist was convicted on 130 counts and sentenced to 44 months in prison.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 12\22\06

Paul L. Lavoie

Paul Lavoie

# EXHIBIT A

# SELECTED CASE NARRATIVES

1.

2. Faith Yanez-Lemire was sentenced in New Hampshire to 4 to 8 years in prison for embezzlement from the State and a nursing home where her husband served as an administrator. While working as a court clerk, Yanez-Lemire issued $40,000 in checks for jury duty to fictitious or non-jury-serving persons and sent the checks to addresses she or her husband used. At the nursing home she stole $50,000 in Medicare, social security and other checks and deposited them to an account for which she was the sole signatory. She was ordered to make restitution of $96,000 and given two additional suspended sentences of 3 1/2 to 7 years.
(File No. 1-93-00521-6, SA Paul Lavoie)

3.

# EXHIBIT B

## HONOREES

National Medical Care Investigation - IDPN

Ken Benton, Special Agent
*Federal Bureau of Investigation*

Paul Lavoie, Special Agent
*H.H.S - O.I.G.*

James Murphy, Special Agent
*DOL-PWBA*

*National Medical Care Investigation - IDPN*

The National Medical Care, Inc. (NMC) investigation was a wide ranging joint civil and criminal healthcare fraud investigation of the nation's largest provider of kidney dialysis services, which recently resulted in a $486 million recovery to the United States. The investigation, which lasted more than 5 years, was conducted by Special Agents and Investigators from the Office of the Inspector General, U.S. Department of Health and Human Services, the Federal Bureau of Investigation, the Defense Criminal Investigative Service, and the Pension and Welfare Benefits Administration of the U.S. Department of Labor. It involved 7 civil False Claims Act Qui Tam actions handled in this district, as well as a related investigation in Philadelphia, and included allegations of fraud, false statements and improper payments in numerous aspects of NMC's business, including, medical director compensation, the provision of a nutritional therapy known as IDPN; failure to report and repay to Medicare credit balances and overpayments; improper billing practices and Kickback Act violations relating to blood laboratory testing; the provision of unnecessary and non-reimbursible diagnostic tests; and the payment of supplemental and Medigap medical insurance premiums. During the investigation more than 2 million documents were subpoenaed and reviewed; the medical records of a statistically valid, 200 patient, sample of Medicare beneficiaries were assembled and reviewed; 6 nationally renowned nephrologists and gastroenterologists were identified and retained as expert consultants; an accounting firm was retained to analyze Medicare claims data; and a $150 million letter of credit was obtained from NMC to secure its future liability to the United States, when it was sold, halfway through the investigation, from one corporate parent to another. During the investigation hundreds of witnesses, including doctors, nurses, dieticians, accountants, sales people, billing clerks, government employees and third party witnesses were interviewed and thousands of pages of detailed interview reports were prepared. In addition, more than 100 witnesses testified before the grand jury. In early 1997 the blood testing aspect of the investigation was assigned to a separate staff of prosecutors and agents. The results of the entire investigation, including the blood laboratory aspects, were a record $101,185,698 in criminal fines from three NMC subsidiary corporations and recovery of $385,147,334 in civil False Claims Act damages.

# Fourth Annual Award Ceremony

United States Courthouse

February 4, 2000

# EXHIBIT C

U.S. Department of Justice

*United States Attorney*
*District of New Hampshire*

*Federal Building*
*P.O. Box 480*
*Concord, New Hampshire 03302-0480*

*603/225-1552*

December 18, 1992

Horace Ervin
Regional Inspector General
for Investigations
Department of Health and Human Services
P.O. Box 8767
Government Center Station
Boston, MA 02114

Re: **United States v. Andrew E. Brandon**

Dear Mr. Ervin:

I write you to commend the outstanding achievement of Special Agent Paul Lavoie in the successful prosecution of audiologist Andrew E. Brandon for Medicare fraud. As you may know, on September 2, 1992 Mr. Brandon was convicted in the United States District Court for the District of New Hampshire on all 130 counts submitted to the jury. On November 12, 1992, Brandon was sentenced to forty-four months imprisonment.

In my eight years of practice I have met no investigator as talented and dedicated as Paul Lavoie. You can appreciate that white collar fraud cases present inherent difficulties of proof; this one involved complex facts regarding audiological testing and dense Medicare regulations. During the three-year investigation of Brandon, Paul engineered a flawless case that was a pleasure to try and overwhelmed the jury. Paul pieced together the critical inculpatory facts from his exhaustive review of thousands of patient records and hundreds of witness interviews. All of Paul's interview reports and evidence summaries were well-written, concise and extraordinarily accurate.

On countless days during the six months between indictment and trial, Paul worked with me well into the evenings reviewing, organizing and marking the hundreds of exhibits used at trial. During the eight-day trial, and intervening weekends, Paul worked sixteen-hour days providing invaluable trial support, always

volunteering to do more. At counsel table, Paul guided the two prosecutors, Michael Gunnison and myself, with sage advice on tactical matters and precise recall of the vital evidence. Moreover, throughout the rigors of the trial, Paul maintained his positive, even-keeled and professional manner. In fact, several of the Medicare beneficiary witnesses commented to me during trial about the professional manner in which Paul conducted the case.

