Question

Will employees transferred to OI be required to sign the OI Mobility Agreement and accept involuntary geographic transfers?

Answer

They will not be required to sign the mobility agreement, even though newly-hired OI investigators are. However, management has the right to relocate an employee for the good of the service and not signing the agreement does not take away that prerogative.

Question

Will background investigations be made of OHFI employees reassigned to OI.

Answer

All OI employees must have a full-field background investigation by OPM if they have not already had one. These have already been initiated for most OHFI employees.

Question

Will reassigned OHFI employees be relocated geographically as a result of being reassigned to OI?

Answer

We do not expect to require relocation of any staff in the immediate future as a result of this reorganization. Eventually, the total OI workload will be assessed and staff apportioned geographically to handle it.

Staffing offices to meet organizational needs has been an ongoing process in OI for some time and nas resulted in the establishment of about 40 suboffices. All of OI's workload can not and should not be serviced in the regional field offices; thus assignments to other offices are normal. In OI, all investigative personnel are subject to relocation for the good of the service, but involuntary transfers are uncommon. Requests for voluntary transfers are considered on a case-by-case basis. Many investigators consider the opportunity to relocate a benefit and find such moves advantageous, personally rewarding, and career enhancing.

# EXHIBIT B

June 24, 1985

Larry D. Morey
Assistant Inspector General
for Investigations

In Reply Refer To:
OM-8
PE-14-1

OIG Reorganization - Incorporation of
OHFI Wrongdoer Activities into OI

Distribution Schedule A

Reference my May 14, 1985 memo, same subject.

The entire text of the memo is repeated below. An omission from page 2, paragraph 3 of the original is corrected, thus clarifying the paragraph.

As the Inspector General stated in his April 25 memo to all OIG employees, all activities and functions related to the investigation of, and dealing with, wrongdoers is the responsibility of OI. Accordingly, those aspects of the OHFI operation which focused on provider sanctions, CMPL, and investigation of HCFA employees were reassigned to OI together with a major portion of the OHFI staff whose work focused on these areas.

The transfer of responsibilities and personnel is to be accomplished by May 15, 1985. The following steps are being taken to accomplish this.

Initially, the OAI employees will be detailed to OI. The target effective date for the details is May 12. The Washington Personnel Servicing Center indicates that it will not be necessary to document these detail reassignments with Forms SF-50, because the duties, series, grades, and duty stations of the employees will be unchanged.

OHFI and OI regional managers have jointly selected the individuals who will be reassigned to OI. OI headquarters has initiated the necessary personnel action requests for the reassignment of professional employees. You were notified by electronic mail on May 7, that RIGIs should contact their PROs to arrange for reassignment of support employees.

The new OI staff will continue to work their existing assignments in the usual manner. The RIGIs will review the workload with their incoming ARIGIs from OHFI; however, no changes will be made in priorities unless notified by headquarters.

OM-8
KD
cc to PE 14

We will begin a period of assessment of the total OI workload, including sanctions and CMPL activities, and decisions will be reached as to appropriateness of work, priority setting, and individual work assignments at headquarters and in the field.

Information describing the GS-1811 criminal investigator series will be distributed to former OHFI employees. RIGIs will discuss the pros and cons of reassignment to 1811 with them. Former OHFI employees will be given sufficient information and time to make a decision whether or not they wish to be reassigned to the GS-1811 series. All former OHFI staff will be asked to state in writing whether they do or do not seek reassignment and all will be required to furnish updated SF-171s, Personal Qualifications Statements. However, no one who does not wish to become an 1811 will be reassigned to that series.

The 171s of those employees who want to become 1811s will be reviewed by the Washington Personnel Servicing Center. Personnel Specialists will compare the educational and work experience shown in the 171s against the OPM qualification standards for the GS-1811 series. Qualified employees who hold OHFI positions at GS-12 and above will be reassigned to 1811 positions at their same (current) grade.

Employees at GS-12 and above who need additional experience and/or training to qualify for the 1811 series will be reassigned to 1811 in a trainee capacity at their current grades under the Career Opportunities Training Agreement (COTA). These employees cannot be promoted until they fully meet the 1811 qualification requirements.

All employees at grade GS-11 and below who wish to be reassigned to a GS-1811 position, and who have not previously competed and been selected for a position with promotion potential to the GS-12 level, will be required to do so under either merit promotion provisions or COTA to be reassigned to an 1811 position.

Criminal Investigators will be assigned primarily criminal investigations and will also handle some civil and administrative cases. Non-1811 professionals will be assigned civil and administrative cases and may also be assigned support duties on some criminal investigations.

Those employees who are reassigned to 1811 will be scheduled for the 7-week basic criminal investigator course at the Federal Law

Enforcement Training Center, Glynco, Georgia on a space available basis. This training will probably be completed by all former OHFI employees by the **end of FY 86.**

We anticipate that the transfer will be smooth and that the personal and operational adjustments we need to make will not be unsettling. Working together, we will be able to maintain our high level of accomplishments and our contributions to the OIG mission.

I believe the acquisition of OHFI staff enhances OI and I want to personally welcome all of them to the organization. I am sure that our combined efforts to thwart fraud and abuse in HHS programs will be productive and meaningful and I look forward to our future. s
OI/CID/ESBarnhardt/lw/6-14-85

OIG-DAIGICID for OIG-RIGI78 13:47 MDT 25-Jun-85 Message 321-18

[ Done ]

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al.,<br>Plaintiffs,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | Case No. 90-162C<br>and consolidated cases<br>(Judge Bush) |

**DECLARATION OF JERALD M MESSER**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") in 1980, as a GS-13. Prior to being hired at HHS, I had worked as an OPM Series 1811 criminal investigator with the United States Secret Service at the GS-12 grade level.

