IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STEPHEN S. ADAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 90-162C |
| | ) | and consolidated cases |
| THE UNITED STATES, | ) | (Judge Bush) |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT REGARDING HUD CRIMINAL INVESTIGATORS**

Pursuant to Rule 56(h)(2) of the rules of this Court, Plaintiffs respond to Defendant's proposed findings of uncontroverted fact as follows:

1. The mission of the Department of Housing and Urban Development ("HUD") is to "increase home ownership, support community development and increase access to affordable housing free from discrimination." HUD's Mission, *available at* http://www.hud.gov/library/bookshelf12/hudmission.cfm. HUD's mission during the period 1987-1994 was not materially different than its current mission. United States Government Manuals from the relevant time period state that HUD "is the principal Federal agency responsible for programs concerned with the Nation's housing needs, fair housing opportunities, and improvement and development of the Nation's communities." See, e.g., Def. HUD App. at 77, 82; see also Def. HUD App. at 72.[1]

[1] Plaintiffs adopt the following convention to clarify and abbreviate the references:

(a) "Pl. HUD App." refers to the Appendix to Plaintiffs' Cross-Motion and Opposition To Defendant's Motion for Partial Summary Judgment for the HUD criminal investigators;
(b) "Pl. HUD Statement of Fact" refers to Plaintiffs' Proposed Finding of Uncontroverted Fact to support its Cross-Motion and Opposition To Defendant's Motion for Partial Summary Judgment for the HUD criminal investigators;
(c) "Def. HUD App." refers to the Appendix to Defendant's Motion for Partial Summary

Plaintiffs do not dispute this partial but incomplete statement of the mission of HUD and add, from Defendant's Statement at Paragraphs 9-10, *infra,* and Pl. HUD App. at, e.g., 87, 174, 192, 197, that HUD's mission is to provide safe and affordable housing.

2. During the period February 1987 through October 1994, the function of HUD's Office of Inspector General ("OIG") was defined as follows: "The function of the OIG is to conduct and supervise audits and investigations relating to HUD programs and activities. The audits and investigations are designed to determine the efficiency and effectiveness of HUD's programs and to prevent and detect fraud and abuse. The OIG is also charged with the responsibility of keeping the Secretary and the Congress fully and currently informed about problems and deficiencies relating to the operation of HUD programs and the necessity for and progress of corrective action." Organizations, Functions, and Delegations of Authority; Availability of Information to the Public; Production in Response to Subpoenas or Demands of Courts or Other Authorities, 57 Fed. Reg. 2225 (Jan. 21, 1992); Organizations, Functions and Delegations of Authority, 49 Fed. Reg. 11161 (Mar. 26, 1984); see also 73-74, 79, 84.

Plaintiffs agree that these are among the functions of the HUD OIG; however, plaintiffs only performed the investigative function of HUD's OIG but Defendant does not dispute that fact. See Paragraph 4, *infra.*

3. The investigative office of HUD's OIG was "primarily responsible for investigating alleged violations of Federal criminal statutes involving fraud and corruption relative to [HUD's] programs." Def. HUD App. at 52, 56.

---

Judgment for the HUD criminal investigators; and

(d) "Def. HUD Statement of Fact" refers to Defendant's Proposed Findings of Uncontroverted Fact to support its Motion for Partial Summary Judgment for the HUD criminal investigators.

Plaintiffs agree that this fact is undisputed.

4. During the period February 1987 through approximately February 1994, approximately 98% of a typical GS-1811-12 or GS-1811-13 criminal investigator's time was spent investigating or leading investigations into fraud upon HUD programs, such as HUD's Single Family Mortgage Insurance Program, Multifamily Mortgage Insurance Program and Rental Assistance Program. Id. at 47.

Plaintiffs dispute this fact as written insofar as it could be read to leave open the possibility that HUD criminal investigators spent over 50% of their time "leading" investigations in a supervisory sense. However, this dispute has been resolved by Defendant's stipulation that HUD criminal investigators "spent the majority of their time planning and conducting investigations." See Stipulation By The Parties Regarding [HUD], Pl. HUD App. at 267-69; see also id. 14-15, 19 (Testimony of HUD's principal law enforcement declarant that he has no idea how much time plaintiffs may have spent "leading" an investigation; indeed, given that they usually work as the sole HUD criminal investigator on a case, he does not know how they could lead.) In any event, even were this fact still disputed, it would not be material because Defendant does not assert that Plaintiffs satisfy the executive exemption.

5. Examples of the types of fraud GS-1811-12 and GS-1811-13 criminal investigators investigated are false statements, embezzlement, bribery and kickbacks. Id. at 47, 92, 111. False statement cases consisted primarily of grantees making false statements in order to fraudulently obtain grant money from the various HUD programs. See, e.g., id. at 86-90,115-19. Embezzlement cases consisted mainly of grantees diverting HUD program money for a purpose other than what was authorized by the grant. See, e.g., id. "Kickback" cases consisted

largely of people accepting money in exchange for HUD funded loans or grants. See, e.g., id. at 124.

