IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ORIGINAL

- - - - - - - - - - - - - - - - - - )
STEPHEN ADAMS, et al, ) Case No. 90-162-C
Plaintiffs, ) and
v. ) Consolidated Cases
UNITED STATES OF AMERICA, )
Defendants. )
- - - - - - - - - - - - - - - - - - )

Deposition of PATRICK NERI

Washington, D.C.

Wednesday, March 7, 2007

9:40 a.m.

Job No. 179679

Pages 1 - 60

Reported by: Sandy Medford Nelson

**October 30th, '94; is that correct?**

A That's my recollection.

**Q That's not a disputed fact between us. The -- so, let's take the period from 1990 to October 30th, '94.**

**And will you tell us what you did at the agency at that time?**

A I was Assistant Inspector General for Investigations and basically responsible for running the Office of Investigations with, you know, the assistance of my staff, my deputy and the ten regional offices, the special agents in charge and so forth.

**Q So, for all that time period, you had the same position?**

A Yeah. I was AIGI from about -- I think it was about '83 until I retired in '97.

**Q What was your grade then?**

A I was a SCS level -- I'm trying to remember now. I think five. I'm not sure.

**Q SCS is a 15 position?**

A Yes, it was SCS. It was SCS.

A I don't -- I don't know. I honestly don't remember.

**Q Do you remember whether there were almost twice as many 13s as there were 12s?**

A I really can't say. I'd have to go back and look. I mean I know most of our offices -- you know, each of the field offices -- like the special agent in charge generally would have usually at least one 13 in an office. The larger offices would have maybe a couple 13s. The resident field offices away from the regions or the -- you know, the districts -- for the most part, that was a 13 level but whether -- the proportion to ratio, I can't recall that.

**Q You don't remember whether there were more 13s than 12's during that time period?**

A No.

**Q Okay. You don't put it this way, but it's my understanding that there are a number of statutes that are peculiar to HUD, criminal statutes.**

**That would be your understanding?**

A I think there's a particular false statement statute, a 1010, as I recall.

Q Well, let me -- I don't want this to be an examination of memory.

A Okay.

Q I'm going to ask you -- I'll tell you the ones I've been given and ask you whether these are statutes that are part of -- peculiarly or particularly part of HUD's mandate. And that's 18 USC 1010, and it's captioned Department of Housing and Urban Development and Federal Housing Administration Transactions.

Are you aware of that statute?

A Right, the 1010, yeah.

Q Would that be one that your people were particularly charged with enforcing?

A If the case required it, I mean yeah, absolutely. That was a -- that was a -- that's specific to HUD.

Q Um-hum. And let me just ask you -- some agencies, when you have a statute that's specific to the agency -- let's say HHS -- Mike Little, he

**said -- and it says in their documents. He testified that they had primary jurisdiction over those statutes.**

**Would that be your term? You had primary jurisdiction over the HUD statutes?**

A I would -- I would think so. I would be very surprised if other agencies would want to investigate a 1010 violation.

**Q Um-hum. But what's the relationship -- that, I understand, but does the -- what's the relationship with the bureau, the FBI's jurisdiction?**

**Is it concurrent with that of HUD?**

A At that -- when we were running fraud investigations, we worked with the FBI. And, you know, it's like any other violation or allegation. You know, if they had a case and they -- you know, that they had come up -- we would support them and work with them. If we did, we might go to them and ask them, you know, for their support or work with them. Or we might work -- you know, say, well, we're going to run this. I mean there was a

lot of coordination.

Q **Um-hum.**

A We always got along with the FBI, so we had a lot of coordination and cooperation. We didn't have too much stepping on toes to say, no, you can't run a 1010 or that's only ours or anything.

Q **Okay.**

A I honestly don't recall off the top of my head the FBI running 1010 violations. I don't -- I don't remember that. I mean I'm sure they may have, but I don't remember specifically.

Q **Did you work with agents from Secret Service?**

A Yeah. If -- you know, depending on the nature of the case or the project or whatever. I mean we would coordinate with whatever agency, you know, was necessary. If we were working, you know, a fraud case or where we'd be contacted -- you know, the AUSA, and there were other aspects that they wanted covered or investigated that might be better served by having the Secret

Service investigate or whatever agency, HHS or whoever -- I mean we would work with whoever, you know, was appropriate.

**Q And, in working with these other criminal investigators, is it accurate to say that the work of a criminal investigator is the same from agency to agency in terms of what you're doing, reviewing documents, surveillance?**

A Well, 1811s basically do 1811 work. That's my --

**Q Okay. You've got some outlined in your declaration. Maybe I'll get into it, but I --**

A All right.

**Q -- think we understand one another. Let me ask you about these other statutes that are captioned or I am told are peculiarly within HUD's mandate. And you can tell me whether I'm right or wrong.**

**18 USC 1012 Department of Housing and Urban Development transactions prohibits false representations or failure to disclose certain information to the Department.**

A Um-hum. One of those, I think, may have been more of misdemeanor type of statute. I can't recall which one or whatever, but 1012 was also one we investigated.

**Q But it's still a criminal statute --**

A Sure, absolutely.

**Q -- that people investigated? Okay. Thank you. Twelve USC section 1715 small "Z" dash 19, equity skimming penalty.**

A Right.

**Q Because that's not intuitively obvious to most people, what equity skimming is, could you explain what that statute is and what your people did?**

A What equity skimming is?

**Q Correct.**

A I'll try and remember the best I can. It's when an owner of a property is -- instead of taking the monies -- for example, rent monies and this type and so forth -- and putting them toward the property is skimming off the profits he's making and not keeping a project or what have you

up to code, up to snuff, trying to keep it rented up and the property runs down and the mortgage was insured by HUD and the property becomes so uninhabitable, for example, and goes into foreclosure and HUD has to pay off the foreclosure and he was skimming off the profits which allowed it to happen.

**Q Okay.**

A That would be my -- I think that's pretty close to what it was.

**Q Um-hum, okay. And 12 USC section 1709 dash two sounds to me like a different type of equity skimming for single-family mortgages.**

**Are you familiar with 1709-2?**

A Well, one was -- you know, one was single family and one was multifamily. I mean the same kind of idea, but they were both statutes that we investigated.

**Q Um-hum. And what about 12 USC 2607, an anti-kickback statute?**

A If there were kickbacks involved in -- you know, in -- in the investigation -- I mean,

you know, when we would get a case, we would coordinate with an AUSA. And the AUSA, you know, I mean -- you know, would -- you know, okay, this is a great -- this is a good statute to look at and so forth and this is kind of how we want to go. And -- and, you know, if there were kickbacks involved, you know, that's what we would go after.

**Q Good point. It's up to the prosecutor to determine exactly which criminal statute they want to use to proceed?**

A Well, I mean there would be a point where we would coordinate with an AUSA. We have this case we're running. You know, would you -- you know, will you consider prosecuting. If they turned around -- say it was a real small dollar case, okay? A rental assistance case, something like that. And they say, no, if you proved the worst, there's no way we would prosecute because of the dollar threshold, okay? Then we would not necessarily investigate it.

**Q Okay.**

A And so, I mean we tried to target our

resources on those cases that -- you know, where we could, you know, get the results and that type of thing.

**Q Sure. But in terms -- if a prosecutor decides he's got an easier shot at a false statement or mail fraud case --**

A Sure.

**Q -- he might make the determination to go under mail fraud or false statement rather than equity skimming?**

A Sure.

**Q Okay. Did your people enforce the Fair Housing Act?**

A That would be EEO people.

**Q It's listed in the IG report to Congress. I just want to know whether it's a --**

A No.

**Q What about the Real Estate Settlement Procedures Act, RESPA?**

A We had some RESPA cases, not too many as I recall, okay?

