exercise of discretion and independent judgment—rather than "customarily and regularly" exercise discretion and independent judgment—is not a change from current law. Although the Department is aware that there has been some confusion regarding the appropriate standard under the existing "short" duties test, federal court decisions have recognized that the current "short" duties test does not require that the exempt employee "customarily and regularly" exercise discretion and independent judgment, as does the effectively dormant "long" test. *See, e.g., O'Dell* v. *Alyeska Pipeline Service Co.*, 856 F.2d 1452, 1454 (9th Cir. 1988) (district court erred in not applying more lenient "includes" standard under short test which made a difference in determining whether employee was exempt); *Dymond* v. *United States Postal Service*, 670 F.2d 93, 95 (8th Cir. 1982) (while the "long" duties test for the administrative exemption requires that the employee "customarily and regularly" exercise discretion and independent judgment, when an employee makes more than $250 a week, "that requirement is reduced to requiring that the employee's primary duty simply 'includes work requiring the exercise of discretion and independent judgment'").

Also retained from existing subsection 541.207(a), the final subsection 541.202(a) provides that discretion and independent judgment must be exercised "with respect to matters of significance." Final subsection 541.202(a) states that the term "matters of significance" refers to "the level of importance or consequence of the work performed." This concept of the importance or high level of work performed does not appear as a regulatory requirement in existing section 541.2, but is included twice in the existing interpretive guidance. Existing section 541.205(a), defining the primary duty requirement, states that the administrative exemption is limited "to persons who perform *work of substantial importance* to the management or operation of the business." This language was the basis of the "work of substantial importance" option in the proposed definition of "position of responsibility." Existing section 541.207(a), defining the term "discretion and independent judgment" provides that an exempt administrative employee "has the authority or power to make an independent choice, free from immediate direction or supervision and *with respect to matters of significance*."

The existing regulations use these two different phrases found in two different sections to describe the same general concept—that the work performed by an exempt administrative employee must be significant, substantial, important, or of consequence. *See, e.g., Piscione* v. *Ernst & Young, L.L.P.*, 171 F.3d 527, 535–43 (7th Cir. 1999). The words "substantial" and "significant" are synonyms. Existing section 541.207(d) describes the "matters of significance" concept as requiring that "the discretion and independent judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence." Further, existing section 541.205 and existing section 541.207 use some of the same examples (*i.e.*, personnel clerks, inspectors, buyers) to illustrate the meaning of "substantial importance" and the meaning of "matters of significance."

Describing the same concept using two different phrases in two different sections of the existing interpretive guidelines is duplicative and confusing. Accordingly, the final rule chooses one phrase—"matters of significance"—and makes that phrase part of the regulatory test for the administrative exemption, rather than merely interpretive guidance. As described below, final subsections 541.202(b) through (f) combine language from existing section 541.205, existing section 541.207, and current case law to more clearly define and delimit this concept.

Final subsection 541.202(b) begins with language from existing section 541.207(b) stating that the phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises." Final subsection 541.202(b) then contains the following non-exclusive list of factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance:

> [W]hether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

These factors were taken from the existing regulations, *see* 541.205(b), 541.205(c) and 541.207(d), or developed from facts which federal courts have found relevant when determining whether an employee exercises discretion and independent judgment. Federal courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment, although a case-by-case analysis is required. *See, e.g., Bondy* v. *City of Dallas*, 2003 WL 22316855, at *1 (5th Cir. 2003) (making recommendations to management on policies and procedures); *McAllister* v. *Transamerica Occidental Life Insurance Co.*, 325 F.3d 997, 1000–02 (8th Cir. 2003) (independent investigation and resolution of issues without prior approval; authority to waive or deviate from established policies and procedures without prior approval); *Cowart* v. *Ingalls Shipbuilding*, Inc., 213 F.3d 261, 267 (5th Cir. 2000) (developing guidebooks, manuals, and other policies and procedures for employer or the employer's customers); *Piscione*, 171 F.3d at 535–43 (making recommendations to management on policies and procedures); *Haywood* v. *North American Van Lines, Inc.*, 121 F.3d 1066, 1071–73 (7th Cir. 1997) (negotiating on behalf of the employer with some degree of settlement authority; independent investigation and resolution of issues without prior approval; authority to waive or deviate from established policies and procedures without prior approval); *O'Neill-Marino* v. *Omni Hotels Management Corp.*, 2001 WL 210360, at *8–9 (S.D.N.Y. 2001) (negotiating on behalf of the employer with some degree of settlement authority; developing guidebooks, manuals, and other policies and procedures for employer or the employer's customers); *Stricker* v. *Eastern Off-Road Equipment, Inc.*, 935 F. Supp. 650, 656–59 (D. Md. 1996) (authority to commit employer in matters that have financial impact); *Reich* v. *Haemonetics Corp.*, 907 F. Supp. 512, 517–18 (D. Mass. 1995) (negotiating on behalf of the employer with some degree of settlement authority; authority to commit employer in matters that have financial impact); *Hippen* v. *First National Bank*, 1992 WL 73554, at *6 (D. Kan. 1992) (authority to commit employer in matters that have

HeinOnline -- 69 Fed. Reg. 22143 2004

resulting from the *deminimis* differences in the standard duties tests compared to the current short duties tests (see the discussions presented below).

2.2 Impact of the Final Duties Test for Executive Employees

Although some commenters asserted the proposed duties test for executive employees would reduce overtime protection for workers, as discussed in the preamble above and shown in Table 2–2, the final standard duties test for executives, like the proposed duties test, is stronger than the current short duties test because it incorporates an additional requirement taken from the current long duties test: An exempt executive must have authority to hire or fire other employees, or the exempt executive's suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees must be given particular weight. The final rule also returns to the language in the current rule "whose primary duty" is management, instead of the proposed rule's "with a primary duty" of management.

Because of these changes, the Department concludes the standard duties test for executive employees in the proposed and final regulations is more protective than the current short test and some workers may gain overtime protection. However, this number is too small to estimate quantitatively given the data limitations presented below in Chapter 3.

TABLE 2–2.—COMPARING THE DUTIES TEST FOR EXECUTIVE EMPLOYEES

| Salary level | Current short test $250 per week | Final standard test $455 per week |
|---|---|---|
| Duties | Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and<br>Who customarily and regularly directs the work of two or more other employees. | Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;<br>Who customarily and regularly directs the work of two or more other employees; and<br>Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. |

2.3 Impact of the Final Duties Tests for Administrative Employees

The proposed duties tests for administrative employees generated a significant number of comments. As discussed in the preamble above, the final rule's duties test for administrative employees is significantly different than the test contained in the proposed rule. In drafting the final language, the Department sought to avoid introducing new terms (such as "position of responsibility") that generated confusion in the comments on the proposal and to retain terms (such as "primary duty," "discretion and independent judgment" and "general business operations") that are used in the current rule and have been clarified by court decisions and opinion letters. The final regulatory text also requires that the discretion and independent judgment must be exercised "with respect to matters of significance," language that appears only in the current interpretive guidelines and not the existing regulatory text.

As Table 2–3 indicates, the standard duties test for administrative employees in the final rule is very similar, if not functionally identical, to the current short duties test when the current interpretive guidelines are taken into account as would be appropriate. Based on the significant changes the Department made in the final rule to return the administrative duties test to the structure in the current rule, the Department has concluded that the standard duties test for administrative employees in the final rule is as protective as the current short test. Therefore, the Department has determined that very few, if any, workers will lose their right to overtime as a result of updating the current short test with the final standard duties test. However, this number is too small to estimate quantitatively given the data limitations presented below in Chapter 3.