In short, Paul is a shining example to the Federal law enforcement community. It has been deeply rewarding and a privilege for me to have worked with him.

Sincerely,

JEFFREY R. HOWARD
United States Attorney

By: [signature]
Michael J. Connolly
Assistant U.S. Attorney

MJC/jc

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF LEWIS M. LEE**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on April 18, 1984 as a GS-12. Only after the HHS OI criminal investigators had been converted to Availability Pay on September 17, 1995, was I converted to a GS-13 so I was a GS-12 at all times relevant to this case. Prior to being transferred to HHS, I

had worked since August 1, 1976 in various positions, including as a criminal investigator, with the Social Security Administration ("SSA").

2. I filed my case on September 18, 1995. I was treated by the both agencies as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA. During the relevant time period, I worked in the Lexington, Kentucky, Sub-Office under the direction of the Atlanta Regional Office. The Atlanta office had responsibility for conducting criminal investigations in the region that included Kentucky, my assigned territory. I was supervised directly by an Assistant Regional Inspector General ("ARIGI") GS-14 located in the Atlanta Field Office.

3. The OIG at HHS during the relevant time frame consisted of three separate entities in addition to the Office of the Inspector General and the Office of the Principal Deputy Inspector General: the OI, the Office of Audit ("OA"), which consisted of a much larger staff of auditors, and the Office of Evaluation and Inspection ("OEI"), which conducted surveys and analyses of HHS programs. The criminal investigators within the HHS OI office worked for the Deputy Inspector General for Investigations. Only two criminal investigators worked for OI in the Lexington, Kentucky, Sub-Office.

4. I frequently obtained referrals from Medicare providers such as Blue Cross and Blue Shield, auditors within the HHS IG offices, the FBI and other law enforcement agencies, tips from members of the public, developments from my or other agents' ongoing investigations, and referrals from other HHS program staff.

5. During the relevant time period, I was first issued a Model 19 Smith & Wesson .357 caliber revolver by HHS, and I was later issued a 9 mm Sig Sauer semi-automatic pistol. I was also issued the same hollow-point ammunition used by the Secret Service. I was regularly trained in the operation of these weapons and required to qualify in their use every three months.

6. I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government, from serving subpoenas and search warrants and going undercover to gather information to drafting investigation reports and presenting cases to federal prosecutors. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. At times I conducted electronic monitoring and other covert surveillance and used confidential informants and undercover operatives. I conducted interviews of witnesses and subjects, obtained signed and sworn statements, and prepared interview reports and comprehensive investigative case reports. I assisted Federal prosecutors in the drafting of indictments, criminal informations, and grand jury and trial subpoenas which I was also required to serve. I regularly testified as a government witness before grand juries and at trials.

7. During the relevant time period, I investigated fraud in various HHS programs, primarily Medicare/Medicaid. In doing so, I usually worked with a wide range of criminal investigators from agencies such as the FBI, IRS, DEA, and the Defense Criminal Investigative Service, as well as local law enforcement officers and the state Medicaid Fraud Unit. These fraud investigations involved charges for medical services not rendered and various other forms of medical fraud and theft. Many of these cases were worked in conjunction with and under the

supervision of the U. S. Attorney's office in both the Eastern and Western Districts of Kentucky as part of a group of law enforcement officers from various state and federal agencies.

8. During the relevant time period, I participated in several large investigations. For example, I, along with the FBI and the Kentucky State Medicaid Fraud Unit, investigated several medical equipment suppliers in Louisville, Kentucky, who were billing Medicare/Medicaid for expensive items while actually supplying inferior, cheaper brands to the patients. After search warrants and investigation, several individuals pled guilty with sentences of several years in jail and large civil penalties. In another case I worked with the DEA to convict a pharmacist in Saylorsville, Kentucky. He was billing Medicaid for phony prescriptions and selling controlled substances without a prescription. This pharmacist was sentenced to 72 months in jail.

9. During my career as a criminal investigator with OI, I did conduct criminal investigations targeting HHS employees, but none during the relevant time period.

10. During the relevant time period, the investigations that I worked on resulted in a number of convictions as well as fines and restitution. I do not have the necessary records in my possession to be more specific in this regard. I also was cited by U. S. Department of Justice, the Drug Enforcement Administration, and the Defense Criminal Investigative Service as well as my own agency for meritorious service during the relevant time period.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 12/22/06

Lewis M. Lee

Lewis Lee

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF JOANNE LYNN**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on March 4, 1985, as a GS-12. On January 28, 1990, I was promoted to GS-13. Prior to being hired at HHS, I had worked as a criminal investigator with the Internal Revenue Service since June 3, 1979.

2. I was a GS-13 with the HHS OIG OI until July 31, 2001, when I retired.

3. I filed my case on October 27, 1995. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

4. At HHS OIG OI during the relevant time frame, I worked in the Detroit Sub-Office of the Chicago Regional Office, which had responsibility for conducting criminal investigations in Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin.