2. I was a GS-13 criminal investigator with HHS OIG OI until March 31, 1995, when I transferred to the Social Security Administration ("SSA"), where I continued to serve as a GS-13 criminal investigator until I retired in 2002.

3. I filed my case on July 12, 1995. I was treated by both agencies as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

4. At HHS OIG OI during the relevant time frame, I worked in the Cincinnati Sub-Office of the Chicago Regional Office, which had responsibility for conducting criminal investigations in Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin.

5. During my tenure at HHS, the OIG consisted of three major entities, the OI, the Office of Audit ("OA"), which consisted of a much larger staff of auditors, and the Office of Evaluation and Inspections ("OEI"), which conducted evaluations of HHS programs. The OIG at HHS also had other divisions, such as the Office of General Counsel and the Special Investigative Unit, which were located in Washington DC.

6. I frequently obtained referrals from Medicare providers, criminal investigators in other agencies, including the FBI, Secret Service, INS, DEA, and state and local law enforcement, members of the public, Social Security offices, HHS program recipients, other health care providers, other agents' ongoing investigations, referrals from other HHS program staff, and from contacts and informants that I developed over the course of my career.

7. As an OPM series 1811 criminal investigator with HHS OIG OI, I was responsible for conducting criminal investigations of alleged or suspected criminal violations of Title 42, including sections 408 (Social Security Fraud), 1320a-7b (Medicare/Medicaid Fraud) and 1382a (Supplemental Security Income Fraud).

8. As an OPM series 1811 criminal investigator with HHS OIG OI, I was also responsible for conducting criminal investigations of alleged or suspected criminal violations of the general criminal laws of the United States relating to the programs and

operations of HHS. In this capacity, I was responsible for investigating alleged or suspected violations of general criminal statutes such as 18 U.S.C. §§ 287 (False Claims), 371 (Conspiracy), 495 (Counterfeiting And Forgery), 641 (Theft Of Public Money Or Property), 666 (Theft Of Federal Funds), 1001 (False Statements), 1028 (Fraudulent Identification Documents), 1341 (Mail Fraud), 1505 (Obstruction Of Agency Proceeding), 1510 (Obstruction Of Criminal Investigation), and 1516 (Obstruction Of A Federal Audit).

9. If I believed a case was worthy of prosecution, I would first take it to the United States Attorney's Office ("USAO"). If the USAO was not interested in the case, I would sometimes take it to a state or local prosecutor if the investigation revealed that a state criminal statute may have been violated.

10. The choice of which particular criminal statutes to apply in any individual case selected for prosecution was made by those state or federal prosecutors. Federal prosecutors often chose to apply general federal statutes criminalizing mail and wire fraud, conspiracy, false statements, false claims, and other criminal statutes of general applicability to the cases I brought to them as well as statutes governing health care and/or Social Security fraud in particular.

11. HHS first issued me a .38 caliber revolver and I was later issued a 9 mm. semi-automatic pistol. I was regularly trained in the operation of these weapons and required to qualify in their use on a quarterly basis. I was also trained in defensive tactics quarterly. I was also issued handcuffs and pepper spray.

12. During the relevant time period, I investigated fraud in various HHS programs, primarily Medicare and the Indian Health Service. In doing so, I usually

worked with criminal investigators from other law enforcement agencies such as the FBI, DEA, INS, IRS, Secret Service, other IG offices, and state and local police. These fraud investigations involved charges for medical services that were not provided or were not medically necessary, doctors running prescription mills, doctors writing prescriptions for drug addicts in return for money or sex, misuse of federal grant funds, claims for social security benefits by beneficiaries who were not entitled to them or by persons other than the proper beneficiary, the creation and/or use of forged or stolen social security cards or numbers and many other types of fraud.

13. During the relevant time period, I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government, from physically searching for evidence and interviewing subjects to drafting investigation reports and presenting cases to federal prosecutors. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. At times I conducted electronic monitoring and other covert surveillance and worked with confidential informants and undercover operatives. I requested and executed search warrants and arrest warrants. I conducted interviews of witnesses and subjects, obtained signed and sworn statements, prepared interview reports and comprehensive investigative case reports. I assisted Federal prosecutors in the drafting of indictments, criminal information, grand jury and trial subpoenas, which I was also required to serve. I regularly testified as a government witness before grand juries and at trials. My annual evaluations were largely based on the number of arrests my investigations generated.

14. I have read Position Descriptions 804 for GS-12 criminal investigators and 805 for GS-13 criminal investigators that were attached to the Declaration of Alcine Pike in this case, and I have read the Declaration of Michael Little. While these old and generic Position Descriptions describe a range of functions that a criminal investigator may perform at that grade, they do not describe by any means the duties actually performed at any time let alone on a day-to-day basis. They do accurately state that, at the higher grades, agents generally handle more complex investigations and with less supervision. Some of the functions I performed regularly, such as complex investigations, some I performed only on occasion and some not at all. For example, I rarely wrote Management Implication Reports ("MIRs"). I do not recall writing any MIRs during the relevant time period, and would estimate that I wrote an average of 0-1 MIRs per year over the course of my career.

15. During the relevant time period, I participated in a number of significant investigations. For example, I was case agent on a three-year investigation into the suspected diversion of controlled pharmaceuticals in southern Ohio. Other participants in the project included the FBI, DEA and the Cincinnati, Dayton and Columbus Police Departments. The project utilized surveillance, search warrants, undercover informants and other traditional law enforcement investigative techniques and resulted in numerous criminal convictions of health care professionals in both state and federal courts.