Plaintiffs agree that this fact is undisputed.

6. GS-1811-12 and GS-1811-13 criminal investigators were the senior investigators in HUD's OIG and typically handled the most complex cases in the office, such as, multifamily program cases, bribery cases and cases with multiple Defendants. Id. at 47, 60.

Plaintiffs agree that this fact is undisputed.

7. The other approximate 2% of a typical GS-1811-12 or GS-1811-13 criminal investigator's time during the period February 1987 through approximately February 1994 was spent investigating misconduct by HUD employees. Id. at 47.

Plaintiffs agree that this fact is undisputed.

8. In February 1994, Operation Safe Home was announced. Id. at 47, 122. Operation Safe Home focused upon three major types of wrongdoing that undermine HUD programs: (a) violent crime in public and assisted housing; (b) fraud in public housing administration; and (c) equity skimming in multifamily insured housing. Id.

Plaintiffs agree that this fact is undisputed.

9. The only part of Operation Safe Home that was a new investigative focus for HUD's OIG was combating violent crime in public and assisted housing. Id. at 47. HUD's OIG assisted Federal, state and local law enforcement in protecting HUD's interest in providing safe public housing for HUD's program beneficiaries. Id. For example, GS-1811-12 and GS-1811-13 criminal investigators worked with Federal, state and local law enforcement officers to investigate gangs and other drug and gun rings in an effort to prosecute their leaders. Id. at 62.

Plaintiffs dispute that combating violent crime in public and assisted housing was a new focus for HUD's criminal investigators, although this dispute is not material. Pl. HUD App. at 212, 231-32. A number of HUD criminal investigators, including Plaintiffs in this case, were performing investigations of drugs and violence in public and assisted housing well prior to the announcement of Operation Safe Home. Id. Otherwise, Plaintiffs do not dispute these facts.

10. Violent crime in public and assisted housing undermines HUD's goal or providing "decent, safe, and sanitary housing to needy Americans." Id. at 122.

Plaintiffs agree that this fact is undisputed.

11. After Operation Safe Home started in February 1994, some GS-1811-12 or GS-1811-13 criminal investigators for HUD's OIG spent a majority of their time working on cases involving violent crime in public and assisted housing, while others continued to spend the majority of their time investigating fraud upon HUD programs. Id. at 47-48.

Plaintiffs agree with this fact but incorporate their response to Paragraph 9, *supra*.

12. During the period from February 1987 through October 1994, the typical day-to-day duties of GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG varied depending upon what type of case they were working on. Id. at 48. However, most GS-1811-12 and GS-1811-13 investigators in HUD's OIG spent the majority of their time engaged in typical law enforcement duties such as planning and/or leading investigations, collecting and reviewing evidence, conducting surveillance and interviewing witnesses. Id. at 48, 60-62.

Plaintiffs agree with these facts except for the statement about "leading" and incorporate their response to Paragraph 4, *supra.*

13. For fraud investigations, collecting evidence consisted predominantly of

reviewing paperwork. Id. at 48, 60. For violent crime investigations, evidence was usually collected through warrants or informants, surveillance and purchasing contraband. Id. at 48, 62.

Plaintiffs agree that these facts are undisputed.

14. Other duties consisted of initiating contact with Federal, state and local officials, preparing investigative reports, providing advice and assistance to the Department of Justice and United States Attorneys in preparing cases to present before grand juries and at trial and testifying before grand juries and at trial. Id. at 48, 60.

Plaintiffs agree that these facts are undisputed.

15. A typical GS-1811-12 or GS-1811-13 criminal investigator for HUD's OIG exercised significant discretion in his or her day-to-day activities. Id.

Plaintiffs agree that this fact is undisputed.

16. Supervisors of GS-1811-12 criminal investigators provided only "general technical and administrative direction." Id. at 53. Their work was "reviewed for adequacy and from the standpoint of adherence to policy and exercise of sound judgment." Id. GS-1811-13 criminal investigators in HUD's OIG typically received "only generalized instructions and guidance." Id. at 58.

Plaintiffs agree that this fact is undisputed.

17. GS-1811-12 criminal investigators in HUD's OIG had "wide latitude for individual judgment, initiative and resourcefulness." Id. at 54. Furthermore, although many investigations were conducted jointly with, or under the supervision of, a higher grade criminal investigator, GS-1811-12 criminal investigators in HUD's OIG were "required to exercise sound judgment as situations develop, requiring immediate on-the-spot action where it is not possible to

consult" with his or her supervisor. Id.

Plaintiffs do not dispute this fact. Plaintiffs dispute any implication that they were supervised by GS-13 criminal investigators.

18. GS-1811-13 criminal investigators had "a wide latitude in planning and conducting" investigations, Id. at 58, often led teams of criminal investigators and had discretion to add other professional and technical personnel to their teams, such as architects, engineers, construction analysts and appraisers. Id. at 57.