**Q Okay.**

A Um-hum.
**Q The incumbent plans and conducts complete and complex criminal investigations or administrative inquiries.**
**Is that an accurate statement?**
A The 12 level, I would say yes.
**Q Um-hum. And what does administrative inquiries mean?**
A That generally would be, say, a misconduct case involving an employee --
**Q Um-hum, okay.**
A -- for the most part.
**Q But you've testified that that's very little of the time --**
A Yeah. We tried not to run anymore personnel cases, you know, than we had to. We had such a heavy workload in the criminal area that we didn't try to focus on that very much.
**Q And, indeed, we were at the Department of Justice and had -- the senior person at the Department of Justice complained that he couldn't get the IG people to do the employee cases. There**

**was a push-back by the IG generally against doing employee cases.**

A During what time period? That time period?

**Q Under the FLSA. It's '90 to '94, is what we're talking about.**

A Really? Okay. Well, I can't speak to that. All I know is -- I mean we tried not to run -- we tried -- you know, if we had a complaint on a HUD employee -- if it was possible that it was something that management could deal with, we tried to get that to happen. If it required our investigative services, we would investigate. But I mean our criminal workload was so heavy that we tried to only focus on most egregious employee cases, if that were the situation.

**Q Is it fair to say if it's an employee case you generally were brought in because of some criminal dimension?**

A Yeah. I mean, you know, the -- we tried not to spend anymore time than we absolutely had to if it was strictly an administrative type of

**Q And tell me whether I'm wrong, but I'm led to believe that lot of your people worked alone. They worked on their own investigations.**

A Yeah. We -- we rarely had -- you know, unlike T.V., we rarely had people team up on cases.

**Q Um-hum.**

A We just had huge workload and -- and each agent generally would have their case assignments.

**Q Okay.**

A And, you know, the cases assigned would be generally according to, you know, what their grade was and what they were capable of handling and looking at.

**Q Yeah. And here's my question really, that -- you say they spent almost all of their time planning and directing and -- or leading investigations. In the dictionary here, it says leading is directing the performance or activities of another.**

**Is it more accurate to say when they're planning and leading, they're planning and doing**

**their -- planning and conducting investigations?**

A Yeah. Well, I mean -- I'm not sure I understand --

**Q How do I lead my own investigation if I'm working alone?**

A I have no idea.

**Q Um-hum. So, I just want to get at the word "leading" because there's a way in which you can use the word, but I think it's not intuitive to the reader in that I'm a -- I'm a HUD criminal investigator doing my investigation.**

**Would you agree he's planning and conducting his own investigation?**

A For the most part, sure.

**Q Um-hum. And to say he's leading is sort of a non-standard English. I'm leading my own investigation. I'm not directing anyone in that investigation. I'm doing it myself.**

A Well, I mean it depends. If it was some type of effort that required more than yourself, obviously then you might be a team leader or might be having another agent work with you in your --

you know, in that case, you would be leading it or if you were the senior agent, but otherwise no.

MR. JAMES: Well, let me ask you about the position description. I want to mark this as Plaintiff's Exhibit No. 3.

(Deposition Exhibit No. 3 was marked for identification.)

(Witness examined document.)

BY MR. JAMES:

**Q Are you aware of the classification guide for criminal investigators, how you grade positions?**

A I probably at one time looked through it. I didn't classify grades. You know, I wasn't a classifier so --

**Q But have you ever had disputes where people say, I should be a 12 or a 13, a different grade, and you've had to look at what the criteria are for classifying positions?**

A No. I don't recall going to this. I recall people claiming they should be promoted and that type of thing, but I don't recall pulling out

**back door, I'll take the front door, I'm leading that particular effort, am I not?**

A I would guess if that's what you feel. I don't know. I mean I'm not -- you know, it's a tough one to answer. I mean if you're telling -- if you're in charge and you have the experience and you've gone in more doors than the other person and you tell them, this is what you should do and this is what I'll do, I would say sure. You're leading the --

**Q Well, if I've checked out the house, I know where the doors are. And I say, you take the back door, I'll take the front door, I'm leading on that particular aspect of the investigation.**

A On that particular function, I would say yes.

**Q Um-hum. And what the grade guide says is that has no particular -- that's not a grade determinant issue, that criminal investigators from time to time lead and coordinate other investigators just depending on what the nature of the investigation is.**

**Is that your understanding?**

A Yeah. I mean when I think of leading in our context pre-Safe Home -- let's talk about that. You know, you might have few agents assigned because it's a -- it's a big project, big case, what have you. And you would put a senior agent in charge and maybe have a couple other -- another agent or an auditor even come over and be assigned to help them to work that case and they would be leading that -- that group.

**Q But when you say in your declaration that 98 percent of the time that's planning and leading investigations --**

MR. RAYEL: Objection. That's a mischaracterization.

MR. JAMES: Okay.

BY MR. JAMES:

**Q Paragraph four, second sentence -- or third sentence, I estimate that approximately 98 percent of a typical GS-1811 dash 12 or GS-1811 dash 13 criminal investigator's time was spent investigating or leading investigations.**

A Okay.

**Q How much time was investigative -- planning and conducting investigations versus leading an investigation?**

A I have no idea.

**Q Um-hum.**

A It depends on the case, the agent and the office at that time. I have -- I have no way of telling you that.

**Q Okay. So, let me give you names of these people from -- we're talking about, again, 1990 to October of '94.**

**Are you aware of Mike Carlucci?**

A Yeah. Mike was in Detroit, I think, as I recall.

**Q Um-hum.**

A No. I'm sorry. No, no. I'm getting them -- I'm getting them -- it was a different -- Mike Carlucci was in New York.

**Q New York.**

A Right.

**Q David Condit?**

2/24

No. 90-162C
and consolidated cases

IN THE UNITED STATES CLAIMS COURT

STEPHEN S. ADAMS, _et al._,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

STUART M. GERSON
Assistant Attorney General

DAVID M. COHEN
Director

SHALOM BRILLIANT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
2nd Floor, Todd Building
Washington, D.C. 20530
Tele: (202) 514-7300

Attorneys for Defendant

FEBRUARY 24, 1992

A. The Duties Described In The Position Descriptions Meet The Criteria Set Forth In Subsection (a) Of The Regulation

Subsection (a) of the OPM regulation governing the administrative exemption provides that, to come within that exemption, the employee's primary duty must consist of work that:

> (1) Significantly affects the formulation or execution of management policies or programs; or
>
> (2) Involves general management or business functions or supporting services of substantial importance to the organization serviced; or
>
> (3) Involves substantial participation in the executive or administrative functions of a management official.

5 C.F.R. § 551.205(a) (emphasis added). Subsection (a) is satisfied by work meeting any one of these three descriptions. The employees in question here perform work meeting at least two of these descriptions. The work of these employees significantly affects the execution of the policies and programs of the employing agencies. In some instances, this work also affects the formulation of these policies and programs. The duties of these employees thus satisfy subsection (a)(1) of the regulation. Additionally, the major duties performed by these employees constitute a supporting services of substantial importance to the agencies in which they are employed and to the Government as a whole. These duties thus satisfy subsection (a)(2) of the regulation.[4]

---

[4] The features that make plaintiffs' work an important supporting services to the agencies also demonstrate that these employees are "specialist[s] in a . . . supporting service," as (continued...)

### 1. Plaintiffs' Primary Duty Consists Of Work That Significantly Affects The Execution Of Management Policies And Programs

In FPM Letter 551-7, OPM has explained subsection (a)(1) of the administrative exemption regulation as follows:

> Management policies and programs range from broad national goals that are expressed in statutes or Executive Orders to specific objectives of a small field office. Employees may actually make policy decisions or participate indirectly, through developing proposals that are acted on by others. Employees who significantly affect the execution of management policies and programs typically are those whose work involves obtaining compliance with such policies by other individuals or organizations, within or outside the Federal Government, or making significant determinations in furtherance of the operation of the programs and accomplishment of program objectives.