TABLE 2–3.—COMPARING THE DUTIES TEST FOR ADMINISTRATIVE EMPLOYEES

| Salary level | Current short test $250 per week | Final standard test $455 per week |
|---|---|---|
| Duties | Whose primary duty consists of the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers; and<br>Which includes work requiring the exercise of discretion and independent judgment. | Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and<br>Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. |

2.4 The Impact of the Final Duties Tests for Learned Professional Employees

For reasons discussed in the preamble above, the final standard duties test for the learned professional exemption was modified from the proposed test to track the current rule's primary duty test and to restructure the proposed rule's reference to acquiring advanced knowledge through other means such as an equivalent combination of intellectual instruction and work experience so that it is consistent with the current regulation. As the preamble explains, the Department did not intend to depart from the current rule's educational requirements for the

learned professional exemption. Accordingly, the final rule clarifies that, just as under the current primary duty test, an employee must meet all three requirements of the test in order to be exempt—the primary duty must be performing work that requires advanced knowledge; the knowledge must be in a field of science or learning; and the knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction. The final rule also expands on each of those three components, using language from the current rule. For example, an employee's "work requiring advanced knowledge" must include work requiring the consistent exercise of discretion and judgment (see Table 2–4). The final standard duties test for learned professionals also adds language from the current long test in section 541.301(b) by defining work requiring advanced knowledge as work that is "predominantly intellectual in character" as distinguished from the "performance of routine mental, manual, mechanical or physical work." These revisions clarify that the final rule is at least as protective as current rule.

TABLE 2–4.—COMPARING THE DUTIES TEST FOR PROFESSIONAL EMPLOYEES

| Salary level | Current short test $250 per week | Final standard test $455 per week |
|---|---|---|
| Duties | Whose primary duty consists of the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study; and<br>Which includes work requiring the consistent exercise of discretion and judgment; or<br>Whose primary duty consists of the performance of work requiring invention, imagination, or talent in a recognized field of artistic endeavor. | Whose primary duty is the performance of work requiring knowledge of an advanced type (defined as work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment) in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or<br>Whose primary duty is the performance of work requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor. |

Other commenters expressed concern the proposed duties test for learned professionals would result in many workers in some occupations (*e.g.*, Licensed Practical Nurses, dental assistants, and cooks) losing overtime protection. Although most of the specific concerns raised by these comments were addressed by the Department's modifications to the proposed rule's professional duties test, discussed above, the Department notes the final rule clarifies a number of occupations. For example, Licensed Practical Nurses could not be classified as learned professionals because, unlike Registered Nurses, the possession of a specialized advanced academic degree is not a standard prerequisite for entry into that occupation. Therefore, the Department has determined very few, if any, workers will lose overtime protection as a result of updating the current short duties tests with the final standard duties test for learned professionals. However, this number is too small to estimate quantitatively given the data limitations presented below in Chapter 3.

2.5 The Impact of the Final Duties Test for Creative Professional Employees

As discussed in the preamble above, the comments stating the proposed revisions weakened the current duties tests illustrate the confusion and misunderstanding that surrounds the current short duties test for artistic professionals. The Department considers the language in the final rule to be a restatement of the artistic primary duty test in the current short test (see Table 2–4). Further, the final rule reflects current case law regarding the creative professional exemption for journalists while recognizing, as the current regulations do, that the duties of employees referred to as journalists vary along a wide spectrum from the nonexempt to the exempt (29 CFR 541.302(f)). Therefore, the Department considers the language in the final rule for creative professionals to be as protective as the current short test and that few, if any, creative professionals will lose overtime protection as the result of the revisions. However, this number is too small to estimate quantitatively given the data limitations presented below in Chapter 3.

2.6 The Impact of the Final Duties Tests for Teachers and the Practice of Law or Medicine

As discussed above in the preamble, contrary to the assertions made by some commenters, the proposed and final rule merely restate the current exclusions from the salary requirements and do not change the existing exemption criteria for teachers in educational establishments and licensed practitioners of law and medicine. The Department concludes these provisions in the final rule are not likely to result in any additional teachers in educational establishments, or licensed practitioners of law or medicine losing overtime protections compared to the current regulations.

2.7 The Impact of the Final Duties Tests for Computer Employees

Based on the comments received and for reasons discussed in the preamble above, several revisions were made in the final rule to align the current regulatory text with the specific standards adopted by Congress in 1996 for the computer employee exemption in section 13(a)(17) of the Act. As shown in Table 2–5, the Department considers the duties tests in the final regulations for computer employees to be functionally identical to those in the current regulations (section 541.303(b)) and statute (29 U.S.C. 213(a)(17)). Therefore, the Department concludes that it is unlikely that any additional employees will lose overtime protection as a result of the final duties tests for computer employees as compared to current law.

TABLE 2–5.—THE DUTIES TESTS FOR COMPUTER EMPLOYEES IN THE CURRENT AND FINAL REGULATIONS

| Salary | Current short test $250 per week | Section 13(a)(17) $27.63 an hour | Final standard test $455 per week or $27.63 an hour |
|---|---|---|---|
| Duties | Employed as a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker in the computer software field (as provided in 541.303).<br>Primary duty of performing work requiring theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering; and<br>Whose work requires the consistent exercise of discretion and judgment. | Employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is<br>(A) application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional applications;<br>(B) design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;<br>(C) design, documentation, testing, creation or modification of computer programs related to machine operating systems; or<br>(D) a combination of duties described in (A), (B) and (C), the performance of which requires the same level of skills. | The exemptions apply only to a computer employee whose primary duty consists of:<br>(1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;<br>(2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;<br>(3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or<br>(4) A combination of the aforementioned duties, the performance of which requires the same level of skills. |

### 2.8 The Impact of the Final Duties Tests for Outside Sales Employees

As discussed in the preamble above, the Department has determined that the application of the proposed primary duty test to the outside sales exemption is preferable to the 20 percent tolerance test. Utilization of the explicit primary duty concept also provides a consistent approach between the structure of the outside sales exemption and the exemptions for executive, administrative, and professional employees. Moreover, any potential issues under the final rule are addressed by the objective criteria and factors for determining an employee's primary duty that are contained in section 541.700. Therefore, the Department concludes that few, if any, employees would lose overtime protection as a result of the final revisions to the duties tests for outside sales employees. However, this number is too small to estimate quantitatively given the data limitations presented below in Chapter 3.

### 2.9 The Impact of the Final Rule on Police Officers, Fire Fighters, Paramedics, and Other First Responders

As discussed in the preamble above, the final rule expressly provides that the section 13(a)(1) exemptions do not apply to police officers, fire fighters, paramedics, emergency medical technicians (EMTs), and other first responders "regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work." Most courts have held that such workers generally are non-exempt because they typically do not perform the duties that are required for the executive or administrative exemption. Similarly, federal courts have held that police officers, paramedics, EMTs, and similar employees are not exempt professionals because they do not perform work requiring knowledge of an advanced type in a "field of science or learning" requiring knowledge "customarily acquired by a prolonged course of specialized intellectual instruction" as required under the current and final rules. The Department has no intention of departing from this established case law. Moreover, some police officers, firefighters, paramedics and EMTs treated as exempt executives under the current regulations may be entitled to overtime under the final rule because of the additional requirement in the standard duties test not found in the current short test that an exempt executive must have the authority to "hire or fire" other employees or make recommendations given particular weight on hiring, firing, advancement, promotion or other change of status. Therefore, the Department concludes that the executive duties tests for police officers, fire fighters, paramedics, EMTs, or other first responders in the final rule is more stringent than the current short tests and some such workers may actually gain overtime protection. However, this number is too small to estimate quantitatively given the data limitations presented below in Chapter 3.