5. During my tenure at HHS, the OIG consisted of three major entities, the OI, the Office of Audit ("OA"), which consisted of a much larger staff of auditors, and the Office of Evaluation and Inspections ("OEI"), which conducted evaluations of HHS programs. The OIG at HHS also had other divisions, such as the Office of General Counsel and the Special Investigative Unit, which were located in Washington DC.

6. I frequently obtained referrals from Medicare providers, Blue Cross and Blue Shield, criminal investigators in other agencies, including the FBI and state and local law enforcement, contacts in the health care industry that I or other agents had developed, members of the public, HHS program recipients, other health care providers, developments from my or other agents' ongoing investigations and referrals from other HHS program staff.

7. As an OPM series 1811 criminal investigator with HHS OIG OI, I was responsible for conducting criminal investigations of alleged or suspected criminal violations of Title 42, including sections 408 (Social Security Fraud), 1320a-7b (Medicare/Medicaid Fraud) and 1382a (Supplemental Security Income Fraud).

8. As an OPM series 1811 criminal investigator with HHS OIG OI, I was also responsible for conducting criminal investigations of alleged or suspected criminal violations of the general criminal laws of the United States relating to the programs and operations of HHS. In this capacity, I was responsible for investigating alleged or suspected violations of general criminal statutes such as 18 U.S.C. §§ 287 (False Claims),

371 (Conspiracy), 495 (Counterfeiting And Forgery), 641 (Theft Of Public Money Or Property), 666 (Theft Of Federal Funds), 1001 (False Statements), 1028 (Fraudulent Identification Documents), 1341 (Mail Fraud), 1505 (Obstruction Of Agency Proceeding), 1510 (Obstruction Of Criminal Investigation), and 1516 (Obstruction Of A Federal Audit).

9. If I believed a case was worthy of prosecution, I would first take it to the United States Attorney's Office ("USAO"). If the USAO was not interested in the case, I would sometimes take it to a state or local prosecutor.

10. The choice of which particular criminal statutes to apply in any individual case selected for prosecution was made by those state or federal prosecutors. Federal prosecutors often chose to apply the general federal statutes criminalizing mail and wire fraud, conspiracy, false statements, false claims, and other criminal statutes of general applicability to the cases I brought to them as well as statutes governing health care and/or Social Security fraud in particular.

11. I was first issued a .38 caliber revolver by HHS, and I was later issued a 9 mm. semi-automatic pistol. I was also issued the same hollow-point ammunition used by the Secret Service. I was regularly trained in the operation of these weapons and required to qualify in their use on a quarterly basis. I was also trained in defensive tactics quarterly.

12. During the relevant time period, I investigated fraud in various HHS programs, primarily Medicare and Medicaid. In doing so, I usually worked with criminal investigators from other law enforcement agencies such as the FBI, other IG offices, and state and local police. These fraud investigations involved charges for medical services

that were not provided or were not medically necessary, doctors running prescription mills, claims for Social Security benefits by beneficiaries who were not entitled to them or by persons other than the proper beneficiary, and many other types of fraud.

13. During the relevant time period, I also provided physical security for the Secretary of HHS during visits to Michigan. During the relevant time period, I would estimate that I performed this function roughly six times over the course of a typical year.

14. During the relevant time period, I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government, from searching through garbage dumpsters for evidence and interviewing subjects to presenting cases to federal prosecutors and testifying at trials. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. At times I conducted electronic monitoring and other covert surveillance and worked with confidential informants and undercover operatives. I executed search warrants and arrest warrants. I conducted interviews of witnesses and subjects and prepared interview reports. I drafted indictments and also assisted Federal prosecutors in the drafting of indictments, criminal informations, and grand jury and trial subpoenas which I was also required to serve. I regularly reviewed evidence prior to trial and assisted in the selection, compilation, and creation of trial exhibits. I also regularly testified as a government witness before grand juries and at trials.

15. I have read Position Descriptions 804 for GS-12 criminal investigators and 805 for GS-13 criminal investigators that were attached to the Declaration of Alcine Pike in this case, and I have read the Declaration of Michael Little. While these old and

generic Position Descriptions describe a range of functions that a criminal investigator may perform at that grade, they do not describe by any means the duties actually performed at any time let alone on a day to day basis. They do accurately state that, at the higher grades, agents generally handle more complex investigations and with less supervision. Some of the functions I performed regularly, such as complex investigations, some I performed only on occasion and some not at all. For example, I do not recall ever writing a Management Incident Report during my career, nor do I recall other agents I worked with writing such reports on a regular basis. Nor do I recall ever writing a comprehensive investigation report. Such reports were generally unnecessary because I made a practice of contacting the USAO early in my investigations and keeping in constant contact with the USAO thereafter.

16. The day-to-day criminal investigative activities I engaged in while at HHS were essentially the same as the criminal investigative activities I engaged in as a criminal investigator with the Internal Revenue Service.

17. During my career as a criminal investigator with HHS OIG OI, I do not recall ever conducting a criminal investigation where the subject was an employee of HHS.

18. A copy of my Employee Performance Management Plan and Rating, a review of my performance which was conducted annually, for the year 1994 is attached to this Declaration as Exhibit A.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: February 17, 2007

Joanne Lynn