16. During my career as a criminal investigator with OI, I spent very little time investigating cases where the subject was an employee of HHS. I would estimate that I worked on roughly 0-3 such cases per year.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: February 10, 2007

Jerald M. Messer

Jerald Messer

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF CRAIG M. MORGAN**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a Criminal Investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") in the Office of Investigations ("OI") on May 25, 1986. (Monday, May 26, 1986 was a Federal holiday, so my "service comp date" is May 27, 1986, but my appointment was effective as of the beginning of the pay period.) Due to my prior experience investigating health care fraud, my initial appointment was at a grade GS-11. I was a GS-12 from January 1989 until I was promoted to GS-13 on April 17, 1994.

2. Prior to being hired at HHS, I was employed as the Special Agent in Charge for the Medicaid Fraud Control Unit of the Ohio Attorney General's Office, and previously as a sworn law enforcement officer in the state of Ohio from 1974 through 1979.

3. I filed my case on August 31, 1995, so the relevant time period includes time that I served as a GS-12 and GS-13 within the HHS OI. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA. I continue to be employed currently by HHS/OIG/OI as a Criminal Investigator at a grade GS-13, and expect to retire from Federal service on or about August 31, 2007.

4. As a condition of my employment with HHS/OIG/OI as a Criminal Investigator in the OPM Series 1811, I was required to attend and successfully complete the Criminal Investigator Training Program ("CITP") at the Federal Law Enforcement Training Center ("FLETC") located in Glynco, Georgia. This is the same course required of other Criminal Investigators in the OPM Series 1811 (with the exception of the FBI and DEA who each attend the FBI Academy), and I was trained with other criminal investigators from the United States Secret Service ("USSS"), the United States Customs Service ("USCS"), and the Department of Defense. Among the courses taught in this program were both classroom and practical exercises involving arrest, search and seizure, and use of firearms.

5. During the entire time period pertinent to this action, I was assigned to the Columbus, Ohio Sub-Office, now known as the Columbus Field Office, of the Chicago Regional Office. I was supervised, however, by an Assistant Regional Inspector General for Investigations ("ARIGI") located in the Detroit, Michigan Sub-Office of the Chicago Regional Office. My geographic area of responsibility consisted primarily of the Southern District of Ohio; during the period immediately following the separation of the Social Security

Administration ("SSA") from HHS in March 1995; however, I and the other agents assigned to the Columbus Sub-Office were given responsibility for cases originating in the Northern District of Ohio.

6. My work responsibilities consisted primarily of the conduct of criminal investigations of fraud involving the programs of HHS, including all of its component agencies. While the majority of my investigations related to health care fraud perpetrated against the Medicare and, occasionally, Medicaid programs, I also conducted investigations related to fraud against the Social Security system, violations of the Food, Drug and Cosmetic Act, and fraud against other Departmental grants and contract programs. Investigations by me were initiated from a variety of sources including: the Medicare contractors and/or intermediaries; personnel within SSA or other HHS component agencies; complaints from private citizens; referrals from other Federal, state or local law enforcement agencies; referrals from the U.S. Attorney's Offices and/or U.S. Department of Justice; information developed independently by me through investigation; or by developments from other agent's ongoing investigations.

7. The choice of criminal statutes to enforce is made by the state and federal prosecutors. Federal prosecutors typically chose to apply the general federal statutes criminalizing mail and wire fraud, conspiracy, false statements, false claims, and other criminal statutes of general applicability to the cases I brought to them, although federal prosecutors would frequently use the Social Security fraud statute because they only needed to prove that the recipient's identity was not the same as the cardholder's. The cases I investigated involved a variety of Federal criminal statutes including: 18 U.S.C. §2 (Aiding and Abetting); 18 U.S.C. §287 (False Claims); 18 U.S.C. §371 (Conspiracy); 18 U.S.C. §641 (Theft); 18 U.S.C. §666 (Embezzlement); 18 U.S.C. 1001 (False Statements); 18 U.S.C. 1341 (Mail Fraud); 18 U.S.C.

1343 (Wire Fraud); 18 U.S.C. §1503 (Obstruction); 18 U.S.C. §1956, §1957 (Money Laundering); 42 U.S.C. §408(g) (False SSN Use); 42 U.S.C. §1320a7-b (Medicare/Medicaid False Claims); and other miscellaneous criminal statutes. I also have investigated cases which resulted in prosecution and conviction for violations of state criminal statutes in various jurisdictions in the State of Ohio, including theft, forgery, falsification, embezzlement, and related criminal offenses.

8. Beginning July 6, 1987 and continuing during the relevant time period, I carried a variety of firearms, including my own .38 caliber and .357 caliber Smith & Wesson revolvers, and 9mm Smith & Wesson semi-automatic pistol. Subsequently, I was issued a 9mm Sig Sauer semi-automatic pistol by my agency, which later was replaced by an issued .40 caliber Glock semi-automatic pistol, which is the weapon I currently carry. I was also issued the same types of ammunition used by the other Federal agencies carrying similar weapons. I was regularly trained in the operation of these weapons and required to qualify in their use every three months.

9. During the relevant time period, I performed the entire range of criminal investigative duties performed by other criminal investigators for the Federal government, from sifting through garbage dumpsters for evidence and going undercover to gather information to drafting investigation reports and presenting cases to federal prosecutors. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. At times I conducted consensual telephonic and non-telephonic electronic monitoring and covert surveillance. I applied for, received and executed Federal search warrants. I conducted interviews of witnesses and subjects, obtained signed and sworn statements, and prepared interview reports and comprehensive investigative case reports. I assisted Federal prosecutors in the drafting of

indictments, criminal informations, and grand jury and trial subpoenas which I also was required to serve. I regularly testified as a government witness before grand juries and at trials.