Plaintiffs do not dispute that they had "wide latitude in planning and conducting investigations." Plaintiffs do dispute that they "often" led investigations. Plaintiffs incorporate their objections that are set forth in response to Paragraph 4*, supra*.

19. The investigators had the responsibility of identifying subjects, witnesses and coordinating their cases with law enforcement agencies and prosecutors. Id. at 48. GS-1811-12 and GS-1811-13 criminal investigators for HUD's OIG made decisions such as who to interview, when to interview the witness or subject, when and where to conduct surveillance, etc. and kept their supervisors informed of these decisions and the status of the cases. Id. at 48-49.

Plaintiffs do not dispute this statement of fact but would add a non-material comment that it ignores the role of the prosecutors who usually oversee the work of the criminal investigator. Pl. HUD App. at 10-11, 175, 193.

20. GS-1811-12 and GS-1811-13 criminal investigators did not need supervisory approval for most day-to-day activities. Id. at 49. GS-1811-12 and GS-1811-13 criminal investigators only needed approval of a supervisor for certain things, such as deputization, subpoenas or warrants and anything that involved a potential safety hazard for the investigator,

such as late night surveillance in a dangerous area. Id. at 61.

Plaintiffs do not dispute these facts.

21. Every time a GS-1811-12 or GS-1811-13 criminal investigator in HUD's OIG interviewed a witness, he or she assessed the credibility of that witness and determined what additional questions to ask based upon previous answers in the same interview. Id. at 49, 61.

Plaintiffs agree with this fact.

22. In reviewing evidence, GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG determined which pieces of evidence would prove a case against a suspect or prove exculpatory for the suspect and adjusted their investigations accordingly. Id. GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG had almost complete discretion to follow a case wherever the evidence led them. Id.

Plaintiffs do not dispute this statement of fact but would add a non-material comment that it ignores the role of the prosecutors who usually oversee the work of the criminal investigator. Plaintiffs incorporate their response to Paragraph 19, *supra*.

23. In conducting surveillance, GS-1811-12 and GS-1811-13 criminal investigators made decisions as to when they had seen or heard what they needed to see or hear or when it was unlikely that they would obtain the visual or audio evidence they were seeking. Id. at 63.

Plaintiffs do not dispute this statement of fact but would add a non-material comment that it ignores the role of the prosecutors who usually oversee the work of the criminal investigator. Plaintiffs incorporate their response to Paragraph 19, *supra*.

24. In investigating violent crime, GS-1811-12 and GS-1811-13 criminal investigators had considerable discretion. Id. at 62. As in a fraud investigation, the investigators were free to follow the case wherever the evidence led them and needed to assess the credibility of all witnesses they interviewed. Id.

Plaintiffs do not dispute this statement of fact but would add a non-material comment that it ignores the role of the prosecutors who usually oversee the work of the criminal investigator. Plaintiffs incorporate their response to Paragraph 19, *supra*.

25. GS-1811-12 criminal investigators in HUD's OIG needed to be "thoroughly familiar with the various programs of [HUD], the Labor Standards Act, and the Davis-Bacon Act, as well as the various Federal criminal statutes relating to fraud and corruption, viz bribery, theft or vandalism of Government property, conflict of interest, [and] fraud against the Government." Id. at 52.

Plaintiffs do not dispute this fact.

26. GS-1811-13 criminal investigators in HUD's OIG must have knowledge of "admissibility of evidence, rules of criminal procedure and constitutional rights" and that they "must be constantly aware of and follow closely the implications of precedent court decisions." Id. at 57-58.

Plaintiffs do not dispute this fact.

27. Both GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG must possess an extensive knowledge of generally accepted investigative principles, techniques, methods and procedures. Id. at 49, 63.

Plaintiffs do not dispute this fact.

28. During the period April 1, 1987 through September 30, 1994, investigations by HUD's OIG resulted in approximately $200 million dollars in savings, recoveries, fines and cost efficiencies. Id. at 91, 94, 96, 98, 100, 102, 104, 106, 108, 110, 113, 120, 125, 127. This amounts to millions of dollars each year during the period 1987 through 1994, as well as significant indictments and convictions. Id. at 50.

Plaintiffs do not dispute this fact.

29. On October 30, 1994, all GS-1811 criminal investigators in HUD's OIG started receiving availability pay under the Law Enforcement Availability Pay Act of 1994 at the same time. Id. at 46, 67-69.

Plaintiffs do not dispute this fact but would add that the initiation of LEAP for the HUD criminal investigators removed them from coverage under the FLSA.

Respectfully submitted,

/s/ Jules Bernstein

OF COUNSEL:
Linda Lipsett

Jules Bernstein
Bernstein & Lipsett, P.C.
1920 L Street, N.W., Suite 303
Washington, D.C. 20036
(202) 296-1798
(202) 296-7220 facsimile

Counsel of Record

/s/ Edgar James

Edgar James
Sean Bajkowski
James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036
(202) 496-0500
(202) 496-0555 facsimile

Of Counsel

Dated: March 28, 2007