FPM Letter 551-7, Attachment, p. 8 (emphasis added). App. 11.[5] There can be no dispute that plaintiffs' work as GS-1811 criminal investigators meets this standard, because it involves obtaining compliance with the policies and programs of their employer agencies -- i.e., the agencies' broad national goals, as well as the specific objectives of the plaintiffs' field offices -- by other individuals or organizations.

---

[4](...continued) provided in the introductory sentence preceding subsection (a) of 5 C.F.R. § 551.205.

[5] This interpretation of 5 C.F.R. § 551.205(a)(1) is entitled to an extremely high degree of deference. As the Supreme Court has stated: "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. . . . When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." Udall v. Tallman, 380 U.S. 1, 16 (1965) (emphasis added).

As stated in the Department of the Treasury's Single Agency Qualification Standard for criminal investigators, Treasury enforcement agents -- including criminal investigators at IRS, ATF, Customs, and Secret Service -- "investigate criminal violations of Federal laws within the enforcement jurisdiction of the Department of the Treasury and conduct certain noncriminal investigations relating to the functions of the Department." App. 29. These "special agents" enforce their employer's policies and programs concerning the collection of income tax and customs revenues, and concerning other regulatory and protective programs administered by the Treasury Department through its component agencies.

The role of IRS criminal investigators in the execution of IRS's policies is indicated in the Internal Revenue Manual (IRM), as follows:

> (1) The purpose of the IRS is to collect the proper amount of tax revenues at the least cost to the public, and in a manner that warrants the highest degree of public confidence in integrity, efficiency and fairness. To achieve that purpose, we will: . . . determine the extent of compliance and the causes of noncompliance; do all things needed for the proper administration and enforcement of the tax laws . . .
>
> (2) In order to fulfill this mission, the Service must establish programs and facilities for receiving and processing returns, for detecting fraud and delinquency . . . .

IRM ¶ 1111.1, App. 27. IRS criminal investigators, or "special agents," support IRS's mission by performing the investigative work necessary in order enable IRS to "determine the extent of compliance and the causes of noncompliance" and to "detect fraud

and delinquency." These agents "conduct investigations of alleged criminal violations of Federal tax law . . . ; make recommendations with respect to criminal prosecutions and the assertion of Civil penalties against taxpayers . . . ; and assist the United States Attorney in the preparation of the case during the trial." App. 29.

The roles of criminal investigators at ATF, Customs, Secret Service, and DEA, in the execution of these agencies' respective programs, are analogous to the IRS agents' role. The mission of ATF, as described in its manual, is to combat the unlawful use of firearms, explosives, arson-for-profit schemes; to ensure the collection of alcohol and tobacco tax revenues; to suppress prohibited trade practices in the beverage alcohol industry; and to assist the States in eliminating interstate trafficking in the sale and distribution of contraband cigarettes. App. 25. To support this mission, ATF criminal investigators "conduct investigations of violations of Federal laws relating to explosives, arson, firearms, illicit liquor and tobacco." App. 29. Customs agents "conduct investigations relative to the prevention and detection of fraud affecting Customs revenue through under-evaluation of merchandise; smuggling of merchandise and contraband . . . ; neutrality act violations involving illegal shipment of arms; allegations of suspected criminal violations involving Customs employees; and other Customs matters." App. 29. Secret Service agents "conduct investigations of violations of laws relating to the counterfeiting or forgery of the currency, obligations and

### 1110 (7-6-83)
### Organizational History

### 1111 (7-6-83)
### Establishment of the Internal Revenue Service

### 1111.1 (8-27-88)
### Mission

(1) The purpose of the IRS is to collect the proper amount of tax revenues at the least cost to the public, and in a manner that warrants the highest degree of public confidence in our integrity, efficiency and fairness. To achieve that purpose, we will: encourage and achieve the highest possible degree of voluntary compliance in accordance with the tax law and regulations; advise the public of their rights and responsibilities; determine the extent of compliance and the causes of noncompliance; do all things needed for the proper administration and enforcement of the tax laws; and continually search for and implement new, more efficient and effective ways of accomplishing our Mission.

(2) In order to fulfill this mission, the Service must establish programs and facilities for receiving and processing returns, for collecting all taxes due, for examining, for detecting fraud and delinquency, for hearing and adjudicating appeals, for providing taxpayer service and information, for recruiting persons with a professional outlook and maximizing their ability to perform through training in both the ethical and professional aspects of their jobs, for developing evaluation methods designed to measure these aspects, for the uniform interpretation and application of the tax laws, for the preparation of regulations and tax guide materials, for clarification and simplification of tax rules, for maintaining the integrity of the Service and its efficient operation, and for performing such other duties as may be required by laws and regulations.

### 1111.2 (7-6-83)
### Organic Act

(1) The Office of the Commissioner of Internal Revenue was established by an act of Congress (12 Stat. 432) on July 1, 1862, and the first Commissioner of Internal Revenue took office on July 17, 1862.

(2) The act of July 1 provided:

"... That, for the purpose of superintending the collection of internal duties, stamp duties, licenses, or taxes imposed by this Act, or which may be hereafter imposed, and of assessing the same, an office is hereby created in the Treasury Department to be called the Office of the Commissioner of the Internal Revenue; ... Commissioner of Internal Revenue, ... shall be charged, and hereby is charged, under the direction of the Secretary of the Treasury, with preparing all the instructions, regulations, directions, forms, blanks, stamps, and licenses, and distributing the same or any part thereof, and all other matters pertaining to the assessment and collection of the duties, stamp duties, licenses, and taxes, which may be necessary to carry this Act into effect, and with the general superintendence of his office, as aforesaid, and shall have authority, and hereby is authorized and required, to provide proper and sufficient stamps or dies for expressing and denoting the several stamp duties, or the amount thereof in the case of percentage duties, imposed by this Act, and to alter and renew or replace such stamps from time to time, as occasion shall require; ..."

(3) By common parlance and understanding of the time, an office of the importance of the Office of Commissioner of Internal Revenue was a bureau. The Secretary of the Treasury in his report at the close of the calendar year 1862 stated that "The Bureau of Internal Revenue has been organized under the Act of the last session ..." Also it can be seen that Congress had intended to establish a Bureau of Internal Revenue, or thought they had, from the act of March 3, 1863, in which provision was made for the President to appoint with Senate confirmation a Deputy Commissioner of Internal Revenue "who shall be charged with such duties in the bureau of internal revenue as may be prescribed by the Secretary of the Treasury, or as may be required by law, and who shall act as Commissioner of internal revenue in the absence of that officer, and exercise the privilege of franking all letters and documents pertaining to the office of internal revenue." In other words, "the office of internal revenue" was "the bureau of internal revenue," and the act of July 1, 1862 is the organic act of today's Internal Revenue Service.

### 1111.3 (7-6-83)
### History

### 1111.31 (7-6-83)
### Internal Taxation

Madison's Notes on the Constitutional Convention reveal clearly that the framers of the Constitution believed for some time that the principal, if not sole, support of the new Federal Government would be derived from customs duties and taxes connected with shipping and importations. Internal taxation would not be resorted to except infrequently, and for special



27

# Table of Contents



Financial Analysis Series, GS-1160 • (11)60
Internal Revenue Officers Series, GS-1169 • (11)69
Single Agency Qualification Standard, GS-5/15 • (11)69.1
Interpretive Guidance • (11)69.2
Supervisory Collection Office Function Experience • (11)69.21
Appraising and Assessing Series, GS-1171 • (11)71

(12)00
Copyright, Patent, and Trademark Group

(13)00
Physical Sciences Group
Geology Series, GS-1350 • (13)50

(14)00
Library and Archives Group
Technical Information Service Series, GS-1412 • (14)12

(15)00
Mathematics and Statistics Group
Actuary Series, GS-1510 • (15)10
Operations Research Series, GS-1515 • (15)15
Mathematical Statistician Series, GS-1529 • (15)29
Statistician Series, GS-1530 • (15)30
Statistical Assistant Series, GS-1531 • (15)31