### 2.10 The Impact of the Final Highly Compensated Test

Some employees earning $100,000 or more per year could lose overtime protection because of the less stringent duties test applicable to these employees under the highly compensated test adopted in the final regulations. However, the number of highly compensated employees earning $100,000 or more per year who could lose protection is relatively small—approximately 107,000 (see Chapter 4). Taking into account the differences in regional wage levels, the highly compensated test has been set high enough to avoid exempting employees who are likely to be otherwise entitled to overtime protection. Adopting a $100,000 salary level for the highly compensated test, increased from the proposed $65,000 level, will result in far fewer workers being reclassified as exempt compared to the proposed rule. Moreover, in the Department's enforcement experience, most salaried

Plaintiffs'
EXHIBIT 2
7/22/99 cmf

POSITION CLASSIFICATION STANDARD FOR

# GRADE-LEVEL GUIDES FOR CLASSIFYING INVESTIGATOR POSITIONS

## GS-1810/1811

UNITED STATES CIVIL SERVICE COMMISSION

U.S. CIVIL SERVICE COMMISSION
BUREAU OF POLICIES AND STANDARDS
TS-8 FEBRUARY 1972

CONTENTS


| | Page |
|---|---|
| Series definitions: | |
| —General Investigating Series, GS-1810 | 1 |
| —Criminal Investigating Series, GS-1811 | 1 |
| Exclusions | 2 |
| Distinctions between investigating and other occupations | 3 |
| Distinctions between general and criminal investigating occupations | 4 |
| —General Investigating Series, GS-1810 | 4 |
| —Criminal Investigating Series, GS-1811 | 5 |
| Occupational information: | |
| —Investigative techniques | 6 |
| —Definition of a case | 6 |
| —Variations within the basic function | 8 |
| —Influence of environmental and legal factors | 9 |
| Titles: | |
| —Nonsupervisory positions | 11 |
| —Supervisory positions | 11 |
| Classification criteria | 11 |
| —Complexity of assignments | 11 |
| —Level of responsibility | 12 |

UNITED STATES CIVIL SERVICE COMMISSION




| | Page |
|---|---|
| Knowledges, skills, and abilities required | 12 |
| Notes to users: | |
| —Nature of assignments | 14 |
| —Range of grade levels described | 15 |
| —Use of examples in the standard | 15 |
| —The information-gathering function | 16 |
| —Mixed positions | 17 |
| —The element of danger | 17 |
| Grade levels: | |
| —Investigator GS–5, Criminal Investigator GS–5 | 17 |
| —Investigator GS–7, Criminal Investigator GS–7 | 18 |
| —Investigator GS–9, Criminal Investigator GS–9 | 19 |
| —Investigator GS–11, Criminal Investigator GS–11 | 21 |
| —Investigator GS–12, Criminal Investigator GS–12 | 26 |
| —Investigator GS–13, Criminal Investigator GS–13 | 31 |

# GRADE-LEVEL GUIDES FOR CLASSIFYING INVESTIGATOR POSITIONS

## GS-1810 GENERAL INVESTIGATING SERIES GS-1810

This series includes positions that involve planning and conducting investigations covering the character, practices, suitability or qualifications of persons or organizations seeking, claiming, or receiving Federal benefits, permits, or employment when the results of the investigation are used to make or invoke administrative judgments, sanctions, or penalties. These positions require primarily a knowledge of investigative techniques and a knowledge of the laws, rules, regulations and objectives of the employing agency; skill in interviewing, following leads, researching records, and preparing reports; and the ability to elicit information helpful to the investigation from persons in all walks of life.

## GS-1811 CRIMINAL INVESTIGATING SERIES GS-1811

This series includes positions that involve planning and conducting investigations relating to alleged or suspected violations of criminal laws. These positions require primarily a knowledge of investigative techniques and a knowledge of the laws of evidence, the rules of criminal procedure, and precedent court decisions concerning admissibility of evidence, constitutional rights, search and seizure and related issues; the ability to recognize, develop and present evidence that reconstructs events, sequences, and time elements, and establishes relationships, responsibilities, legal liabilities, conflicts of interest, in a manner that meets requirements for presentation in various legal hearings and court proceedings; and skill in applying the techniques required in performing such duties as maintaining surveillance, performing undercover work, and advising and assisting the U. S. Attorney in and out of court.

These guides supersede the Grade-Level Guides for Classifying Investigator Positions, GS-1810 and GS-1811, issued June 1958;

together with the Commission's former approval of the following single-agency supplements: Supplement to the Position-Classification Standards for the General Investigating Series, GS-1810, for Positions in the Immigration and Naturalization Service, Department of Justice, issued October 1959, with Explanatory Memorandum issued June 1969; Treasury Law Enforcement Agent Supplement to the Grade-Level Guides for Classifying Investigator Positions, GS-1810/1811, issued June 1965, May 1962, August 1961; and Supplement to the Position-Classification Standards for the General Investigating Series, GS-1810, for Positions in the Department of Veterans Benefits, Veterans Administration, issued December 1959. This standard contains examples of the kinds of cases which illustrate the distinguishing characteristics of the grade levels in these occupations. Such examples are included to provide more pertinent guidance that will enable agencies to evaluate their own positions by comparison with the grade-level characteristics.*

## EXCLUSIONS

The following occupations are excluded from these series:

1. Positions concerned with safeguarding information or material affecting national defense and national security from unauthorized disclosure or sabotage. See the Security Administration Series, GS-080.

2. Positions involving a range of law enforcement activities, such as serving civil writs and criminal warrants, tracing and arresting wanted persons, seizing and disposing of property under court orders, and other similar duties that require the ability to find and identify wanted persons or property, a knowledge of court procedures, and a basic knowledge of business records and practices. See the United States Marshal Series, GS-082.

3. Positions that involve performing or supervising law enforcement work in the protection of life, property, and civil

* For this reason, the Commission has not provided for revision or approval of single-agency classification supplements to the standard.

rights of individuals. Such positions involve the prevention, detection, and investigation of accidents and crimes. Law enforcement positions involve conducting short-term investigations to determine the immediate circumstances of a suspected violation in order to make an immediate decision that there may or may not be a basis for arrest or questioning. See the Police Series, GS-083.

3. Positions involved in law enforcement work connected with detecting and preventing the smuggling or illegal entry of aliens into the United States, detecting and apprehending aliens who have violated the conditions under which they entered the United States, or who are falsely claiming United States citizenship. This work involves the application of basic investigative techniques to the solution of immediate problems in locating and identifying suspects. See the Border Patrol Agent Series, GS-1896.

4. Positions concerned with the enforcement of Federal labor laws regarding wages, hours, and working conditions. Such positions involve the performance of investigative, advisory, evaluative, and other similar duties and require a knowledge of laws, regulations, and orders relating to wages, hours, overtime pay, equal pay, safety, and health. In addition to investigative work, such positions involve negotiating with employers to bring about compliance with laws and regulations on hours and pay. See the Wage-Hour Law Enforcement Series, GS-1813.