10. I have read Position Descriptions 804 for GS-12 criminal investigators and 805 for GS-13 criminal investigators that were attached to the Declaration of Alcine Pike in this case, and I have read the Declaration of Michael Little. While these old and generic Position Descriptions describe a range of functions that a criminal investigator may perform at that grade, they do not describe by any means the duties actually performed at any time let alone on a day to day basis. They do accurately state that, at the higher grades, agents generally handle more complex investigations and with less supervision. Some of the functions I performed regularly, such as complex investigations, some I performed only on occasion and some not at all. Even some of the more routine activities listed in the Position Description such as serving subpoenas, conducting surveillance and interviewing witnesses did not occur every day. Consensual monitoring, for example, was infrequent as were physical arrests. The Position Description cannot be used to say what criminal investigators did, only what they might do during the course of their employment at the particular grade.

11. In conducting investigations within my jurisdiction, I routinely worked with criminal investigators from other Federal agencies including the Federal Bureau of Investigation ("FBI"); Internal Revenue Service, Criminal Investigation Division ("IRS"); USSS; the Bureau of Alcohol, Tobacco and Firearms ("BATF"); the Immigration and Naturalization Service ("INS"); and Inspector General Offices of other government agencies, as well as numerous state and local law enforcement agencies and officers, including the Ohio Attorney General's Office, the Ohio State Highway Patrol, the Ohio Organized Crime Investigations Commission, the Columbus Police Organized Crime Bureau, the Dayton Police Special Investigations Unit, and

the Cincinnati Police Pharmaceutical Diversion Unit. These investigations involved fraudulent claims for medical services, drug trafficking and/or diversion of legitimate pharmaceutical drugs, theft or embezzlement of program funds, forgery and/or uttering of forged documents (i.e., benefit checks, grant applications, applications for benefits, and the like), and the fraudulent use of Social Security numbers for a wide variety of purposes, as well as other similar offenses.

12. During the relevant time period, I participated in several large investigations. For example, I participated in a multi-agency, multi-jurisdictional investigation of a group of middle-eastern shopkeepers located in the Central Ohio area who were engaged in the illegal purchasing and trafficking of food stamps, fencing of stolen property, and fraudulent use of Social Security numbers to avoid detection. Other agencies participating in that investigation included the USSS, the Department of Agriculture Office of Inspector General, INS, the Columbus, Ohio Police Division, and the Franklin County, Ohio Sheriff's Office. The investigation included simultaneous execution of search warrants at approximately a half-dozen locations and involved over 175 officers and agents. This investigation culminated with the indictment and subsequent convictions of a number of individuals on Federal charges of food stamp trafficking and money laundering.

13. A second major investigation in which I participated during the relevant time period involved the first regional task force formulated by the Ohio Organized Crime Investigations Commission shortly after passage of its enabling legislation in the state of Ohio. The investigation involved a large theft and fencing ring operating in the southeastern portion of Ohio and, again, involved the fraudulent use of Social Security numbers to disguise the identities

of individuals disposing of stolen property at independent flea markets. The Columbus OI agents of HHS were the only Federal criminal investigators invited to participate as a cooperating agency in this task force investigation. The result of the investigation was the conviction of several individuals in the first prosecution brought under the State's newly-passed version of the "RICO" statute, the recovery of nearly $100,000 in stolen property, and the forfeiture of almost $1 million in assets of the defendants.

14. Since the early 1990s, I have participated in numerous investigations of health care fraud, along with other agencies, under the auspices of the Health Care Fraud Task Force of the U.S. Attorney for the Southern District of Ohio. Generally, these investigations have involved multiple Federal law enforcement agencies including the FBI, IRS, other Offices of Inspector General, and various state and local agencies on a case-by-case basis.

15. During my over 20 year tenure as a criminal investigator with OI, I can recall being assigned to only one investigation involving possible misconduct by an HHS employee. This involved an SSA employee who was alleged to have misappropriated property of the agency, and the complaint was found to be unsubstantiated. With the exception of a change that occurred about two years ago, it had always been my understanding that internal investigations involving OI personnel, particularly criminal investigators, are assigned only to supervisory personnel and not to field investigators. OI now has a "Special Investigations Unit" within headquarters. I have never been assigned to conduct or assist with such an investigation.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 26 FEB 2007

Craig M. Morgan

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 90-162C<br>and consolidated cases<br>(Judge Bush) |

**DECLARATION OF JOHN A. POLLOCK**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on June 21, 1987 as a GS-7. I became a GS-12 on July 29, 1990 and a GS-13 on December 25, 1994.

2. I filed my case on March 3, 1995, when I was a GS-13 with the HHS OI. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA. On March 31, 1995, I transferred to the OI of the Social Security Administration, and, on September 17, 1995, the criminal investigators at SSA were removed by statute from coverage under the FLSA and converted to a new pay system known as Law Enforcement Availability Pay.

3. At HHS during the relevant time frame, I worked in the Detroit office of the HHS OI, which had responsibility for investigations within the State of Michigan. The Detroit office was under the direction of the Chicago Field Division.

4. During the relevant time period, I was first issued a Model 19 Smith & Wesson .357 caliber revolver by HHS. I was regularly trained in the operation of this weapon and required to qualify every three months.

5. During the relevant time period, I investigated fraud in various HHS programs, primarily in connection with Social Security fraud. In doing so, I usually worked with criminal investigators from a range of law enforcement agencies but principally and almost always with criminal investigators of the USSS.