(16)00
Equipment, Facilities, and Service Group
Printing Management Series, GS-1654 • (16)54

(17)00
Education Group
General Education and Training Series, GS-1701 • (17)01
Education and Training Technician Series, GS-1702 • (17)02
Education and Vocational Training Series, GS-1710 • (17)10
Training Instruction Series, GS-1712 • (17)12

(18)00
Investigation Group
General Inspection, Investigation and Compliance Series, GS-1801 • (18)01
Compliance Inspection and Support Series, GS-1802 • (18)02
Interpretive Guidance • (18)02.1
General Investigating Series, GS-1810 • (18)10
Interpretive Guidance • (18)10.1
Criminal Investigating Series GS-1811 • (18)11
Single Agency Qualification Standard, GS-5/15 • (18)11.1
Waiving Qualification Standards • (18)11.2
Guidelines for Evaluating Qualifications of Candidates for Special Agent and Inspector (Internal Security) Positions • (18)11.3
Background and Purpose • (18)11.31
Academic Requirements for Special Agents • (18)11.32
Accounting and Related Business Experience for Special Agents • (18)11.33
Specialized Experience for Special Agents • (18)11.34
Specialized Experience for Inspectors • (18)11.35
Education Substitutions for Special Agent • (18)11.36
Written Test • (18)11.37
Age Limits • (18)11.38

(19)00
Quality Assurance, Inspection and Grading Group

(20)00
Supply Group
General Supply Series, GS-2001 • (20)01
Supply Program Management Series, GS-2003 • (20)03
Supply Clerical and Technician Series, GS-2005 • (20)05
Inventory Management Series, GS-2010 • (20)10

(21)00
Transportation Group
Traffic Management Series, GS-2130 • (21)30

EXHIBITS

Exhibit 003-1
Training Agreement: Data/Service Center Management Trainee

Exhibit 003-2
Training Agreement: Digital Computer Programmer, Digital Computer Systems Analyst, Resident Programmer Analyst, Digital Computer Analyst

Exhibit 301-1
Training Agreement: Resources Management Intern Program

Exhibit 332.1-1
Test Parts and Weights

Exhibit 340.2-1
Training Agreement: Executive Selection and Development



28

perience is required at GS-7 and the movement is from a one-grade interval series to a two-grade interval series. It is possible, of course, for an individual who is assigned to an Investigative Assistant, GS-1802-6, position to qualify for an Investigator, GS-1810-7 position on the basis of other kinds of specialized experience or education. For example, a person who is an Investigative Assistant, GS-1802-6, and has an appropriate bachelor's degree and a year of graduate work would probably meet the specialized experience requirement for GS-1810-7.

## (18)11 *(4-16-82)* 0338
## Criminal Investigating Series GS-1811

### (18)11.1 *(4-16-82)* 0338
### Single Agency Qualification Standard, GS-5/15

CRIMINAL INVESTIGATOR AND SUPERVISORY CRIMINAL INVESTIGATOR

GS-5/15

Treasury Enforcement Agent

(Department of the Treasury)

DESCRIPTION OF WORK

Treasury Enforcement Agents investigate criminal violations of Federal laws within the enforcement jurisdiction of the Department of the Treasury and conduct certain noncriminal investigations relating to the functions of the Department. Investigations involve surveillance, participation in raids, interviewing witnesses, interrogating suspects, searching for physical evidence and clues; seizures of contraband, equipment and vehicles; securing and serving search warrants; making arrests; inspecting records and documents, etc. The duties of the positions require the ability to recognize and develop evidence for orderly presentation to U.S. Attorneys and other legal officers; the ability to meet and confer with persons in all walks of life; the ability to testify effectively in court; the ability to prepare detailed written reports; proficiency in the use of firearms; skill in unarmed defense; and the exercise of judgment, resourcefulness and initiative. Some undercover phases of the work require that the agent live and associate with known criminals for varying periods of time.

The duties frequently require irregular unscheduled hours, and involve personal risks, exposure to all kinds of weather, arduous physical exertion under rigorous and unusual environmental conditions, and considerable travel. Persons selected may be stationed anywhere in the United States.

TYPES OF POSITIONS

Positions covered are:

*Bureau of Customs: U.S. Customs Service: Special Agents* conduct investigations relative to the prevention and detection of fraud affecting Customs revenue through under-evaluation of merchandise; smuggling of merchandise and contraband into or out of the United States; neutrality act violations involving illegal shipment of arms; allegations of suspected criminal violations involving Customs employees; and other Custom matters.

*Internal Revenue Service:* (a) *Special Agents (Criminal Investigation Division)* conduct investigations of alleged criminal violations of Federal tax law particularly those relating to income and wagering or gaming devices; make recommendations with respect to criminal prosecution and the assertion of Civil penalties against taxpayers; prepare comprehensive documented technical reports, including accounting analyses and summaries; and assist the United States Attorney in the preparation of the case during the trial. (b) *Inspectors (IRS—Internal Security)* conduct investigations of charges against Internal Revenue Service employees involving alleged or suspected criminal violations of sections of the Internal Revenue Code, violations of the Criminal Code or other Criminal Statutes, and character and security investigations of prospective employees of the Internal Revenue Service. Also conduct investigations of non-Service persons when their actions may affect the integrity of the Service or the safety of Service personnel.

*U.S. Secret Service: Special Agents* conduct investigations of violations of laws relating to the counterfeiting or forgery of the currency, obligations and securities of the United States and foreign governments and investigations in connection with other laws administered by the Department of the Treasury or as directed by the Secretary; protect the President and Vice President of the United States and their immediate families; former Presidents; their wives or widows; visiting foreign dignitaries and others.

*Bureau of Alcohol, Tobacco and Firearms: Special Agents* conduct investigations of violations of the Federal laws relating to explosives, firearms, illicit liquor, and tobacco. These investigations are designed to prevent and solve bombings; to detect illegal interstate transportation of explosives and firearms, and to control the illegal possession of these items by the criminal element. Also enforced are various laws governing possession of machine guns, destructive devices, and other weapons subject to registration. Special Agents work to prevent or detect illicit traffic in liquor or tobacco products and the diversion of raw materials to use in illicit production of distilled spirits.

# Federal Register

4–23–04 Friday
Vol. 69 No. 79 Apr. 23, 2004

Pages 21941–22376

HeinOnline -- 69 Fed. Reg. I 2004

not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities."

The Department does not believe that eliminating the 20-percent rule from the new standard test contravenes Congress' intent. By adding the 40-percent language in 1961, Congress intended that the 20-percent limitation in the "long" tests would not be used to prohibit employers from applying the exemption to retail and service employees, even if they spent more than 20 percent of their time in nonexempt work. Thus, this statutory language is a limitation on the Department's authority to define certain employees as *nonexempt*—not a Congressional declaration that the Department can never reconsider the 20-percent limitation. Congress could have imposed the 20-percent rule on all employees in 1961, but it did not. In fact, the primary duty approach of the final regulations was first adopted by the Department as part of the "short" tests in 1949. When Congress amended the FLSA in 1961, the primary duty tests were in effect and did not contain mandatory percentage limitations on nonexempt work. *See* 29 CFR 541.103 (50 percent is "rule of thumb"); *Jones*, 2003 WL 21699882, at *3 (the 50-percent "rule of thumb" is not dispositive). Congress did not act to abrogate the primary duty tests, and the Department believes that the "short" duties tests are in no way inconsistent with section 13(a)(1) of the Act.