DISTINCTIONS BETWEEN INVESTIGATING AND OTHER OCCUPATIONS

Although all Federal investigators factfind and report, not all positions that involve factfinding and reporting are classified as investigators. Investigator positions are those that involve cases whose development requires application of the *full range* of knowledges, skills, and abilities described in this standard. Typically, this full range of knowledges, skills, and abilities is called into use only in the development of cases that are so complex that they normally unfold over a period of time, i.e., days, weeks or months. Thus, investigator positions covered by this standard are distinguished from certain law enforcement occupations that require incumbents to use some investigative techniques, e.g.,

interviewing, or records checking in on-the-spot or short-term situations that end, for the law enforcement officers in those occupations, with the arrest or detention of the suspect.

Other occupations outside the law enforcement field involve some aspects of investigating work, but do not require their incumbents to apply the full range of investigator knowledges, skills, and techniques described in this standard. This is particularly true of certain subject-matter positions that involve factfinding and reporting. For example, accountants perform factfinding and reporting within their area of specialization. Their primary objective is to discover and solve accounting problems.

On the other hand, to the investigator, subject-matter knowledge, e.g., accounting or law, is secondary to the primary investigator knowledges, skills, and abilities. There may, however, be some instances in which an investigator might be unable to apply his broad investigative knowledges if his subject-matter knowledges were not of a sufficient level to cope with the complexities of, for example, an accounting or legal case.

## DISTINCTIONS BETWEEN GENERAL AND CRIMINAL INVESTIGATING OCCUPATIONS

All Federal investigators perform factfinding and reporting duties on assignments that normally unfold over a period of time. The key distinctions between the general and criminal investigating occupations lie in the different kinds of investigations performed by each and the different knowledges, skills, and abilities those different kinds of investigations impose.

### *General Investigating Series, GS-1810*

Investigations in this occupation result in civil or administrative actions, judgments, sanctions, or decisions. For example, employees in this occupation investigate individuals or organizations seeking or receiving benefits, licenses, loans or employment from the Federal Government or otherwise involved in civil matters of concern to Federal agencies, such as claims, loans or loan guarantys, insurance, malpractice suits, guardianship and custody matters, pensions, etc. This work requires a knowledge of the laws, rules and regulations of the employing agency, skill in interviewing, following leads, researching records, and reconstructing events, and the ability to prepare reports of findings.

*Criminal Investigating Series, GS-1811*

Positions in this occupation are concerned with investigations of alleged or suspected violations against the laws of the United States. This work requires, in addition to the knowledges, skills, and abilities described for the General Investigating Series, GS-1810, a knowledge of the criminal laws and Federal rules of procedure which apply to cases involving crimes against the United States, for example:

- — Knowledge of what constitutes a crime or violation as defined in pertinent statutes, including the Uniform Code of Military Justice, and statutes with anti-fraud or similar criminal penalties;
- — The kind of evidence that is required to prove that a crime was committed;
- — The relationships among the criminal investigative jurisdictions of various agencies;
- — Decisions and precedent cases involving:
  - admissibility of evidence
  - search and seizure
  - arrest authority
- — Sources of information, i.e., informants, and methods of obtaining required evidence;
- — The methods and patterns of criminal operations;
- — Availability and use of modern detection devices and laboratory services;
- — Awareness of continuing advances in investigative technology.

The purpose of the case, i.e., alleged or suspected violation of criminal law, imposes additional requirements on most positions in the Criminal Investigating Series, GS-1811. For example, most criminal investigators must be skillful in such activities as:

- — Maintaining surveillances;
- — Performing undercover work;
- — Making arrests;
- — Taking part in raids.

There are also instances in which investigators follow leads that indicate a crime will be committed rather than begin an investigation after a crime has been committed.

OCCUPATIONAL INFORMATION

*Investigative techniques*

While there is a wide range of work assignments and the corresponding variations in agency programs, investigators throughout the Federal service have in common the application of a number of techniques, such as:

— Interviewing or interrogating suspects and witnesses;
— Searching for physical or documentary evidence or clues;
— Using evidence to substantiate findings or conclusions;
— Examining records to detect links in a chain of evidence or information;
— Using cameras and photostatic machines to record evidence and documents;
— Doing undercover work assignments;
— Developing and using informants to get leads to information;
— Maintaining surveillances;
— Preparing reports of investigations.

Not all Federal investigators use all of the above techniques all of the time. Some investigators use special techniques that are not included in the above list, e.g., various electronic and infrared detection devices.

*Definition of a case*

The techniques outlined above are applied by investigators in performing assignments that are sufficiently complex as to normally require a period of days, weeks, and sometimes months to complete. Such assignments typically involve:

— Analyzing the request, complaint or allegation to identify the issues involved and the types of evidence that will be needed in each case;
— Determining the scope, timing and direction of the investigation;
— Gathering facts through such methods as interview, observation, interrogation, contacting informants, and analyzing records to establish facts or obtain evidence;
— Recognizing, exploring and exploiting leads to information and evidence;
— Verifying information obtained to establish accuracy and authenticity of facts or evidence;

- Recognizing the need for prompt reporting of critical information to other offices and agencies as the exigencies of any given situation may require;
- Presenting findings in clear, logical, impartial, and properly documented reports.

The specific techniques applied and the functions performed by investigators differ with agency missions. Thus, the techniques and knowledges applied by the undercover narcotics agent are different from the techniques and knowledges applied by the investigator seeking information regarding the suitability of a person for employment in a position of trust, and these, in turn, differ from those applied by the investigator examining tax records in search of evidence indicating intent to defraud. Nonetheless, functions common to investigators in different agencies are to find facts through application of sound investigative processes and to support those facts in reports that serve the needs of interested officials in the legislative, executive or judicial branches of the Government.

In addition to his work on cases assigned to him individually, an investigator, at any grade level, from time to time, works on particular investigative tasks associated with cases that are assigned to other investigators. Similarly, from time to time, an investigator may lead or coordinate the work of other investigators who are temporarily assigned to work on the cases for which he has the primary responsibility. These situations occur especially when—

- an investigator temporarily needs more manpower to bring an assignment to a swift conclusion, e.g., when he must set up and maintain surveillance in several places on a 24-hour basis, or when he must track down a large number of separate leads in a short time span.
- an investigation that is centered in one geographic area involves issues that require inquiries in other geographic areas.

These temporary conditions are a normal part of completing investigative assignments and have no particular impact with respect to determining the grade level of an investigator's position. Nor is there a particular relationship between the grade level of the investigator who has primary responsibility for a case and the grade levels of other investigators who are tempo-

rarily called upon to assist him with particular investigative tasks. In classifying investigative positions, it is particularly important, because of the variety of tasks and assignments normally carried out by an investigator, to consider the work assignments that are typical and representative of the cases for which he has primary responsibility over a period of time.

*Variations within the basic function*

The specific duties and techniques characteristic of individual assignments differ to some extent from agency to agency and case to case. To illustrate, the investigator who is on an undercover assignment today, may check the records of legitimate wholesalers tomorrow. Similarly, the investigator checking such records today, may be assigned to undercover work tomorrow.