6. In 1993, I conducted criminal investigations with a number of law enforcement agencies, including the USSS, FBI and others. I was responsible for 29 prosecutions involving Social Security fraud and 7 prosecutions involving identity theft in connection with welfare fraud in Michigan. I worked with other criminal investigators on various health care fraud investigations, including investigations that involved sorting through trash after dark in a search for evidence. I obtained over 30 confessions that led to criminal prosecutions. I was awarded the HHS OIG Special Citation Award for "Unusual and Exemplary Dedication and Effectiveness for 1993."

7. In 1994, I obtained confessions in nearly every one of approximately 50 criminal cases that were prosecuted by the United States Attorneys Offices in Detroit, Flint and Bay City, Michigan. I conducted surveillance operations in connection with disability insurance fraud. I handled three armed protective details in Detroit and Flint, Michigan that year, and I prepared 12

reports recommending criminal prosecutions to the United States Attorneys Office for the Eastern District of Michigan.

8. In 1995, I participated in a joint criminal investigation with the FBI involving a Social Security beneficiary who was stealing cable TV services. I worked with the FBI on a case related to the bombing of the Oklahoma City Federal Building. I also worked with the FBI, USSS and agents from the Immigration and Naturalization Service to prepare and serve search and arrest warrants.

9. In all my years of working with criminal investigators from other federal and state agencies, I can say that we do the same work. During the relevant time period, I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government, from sifting through garbage dumpsters for evidence and going undercover to gather information to drafting investigation reports and presenting cases to federal prosecutors. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. In a couple of cases I conducted surveillance and worked undercover pretending to be a patient; in another, involving disability fraud, I pretended to be a customer.

10. During my career as a criminal investigator with OI, I only worked 6 cases involving employees of HHS, and I estimate that I spent about 1 percent or less of my time on these cases.

11. During the relevant time period, I received a number of commendations, which are attached as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 12, 2007 ____________________
John A. Pollock

# EXHIBIT A

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Michigan*

*Federal Building and United States Courthouse*
*231 W. Lafayette, Eighth Floor*
*Detroit, Michigan 48226*

November 30, 1992

Michael Dyer
Regional Inspector General
for Investigations
HHS-OIG
105 West Adams, 23rd Floor
Chicago, Illinois 60603

Re: <u>United States v. Shawn Huffman</u>,
HHS [redacted]

Dear Mr. Dyer:

This is to commend the assistance of Health and Human Services Office of Inspector General Special Agent John A. Pollack in the successful prosecution of the above case. Agent Pollack's efforts were crucial to the conviction of Shawn Huffman both on federal false identification and narcotics and weapons charges.

On September 4, 1992, defendant Shawn Huffman was sentenced in the Eastern District of Michigan before the Honorable Anna Diggs Taylor to a total term of 45 years imprisonment.

Again, our office extends its appreciation to the Department of Health and Human Services and to Special Agent John A. Pollack.

Sincerely,

STEPHEN J. MARKMAN
United States Attorney

Amy Hartmann

AMY HARTMANN
Assistant United States Attorney
817 Federal Building
231 W. Lafayette
Detroit, Michigan 48226
(313) 226-3872

THANKS FOR ANOTHER JOB WELL DONE
THANKS JOHN
MIKE D.

HHS/OIG
OFFICE OF INVESTIGATIONS
CHICAGO FIELD OFFICE
DEC 02 1992

AH:clr

cc: Special Agent John A. Pollack

1 - POLLACK
1 - PERSONNEL FILE
1 - HANOWAY

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Michigan*

*Southern Division-Flint*
*210 Federal Building*
*600 Church Street*
*Flint, Michigan 48502*

*Phone (313) 766-5177*
*(FAX) (313) 766-5427*

March 10, 1993

Michael Dyer
Regional Inspector General
for Investigations
U. S. Dept of Health and
Human Services
Office of Inspector General
105 W. Adams Street
Chicago, IL 60603

Re: U.S. v. Harvey James Duranseau
Docket No. 92-CR-80022

Dear Mr. Dyer:

I am writing to acknowledge the assistance of Special Agent John Pollack, Office of the Inspector General, Detroit, Michigan in the above-referenced matter. Prior to a trial charging Harvey Duranseau with False Statement, I requested that John provide some certification regarding social security numbers from the Department of Health and Human Services. This information was instrumental in establishing that Harvey James Duranseau, a significant violator, had been using false identities. John acted quickly in acquiring this information. I am enclosing copies of the court records regarding this case.

If you have any questions, please feel free to contact me.

Very truly yours,

STEPHEN J. MARKMAN
UNITED STATES ATTORNEY

Mark C. Jones
Mark C. Jones
Assistant U. S. Attorney

1- John P ✓
1- Personnel File
1- [illegible]

MCJ/cc
Enclosures

John
Thanks for a super job
Mike
D

HHS/OIG
OFFICE OF INVESTIGATIONS
CHICAGO FIELD OFFICE
MAR 17 1993

**STATE OF MICHIGAN**

OFFICE OF PROSECUTING ATTORNEY
JACKSON, MICHIGAN

**DENNIS HURST**
PROSECUTING ATTORNEY

300 COUNTY COURT HOUSE
JACKSON, MICHIGAN 49201

TELEPHONE (517) 788-4283
FACSIMILE (517) 780-4714

August 16, 1995

**John Pollack, Special Agent**
**Office of Inspector General**
**Social Security Administration**
477 Michigan Avenue
Detroit, MI 48226

**Re: Officer of the Month Award**

**Dear Special Agent Pollack:**

Upon assuming office as Prosecuting Attorney, I initiated an awards program called **"Officer of the Month"** to recognize the outstanding performance of law enforcement officers in the line of duty.