In reaching its regulatory decisions, the Department is mindful of its obligations under the delegated statutory authority applicable in this situation, and other laws and Executive Orders that apply to the regulatory process, to define and delimit the "white collar" exemption criteria in ways that reduce unnecessary burdens (*e.g.*, the Paperwork Reduction Act, the Regulatory Flexibility Act, the Unfunded Mandates Reform Act, and Executive Orders 12866, 13272, and 13132). Under currently applicable guidelines, implementation of regulatory standards should, to the maximum extent possible within the limits of controlling statutory authority and intent, strike an appropriate balance and be compatible with existing recordkeeping and other prudent business practices, not unduly disruptive of them. Regulatory standards should also strive to apply plain, coherent, and unambiguous terminology that is easily understandable to everyone affected by the rules. Consequently, the Department has decided to adopt the proposed restructuring of the regulations into separate subparts containing standard tests under each category of the exemption, which do not include the former "long" test requirements that require calculating the 20-percent (or 40-percent in retail or service establishments) limits on the amount of time devoted to nonexempt tasks.

*Subpart A, General Regulations*

Proposed Subpart A included several general, introductory provisions scattered throughout the existing regulations. Proposed section 541.0 combined an introductory statement from existing section 541.99 and information currently located at section 541.5b regarding the application of the equal pay provisions in section 6(d) of the FLSA to employees exempt from the minimum wage and overtime provisions of the FLSA under section 13(a)(1). Proposed section 541.0 also provided new language to reflect legislative changes to the FLSA regarding computer employees and information regarding the new organizational structure of the proposed regulations. Proposed section 541.1 provided definitions of "Act" and "Administrator" from their current location in section 541.0. Finally, proposed section 541.2 provided a general statement that job titles alone are insufficient to establish the exempt status of an employee. This fundamental concept, equally applicable to all the exemption categories, currently appears in section 541.201(b) of the existing regulations regarding administrative employees.

The Department received few comments on these general regulations. Thus, Subpart A is adopted as proposed, except for the addition of a new section 541.3 entitled "Scope of the section 13(a)(1) exemptions" and a new section 541.4 entitled "Other laws and collective bargaining agreements." The Department adds these new sections in response to public commentary which evidenced general confusion, especially among employees, regarding the scope of the exemptions and the impact of these regulations on state laws and collective bargaining agreements.

The subsection 541.3(a) clarifies that the section 13(a)(1) exemptions and the Part 541 regulations do not apply to manual laborers or other "blue collar" workers who "perform work involving repetitive operations with their hands, physical skill and energy." Such employees "gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required of exempt learned professional employees such as medical doctors, architects and archeologists. Thus, for example, non-management production-line employees and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers and laborers are entitled to minimum wage and overtime premium pay under the Fair Labor Standards Act, and are not exempt under the regulations in this part no matter how highly paid they might be."

The new § 541.3(a) responds to comments revealing a fundamental misunderstanding of the scope and application of the Part 541 regulations among employees and employee representatives. To ensure employees understand their rights, the new subsection 541.3(a) clearly states that manual laborers and other "blue collar" workers cannot qualify for exemption under section 13(a)(1) of the FLSA. The description of a "blue collar" worker as an employee performing "work involving repetitive operations with their hands, physical skill and energy" was derived from a standard dictionary definition of the word "manual." *See, e.g., Adam* v. *United States*, 26 Cl. Ct. 782, 792–93 (1992) ("dictionary definition of 'manual' is, 'requiring or using physical skill and energy' "). The illustrative list of such "blue collar" occupations included in this subsection is the same language included in the proposed and final section 541.601 on highly compensated employees.

Section 541.3(b)(1) provides that the section 13(a)(1) exemptions and these regulations also do not apply to "police officers, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole or probation officers, park rangers, fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation

or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or similar work." Final subsection 541.3(b)(2) provides that such employees do not qualify as exempt executive employees because their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof as required under section 541.100. Thus, for example, "a police officer or fire fighter whose primary duty is to investigate crimes or fight fires is not exempt under section 13(a)(1) of the Act merely because the police officer or fire fighter also directs the work of other employees in the conduct of an investigation or fighting a fire." Final subsection 541.3(b)(3) provides that such employees do not qualify as exempt administrative employees because their primary duty is not the performance of work directly related to the management or general business operations of the employer or the employer's customers as required under section 541.200. Final subsection 541.3(b)(4) provides that such employees do not qualify as exempt learned professionals because their primary duty is not the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction or the performance of work requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor as required under section 541.300. Final subsection 541.3(b)(4) also states that "although some police officers, fire fighters, paramedics, emergency medical technicians and similar employees have college degrees, a specialized academic degree is not a standard prerequisite for employment in such occupations."

This new subsection 541.3(b) responds to commenters, most notably the Fraternal Order of Police, expressing concerns about the impact of the proposed regulations on police officers, fire fighters, paramedics, emergency medical technicians (EMTs) and other first responders. The current regulations do not explicitly address the exempt status of police officers, fire fighters, paramedics or EMTs. This silence in the current regulations has resulted in significant federal court litigation to determine whether such employees meet the requirements for exemption as executive, administrative or professional employees.

Most of the courts facing this issue have held that police officers, fire fighters, paramedics and EMTs and similar employees are not exempt because they usually cannot meet the requirements for exemption as executive or administrative employees. In *Department of Labor* v. *City of Sapulpa, Oklahoma*, 30 F.3d 1285, 1288 (10th Cir. 1994), for example, the court held that fire department captains were not exempt executives because they were not in charge of most fire scenes; had no authority to call additional personnel to a fire scene; did not set work schedules; participated in all the routine manual station duties such as sweeping and mopping floors, washing dishes and cleaning bathrooms; and did not earn much more than the employees they allegedly supervised. In *Reich* v. *State of New York*, 3 F.3d 581, 585–87 (2nd Cir. 1993), *cert. denied*, 510 U.S. 1163 (1994), the court granted overtime pay to police investigators whose duties included investigating crime scenes, gathering evidence, interviewing witnesses, interrogating and fingerprinting suspects, making arrests, conducting surveillance, obtaining search warrants, and testifying in court. The court held that such police officers are not exempt administrative employees because their primary duty is conducting investigations, not administering the affairs of the department itself. *See also Bratt* v. *County of Los Angeles*, 912 F.2d 1066, 1068–70 (9th Cir. 1990) (probation officers who conduct investigations and make recommendations to the court regarding sentencing are not exempt administrative employees), *cert. denied*, 498 U.S. 1086 (1991); *Mulverhill* v. *State of New York*, 1994 WL 263594 (N.D.N.Y. 1994) (investigators of environmental crimes who carry firearms, patrol a sector of the state and conduct covert surveillance, and rangers who prevent and suppress forest fires, are not exempt administrative employees).

Similarly, federal courts have held that police officers, paramedics, EMTs, and similar employees are not exempt professionals because they do not perform work in a "field of science or learning" requiring knowledge "customarily acquired by a prolonged course of specialized intellectual instruction" as required under the current and final section 541.301 of the regulations. The paramedic plaintiffs in *Vela* v. *City of Houston*, 276 F.3d 659, 674–676 (5th Cir. 2001), for example, were required to complete 880 hours of classroom training, clinical experience and a field internship. The EMT plaintiffs were required to complete 200 hours of classroom training, clinical experience and a field internship. The court held that the paramedics and EMTs were not exempt professionals because they were not required to have a college degree. *See also Dybach* v. *State of Florida Department of Corrections*, 942 F.2d 1562, 1564–65 (11th Cir. 1991) (probation officer held not exempt professional because the required college degree could be in any field—"'nuclear physics, or * * * corrections, or * * * physical education or basket weaving'"—not in a specialized field); *Fraternal Order of Police, Lodge 3* v. *Baltimore City Police Department*, 1996 WL 1187049 (D. Md. 1996) (police sergeants and lieutenants held not exempt professionals, even though some possessed college degrees, because college degrees were not required for the positions); *Quirk* v. *Baltimore County, Maryland*, 895 F. Supp. 773, 784–86 (D. Md. 1995) (certified paramedics required to have a high school education and less than a year of specialized training are not exempt professionals).