In addition to the actual conduct of investigations requiring application of the full range of investigative knowledges, skills and techniques, there are certain other tasks that investigators may be called upon to do. Such tasks are characteristic of work in other law enforcement occupations as well. Examples of these tasks include:

- — Testifying before grand juries;
- — Working with the Office of the U. S. Attorney in and out of court;
- — Serving subpoenas or other official papers;
- — Obtaining and using search and arrest warrants;
- — Serving on a full-time, detail, or rotational basis on protection assignments;
- — Carrying firearms and making arrests.

The fact that an investigator may perform such tasks does not mean that all persons who perform them are investigators. Rather, the total context of a position must be taken into account by comparison with the series definition, occupational information, and grade-level criteria of the appropriate standard. This is in accordance with the principle that a position as a whole must be considered before arriving at a proper series and grade level. This is necessary because the value of an individual task should not be considered out of context. The value of one individual task may, for example, be different from the total grade-level value of the position as a whole.

*Influence of environmental and legal factors*

One key to success in investigative work is getting people to cooperate and to provide information and assistance to investigators. Investigators rely very heavily on securing the confidence, good will, and cooperation of others—witnesses, informants, and persons under investigation. The investigator must be respectful of the rights of all persons involved in each investigation, including the right to privacy, all forms of civil rights, the right to be treated fairly and impartially and with dignity. His positive concern for protecting such rights is vital to building the public's respect for law and their willingness to cooperate with investigative programs.

During the past few years, the work of the investigator has been influenced considerably by a number of legal and environmental factors. Some of these factors are:

— The growing size and diversity of metropolitan communities; and the increasing crowding of urban areas;
— The polarization of public attitudes with regard to law enforcement and investigative activities; and the fact that the investigator must perform assignments in areas where people are hostile toward law enforcement;
— The changing age composition of the population in terms of the high percentage of crimes committed by young people, i.e., ages 16–24;
— The changing policies of prosecuting officials, the courts and administrative bodies;
— The greater opportunities to commit crime in an affluent society;
— The increasing sophistication and complexity of mechanical, electronic, and scientific devices used by investigators and others;
— The increasing tendency for disaffected groups to express their views through organized violence and confrontations with law enforcement forces;
— The major court decisions, e.g., in such areas as search and seizure and the rights of accused persons.*

* It is recognized that there have been and will continue to be many court decisions that influence the manner in which investigative work is carried out and investigative techniques applied. For this reason, no purpose would be served in attempting to keep an up-to-date list of pertinent court decisions in this standard.

The work of the investigator requires the highest standards of knowledge, conduct, methodology and discipline, and the highest dedication to concepts of public service, impartial justice, and protection of the rights of individuals in a democratic society.

The above considerations have had an influence on the Federal investigator in terms of:

— The need for individual investigators to be aware of the involvement of organized crime in legitimate affairs;

— The increased necessity for coordination and cooperation with other Federal, State and local investigative and law enforcement agencies to avoid duplication of efforts and to enhance the effectiveness of each agency;

— The need for heightened sensitivity imposed on the investigator by newer kinds of offenders or subjects of investigations, e.g.:

- Persons motivated more by passion, i.e., fanatical belief in political, economic, or social reform are different in kind from those motivated by the prospect of financial gain or advancement.

— The requirement for greater awareness of the wider implications of each act taken by the investigator, e.g.:

- Every kind of action must be viewed as the potential basis for a court decision.
- Because of the newsworthiness of investigations, nearly any investigation involves a potential for focusing substantial attention on and reflecting on the investigative efforts of the Federal Government.

— The potential impact of actions taken by the investigator.

- Action taken against a person who is a prominent leader in an active social group in one city could have repercussions in other cities.

— The greater complexity of techniques and technical equipment he must know how to use, e.g.:

- Laboratory findings
- Electronic devices
- Legal advice and rulings pertaining to the use of such items.

## TITLES

*Nonsupervisory positions*

Two basic titles are authorized for nonsupervisory positions covered by this standard:

— *Investigator*

- For positions that meet the definition of the General Investigating Series GS-1810

— *Criminal Investigator*

- For positions that meet the definition of the Criminal Investigating Series GS-1811

*Supervisory positions*

Positions that meet the criteria defined in the Supervisory Grade-Evaluation Guide are titled, as appropriate:

— *Supervisory Investigator*
— *Supervisory Criminal Investigator*

## CLASSIFICATION CRITERIA

The two factors that are used to distinguish between grade levels in these occupations are *Complexity of Assignments* and *Level of Responsibility*.

*Complexity of assignments*

This factor measures the scope, complexity, and sensitivity of investigative assignments, including such elements as:

— the levels of difficulty involved in resolving conflicting facts or evidence;
— the difficulty and complexity imposed by the subjects of investigations;
— the nature of separate investigative matters that grow from the original assignments;
— the skill required to establish facts and evidence in assigned cases;
— the sensitivity of assignments;
— the jurisdictional problems involved in case assignments.

Assignment patterns range from basic training in laws and investigative procedures and techniques; to difficult investigations involving conflicts in facts; to extremely complex and sensitive investigations involving extensive conspiracies.

 GS-1810/1811

*Level of responsibility*

This factor measures the kind and extent of supervision that is given to investigators and the degree of resourcefulness required in finding and verifying information pertinent to cases assigned. Responsibility patterns range from training situations in which the investigator receives detailed, step-by-step supervision on assignments that require limited probing for information, to situations in which he independently develops complex cases requiring highly sophisticated inquiries into matters that tend to break new ground in the investigative field.

## KNOWLEDGES, SKILLS, AND ABILITIES REQUIRED

The work of the investigator in the General Investigating Series GS-1810 focuses on investigating such matters as the character, practices, suitability or qualifications of persons or organizations seeking, claiming, or receiving Federal benefits, permits or employment. This work requires primarily a knowledge of the civil and administrative aspects of law and the application of such investigative skills and techniques as those investigations require.

Investigators in the Criminal Investigating Series GS-1811 focus on investigating alleged or suspected violations of criminal law. This work requires primarily a knowledge of the laws of evidence, the rules of criminal procedure, precedent court decisions and the like, and the application of such investigative techniques, e.g., maintaining surveillances, performing undercover work, as those investigations require.

The following listing identifies the kinds of knowledges, skills, and abilities applied in the different kinds of investigations work. In light of the preceding paragraphs, certain items listed are primarily applicable to positions in the Criminal Investigating Series GS-1811, while others are common to both occupations.

*Knowledge required of:*

- Basic principles and techniques of investigating;
- Rules of evidence;
- Functions and jurisdictions of other Federal, State, and local agencies;
- Prohibited matters and guides concerning invasion of privacy;

- — Scope, application and interpretation of the specific laws and regulations relating to the investigative jurisdiction of the agency;
- — Objectives of various types of investigations, including specialized factor coverage requirements;
- — Laws and decisions relating to search, seizure, and arrest;
- — Decisions relating to national security;
- — Subversive organizations and their methods of operation;
- — Current internal security problems;
- — Specialized industrial, commercial, or agency accounting or recordkeeping practices;
- — Operation and scope of laws of foreign governments as they relate to cases within the agency's jurisdiction;
- — Specialized investigative devices and equipment;
- — Resources and uses of technical laboratories;
- — Relationships between Federal agencies and the need to share information with them or with other governmental jurisdictions that have primary responsibility for particular kinds of cases.

*Skill required in:*

- — Conducting interviews and interrogations;
- — Recognizing, exploring and exploiting leads;
- — Recognizing, collecting, and preserving physical evidence;
- — Detecting discrepancies in information;
- — Distinguishing between relevant and irrelevant information or evidence;
- — Developing and using specialized investigative techniques, devices and procedures;
- — Carrying out undercover work assignments;
- — Maintaining surveillances;
- — Dealing with emergency situations;
- — Subduing persons and defending oneself, associates, and others;
- — Using firearms;
- — Preparing reports.