I am pleased to announce that you have been chosen **Officer of the Month for July, 1995**, on the recommendations of Chief Trial Attorney Kirk Tabbey in recognition of your exemplary investigative efforts in the case of **People v Walter Baisden**.

Thanks to your efforts, we plan to successfully prosecute Mr. Baisden for Social Security fraud, and by so doing, send a message to other criminals that we will not allow the Social Security Trust Fund to be plundered.

If there is a departmental protocol I should follow in order to present this Outstanding Achievement Award to you, please contact me, or Barb Heselschwerdt, as we want to be certain to honor it.

Again, congratulations on your excellent investigative work!

Very truly yours,

**Dennis Hurst**
**Prosecuting Attorney**

DH/jrl

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al.,<br>Plaintiffs,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | Case No. 90-162C<br>and consolidated cases<br>(Judge Bush) |

**DECLARATION OF WILLIAM W. ROOT**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on August 16, 1987, as a GS-9. On September 10, 1989, I was promoted to GS-12. On December 1, 1991, I was promoted to GS-13. Prior to being hired at HHS, I had worked as a criminal investigator with the Louisiana State Attorney General's Office for seven years.

2. I was a GS-13 with the HHS OIG OI until June of 2002, when I was promoted to GS-14 supervisor, a position I continue to hold today.

3. I filed my case on May 26, 1995. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

4. At HHS OIG OI during the relevant time frame, I worked in the Baton Rouge Sub-Office of the Dallas Regional Office.

5. During my tenure at HHS, the OIG consisted of three major entities: the OI, the Office of Audit ("OA"), which consisted of a much larger staff of auditors, and the Office of Evaluation and Inspections ("OEI"), which conducted evaluations of HHS programs. The OIG at HHS also had other divisions, such as the Office of Counsel to the Inspector General and the Special Investigative Unit, which were located in Washington, DC.

6. I frequently obtained referrals from Social Security offices, Medicare providers, criminal investigators in other agencies, including the FBI, Secret Service, INS, and state and local law enforcement, members of the public, HHS program recipients, other health care providers, state medical agencies, developments from my or other agents' ongoing investigations and referrals from other HHS program staff.

7. As an OPM series 1811 criminal investigator with HHS OIG OI, I was responsible for conducting criminal investigations of alleged or suspected criminal violations of Title 42, including sections 408 (Social Security Fraud), 1320a-7b (Medicare/Medicaid Fraud) and 1382a (Supplemental Security Income Fraud).

8. As an OPM series 1811 criminal investigator with HHS OIG OI, I was also responsible for conducting criminal investigations of alleged or suspected criminal violations of the general criminal laws of the United States relating to the programs and operations of HHS. In this capacity, I was responsible for investigating alleged or

suspected violations of general criminal statutes such as 18 U.S.C. §§ 287 (False Claims), 371 (Conspiracy), 495 (Counterfeiting And Forgery), 641 (Theft Of Public Money Or Property), 666 (Theft Of Federal Funds), 1001 (False Statements), 1028 (Fraudulent Identification Documents), 1341 (Mail Fraud), 1505 (Obstruction Of Agency Proceeding), 1510 (Obstruction Of Criminal Investigation), and 1516 (Obstruction Of A Federal Audit).

9. If I believed a case was worthy of prosecution, I would first take it to the United States Attorney's Office ("USAO"). If the USAO was not interested in the case, I would sometimes take it to the Department of Justice's Civil Division or to a state or local prosecutor.

10. The choice of which particular criminal statutes to apply in any individual case selected for prosecution was made by those state or federal prosecutors. Federal prosecutors often chose to apply the general federal statutes criminalizing mail and wire fraud, conspiracy, false statements, false claims, and other criminal statutes of general applicability to the cases I brought to them as well as statutes governing health care and/or Social Security fraud in particular.

11. I was first issued a .38 caliber revolver by HHS, and I was later issued a 9 mm. semi-automatic pistol. I was regularly trained in the operation of these weapons and required to qualify in their use on a quarterly basis. I was also trained quarterly in defensive tactics.

12. During the relevant time period, I investigated fraud in various HHS programs, primarily Social Security and Medicare/Medicaid. In doing so, I occasionally

worked with criminal investigators from other law enforcement agencies such as the FBI, INS, IRS, DEA, Secret Service, other IG offices, and state police and Medicaid investigators. These fraud investigations involved charges for medical services that were not provided or were not medically necessary, misuse of federal grant funds, claims for Social Security benefits by beneficiaries who were not entitled to them or by persons other than the proper beneficiary, the creation and/or use of forged or stolen Social Security cards or numbers and many other types of fraud.

13. During the relevant time period, I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government, from physically searching for evidence and interviewing subjects to drafting investigation reports and presenting cases to federal prosecutors. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. At times I conducted electronic monitoring and other covert surveillance. I executed search warrants and arrest warrants. I conducted interviews of witnesses and subjects, obtained signed and sworn statements, and prepared interview reports and comprehensive investigative case reports. I assisted Federal prosecutors in the drafting of indictments, criminal informations, and grand jury and trial subpoenas which I was also required to serve. I regularly testified as a government witness before grand juries and at trials.

14. I have read Position Descriptions 804 for GS-12 criminal investigators and 805 for GS-13 criminal investigators that were attached to the Declaration of Alcine Pike in this case, and I have read the Declaration of Michael Little. While these old and generic Position Descriptions describe a range of functions that a criminal investigator

may perform at that grade, they do not describe by any means the duties actually performed at any time let alone on a day to day basis. They do accurately state that, at the higher grades, agents generally handle more complex investigations and with less supervision. Some of the functions I performed regularly, such as complex investigations, some I performed only on occasion or not at all. For example, I estimate that I submitted only one or two Management Implication Reports over the course of a typical year.