The Department has no intention of departing from this established case law. Rather, for the first time, the Department intends to make clear in these revisions to the Part 541 regulations that such police officers, fire fighters, paramedics, EMTs and other first responders are entitled to overtime pay. Police sergeants, for example, are entitled to overtime pay even if they direct the work of other police officers because their primary duty is not management or directly related to management or general business operations; neither do they work in a field of science or learning where a specialized academic degree is a standard prerequisite for employment.[7]

Finally, such police officers, fire fighters, paramedics, EMTs and other public safety employees also cannot qualify as exempt under the highly compensated test in final section 541.601. As discussed below, final section 541.601(b) provides that the highly compensated test "applies only to employees whose primary duty includes performing office or non-manual work." Federal courts have recognized that

[7] In addition to the case law and comments cited above, when drafting this new section, the Department also looked to the definitions of "fire protection activities" and "law enforcement activities" contained in Sections 3(y) and 7(k) of the FLSA, and their implementing regulations at 29 CFR 553.210 and 553.211, which allow public agencies to pay overtime to fire and law enforcement employees based on a 7 to 28 day period, rather than the 40-hour workweek. These sections do not govern exempt status under section 13(a)(1) and, thus, are illustrative but not determinative of duties performed by nonexempt fire and law enforcement employees. *See* 29 CFR 553.216.

HeinOnline -- 69 Fed. Reg. 22129 2004

such public safety employees do not perform "office or non-manual" work. *Adam* v. *United States,* 26 Cl. Ct. at 792–93, for example, involved border patrol agents who spent a significant amount of time in the field, wore "uniforms and black work boots," and used "a handgun, a baton, night-vision goggles, and binoculars." Their work required "frequent and recurring walking and running over rough terrain, stooping, bending, crawling in restricted areas such as culverts, climbing fences and freight car ladders, and protecting one's self and others from physical attacks." Their work also involved "high speed pursuits, boarding moving trains and vessels, and physical threat while detaining and arresting illegal aliens, smugglers, and other criminal elements." The court held that these border patrol agents are not exempt from the FLSA overtime requirements, stating that the "level of physical effort required in the environment described plainly cannot be characterized as 'office or other predominately nonmanual work.' A dictionary definition of 'manual' is, 'requiring or using physical skill and energy.' * * * Non-manual work, therefore, would not call for significant use of physical skill or energy. Certainly, the agents' job duties do not fit that definition." *See also, Roney* v. *United States,* 790 F. Supp. 23, 25 (D.D.C. 1992) (Deputy U.S. Marshal entitled to overtime pay where position requires "'physical strength and stamina to perform such activities as long periods of surveillance, pursuing and restraining suspects, carrying heavy equipment'" and the employee "'may be subject to physical attack, including the use of lethal weapons'") (citation omitted).

Federal courts have found high-level police and fire officials to be exempt executive or administrative employees only if, in addition to satisfying the other pertinent requirements, such as directing the work of two or more other full time employees as required for the executive exemption, their primary duty is performing managerial tasks such as evaluating personnel performance; enforcing and imposing penalties for violations of the rules and regulations; making recommendations as to hiring, promotion, discipline or termination; coordinating and implementing training programs; maintaining company payroll and personnel records; handling community complaints, including determining whether to refer such complaints to internal affairs for further investigation; preparing budgets and controlling expenditures; ensuring operational readiness through supervision and inspection of personnel, equipment and quarters; deciding how and where to allocate personnel; managing the distribution of equipment; maintaining inventory of property and supplies; and directing operations at crime, fire or accident scenes, including deciding whether additional personnel or equipment is needed. *See, e.g., West* v. *Anne Arundel County, Maryland,* 137 F.3d 752 (4th Cir.) (EMT captains and lieutenants), *cert. denied,* 525 U.S. 1048 (1998); *Smith* v. *City of Jackson, Mississippi,* 954 F.2d 296 (5th Cir. 1992) (fire chiefs); *Masters* v. *City of Huntington,* 800 F. Supp. 363 (S.D.W. Va. 1992) (fire deputy chiefs and captains); *Simmons* v. *City of Fort Worth, Texas,* 805 F. Supp. 419 (N.D. Tex. 1992) (fire deputy and district chiefs); *Keller* v. *City of Columbus, Indiana,* 778 F. Supp. 1480 (S.D. Ind. 1991) (fire captains and lieutenants). Another important fact considered in at least one case is that exempt police and fire executives generally are not dispatched to calls, but rather have discretion to determine whether and where their assistance is needed. *See, e.g., Anderson* v. *City of Cleveland, Tennessee,* 90 F. Supp.2d 906, 909 (E.D. Tenn. 2000) (police lieutenants "monitor the radio in order to keep tabs on their men and determine where their assistance is needed").[8]

A new section 541.4 highlights that the FLSA establishes a minimum standard that may be exceeded, but cannot be waived or reduced. *See Brooklyn Savings Bank* v. *O'Neil,* 324 U.S. 697, 706 (1945). Section 18 of the FLSA states that employers must comply "with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum * * * or a maximum workweek lower than the maximum workweek established under the Act." 29 U.S.C. 218. Similarly, employers, on their own initiative or in collective bargaining negotiations with a labor union, are not precluded by the FLSA from providing a wage higher than the statutory minimum, a shorter workweek than provided by the FLSA, or a higher overtime premium (double time, for example) than provided by the FLSA. *See, e.g., Barrentine* v. *Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 739 (1981) ("In contrast to the Labor Management Relations Act, which was designed to minimize industrial strife and to improve working conditions by encouraging employees to promote their interests collectively, the FLSA was designed to give specific minimum protections to individual workers and to ensure that each employee covered by the Act would receive '[a] fair day's pay for a fair day's work' and would be protected from 'the evil of overwork as well as underpay.'") (citation omitted); *NLRB* v. *R & H Coal Co.,* 992 F.2d 46 (4th Cir. 1993) (purpose of FLSA is to guarantee minimum level of compensation to workers, regardless of outcome of bargaining process; by contrast, purpose of National Labor Relations Act is to facilitate collective bargaining process and ensure that its outcome is enforced). Thus, the new section 541.4 states: "The Fair Labor Standards Act provides minimum standards that may be exceeded, but cannot be waived or reduced. Employers must comply, for example, with any Federal, State or municipal laws, regulations or ordinances establishing a higher minimum wage or lower maximum workweek than those established under the Act. Similarly, employers, on their own initiative or under a collective bargaining agreement with a labor union, are not precluded by the Act from providing a wage higher than the statutory minimum, a shorter workweek than the statutory maximum, or a higher overtime premium (double time, for example) than provided by the Act. While collective bargaining agreements cannot waive or reduce the Act's protections, nothing in the Act or the regulations in this part relieves employers from their contractual obligations under collective bargaining agreements."

*Subpart B, Executive Employees*

Section 541.100 General Rule for Executive Employees

The Department's proposal streamlined the existing regulations by adopting a single standard duties test in proposed section 541.100. The proposed standard duties test provided that an exempt executive employee must: have a primary duty of managing the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; customarily and regularly direct the work of two or more other employees; and have the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other

[8] Some police officers, fire fighters, paramedics and EMTs treated as exempt executives under the current regulations may be entitled to overtime under the final rule because of the additional requirement in the standard duties test that an exempt executive must have the authority to "hire or fire" other employees or make recommendations given particular weight on hiring, firing, advancement, promotion or other change of status.

HeinOnline -- 69 Fed. Reg. 22130 2004

Section 541.201 Directly Related to Management or General Business Operations

The proposed section 541.201 defined the phrase "related to the management or general business operations" as referring "to the type of work performed by the employee" and requiring that the exempt administrative employee "perform work related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product." The proposal also provided examples of the types of work that generally relate to management or general business operations, including work in areas such as tax, finance, accounting, auditing, quality control, advertising, marketing, research, safety and health, personnel management, human resources, labor relations, and others. Finally, the proposal stated that an employee also may qualify for the administrative exemption if the "employee performs work related to the management or general business operations of the employer's customers," such as employees acting as advisers and consultants to their employer's clients or customers.