*Ability required to:*

- — Plan, organize, and conduct investigations;
- — Adapt investigative methods, techniques and procedures to specific situations;



355-551 O - 82 - pt. 5 --- 4

— Observe and record facts about persons, objects and events;
— Make thorough and complete investigations;
— Distinguish between conclusions and facts;
— Report facts accurately in a concise, logical and objective manner;
— Evaluate reliability and credibility of statements and witnesses;
— Deal effectively with others and gain their confidence and cooperation;
— Make positive decisions;
— Testify in legal, quasi-legal or administrative proceedings;
— Understand and analyze business, commercial, industrial and agency records;
— Discover and recognize evidence of crimes and violations;
— Anticipate and respond appropriately to violent actions;
— Analyze, interpret, and evaluate information obtained;
— Function effectively under stress.

*Other qualities:*

— Loyalty to the United States and its democratic institutions;
— Integrity;
— Impartiality;
— Objectivity;
— Emotional and mental stability;
— Sound judgment;
— Physical stamina;
— Initiative;
— Resourcefulness;
— Discretion;
— Alertness;
— Adaptability;
— Thoroughness;
— Physical and moral courage;
— Capacity for effective public relations.

NOTES TO USERS

1. *Nature of assignments*

The nature of investigative assignments normally requires an extended period of time, i.e., days, weeks, or months for their completion. Positions involving assignments that are completed primarily by detecting, apprehending, and interrogating suspects,

and that are typically completed within short-time periods are not classified on the basis of the criteria in this standard. Such assignments may require use of some investigative techniques but typically do not involve the *full range* of investigator techniques and functions that the grade-level criteria in this standard contemplate.

2. *Range of grade levels described*

This standard describes grade levels GS-5 through GS-13. There may be a small proportion of nonsupervisory investigative positions that warrant classification above the GS-13 level, based on duties and responsibilities that clearly exceed that level. These positions are likely to be so highly individualized that the establishment of specific criteria to evaluate them is not practicable. However, such positions can be evaluated by comparison with the grade-level criteria in this standard and in related standards.

Individual positions that may warrant consideration for classification at grades about GS-13 may involve responsibility for planning and leading the investigation of, for example, wide-scale conspiracies aimed at overthrow of the established order, plans to assassinate key members of the Government, financial conspiracies involving conglomerates and foreign bank accounts and the like. Other individual positions may warrant evaluation to higher grade levels because the investigator has been delegated authority of such broad nature for planning and conducting exceptionally complex and large-scale investigations that his responsibility clearly and substantially exceeds that described at the GS-13 level.

3. *Use of examples in the standard*

Positions in the investigative occupations are located in many kinds of agency programs, each of which has a distinct emphasis since it was designed to serve the needs of a particular agency. The grade-level criteria in this standard were developed to be useful for positions in these many organizational patterns. The examples in the grade-level criteria were chosen, insofar as possible, to cover the more typical situations, large numbers of positions, and to be recognizable and meaningful across agency lines. No attempt has been made to describe the many possible combinations of duties and responsibilities. Some work situations may have patterns of assignments or of delegations of responsi-

bility that differ from the examples given in this standard. In such cases, the appropriate grade level must be determined by use of sound classification judgment in making comparisons with the discussions of grade-level characteristics and examples.

The examples of work included at each level are intended only to be illustrative of the concept of the grade level. Thus, in applying this standard, the evaluation of individual positions requires careful attention to both similarities and differences in the nature and scope of work assignments, delegations of authority and the organizational and program setting of the position under review.

The presence or absence of an example of work at a given grade level should not be interpreted as a floor or ceiling on the grade level of a particular kind of position. In applying the standard, *reliance should be primarily placed on the overall characteristics of each grade level*, rather than on a specific example. For instance, there are examples of non-criminal investigatory work at grade GS-11. There are a few situations in which non-criminal investigators may be regularly performing work which clearly and substantially exceeds the GS-11 level. However, such examples of work are not spelled out at grade GS-12 because the positions are too individualized or few in number to warrant inclusion in the standard. These positions are to be evaluated by comparison with the grade-level discussions in this standard, by analogy with the examples of investigatory work described at grade GS-12, and by application of general classification principles.

4. *The information-gathering function*

Some agencies have specific information-gathering and information-interpreting missions. In view of this and for the purposes of planning and allocating investigative and law enforcement resources, agencies need to have reliable information on such subjects as trends in illegal operations or activities and plans of groups and key individuals that may affect the work of the agency. Hence, some investigators work on gathering information that does not relate to particular individual case assignments leading to prosecution. The purpose of such information-gathering is to detect trends, plan programs, or accumulate information and knowledge for future cases or for other use in a specific program of the agency involved.

Although there is a difference in purpose between an investigative case and this information-gathering function, the techniques used, e.g., surveillance, interview, undercover work, etc., are much the same in both situations. The ranges of complexity are usually similar. Thus, the grade-level criteria in this standard, although developed primarily for investigative work on cases, can be adapted and used for the evaluation of such information-gathering assignments.

5. *Mixed positions*

Some investigator positions regularly involve both non-criminal and criminal cases. The series determination of such positions should be made in accordance with section II. E. of the General Introduction, Background, and Instructions to the Position-Classification Standards.

6. *The element of danger*

Danger is an inherent element in the nature of criminal investigatory work and must be taken into account by the investigator in the planning, factfinding and closing stages of a case. Dangerous assignments may include, for example, undercover and surveillance activities, participating in raids, subduing persons with violent tendencies, and other activities that could result in exposure to gunfire, other types of attack or injury, or death. Such considerations have been taken into account in developing the grade-level criteria for this standard. Typical dangers are described under "Complexity of assignments" at the various grade levels. Such examples are, however, not intended to be all inclusive or limited to any particular grade level.

GS-1810-5/1811-5 GS-1810-5/1811-5

## Investigator GS-5
## Criminal Investigator GS-5

*Complexity of assignments*

The GS-5 investigator is trained in preparation for performing work of higher levels. He receives formal training designed to instruct him in such matters as:

— The laws and regulations enforced or applied by his agency;
— The use of investigative techniques available to Federal investigators;

— The rules of evidence that are applicable in criminal and non-criminal court cases;
— Court decisions that set precedents in guiding the work of investigators;
— Preparation of reports;
— Investigative procedures applicable to the work of his agency;
— The use of firearms, as appropriate.

The GS-5 investigator works with higher grade investigators primarily as an observer in the beginning stages of his employment. As the GS-5 investigator develops experience, he performs selected basic investigative duties, e.g., interviews and records searches, which equip him to handle investigative assignments at higher levels independently.

*Level of responsibility*

The GS-5 trainee works under immediate supervision that includes instruction for each phase of his training assignments. He receives detailed instructions pertaining to his assignments and to problems that arise during the performance of the work. He receives guidance and instructions on the objectives of his agency, and he applies basic investigative techniques and procedures as he learns them.