15. The day-to-day criminal investigative activities I engaged in while at HHS were essentially the same as the criminal investigative activities I engaged in as a criminal investigator with the Louisiana State Attorney General's Office.

16. During my career as a criminal investigator with HHS OIG, I spent very little time investigating cases where the subject was an employee of HHS. I would estimate that I investigated no more than one or two such cases during the relevant time period.

17. Over the course of my career as a criminal investigator with HHS OIG OI, I have secured over 100 convictions and civil settlements, none of which involved HHS employees.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 3/15/07

William Root

William Root

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 90-162C<br>and consolidated cases<br>(Judge Bush) |

**DECLARATION OF NANCY SCANLAN**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on January 20, 1985 as a GS-7. On September 29, 1985, I was promoted to GS-9. On October 11, 1987, I was promoted to GS-11. On October 9, 1988, I was promoted to GS-12. On March 28, 1999, I was promoted to GS-13, a position I still hold today.

2. I filed my case on August 18, 1995. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

3. At HHS OIG OI during the relevant time frame, I worked in the Boston Regional Office, which had responsibility for conducting criminal investigations throughout New England.

4. During my tenure at HHS, the OIG consisted of three major entities: the OI, the Office of Audit ("OA"), which consisted of a much larger staff of auditors, and the Office of Evaluation and Inspections ("OEI"), which conducted evaluations of HHS programs. The OIG at HHS also had other divisions, such as the Office of General Counsel and the Special Investigative Unit, which were located in Washington, DC.

5. I frequently obtained referrals from Social Security offices, Medicare providers, criminal investigators in other agencies, including the FBI, Secret Service, INS, and state and local law enforcement, members of the public, HHS program recipients, other health care providers, developments from my or other agents' ongoing investigations and referrals from other HHS program staff.

6. As an OPM series 1811 criminal investigator with HHS OIG OI, I was responsible for conducting criminal investigations of alleged or suspected criminal violations of Title 42, including sections 408 (Social Security Fraud), 1320a-7b (Medicare/Medicaid Fraud) and 1382a (Supplemental Security Income Fraud).

7. As an OPM series 1811 criminal investigator with HHS OIG OI, I was also responsible for conducting criminal investigations of alleged or suspected criminal violations of the general criminal laws of the United States relating to the programs and operations of HHS. In this capacity, I was responsible for investigating alleged or suspected violations of general criminal statutes such as 18 U.S.C. §§ 287 (False Claims), 371 (Conspiracy), 495 (Counterfeiting And Forgery), 641 (Theft Of Public Money Or Property), 666 (Theft Of Federal Funds), 1001 (False Statements), 1028 (Fraudulent Identification Documents), 1341 (Mail Fraud), 1505 (Obstruction Of Agency Proceeding), 1510 (Obstruction Of Criminal Investigation), and 1516 (Obstruction Of A Federal Audit).

8. If I believed a case was worthy of prosecution, I would first take it to the United States Attorney's Office ("USAO"). If the USAO was not interested in the case, I would sometimes take it to a state or local prosecutor.

9. The choice of which particular criminal statutes to apply in any individual case selected for prosecution was made by those state or federal prosecutors. Federal prosecutors often chose to apply the general federal statutes criminalizing mail and wire fraud, conspiracy, false statements, false claims, and other criminal statutes of general applicability to the cases I brought to them as well as statutes governing health care and/or Social Security fraud in particular.

10. Like other HHS OIG OI criminal investigators, I attended the Criminal Investigator Training Program ("CITP") at the Federal Law Enforcement Training Center ("FLETC"), the same training received by federal criminal investigators at many other agencies, including INS, Secret Service, BATF, IRS, and the U.S. Marshals Service.

11. I was first issued a .38 caliber revolver by HHS, and I was later issued a 9 mm. semi-automatic pistol. I was regularly trained in the operation of these weapons and required to qualify in their use on a quarterly basis. I was also trained quarterly in defensive tactics.

12. Over the course of my career with HHS, I received additional training in law enforcement beyond my initial training at FLETC and quarterly firearms and defensive tactics training. For example, either during or prior to the relevant time period I completed a course on effective interrogation strategy titled "Reid Techniques of Interviewing and Interrogation."

13. During the relevant time period, I investigated fraud in various HHS programs, primarily Social Security and Medicare/Medicaid. In doing so, I usually worked with criminal investigators from other law enforcement agencies such as the FBI, INS, IRS, Secret Service, other IG offices, and state and local police. These fraud investigations involved charges for medical services that were not provided or were not medically necessary, misuse of federal grant funds, claims for Social Security benefits by beneficiaries who were not entitled to them or by persons other than the proper beneficiary, the creation and/or use of forged or stolen Social Security cards or numbers, the use of stolen Social Security numbers by fugitives or wanted criminal suspects attempting to evade capture, identity theft, and many other types of fraud.

14. During the relevant time period, I also provided physical security for the Secretary of HHS during visits to New England. I would estimate that I performed this function several times over the course of a typical year.

15. During the relevant time period, I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government, from physically searching for evidence and interviewing subjects to drafting investigation reports and presenting cases to federal prosecutors. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. At times I conducted covert surveillance, interviews of witnesses and subjects, obtained signed and sworn statements, and prepared interview reports. I assisted Federal prosecutors in the drafting of indictments, criminal informations, and grand jury and trial subpoenas which I was also required to serve, and I regularly testified as a government witness before grand juries.