The Department made two changes in the final subsection 541.201(a). *First*, for the reasons discussed above, the final rule reinserts the word "directly" throughout this section. Some commenters argue that the deletion of the word "directly" from the existing regulations would allow the exemption for an employee whose duties relate only indirectly or tangentially to administrative functions. The Department did not intend any substantive change by deletion of the word "directly" in the proposal, and thus has reinserted this term to ensure that the administrative duties test is not interpreted as allowing the exemption to apply to employees whose primary duty is only remotely or tangentially related to exempt work. *Second*, the words "retail or service establishment" have been reinserted from the current rule in the phrase: "as distinguished, for example, from working on a manufacturing production line or selling a product *in a retail or service establishment*." This addition returns the regulatory text more closely to the current section 541.205(a): "as distinguished from 'production' or, in a retail or service establishment, 'sales' work." Commenters state that deletion of the words "retail or service establishment" could be interpreted as denying the administrative exemption to any employee engaged in any sales, advertising, marketing or promotional activities. Because no such categorical change was intended, or is supported by current case law, the Department has restored the language from the current regulations. *See, e.g., Reich* v. *John Alden Life Insurance Co.*, 126 F.3d 1, 9–10 (1st Cir. 1997) (promoting sales in the insurance industry is exempt administrative work). The Department also notes that this phrase begins with the words "for example." This final phrase in section 541.201(a) provides non-exclusive examples. Thus, the concern of commenters such as the Rudy, Exelrod & Zieff law firm that the reference to "working on a manufacturing production line" suggests that "working on what might be termed a 'white collar production line' is different from working on a manufacturing production line for purposes of the exemption" is unfounded.

The primary focus of most comments on subsection 541.201(a) dealt with the so-called 'production versus staff' dichotomy. The preamble to the proposal stated that the Department intended "to reduce the emphasis on the so-called "production versus staff" dichotomy in distinguishing between exempt and nonexempt workers, while retaining the concept that an exempt administrative employee must be engaged in work related to the management or general business operations of the employer or of the employer's customers."

Many commenters, including the Society for Human Resource Management (SHRM), the FLSA Reform Coalition, the National Association of Manufacturers (NAM), the U.S. Chamber of Commerce (Chamber), the HR Policy Association, the Morgan, Lewis & Bockius law firm and the Fisher & Phillips law firm, strongly support the proposal's intended diminution of the production versus staff dichotomy, which they believe has little value in today's service-oriented economy. For example, the Chamber states that the dichotomy "does not fit in today's workplace" because the "decline in manufacturing and the rise in the service and information industries has rendered the production dichotomy an artifact of a different age." SHRM "applauds the Department's elimination of much of the 'production v. staff' language" but also "recognizes that the production versus staff in some circumstances can be a helpful aid in determining whether an employee fits under the administrative exemptions and, therefore, supports the proposed language. * * * This language strikes a proper balance between retaining this concept and ensuring that it is not so strictly construed so as to deny the exemption to an employee who should be exempt." Similarly, NAM supports the proposed rule's attempt to "reduce the emphasis on the production versus staff dichotomy."

However, many of these commenters believe that the proposal did not go far enough, and that the final rule should strive to eliminate the dichotomy entirely. For example, the FLSA Reform Coalition states that the dichotomy should be eliminated by allowing an employee to qualify for the exemption either by performing work related to management or general business operations, or by doing any work that includes the exercise of discretion and independent judgment: "Thus, even if the employee's work could arguably be characterized as "production," he or she would nonetheless be an exempt administrative employee if his or her job is a responsible, non-manual one that includes the exercise of 'discretion and independent judgment.'" Similarly, the HR Policy Association recommends that the Department "eliminate the production dichotomy from the administrative exemption" because the confusion it causes is too great and it is difficult to apply with uniformity. The Fisher & Phillips law firm also states that the Department should "eliminate the 'dichotomy' altogether."

The primary focus of these comments was the last sentence in proposed subsection (a), which states that the administrative exemption does not apply if an employee is "working on manufacturing production line or selling a product." Numerous commenters ask for clarification about the scope and meaning of the statement. For example, the Morgan, Lewis & Bockius law firm requests clarification that not all sales work is excluded from exemption, such as advertising, marketing and promotional activities, and for confirmation that some individuals who work on a production line, such as a safety and health administrator or quality control specialist, may still be exempt. The U.S. Chamber of Commerce also states that the Department should "revisit its approach, especially with regard to treatment of employees who may be involved in some aspect of sales," and should clarify that sales work is not inherently inconsistent with exempt work. The HR Policy Association recommends that the Department delete the "working on a manufacturing production line or selling a product" phrase, or else clarify its meaning either in the regulations or this preamble.

A large number of commenters have the opposite view about the "production versus staff" dichotomy, stating that minimizing or deleting the dichotomy would deprive the administrative exemption of its meaning. Such commenters, including the AFL–CIO, the National Treasury Employees Union, the American Federation of State, County and Municipal Employees, the Rudy, Exelrod & Zieff law firm, the National Employment Lawyers Association, the American Federation of Television and Radio Artists, the National Partnership for Women and Families and the Stoll, Stoll, Berne Lokting & Shlachter law firm, believe that the courts have found the dichotomy to be a useful and appropriate tool in analyzing workers in a broad variety of non-manufacturing contexts. They oppose any indication that the Department is minimizing the dichotomy.

For example, the AFL–CIO notes that the 1949 Weiss report explained that the phrase "directly related to management policies or general business operations" describes those activities "relating to the administrative as distinguished from the 'production' operations of a business." Similarly, the 1940 Stein Report described administrative exempt employees as "those who can be described as staff rather than line employees, or functional rather than departmental heads." The AFL–CIO quotes *Reich* v. *New York*, 3 F.3d 581, 588 (2nd Cir. 1993), *cert. denied*, 510 U.S. 1163 (1994), stating that the dichotomy "has repeatedly proven useful to courts in a variety of non-manufacturing settings," and cites a number of court decisions applying the dichotomy in a variety of government and service sector contexts. The National Treasury Employees Union states that the "distinction which the Department would so casually discard is a key tool to help identify the specific class of office workers that Congress intended to exempt: support staff contributing to business operations and management. It is imperative to keep this narrow focus rather than blur the distinction between support staff and line workers * * *." The Rudy, Exelrod & Zieff law firm notes that, prior to 1940, the Department did not separately define the administrative exemption from the executive exemption, because the Department recognized that the administrative exemption "was intended to cover no more than a small subclass of 'executive' employees." The firm states that the 1940 Stein Report concluded that the employees whom the administrative exemption was intended to cover had "functional rather than departmental authority," meaning they did not "give orders to individuals." The firm argues that nothing in the modern workplace, involving production of services instead of manufactured goods, makes it improper to continue to draw the line between employees who help to administer an employer's general business operations and those employees whose duties are related to the day-to-day production of the goods or services the employer sells.

Commenters, thus, have very different perspectives about how the Department should approach the "production versus staff" dichotomy and apply it to the modern workplace. Except as stated above, we have not adopted any of the commenters' suggestions for substantial changes to the primary duty standard in section 541.201(a). The Department believes that our proposal struck the proper balance on the "production versus staff" dichotomy. We do not believe that it is appropriate to eliminate the concept entirely from the administrative exemption, but neither do we believe that the dichotomy has ever been or should be a dispositive test for exemption. The Department believes that the dichotomy is still a relevant and useful tool in appropriate cases to identify employees who should be excluded from the exemption. As the Department recognized in the 1949 Weiss Report at 63, this exemption is intended to be limited to those employees whose duties relate "to the administrative as distinguished from the 'production' operations of a business." Thus, it relates to employees whose work involves servicing the business itself—employees who "can be described as staff rather than line employees, or as functional rather than departmental heads." 1940 Stein Report at 27. The 1940 Stein Report further described the exemption as being limited to employees who have "miscellaneous policy-making or policy-executing responsibilities" but who do not give orders to other employees. 1940 Stein Report at 4. Based on these principles, the Department provided in proposed section 541.201(a) that the administrative exemption covers only employees performing a particular type of work—work related to assisting with the running or servicing of the business. The examples the Department provided in proposed section 541.201(b) were intended to identify departments or subdivisions that generally fit this rule.