GS-1810-7/1811-7 **Investigator GS-7** GS-1810-7/1811-7
**Criminal Investigator GS-7**

*Complexity of assignments*

Grade GS-7 is essentially an advanced training level in the investigative occupations. After his formal training, the GS-7 investigator works with higher grade investigators in performing segments of investigations. Characteristic of grade GS-7 duties are the following:

— Observation of higher grade investigators during various phases of investigative work assignments;
— Study of assigned material pertinent to cases;
— Interviewing employees, officials in and out of Government, and others for the purpose of verifying facts and obtaining specific pieces of information;
— Securing signed statements, affidavits and documentary evidence to be included in reports or case records;

— Interviewing witnesses and other persons, both informally and at formally recorded conferences.

Grade GS-7 assignments are routine in the beginning, but as the trainee gains knowledge of the work, his work approaches the level of complexity of grade GS-9 investigative assignments.

*Level of responsibility*

The GS-7 investigator receives detailed instructions with assignments at the beginning of his training period. The amount of supervision and guidance gradually diminishes as the investigator acquires greater experience. After careful instruction by the supervisor, the GS-7 investigator independently carries out specific tasks, such as conducting particular interviews and writing reports of them to be included in case records; searching birth and death records to establish relationships between persons, or other tasks. The employee's completed work is reviewed to assess the investigator's progress, to determine the need for additional instruction, and to evaluate the technical accuracy and adequacy of his work.

GS-1810-9/1811-9 **Investigator GS-9** GS-1810-9/1811-9
**Criminal Investigator GS-9**

*Complexity of assignments*

Grade GS-9 is distinguished from grade GS-7 primarily in that the grade GS-7 investigator is an advanced trainee who works on segments of assignments but who rarely is assigned a complete investigation. Grade GS-9, however, is a full working level. The GS-9 investigator characteristically performs the full range of investigative functions on assigned cases or portions of cases, from planning through factfinding to reporting the results of his investigations.

Assignments at the GS-9 level typically involve subjects on which information is readily available, cases that involve straightforward issues or persons that are not controversial; and routine exchanges of factual information with other agencies. These characteristics are further illustrated in the paragraphs below:

— The subjects of investigations at this level are usually persons whose activities have raised no particular issues and

whose careers or normal activities are not likely to be adversely affected by an investigation, e.g., wage earner, small businessman, or applicants for employment or contracts with the Federal Government.

— Few or no controversial issues or separate investigative matters grow from the original assignment, i.e., the assignment begins and ends with that subject, for example:

- The subject is an applicant for a license to transact business with or for the Federal Government.
  - — The investigation discloses that the applicant has no alleged or actual illegal connections or practices in his background that require additional or separate investigation.
- The subject is a retailer who owns and operates a one- or two-man retail business.
  - — His records are routinely checked for compliance with tax, drug, firearms, explosives or similar laws and regulations.
  - — His history of compliance is good, and the investigation reveals no illegal or irregular transactions that require additional or separate investigation.

— Facts are relatively easy to find, e.g., through readily accessible records, bank accounts, or other documents such as birth and marriage certificates. The interrelationship of facts is readily apparent, e.g., the subject has always used the same name, worked at the same occupation or at closely related occupations, and his references and associates relate approximately the same favorable view of his character, habits, and way of life.

— The investigation rarely involves delicate issues, e.g., there is little real or potential interest on the part of the news media, organized groups, or the public.

— The coordination required with other agencies and individuals involves primarily the willing exchange of factual information and testimony.

Undercover and surveillance work, when performed at this level, involve a few hours of such activity under close watch by other investigators; and the risk of discovery or danger is slight, e.g., posing briefly as a doorman or elevator operator in a hotel or as a taxi driver.

Protection assignments, when performed at this level, involve working as the junior member of a team at a fixed post of duty that is away from the principal person under protection and his proposed route of travel.

*Level of responsibility*

The GS-9 investigator has assistance available to him throughout the initial, interim, and concluding stages of his assignments. Typically, on assignments that are similar to those he has carried out before, the GS-9 investigator works independently in planning and conducting his work. On assignments that involve unfamiliar issues or unusual techniques, the supervisor gives the GS-9 investigator more direction and guidance at the outset, including advice on problems he may encounter.

The supervisor reviews the work completed by the GS-9 investigator for technical accuracy and adequacy and for compliance with operating instructions, guides, rules and regulations. Assignments at the GS-9 level typically involve clear-cut application of an investigator's operating guidelines and instructions, e.g., manuals, handbooks, policy statements. The GS-9 investigator seeks advice when he encounters situations that require significant deviation from instructions and operating procedures.

The GS-9 investigator must have sufficient resourcefulness and judgment to recognize when he has interviewed enough witnesses and collected enough evidence to complete his case. This is distinguished from the grade GS-7 investigator who rarely works complete cases and who normally is carefully guided before, during, and after each investigative step he takes.

GS-1810-11/1811-11 **Investigator GS-11** GS-1810-11/1811-11

**Criminal Investigator GS-11**

*Complexity of assignments*

Grade GS-11 is distinguished from grade GS-9 primarily in: (1) the difficulty involved in resolving conflicts in facts or evidence; (2) the difficulty and complexity imposed by the subjects of the investigations; (3) the number of separate investigative matters that grow from original assignments; (4) the degree of skill required to establish the interrelationship of facts and evidence; (5) the sensitivity of assigned cases; and (6) the juris-

dictional problems involved. Each element described above is illustrated in a separate paragraph below. For classification to the GS-11 level, a position should substantially meet the characteristics illustrated in most or all of the following paragraphs.

1. Grade GS-11 involves substantial difficulty in resolving conflicts in facts or evidence, e.g.:

   — At the GS-11 level, the cases typically involve conflicting testimony or evidence. For example, some—but not all—witnesses describe a person's unsuitable or illegal behavior; document or records searches reveal he has many unpaid bills or a false birth or marriage certificate. Other witnesses and records depict the individual and his actions as entirely normal and legal. The GS-11 investigator must have the resourcefulness and initiative to continue to develop information on such issues through further factfinding until he has enough evidence to support a legal or administrative decision within criteria established by applicable laws, rules or regulations.

2. The subject of a GS-11 investigation normally involves the degree of complexity illustrated by one or more of the examples provided below:

   — A subject suspected of gambling, dope-pushing, counterfeiting or similar illegal activity who operates independently or on the fringe of organized crime. The complexity and scope of the subject's activity are indicated by the fact that he owns and operates his own manufacturing, distribution and transportation facilities, and performs all the activities in question alone or with only one or two occasional helpers.

   — A partnership or closed corporation, or an enterprise of similar scope and complexity with a record-keeping system that facilitates concealing the diversion of goods or material. Such organizations are examined periodically for compliance with, for example, legislation controlling the use, sale, or possession of narcotics, alcohol, weapons, or explosives.

   — An applicant for or recipient of Federal benefits, license, or employment with a questionable background, e.g., charges or documentary evidence of a narcotics, fraudu-

lent, subversive or other nature that could be disqualifying.

3. Several separate investigative matters normally grow from the typical GS-11 investigative assignment, for example:

— Normally the GS-9 investigator closes the case, e.g., through arrest or report, on the user or pusher of illegal goods, fraudulent documents, or forged checks. In comparison, at the GS-11 level, typically the investigator independently develops the case more extensively through further interrogation, documentary search, surveillance, etc., with the objective of reaching a larger seller, distributor, or other indirectly related participants.

— The GS-11 investigator normally develops evidence, e.g., statements or conflicting data in documents that the subject has questionable associates, habits, or behavior patterns that, in the investigator's judgment, must be resolved through additional questions, witnesses, or documentary research before the case assignment can be considered closed.