16. I have read Position Descriptions 804 for GS-12 criminal investigators and 805 for GS-13 criminal investigators that were attached to the Declaration of Alcine Pike in this case, and I have read the Declaration of Michael Little. While these old and generic Position Descriptions describe a range of functions that a criminal investigator may perform at that grade, they do not describe by any means the duties actually performed at any time let alone on a day to day basis. They do accurately state that, at the higher grades, agents generally handle more complex investigations and with less

supervision. Some of the functions I performed regularly, such as complex investigations, some I performed only on occasion and some not at all. For example, I would estimate that I wrote no more than 2-3 Management Implication Reports in a typical year, each of which would take roughly half of a workday to produce. It was also quite rare for me to write a comprehensive final investigative report. I do not specifically recall writing any such reports during the relevant time period and would estimate that I wrote one, at most, over the course of a typical year.

17. During the relevant time period, I participated in a number of successful investigations that led to criminal convictions. For example, I worked with members of the FBI's Fugitive Task Force to investigate a subject suspected of attempting to obtain a passport fraudulently by, among other things, using a stolen Social Security number. This investigation resulted in a two-count indictment and ultimately led to a prison sentence of 18 months.

18. During my career as a criminal investigator with OI, I spent very little time investigating cases where the subject was an employee of HHS. I do not specifically recall working on any such cases during the relevant time period and I would estimate that I worked on 0-1 such cases over the course of a typical year.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 2/27/07

Nancy Scanlan

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 90-162C<br>and consolidated cases<br>(Judge Bush) |

**DECLARATION OF DOUGLAS G. WRIGHT**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator with the Department of Health and Human Services ("HHS") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on August 18, 1985, as a GS-13. I was a GS-13 criminal investigator within the OI at HHS until I faced mandatory retirement on May 31, 1999.

2. I began with a bureau of what was then known as the Department of Health, Education and Welfare in 1974 and worked on healthcare matters in a number of different capacities within the Department.

3. I filed my claim on March 31, 1995, so I was a GS-13 HHS criminal investigator at all times. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

4. During the relevant time period, I worked in the Clearwater, Florida Sub-Office under the Atlanta Regional Office. At that post of duty, I had responsibility for conducting criminal investigations in all HHS programs.

5. The OIG at HHS during the relevant time frame consisted of three separate entities in addition to the Office of the Inspector General and the Office of the Principal Deputy Inspector General, the OI, the Office of Audit ("OA"), which consisted of a much larger staff of auditors, and the Office of Evaluation and Inspection ("OEI"), which conducted surveys and analyses of HHS programs. The OI within HHS had approximately 350 criminal investigators, of which from three to five were assigned to the Clearwater Sub-Office. The OA personnel within our region were located an Atlanta Georgia Regional Office with satellite offices in Jacksonville, Tallahassee and Miami, Florida. None of the OA auditors were colocated with OI criminal investigators.

6. I frequently obtained referrals from Medicare carriers and what are technically known as "intermediaries" such as Blue Cross and Blue Shield, the Social Security Administration and their local offices, the Medicare fraud Hotline and other sources such as auditors within the HHS IG offices, confidential informants, Medicare provider competitors, the FBI, other Federal and State law enforcement agencies, tips from members of the public, developments from other agent's ongoing investigations, and my investigations and referrals from other HHS program staff.

7. While there are a number of federal statutes peculiar to HHS and its program, the choice which federal statute to enforce is made by the federal prosecutors. Federal prosecutors typically chose to apply the general federal statutes criminalizing mail and wire fraud, conspiracy, false statements, false claims, and other criminal statutes of general applicability to the cases I brought to them.

8. During the relevant time period, I was first issued a Smith & Wesson 38 Special, and a Sig Sauer 9 mm. I was also issued the same hollow-point ammunition used by the Secret Service. I was regularly trained in the operation of these weapons and required to qualify in their use every three months.

9. I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government, from sifting through garbage dumpsters for evidence, handling confidential informants and drafting investigation reports and presenting cases to federal prosecutors. For example, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data received from Medicare Carriers and Intermediaries of consequence to the investigation. At times I conducted electronic monitoring and other covert surveillance including the use of body wires and electronic surveillance. I conducted interviews of witnesses and subjects, obtained signed and sworn statements, prepared interview reports and comprehensive investigative case reports. I assisted Federal prosecutors in the drafting of indictments, criminal informations, grand jury and trial subpoenas which I was also required to serve. I regularly testified as a government witness before grand juries and at trials.

10. During the relevant time period, I investigated fraud in various HHS programs, primarily in the Healthcare area. In doing so, I worked with criminal investigators from the FBI, IRS, Department of Labor, Defense Criminal Investigative Service, Labor Racketeering, and other IG offices and State and Local Law Enforcement officers.

11. During the relevant time period, I participated in several large investigations. For example, I, I had one case involving a chiropractor and his family who were convicted under the RICO statutes. I worked this case with IRS-CID, the Florida Department of Insurance Fraud and DCIS, whose agents also investigated healthcare fraud. I had another large case involving a Medicare Home Health Agency and 26 defendants. I worked on this case with IRS, Labor Racketeering investigators from the Department of Labor and auditors from the IG Audit Office. The case involved kickbacks for prescriptions by home health agency and the submission of fraudulent claims by unlicensed Medicare home health agencies. Charges in this matter included RICO, money laundering and a massive scheme to defraud the Medicare Program.

12. During my career as a criminal investigator with OI, I did not conduct any criminal investigations involving HHS employees.

13. During the relevant time period, the investigations that I worked on resulted in over 50 convictions as well as fines and restitution totaling over $100 million.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 12.21.2006

Douglas Wright