The Department's view that the "production versus staff" dichotomy has always been illustrative—but not dispositive—of exempt status is supported by federal case law. In *Bothell* v. *Phase Metrics, Inc.*, 299 F.3d 1120 (9th Cir. 2002), for example, the Ninth Circuit found the dichotomy "useful only to the extent that it helps clarify the phrase 'work directly related to the management policies or general business operations.'" *Id.* at 1126 (citation omitted). The court further stated:

> The other pertinent cases from our sister circuits similarly regard the administration/production dichotomy as but one piece of the larger inquiry, recognizing that a court must 'construe the statutes and applicable regulations as a whole.' Indeed, some cases analyze the primary duty test without referencing the § 541.205(a) dichotomy at all. This approach is sometimes appropriate because, as we have said, the dichotomy is but one analytical tool, to be used only to the extent that it clarifies the analysis. Only when work falls 'squarely on the production side of the line,' has the administration/production dichotomy been determinative.
>
> * * * * *
>
> Moreover, the distinction should only be employed as a tool toward answering the ultimate question, whether work is 'directly related to management policies or general business operations,' not as an end in itself.

*Id.* at 1127 (citations omitted). *See, e.g., Piscione* v. *Ernst & Young, L.L.P.*, 171 F.3d 527, 538–39 (7th Cir. 1999) (even though the employee "produced" some reports and filings, and such work might be viewed as production work, the work was directly related to the management or general business operations); *Spinden* v. *GS Roofing Products Co.*, 94 F.3d 421, 428 (8th Cir. 1996) (employee held administratively exempt despite the fact that he "produced" certain specific outputs), *cert. denied*, 520 U.S. 1120 (1997).

The final regulation is consistent with the Ninth Circuit's approach in *Phase Metrics:* the "production versus staff" dichotomy is "one analytical tool" that should be used "toward answering the ultimate question," and is only determinative if the work "falls squarely on the production side of the line."

As noted above, proposed section 541.201(b) provided an illustrative list of the types of functional areas or departments, including accounting, auditing, marketing, human resources and public relations, typically administrative in nature. The commenters generally found this illustrative list to be accurate and helpful. For example, the FLSA Reform Coalition states that it supported the Department's efforts to clarify the administrative exemption by "focusing on the function performed by the employee and providing examples of exempt, administrative functions." The AFL–CIO comments that the list includes areas "which are clearly

HeinOnline -- 69 Fed. Reg. 22141 2004

encompassed within the servicing functions of a business, and which substantially overlap with the servicing examples set forth in current section 541.205(b)." The U.S. Chamber of Commerce also notes that the list is similar to the examples in the existing regulations and agrees that all of the areas listed in the proposed regulation "are proper illustrations of exempt administrative work." Some commenters suggest a variety of additional areas of work that should be added to the illustrative list. However, the National Treasury Employees Union cautions against exempting workers based upon their job area or title. Other commenters similarly suggest that the Department should include fewer categories in the list, because employees doing routine work may be misperceived as exempt simply because they work in an area like marketing, human resources, or research.

In light of these comments, we have added the language, "but is not limited to," to emphasize that the list is intended only to be illustrative. It is not intended as a complete listing of exempt areas. Nor is it intended as a listing of specific jobs; rather, it is a list of functional areas or departments that generally relate to management and general business operations of an employer or an employer's customers, although each case must be examined individually. Within such areas or departments, it is still necessary to analyze the level or nature of the work (*i.e.*, does the employee exercise discretion and independent judgment as to matters of significance) in order to assess whether the administrative exemption applies. Commenters recommend the inclusion of several areas that we think are appropriate as additional examples of areas that generally relate to management and general business operations. Therefore, we are adding computer network, internet and database administration; legal and regulatory compliance; and budgeting to the illustrative list.

Finally, proposed section 541.201(c) provided that employees who perform work related to the management or general business operations of the employer's customers, such as advisers and consultants, also may qualify for the administrative exemption. The proposed rule included language from existing sections 541.2(a)(2) and 541.205(d), and no substantive changes were intended. The commenters express few substantive concerns with this provision. A small number of commenters suggest that the regulation should provide that the employer's customer could be an individual, while commenter Karen Dulaney Smith urges the Department to insert the word 'business' to clarify that the exemption does not apply to "individuals, whose "business" is purely personal." The Department has not made either change. Nothing in the existing or final regulations precludes the exemption because the customer is an individual, rather than a business, as long as the work relates to management or general business operations. As stated by commenter Smith, the exemption does not apply when the individual's 'business' is purely personal, but providing expert advice to a small business owner or a sole proprietor regarding management and general business operations, for example, is an administrative function. The 1949 Weiss Report stated that the administrative exemption should not be read to exclude "employees whose duties relate directly to the management policies or to the general business operations of their employers' customers. For example, many bona fide administrative employees perform important functions as advisors and consultants but are employed by a concern engaged in furnishing such services for a fee * * *. Such employees, if they meet the other requirements of the regulations, should qualify for exemption regardless of whether the management policies or general business operations to which their work is directly related are those of the employers' clients or customers, or those of their employer." 1949 Weiss Report at 65. Weiss also noted that a consultant employed by a firm of consultants is exempt if the employee's "work consists primarily of analyzing, and recommending changes in, the business operations of his employer's client." 1949 Weiss Report at 56. This provision is meant to place work done for a client or customer on the same footing as work done for the employer directly, regardless of whether the client is a sole proprietor or a Fortune 500 company, as long as the work relates to "management or general business operations."

Section 541.202 Discretion and Independent Judgment (Proposed "Position of Responsibility")

As discussed above, the Department has decided to eliminate the proposed "position of responsibility" requirement. Thus, the final rule deletes proposed section 541.202 defining "position of responsibility," proposed section 541.203 defining "substantial importance," and proposed section 541.204 defining "high level of skill or training." Instead, the final rule reinserts the "discretion and independent judgment" requirement, and defines that term at final section 541.202. Some of the language in proposed sections 541.203 and 541.204 was retained from the existing regulations and also appears in the final regulations as described below. The language from proposed section 541.204 regarding the use of manuals has been moved to a new section in Subpart H, Definitions and Miscellaneous Provisions, and is discussed under that subpart.

The Department continues to believe, as most commenters confirm, that the current discretion and independent judgment standard has caused confusion and unnecessary litigation. Even in the 1949 Weiss Report, the Department recognized that the "discretion and independent judgment" standard was somewhat subjective, and the difficulty of applying the standard consistently has increased with the passing decades. As evidenced by the increasing court litigation, it has become progressively more difficult to apply the standard with the creation of many new jobs that did not exist 50 years ago. Nonetheless, the vast majority of commenters express concern that abandoning the "discretion and independent judgment" standard entirely would create even more uncertainty and litigation. We also recognize the benefit of retaining the standard in some form so as not to jettison completely decades of federal court decisions and agency opinion letters.

Accordingly, while retaining this standard from the existing regulations, final section 541.202 clarifies the definition of discretion and independent judgment to reflect existing federal case law and to eliminate outdated and confusing language in the existing interpretive guidelines. The Department intends the final rule to clarify the existing standard and to make the standard easier to understand and apply to the 21st Century workplace.

Final section 541.202(a) thus restates the requirement that the exempt administrative employee's primary duty must "include" the exercise of discretion and independent judgment and includes the general definition of this term, taken word-for-word from the existing interpretive guideline at subsection 541.207(a): "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." The requirement that the primary duty must "include" the

HeinOnline -- 69 Fed. Reg. 22142 2004