4. The nature of assignments at the GS-11 level requires considerable skill in establishing the interrelationship of facts or evidence, for example:

— Cases at this level typically involve development of facts or resolution of facts in the face of denials. For example, the subject of an investigation denies his association with a building that is used to store or manufacture illegal goods, and witnesses who have information on the matter are unavailable or remain silent.

— The GS-11 investigator uncovers the fact, through interviews with check signers and records searches at banks and utility companies, for example, that utility bills for the building are paid by the suspect although the checks are drawn on the account of a relative, friend or associate.

— The investigation initially discloses no obvious or tangible inconsistences; nevertheless the investigator notes such subtle reactions as speech hesitation or a troubled facial expression on the part of a witness. He probes deeper and finds that the subject's pattern includes a combina-

tion of, for example, many unpaid bills, excessive absenteeism from his job, and erratic behavior. All of these may be relevant to determining the subject's unsuitability for the employment, license, or benefit he is seeking or receiving.

5. GS-11 assignments involve the degree of sensitivity illustrated by the following:

   — The subject of an investigation is sufficiently prominent to create the potential for local publicity that could cause embarrassment to the agency and consternation in the community by casting suspicion on an otherwise respected individual.

   — The success of the investigation of illegal activities depends on not disclosing the fact of the investigation. Such disclosure would shut off the possibility of getting leads that are essential to establishing the violation.

6. GS-11 investigative assignments involve the degree of jurisdictional problems illustrated by the following example:

   — An investigation of suspected drug violations develops evidence, e.g., through statements of witnesses, or observation of the suspect's behavior and associates, that the suspect is also involved in subversive activities that are the concern of another Federal agency. This calls for close coordination between the agencies concerned, and requires the GS-11 investigator to apply a good knowledge of how his agency's investigations' program ties in with that of other programs, to exchange information effectively or otherwise cooperate in advancing investigations under other jurisdictions. Similarly, many situations, e.g., drug or weapons traffic, are Federal, State, and local violations and require the same degree of knowledge of and cooperation with State and local agencies.

Assignments at this level that involve undercover and surveillance work are more dangerous and extensive than undercover or surveillance assignments at the GS-9 level. At the GS-11 level, undercover assignments involve, for example, posing as a buyer of illegal goods, e.g., drugs, alcohol, guns, or counterfeit money, that will be used as evidence. This requires establishing a cover

story and acquiring enough skill to pass as a person trained in a particular occupation, e.g., a truck driver. Discovery in situations characteristic of the GS-11 level could result in expulsion from the group, or abusive treatment.

Surveillance work at the GS-9 level involves, usually, manning one fixed post at a time and watching and reporting on one or two suspects. GS-11 surveillance assignments, by comparison, require observing the characteristics, habits and movements of a suspect and his associates over a period of time and at a number of locations in order to link all the persons involved in a suspected illegal activity.

While protection duties at the GS-9 level normally involve manning a fixed post at a point removed from the principal or his route, GS-11 protection assignments typically involve participation in advance surveys for visits to, for example, small towns. This typically involves orienting local law enforcement officers, interviewing hotel employees, and collaborating in planning routes of travel for the person to be protected.

*Level of responsibility*

The GS-11 investigator either receives assignments from his superiors or initiates them himself, e.g., from informant tips or leads on cases he is investigating. In the latter situation, he receives authorization from his superiors and some instructions on how to develop the case.

The GS-11 investigator is expected to develop and follow leads, e.g., moving from the suspect or subject to his associates, acquaintances, neighbors and fellow workers, without periodic supervisory guidance. If additional manpower is needed, e.g., for surveillances, extensive records checks, etc., the GS-11 investigator makes those arrangements through his superiors.

New points of law or regulations are explained to the GS-11 investigator. His completed work is reviewed for overall adequacy, accuracy, completeness, and accomplishment of objectives.

Investigators at the GS-11 level use more initiative and resourcefulness than at the GS-9 level. Because of conflicts in statements from witnesses, the GS-11 investigator develops more information to resolve the conflicts. The GS-11 investigator, moreover, must use more ingenuity to find witnesses who will

admit to knowing the subject or suspect; and often when he finds them, they are more likely to be reluctant to talk because they dislike becoming involved, identify all investigators—including those involved in civil matters—as law enforcement officers, and are suspicious of law enforcement personnel.

Similarly, the records examined by the GS-9 investigator are generally available and reliable, e.g., dates of birth, amounts of money, family members, and business transactions check out against each other. Records examined by the GS-11 investigator are harder to find, so that the investigator must have the initiative and resourcefulness to reconstruct information from other sources, e.g., interviews with family members, employment agencies, classmates, etc., despite lack of cooperation from such individuals and organizations.

GS-1810-12/1811-12 **Investigator GS-12** GS-1810-12/1811-12

**Criminal Investigator GS-12**

*Complexity of assignments*

Grade GS-12 is distinguished from grade GS-11 primarily in: (1) the difficulty of working with fragmentary or cold evidence; (2) the difficulty or complexity imposed by the prominence or characteristics of the subjects investigated; (3) the substantial number of separate investigative matters that grow from original assignments; (4) the high degree of skill required to establish the interrelationships of fact and evidence; (5) the high degree of sensitivity that assigned cases involve; (6) the significant jurisdictional problems characteristic of assigned cases. For classification to the GS-12 level, a position should substantially meet most or all of the characteristics illustrated in the following paragraphs:

1. GS-12 level involves the degree of difficulty in obtaining, working with, and discretely handling facts or evidence as illustrated by the following:
   - When several principals are involved in the investigation, suspicion of their relationship is aroused initially more by circumstantial evidence, e.g., word of mouth, tips, observations, than by directly verifiable evidence, e.g., paid bills, licenses, testimony, passports. Improper development and conduct of the investigation could cause significant repercussions, e.g., bring about public embar-

rassment of the several principals, or the agency head, or discredit the agency investigative program.

2. The subjects of the investigations conducted at the GS-12 level normally have the characteristics or prominence of one or more of the following illustrations which substantially increases the difficulty and/or complexity of the case over the typical GS-11 case assignment:
   - A suspected or known racketeer, gambler, smuggler, etc., who is known through his associates, behavior, or background as a prominent figure in organized crime or subversion. This is distinguished from grade GS-11, where investigations center on persons who are underlings or operate on the fringes of organized crime, for example.
   - The principal or financial backer in an organization consisting of separate manufacturers, distributors and transporters of illegal goods, drugs, alcohol, counterfeit money, fraudulent documents, explosives, or weapons. Normally the separate parties do not know each other or the overall backer. This is distinguished from the GS-11 level, where investigations center on subjects who usually perform their own manufacturing, distributing, and transporting with the occasional help of one or two others.
   - A figure with financial interests overlapping several activities both legal and illegal, e.g., financial interests in a legitimate concern that are diverted and used to finance illegal activities.
   - The head of an organization involved in legitimate business, e.g., international commerce, an agency for employment of foreign domestics or servants, etc., who is suspected of fraudulent use of invoices, operating fraudulent marriage rings, etc. The activities are carried out under the cover of his legitimate organization, and the suspected violation requires assistance from several accomplices, e.g., attorneys or accountants who are themselves in positions of public trust.

3. The extent that separate investigative matters grow from the original GS-12 assignment is reflected in the following illustration:
   - The investigation begins with the pusher or passer of stolen or illegal goods, e.g., drugs, alcohol, counterfeit