money, or fraudulent documents. Then, by piecing together bits of evidence from interviews, surveillances, documentary examinations, informants, etc., the investigator proceeds through the intermediate distributor, and eventually involves the manufacturer, backer, organizer, importer, etc. This is distinguished from the grade GS-11 investigator who begins with investigation of a first-line pusher or passer and works independently as far as, for example, a secondary pusher or distributor.

4. The degree of difficulty involved in establishing the relationships of facts or evidence at the GS-12 level is illustrated in the following examples:

— The subject, who is suspected of engaging in major and complex criminal activities, is separated from the overt violation by a middleman or organization. This causes the investigator to use such techniques as surveillance, radio communication, toll-call checks, foot and tire imprints, trade or mold marks and other evidence such as scientific matching of soil, hair, and paint specimens to establish a direct link between the suspect and other violators. This differs from the GS-11 assignment that involves the use of similar techniques in less complex situations, e.g., the principal under investigation at grade GS-11 is more clearly and directly involved in criminal activities, e.g., he is observed at the scene of a crime or is seen associating with those against whom direct evidence is available. Thus, at grade GS-12, direct relationships are more difficult to establish.

— Ferreting out legal or administratively defensible testimony requires such techniques as, for example, pitting one violator, criminal, or witness against another or extensively checking the word of one against another, which imposes a need to verify and evaluate information with extreme care. The GS-12 level calls for more careful judgment and expert skill than the GS-11 about such aspects of investigative work as civil rights, invasion of privacy, entrapment, etc., in establishing facts and evidence because of the prominence of the subject or the importance of the case.

5. Investigative assignments at the GS-12 level involve the degree of sensitivity illustrated by the following examples:
   - The subject is so prominent that, after the first witness is interviewed, word of the interview precedes the investigator with the result that subsequent witnesses are evasive because of reluctance to or fear of becoming involved in giving information which witnesses view as having possibilities of exploding into an important Federal case.
   - The subject and his peers are very often the subject of major news media and, therefore, any investigation is likely to result in publicity that would to some degree cast suspicion on the reputation of the subject, or prejudice the investigator's case in court, or complicate subsequent administrative decisions.
6. Investigative assignments at the GS-12 level involve the degree of jurisdictional problems illustrated by the following examples:
   - The subjects are engaged in activities that are the concern of several local, county, State, and Federal agencies, e.g., drug use, traffic and smuggling, forgery, alleged subversion, etc. This involves a web of relationships that requires a more extensive knowledge of the laws, rules, policies, and practices of each of these jurisdictions than GS-11 cases typically involve because, for example, the GS-12 investigator often plans and times raids and surveillances that involve use of local law enforcement agencies. Although such raids and surveillances are often coordinated through the GS-12 investigator's superiors (because of the manpower and equipment involved), the GS-12 investigator must be very knowledgeable to plan, time, and schedule such activities properly.

Undercover and surveillance assignments at the GS-12 level are much riskier and more difficult than assignments of those types at the GS-11 level. Undercover work at the GS-11 level, for example, involves a less complex cover story, e.g., posing as a truck driver without extensive identification papers, false name and history, etc. The GS-11 investigator penetrates loosely-knit groups, and discovery of his identity and purpose could result in expulsion or injury. At the GS-12 level, by comparison, under-



355-561 O - 82 - pt. 6 --- 5

cover work involves a more elaborate cover story, e.g., posing as a member of a skilled trade with a false name, complete identification papers such as social security card and union membership, and a carefully worked out personal history that would withstand investigation by the group penetrated. At the GS-12 level the investigator works his way into closely-knit, highly suspicious groups; and discovery could result in very serious injury or death.

Surveillance work at the GS-11 level involves observing a subject and his associates over a period of time in order to link all the persons involved in suspected illegal activities. Because GS-12 cases are more complex and wider in scope than those assigned at grade GS-11, surveillance work at the GS-12 level is more complex and wider in scope. For example, the GS-12 investigator plans and directs surveillance work that involves several investigators in separate places engaged in round-the-clock observation of various groups of suspects, all of whom are thought to be involved in related illegal activities. The GS-12 investigator makes such decisions as which suspects to follow when groups divide, which house or apartment of several to observe, and when to call off the surveillance.

*Level of responsibility*

The GS-12 investigator, like the GS-11 investigator, receives or generates his own case assignments. The GS-12 investigator receives few instructions on technical aspects of the work, but is given mostly policy guidance, e.g., information on understandings of jurisdictional problems being worked out among agencies, or the fact that this is one of the first of a particular type of case since a new court decision, or authorization to follow a case into another district or region, if necessary. Completed work is reviewed for accomplishment of overall objectives and adherence to policy.

The GS-12 investigator plans his case independently, working out arrangements with other jurisdictions, e.g., Federal, State and local as required, except in policy areas. For example, in setting up a joint raid involving Federal and local law enforcement agents, the GS-12 investigator is responsible for the planning and timing, but in coordinating the commitment of resources and manpower he must, of course, work through his superiors.

*Complexity of assignments*

Grade GS-13 is distinguished from grade GS-12 primarily in: (1) the extreme complexity and scope of assigned cases; (2) the interrelated activities that the subjects under investigation are involved in; (3) the wide number of separate investigative matters that grow from the original assignments; (4) the exceptional difficulty encountered in establishing the interrelationships of fact or evidence; (5) the extreme sensitivity of matters involved in assigned cases; (6) the extensive and critical jurisdictional problems involved in completing investigations. For classification to the grade GS-13 level, a position should substantially meet the characteristics illustrated by most or all of the following paragraphs:

1. The GS-13 level involves the extreme complexity and scope of assignments illustrated in one or more of the following paragraphs:

   — Assignments involve investigations of legal or illegal organizations that are very complex in structure with a large number of primary and subsidiary activities, e. g., several principals of organized crime or subversive groups that are officially recognized in law enforcement as national threats to the peace and stability of the nation. Investigations are of major interregional dimensions or are nationwide in origin or coverage with occasional international implications. There are typically indications of actual or potential threats or challenges to major segments of the national welfare or security. The results, effects, or consequences of investigations at the GS-13 level, to a major degree, constitute deterrents to crimes or violations, and may often influence changes in laws or future court actions.

   — The GS-13 investigator must piece together evidence that comes to him from other investigators stationed throughout several States or the nation. From this evidence he must recognize the suspect's pattern of operation in order to anticipate or even influence events as they unfold by instructing separate investigators or units of investigators working on segments of the case. This complicates the case because the investigator must at the

same time avoid entrapment of the suspects, as at lower levels, but at grade GS-13 the suspects are more prominent and numerous and engage in more complex and serious activities. Similarly, the grade GS-13 investigator must be more aware of the implications of precedent court decisions over a broader area, i.e., in more judicial and law enforcement jurisdictions.

2. The subjects of cases at the GS-13 level are involved in the range and variety of interrelated activities that are reflected in one or more of the following paragraphs:

— The subject is suspected of being a foreign agent who, with several associates, is planning acts extremely harmful to national security, e.g., theft of national defense documents for benefit of another government, or compromise of persons who have access to highly classified information concerning national defense.

— The organization under investigation has an extremely complex structure with diversified interests, e.g., the manufacture, distribution and sale of legal or illegal goods in a national market involving a complex network of widespread distribution and sales outlets.

3. In GS-13 level investigations, many separate investigative matters of great scope and complexity grow from the original assignment, as illustrated in one or more of the following paragraphs:

— The suspected violators are highly organized crime groups whose criminal activities are interwoven with legitimate business activities. For example, seemingly respectable construction firms have ostensibly legal contracts with States, and there is suspicion of bribery of State officials or fraud. The investigator develops leads from known criminal activities; he finds these leads cross over to legitimate businesses, and finally cast suspicion on seemingly respected legitimate political, business, or professional leaders.

— GS-13 cases often unfold to involve large-scale raids and seizures throughout several States. This normally requires the GS-13 investigator to lead and coordinate several units of investigators from his own and other agencies in tracing leads and gathering information.

4. The interrelationship of fact and evidence is extremely difficult to establish in grade GS-13 assignments, as illustrated by the following:
   — Subjects use fictitious names or are otherwise clearly separated from each other and from the illegal activities under investigation. They deal exclusively through subsidiaries and holding companies that engage in diversified mixtures of legal and illegal activities throughout wide sections of the country, e.g., several States.
   — The work of other investigators or teams of investigators that grade GS-13 investigators coordinate involves segments of the case that fully equate to cases described at the GS-12 level of difficulty.
5. Investigative assignments at the GS-13 level typically involve matters of extreme sensitivity, i.e., equivalent to one or more of the following illustrations:
   — The investigation would receive sustained and widespread coverage in the major news media because of the prominence of the suspects or victims of the crime or threat if the investigation became public knowledge prematurely. The investigator must be extremely tactful and circumspect. Premature news coverage could, for example, severely hamper the speed of the investigators' progress and endanger lives of victims.
   — The suspects' financial involvements extend to enterprises that have a significant impact on the national economy, e.g., the transportation or banking industries.
   — The suspects are principals in financial or other enterprises that reach into State and Federal affairs, e.g., through attempted bribery, fraud, collusion, or extortion of public officials.
6. Investigations at the GS-13 level involve extremely difficult planning and coordination problems because of extensive jurisdictional problems involving other Federal, State, county, and local agencies, for example:
   — Evidence may warn the GS-13 investigator that certain of his contacts in other jurisdictions are themselves involved in wide-scale criminal conspiracies, which requires the investigator to use such suspects in double or triple capacities, e.g., in getting and exchanging informa-

tion without permitting such suspects to realize how they are being used.

In duties such as undercover, surveillance, and protection assignments at the GS-13 level, the investigator serves as a key person or coordinator in work involving extremely complex, delicate or dangerous elements. Undercover work, for example, requires penetration of close-knit groups over extended periods of time as at the GS-12 level. As compared with grade GS-12, however, in GS-13 undercover work the investigator serves as a key person on assignments having most or all of the characteristics discussed above. Discovery of such a key figure to the case while on undercover assignment could result not only in great injury or death to the investigator, but cut off information linking the evidence together and thus jeopardize or destroy a critical case that the Federal Government has been developing for months or years, involving a network of State, local, and other Federal agents and informers.

Protection assignments at the GS-13 level involve leading and coordinating advance security surveys for the protection of principals who, because of their kind or level of position, are, for example, vital to the continuity of Government, and the national security, thus, receive this kind of advance protection before traveling or making public appearances. Such assignments require consulting in a lead capacity with high-ranking State, city, town and county officials, business and professional people, and officials of foreign governments. The GS-13 investigator, as a key person and team leader, has full responsibility for directing surveys and investigations for judging how and when to take decisive and immediate action on all factors that are vital to the protection of the principals, and for coordinating the operations of large police, military and other details. GS-12 investigators performing protection assignments would usually serve as team members in the context of this illustration; the GS-12 investigator may, however, be a team leader in a different setting.

*Level of responsibility*

GS-13 investigators receive assignments through program discussions, e.g., conferences, or written directives that outline broad objectives, e.g., to stop smuggling of a particular commodity at a given port. After making a preliminary study of the assignment,

the GS-13 investigator outlines the objectives and boundaries as he sees them, plans the resources he needs, and includes his plans for assuring coordination with other jurisdictions.

The GS-13 investigator receives more generalized instructions than the GS-12 investigator. Review of grade GS-13 work typically is in the form of discussions at certain critical points, e.g., the GS-13 investigator suggests commitment of resources in other domestic or foreign offices, and such suggestions are normally approved.

The recommendations made by the GS-13 investigator for extension, modification, or adoption of new lines of inquiry are normally accepted by his superiors, although his cases are typically so important and sensitive that his plans must be cleared by the very highest officials in his agency. This is similar to the way the GS-12 investigator works, but since cases at the GS-13 level are so much more complex, critical, and sensitive than those at grade GS-12, unexpected problems indicating new lines of inquiry are much more common at the GS-13 level.

Methods, techniques, and approaches to problems devised by the GS-13 investigator often set patterns for subsequent investigations in similar areas and often are adopted for use by investigators in lower grades. Investigations at the GS-13 level are planned and executed for the greatest possible deterrent impact. Thus, the GS-13 investigator is responsible for devising breakthroughs in investigative approaches, techniques, and policies, as well as for completing assigned cases.

An extremely high degree of originality and initiative is required of the GS-13 investigator because investigations involve inquiry into activities occurring in various locations throughout a wide area, e.g., several States; suspected violators typically retain the best legal or accounting advice available; and investigations assigned often establish important precedents. For example, GS-13 assignments may often be the first of a particular type of case to be investigated under a new provision of law, and the outcome may affect pending cases or influence the decision on such cases in the future.

# Inspector General's Semiannual Report to the Congress Number 28

OFFICE OF INSPECTOR GENERAL

DEPARTMENT OF HOUSING & URBAN DEVELOPMENT

HUD-OIG 2422

Department of Housing and Urban Development For the Period Ending September 30, 1992

## INSPECTOR GENERAL'S MESSAGE TO THE CONGRESS

This is our 28th Semiannual Report to the Congress. Secretary Kemp and his management team are to be commended for their aggressive actions to manage the Department's programs in the wake of the HUD scandals and to institute processes for correcting many of the problems that for years have seemed insurmountable. Yet my message today is similar to that of my predecessors with regard to the need for resources and oversight. In our first report to Congress in early June 1979, the Inspector General said:

> "Many problems, however, have plagued HUD over the years....The most serious of these problems has been insufficient program monitoring due to the low level of staff available in HUD for monitoring....Inadequate monitoring and insufficient on-site reviews of program participants have seriously jeopardized HUD's interests and permitted waste and mismanagement to go unchecked...."

Conditions at HUD 13 years later, however, are further compounded by tremendous growth in many of HUD's more vulnerable programs, by the enactment of many new programs, by the need to clean up after an unprecedented scandal, and by the loss of staff resources in terms of numbers and experience.

HUD is one of the largest financial institutions in the United States. At the same time, it has a mandate to provide decent, safe, and sanitary housing for lower-income families. With insured loans and guarantees exceeding three-quarters of a trillion dollars, with housing subsidies serving over 4 million families, and with grants to virtually every state and city in the country, HUD's programs are both diverse and far-reaching. Unfortunately, staffing constraints and the organizational environment (inadequate data systems and management controls) have adversely impacted on HUD's ability to keep pace with the technology, information, and monitoring requirements necessary to run a large business effectively.

After years of inattention, much-needed emphasis is now being placed on upgrading and integrating data systems, and instilling management controls and accountability. Secretary Kemp and his management team deserve high marks for these efforts since they lay the foundation for improved management. However, until systems are fully integrated, sound management controls are in place throughout the Department, and decisions based on risk analyses are routine ways of doing business, HUD desperately needs resources to implement needed changes and to carry out its mission.

The Congress continued to play an active role this period by holding four oversight hearings, one on HUD's systemic weaknesses in data systems, staffing, and internal controls with specific reference to multifamily loan servicing, and three on public housing agencies. These hearings provided an opportunity to discuss the complex issues and recommendations for improvement as seen from the perspective of this Office, HUD management and interest groups.

We urge Congress to continue its oversight of HUD and to ensure that sufficient resources are appropriated to avoid a repeat of the problems of the 1980's. In this regard, it is extremely troubling to us that the recently enacted Fiscal Year 1993 housing authorization bill continued the pattern of proposing new programs and functions for HUD staff without any authorization of the resources to carry out these new responsibilities. Although the Department understated its resource needs,

## CHAPTER 1000 -- ORGANIZATION: OFFICE OF INSPECTOR GENERAL

### SECTION 1. GENERAL

1-1. PURPOSE. This chapter provides all Office of Inspector General (OIG) personnel with an understanding of the principal duties and responsibilities of the OIG. Further details regarding the authority, functions and procedures of the OIG are contained in various OIG Manual Chapters and HUD handbooks.

1-2. BACKGROUND. The OIG was administratively established by the Secretary of the Department of Housing and Urban Development (HUD) on January 29, 1972. The Inspector General Act of 1978, Public Law 95-452, effective October 1, 1978, provided for the statutory establishment of the HUD-OIG.

* The Inspector General Act Amendments of 1988, Public Law 100-504, which became effective on October 18, 1988, enhanced the authorities provided by the Act of 1978, established IG offices in several additional departments and agencies, provided oath administration authority, and provided for a separate appropriations account for each IG office. *

1-3. ROLE OF IG AND DEPUTY IG. The Inspector General heads an independent * and objective organization responsible for audit, investigation, program integrity, and designated security services relating to programs and * operations of the Department. The Inspector General provides leadership and coordination and recommends policies for activities designed to promote economy, efficiency and effectiveness in the administration of programs and operations, as well as to prevent and detect fraud and abuse in such programs and operations. The Inspector General is the principal advisor to the Secretary on the above matters and is responsible for keeping the Secretary and Congress fully and currently informed about problems and deficiencies relating to the administration of the Department's programs and operations and the necessity for, and progress of, corrective action.

The Deputy Inspector General is responsible for assisting the Inspector General in the performance of his or her duties and responsibilities. The Deputy assists the Inspector General and serves as the Acting Inspector General in the absence of the Inspector General.

1-4. ORGANIZATION. The OIG has a Headquarters Office in Washington, D.C., and also has offices in each of the 10 HUD Regions. The Headquarters and Regional organizations consist of the following staff elements.

a. Headquarters. There are three staff elements in the Headquarters organization, each of which is headed by an Assistant Inspector General. They are:

(1) Office of Audit

(2) Office of Investigation

(3) Office of Management and Policy *

b. Regional. In the Field, audit and investigation activities are conducted by OIG personnel stationed at Regional Offices and selected Field Offices. The audit and investigation staffs are * headed by Regional Inspectors General (RIG's), who report directly to their counterpart Assistant Inspector General.

SECTION 2. OFFICE OF AUDIT

2-1. RESPONSIBILITIES. The Office of Audit, headed by an Assistant Inspector General, is responsible for the development and implementation of the Department's audit activities. It is responsible for planning and conducting audits of: (a) Headquarters, Regional and Field Office activities; (b) programs and projects; and (c) contractors and other external activities. It is also responsible for developing criteria for the use and acceptance of audit work done by State and local audit agencies and by Independent Public Accounting (IA) firms hired by recipients of HUD financial assistance and for the appropriate monitoring of such work.

The responsibilities of the Office of Audit are discharged through surveys; internal and external audits; monitoring, reviewing and accepting non-Federal audit reports; liaison with the General Accounting Office; audits conducted in compliance with Office of Management and Budget (OMB) Circular A-128, "Single Audit Act"; and other special surveys conducted for the purpose of seeking out indicators of fraud and program abuse. Based on the problems found, the Office of Audit recommends corrective action to be taken concerning problems, abuses and deficiencies which may be impeding program administration and reports on the progress made by HUD officials in implementing such corrective action. The Office is also responsible for implementing the Audit portion of the OIG Strategic Plan.

2-2. AUDIT OPERATIONS DIVISION. The Audit Operations Division is headed by the Deputy Assistant Inspector General for Audit Operations. The Deputy Assistant Inspector General assists the Assistant Inspector General when both are on duty and serves as Acting Assistant Inspector General as appropriate. The Audit Operations Division is responsible for:

Office, Federal, State, and local government audit organizations and intergovernmental audit forums.

## SECTION 3. OFFICE OF INVESTIGATION

3-1. RESPONSIBILITIES. The Office of Investigation, headed by an Assistant Inspector General, is responsible for the development and implementation of the Department's investigation and security activities. These activities are performed by personnel physically located at HUD Headquarters and in Field Offices. The Office initiates investigations of possible violations of laws or regulations in the administration of HUD programs and activities or misconduct on the part of HUD employees. These include investigations of possible criminal violations for prosecution by the Department of Justice and investigations of program irregularities for civil and/or administrative actions by HUD. Personnel security investigations are initiated, in conjunction with the Office of Personnel Management, to determine the suitability, integrity, and loyalty of employees or prospective employees. Protective services for the Secretary are performed by Headquarters employees. The Office is also responsible for implementing the Investigation portion of the OIG Strategic Plan.

3-2. DEPUTY ASSISTANT INSPECTOR GENERAL FOR INVESTIGATION. The Deputy Assistant Inspector General for Investigation reports directly to the Assistant Inspector General for Investigation and is responsible for the management of the Headquarters Operations Division, the Field Operations Division, and the 10 Offices of the Regional Inspectors General for Investigation. The Deputy Assistant Inspector General assists the Assistant Inspector General when both are on duty and serves as Acting Assistant Inspector General in the absence of the Assistant Inspector General.

3-3. FIELD OPERATIONS DIVISION. The Field Operations Division, headed by a Director is responsible for: *

a. Policy.

(1) Developing and implementing policies, guidelines and procedures for investigations in conformance with Federal laws, Executive Orders, court decisions, legal opinions of the Department of Justice, and professional standards.

(2) Developing new or revising existing investigation programs to allow the Department to effectively carry out its mission and meet national policy objectives.

(3) Analyzing investigation Field operations to ensure that policies, procedures, or guidelines governing the management and conduct of investigations are implemented.

b. Investigation.

(1) Coordinating with the appropriate United States Attorney, the FBI or other Federal enforcement agencies, information of alleged or proven criminal violations by persons or companies engaged in the Department's programs.

(2) Conducting investigations of alleged violations of laws or regulations in the administration of the Department's programs.

(3) Writing reports about the results of all investigations.

c. Technical Assistance.

(1) Providing guidance and direction to the Field investigative staffs to ensure that investigations are carried out in accordance with established policies, procedures and guidelines.

(2) Providing advice to and keeping the Inspector General and appropriate HUD officials informed of the results of ongoing investigation matters.

(3) Recommending procedures to Departmental officials for the use of information developed through investigation of Field operations and alerting HUD management to matters that are in need of their attention. Providing such other investigation-related assistance as may be required by the Inspector General, Secretary or other top HUD officials to support their decisions or policies.

(4) Initiating and directing Field liaison activities with the Department of Justice on all criminal matters involving HUD programs and on audit, investigation and security matters originated by the OIG and referred to Justice.

(5) Controlling the use and dissemination of reports, files and information developed by the Office of Investigation Field Offices, as well as similar information developed or furnished by other investigative agencies, e.g., FBI, Office of Personnel Management, and other Federal agencies.

(6) Making recommendations to the Headquarters Operations Division for the release or denial of investigation records information, developed through Field operations, in response to requests filed in accordance with the Freedom of Information or Privacy Acts.

## SECTION 4. OFFICE OF MANAGEMENT AND POLICY

**4-1.** RESPONSIBILITIES. The Office of Management and Policy (OMAP), headed by an Assistant Inspector General, is responsible for serving as the focal point for the Department's efforts to minimize the opportunities for and occurrences of fraud, waste, and abuse in HUD programs, activities and functions. The Office serves as a base for identifying management or internal controls best suited for detecting and preventing fraud in Departmental programs and functions as well as providing technical assistance and advice to program officials on the implementation of OMB Circular A-123, "Internal Control Systems," and compliance with the Federal Managers' Financial Integrity Act of 1982. The Office provides liaison with HUD and other government agencies on program integrity matters, serving as the Inspector General's representative on the Secretary's Committee on Program Integrity. *

In addition, the Office supports the policy and management operations of the OIG; provides an awareness of OIG activities to internal and external groups by researching and writing a variety of publications; facilitates policies and procedures on the development of internal operating standards and other documents; provides oversight of OIG legislative and regulatory proposals; serves as the principal base for OIG-ADP system operations; and provides a variety of budget and general administrative support to OIG staff. The Office is also responsible for implementing the OMAP portion of the OIG Strategic Plan. *

* 4-2. PROGRAM INTEGRITY DIVISION. The Program Integrity Division, headed by a Director, provides leadership and coordination and recommends policies for activities designed to prevent and detect fraud and abuse in Departmental programs and operations, and identifies trends, patterns, and deficiencies in HUD programs and operations. Specifically, the Division is responsible for: *

* a. Prevention Activities. *

(1) Reviewing and analyzing Departmental programs, activities, or functions to identify and isolate those areas considered sensitive to fraud and abuse.

(2) Providing leadership, and coordinating and participating in a Departmental committee and other Departmental activities dealing with fraud detection and prevention activities including planning, monitoring and resource requirements.

(3) Disseminating information concerning fraud detection and prevention to appropriate disciplines within HUD and coordinating implementation of the techniques by appropriate staff including auditors, investigators and program evaluation groups.

OIGM Chapter 1000
APPENDIX 1

# Office of Inspector General

Department of Housing and Urban Development






January 1991

HUD-OIG 3157

## OIG Full-Time Permanant (FY 1988-1994 Actual Data)

Source: OIG President Budget (PB) Justifications

| Source: FY PB | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|---|
| FY Actual Data | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 |
| OA | 337 | 340 | 326 | 380 | 361 | 357 | 312 |
| Hq | 41 | 35 | 35 | 44 | 40 | 45 | 50 |
| Field | 296 | 305 | 291 | 336 | 321 | 312 | 262 |
| OI | 103 | 101 | 104 | 116 | 131 | 124 | 126 |
| Hq | 21 | 19 | 20 | 22 | 23 | 25 | 18 |
| Field | 82 | 82 | 84 | 94 | 108 | 99 | 108 |
| Oth | 43 | 50 | 49 | 61 | 61 | 55 | 47 |
| TOTAL | 483 | 491 | 479 | 557 | 553 | 536 | 485 |
| Hq | 105 | 104 | 104 | 127 | 131 | 125 | 115 |
| Field | 378 | 387 | 375 | 430 | 422 | 411 | 370 |

HUD-OIG 3050

U.S. Department of Housing
and Urban Development

1989-1990

# Programs of HUD



United States. Programs of HUD.



The United States Congress has mandated the Department of Housing and Urban Development to create conditions for every family to have decent and affordable housing, to ensure equal housing opportunity for all, and to strengthen and enrich our Nation's communities. This publication describes the Department's programs and activities that enable the American people to have the support and assistance they are entitled to under the law.

When President Bush asked me to serve as HUD Secretary, we agreed that we must restore to Americans what he calls "the opportunity society." As he has said often, this means "giving people — working people, poor people, all our citizens — control over their own lives." Together we identified six priorities that are essential to revitalizing the American Dream for those who have been left behind:

- Expand Homeownership and Affordable Housing Opportunities
- Create Jobs and Economic Development through Enterprise Zones
- Empower the Poor through Resident Management and Homesteading
- Enforce Fair Housing for All
- Help Make Public Housing Drug Free
- Help End the Tragedy of Homelessness

If we can meet the challenges these six priorities present, we will go a long way in empowering the most needy people in our society to participate in democracy, in economic choice, in opportunity, and in taking control of their own lives.

Under my stewardship of the Department, we are doing everything possible to assure that people have the opportunity to reach their full potential. Using our programs as fully and effectively as possible, we want to give people the chance to live in housing of their choice and to raise their children in communities that feed the mind and free the spirit — in communities that offer jobs and opportunity and hope.

Jack Kemp

Jack Kemp
Secretary
U.S. Department of Housing and Urban Development

LIBRARY OF CONGRESS 4 JAN - 9 1990 COPY EXCHANGE & GIFT DIVISION

HT167
.2
U53f
1989/90

# Contents


6 **Community Planning and Development**
7 Community Development Block Grants (Entitlement)
9 Community Development Block Grants (Non-Entitlement) for States and Small Cities
11 Community Development Block Grants (Section 108 Loan Guarantee)
12 Secretary's Discretionary Fund
13 Urban Development Action Grants (UDAGs)
15 Rental Rehabilitation
17 Rehabilitation Loans (Section 312)
18 Urban Homesteading
20 Emergency Shelter Grants Program
21 Enterprise Zone Development
23 Solar Energy and Energy Conservation Bank
24 Supportive Housing Demonstration Program — Transitional Housing Component
25 Supportive Housing Demonstration Program — Permanent Housing Component
27 Supplemental Assistance for Facilities to Assist the Homeless (SAFAH)

28 **Housing**
30 One- to Four-Family Home Mortgage Insurance (Section 203)
31 Homeownership Assistance for Low- and Moderate-Income Families (Section 221(d)(2))
32 Housing in Declining Neighborhoods (Section 223(e))
33 Special Credit Risks (Section 237)
34 Condominium Housing (Section 234)
35 Cooperative Housing (Section 213)
36 Manufactured Homes (Title I)
37 Manufactured Home Parks (Section 207)
38 Multifamily Rental Housing (Section 207)
39 Existing Multifamily Rental Housing (Section 223(f))
40 Multifamily Rental Housing for Moderate-Income Families (Section 221(d)(3) and (4))
41 Assistance to Nonprofit Sponsors of Low- and Moderate-Income Housing (Section 106)
42 Rent Supplements
43 Lower-Income Rental Assistance (Section 8)
44 Section 8 Existing Housing Voucher Program

45 Section 8 Existing Housing Certificate Program (Finders-Keepers)
46 Section 8 Moderate Rehabilitation Program
47 Direct Loans for Housing for the Elderly or Handicapped (Section 202)
48 Mortgage Insurance for Housing for the Elderly (Section 231)
49 Mortgage and Major Home Improvement Loan Insurance for Urban Renewal Areas (Section 220)
50 Housing Development Grants
52 Nursing Homes, Intermediate Care Facilities, and Board and Care Homes (Section 232)
53 Hospitals (Section 242)
54 Group Practice Medical Facilities (Title XI)
55 Congregate Housing Services
56 Property Improvement Loan Insurance (Title I)
57 Rehabilitation Mortgage Insurance (Section 203(k))
58 Supplemental Loans for Multifamily Projects and Health Care Facilities (Section 241)
59 Single Family Home Mortgage Coinsurance (Section 244)
60 Multifamily Housing Coinsurance (Section 223(f) and Section 221(d))
61 Graduated Payment Mortgages (Section 245)
62 Adjustable Rate Mortgages (ARMs)
63 Land Development (Title X)
64 Housing in Military Impacted Areas (Section 238)
65 Homes for Service Members (Section 222)
66 Flexible Subsidy
67 Joint Venture for Affordable Housing (JVAH)
68 Counseling for Homebuyers, Homeowners, and Tenants
69 Interstate Land Sales Registration
70 Manufactured Home Construction and Safety Standards
71 Real Estate Settlement Procedures Act (RESPA)

**72 Public and Indian Housing**
73 Public Housing Development
74 Public Housing Operating Subsidy
75 Public Housing Modernization (Comprehensive Improvement Assistance Program)
76 Indian Housing

**77 Fair Housing and Equal Opportunity**
78 Fair Housing (Title VIII)





80 Fair Housing Assistance Program (FHAP) (State and Local Agencies Program)
81 Fair Housing Initiatives Program (FHIP)
82 Certification of Substantially Equivalent Agencies
83 Community Housing Resource Boards (CHRBs)
84 Equal Opportunity in HUD-Assisted Programs (Title VI)
86 Voluntary Compliance

**87 Policy Development and Research**
88 Policy Development and Research Initiatives
90 American Housing Survey
91 National Urban Policy Report to Congress

**92 Government National Mortgage Association (GNMA)**
93 GNMA Mortgage-Backed Securities
94 GNMA II Mortgage-Backed Securities

**95 Access to Housing for the Disabled**

**97 Independent Agencies Located at the Department**
98 Interagency Council on the Homeless
99 The Martin Luther King, Jr. Federal Holiday Commission

**100 Indexes**
101 Major Federal Legislation and Executive Orders Authorizing HUD Programs
107 Programs Generally Identified by Number
109 Financial Highlights of Major HUD Programs
113 HUD Regional and Field Offices

# Community Planning and Development


7 Community Development Block Grants (Entitlement)
9 Community Development Block Grants (Non-Entitlement) for States and Small Cities
11 Community Development Block Grants (Section 108 Loan Guarantee)
12 Secretary's Discretionary Fund
13 Urban Development Action Grants (UDAGs)
15 Rental Rehabilitation
17 Rehabilitation Loans (Section 312)
18 Urban Homesteading
20 Emergency Shelter Grants Program
21 Enterprise Zone Development
23 Solar Energy and Energy Conservation Bank
24 Supportive Housing Demonstration Program — Transitional Housing Component
25 Supportive Housing Demonstration Program — Permanent Housing Component
27 Supplemental Assistance for Facilities to Assist the Homeless (SAFAH)




## Community Development Block Grants (Entitlement)

Federal aid to promote sound community development.

**Nature of Program:** Provides annual Community Development Block Grants (CDBG) on a formula basis to entitled communities to carry out a wide range of community development activities directed toward neighborhood revitalization, economic development, and improved community facilities and services.

Entitlement communities develop their own programs and funding priorities and consult with local residents before making final decisions. All CDBG activities must benefit low- and moderate-income persons; or aid in the prevention or elimination of slums and blight; or address other community development needs that present a serious and immediate threat to the health or welfare of the community. Some of the activities that can be carried out with community development funds include the acquisition of real property; rehabilitation of residential and nonresidential properties; provision of public facilities and improvements, such as water and sewer, streets, and neighborhood centers; and assistance to profit-motivated business to help with economic development activities.

No less than 60 percent of the funds must be used for activities which benefit low- and moderate-income persons, over a period specified by grantee, but not to exceed three years.

**Grantee Eligibility:** Metropolitan cities and urban counties are entitled to receive annual grants. Metropolitan cities are central cities of Metropolitan Statistical Areas (MSAs) or other cities within MSAs which have populations of at least 50,000. Urban counties are within MSAs which are authorized to undertake community development and housing activities and meet certain population requirements.

**Funding Distribution:** From each year's appropriation, excluding the amounts provided for the UDAG program and the Secretary's Discretionary Fund, 70 percent is allocated to metropolitan cities and urban counties. The amount of each entitlement grant is determined by statutory formula which uses several objective measures of community need, including poverty, population, housing overcrowding, age of housing, and growth lag.

**Legal Authority:** Title I, Housing and Community Development Act of 1974 (42 U.S.C. 5301 et seq.).

**Administering Office:** Assistant Secretary for Community Planning and Development, Department of Housing and Urban Development, Washington, D.C. 20410-7000.

**Information Sources:** Local officials and HUD Field Offices.

**Current Status:** Active.

**Scope of Program:** Funds appropriated annually. In FY 89, about $2,053 billion are appropriated for allocation among 737 metropolitan cities and 121 urban counties.



## Community Development Block Grants (Non-Entitlement) for States and Small Cities

Federal aid to promote sound community development.

**Nature of Program:** Provides grants to carry out a wide range of community development activities directed toward neighborhood revitalization, economic development, and improved community facilities and services. Applicants must give maximum feasible priority to activities which will benefit low- and moderate-income families, or aid in the prevention or elimination of slums and blight. Funds may also be used to meet other community development needs that present a serious and immediate threat to the health or welfare of the community. No less than 60 percent of the funds must be used for activities which benefit low- and moderate-income persons over a period specified by the State, but not to exceed three years.

Under the 1981 amendments to the Community Development Block Grant (CDBG) legislation, each State has the option to administer the block grant funds provided for its non-entitlement areas.

If this option is exercised, the block grant funds are provided to the States which distribute them as grants to the eligible units of general local government. The States' objectives and methods of distributing the funds are determined in consultation with affected citizens and local elected officials. States are required to report annually on the use of funds.

If this option is not exercised, HUD continues as administrator and awards funds in a competition on the basis of selection criteria established by the Department. Only New York and Hawaii have not exercised their option.

Legislation establishing this program was enacted in 1974.

**Applicant Eligibility:** Fifty States and Puerto Rico are eligible to apply to distribute funds to non-entitlement units of government, generally under 50,000 in population, that are not metropolitan cities or part of an urban county.

**Funding Distribution:** From each year's CDBG appropriation, excluding the Secretary's Discretionary Fund, 30 percent is allocated to non-entitlement areas. This amount is then allocated among the States on a formula basis. Each State's allocation is distributed to units of general local government by either the State or HUD under the option described above.

**Legal Authority:** Title I, Housing and Community Development Act of 1974 (42 U.S.C. 5301 et seq.).

## Secretary's Discretionary Fund

**Nature of Program:** Provides Community Development Block Grants (CDBG) to special constituencies not eligible for Entitlement or Small City CDBG funds, and technical assistance awards to help implement the various programs authorized by Title I of the Housing and Community Development Act of 1974.

Legislation establishing this program was enacted in 1974.

**Program Eligibility:**

- *Community Development Block Grants for Insular Areas:* Guam, the Virgin Islands, American Samoa, the Northern Mariana Islands, Marshall Islands, Palau, and the Federated States of Micronesia.
- *Community Development Block Grants for Indian Tribes and Alaskan Native Villages:* Indian tribes and Alaskan native villages eligible under the Indian Self-Determination and Education Assistance Act or the State and Local Fiscal Assistance Act of 1972.
- *Technical Assistance:* States, units of general local government, Indian tribes, areawide planning organizations, and other qualified groups designated by, or assisting, one or more such governmental units.
- *Community Development Work-Study:* Colleges and universities, either directly or indirectly, or through areawide planning organizations or States for work-study programs for economically disadvantaged and minority students in fields related to community development.
- *Special Projects:* States and units of general local government.

**Funding Distribution:** The amount appropriated for the Secretary's Discretionary Fund is divided among the Indian tribes, Insular Areas, Technical Assistance Programs, and Special Project Programs.

**Legal Authority:** Section 107, Housing and Community Development Act of 1974 (42 U.S.C. 5307).

**Administering Office:** Assistant Secretary for Community Planning and Development, Department of Housing and Urban Development, Washington, D.C. 20410-7000.

**Information Source:** Office of Program Policy Development, Community Planning and Development, Department of Housing and Urban Development, Washington, D.C. 20410-7000.

**Current Status:** Active.

**Scope of Program:** Funds are appropriated annually. In FY 89, $27.0 million were allocated for Indian tribes, $6.0 million for Insular Areas, $10.75 million for technical assistance, $3.0 million for work-study, and $12.25 million for Special Projects.



## Urban Development Action Grants (UDAGs)

Grants to assist distressed cities and urban counties.

**Nature of Program:** Assists cities and urban counties which are experiencing severe economic distress to help stimulate economic development activity necessary for local economic recovery. UDAG grants are made to local governments that, in turn, use the funds to make loans to private developers for commercial, residential, or industrial projects. The private sector's commitment for investment in the projects must be secured prior to the preliminary approval of an Action Grant project. A minimum ratio of 2.5 private dollars to every Action Grant dollar is required.

The program is intended to help revitalize cities and urban counties which have a combination of characteristics used to measure economic distress. Among the factors measured are amount of pre-1940 housing, poverty, population and job growth lag or decline, per capita income, unemployment, and designation as a labor surplus area.

Legislation establishing this program was enacted in 1977.

**Applicant Eligibility:** Urban counties and cities provided they have (1) met minimum criteria that indicate severe economic distress; and (2) demonstrated results in providing housing for low- and moderate-income persons and equal opportunity in housing and employment for low- and moderate-income persons and members of minority groups. Communities which do not meet the distress criteria may qualify for Action Grants if they contain distressed areas defined as "Pockets of Poverty." These communities must meet special eligibility criteria and plan to target the Action Grant assistance and benefits to the residents of the "pocket" area. Interested communities must request a determination of eligibility from the HUD Field Offices before applications can be submitted.

**Funding Distribution:** From each year's appropriation, at least 25 percent of the funds available for the UDAG program must go to small cities of less than 50,000. Up to 20 percent may be used to fund projects in "Pockets of Poverty" communities. Action Grant funding is not based on an automatic entitlement. Six times a year, HUD reviews all new applications received and all applications held over for further consideration and determines which projects are fundable. HUD uses approximately 65 percent of the funds for projects selected on the basis of a city's distress and impaction and on project merit, including measures such as number and cost of jobs created. Approximately 35 percent of the funds are distributed solely on the basis of project merit, not taking into account city distress or impaction in project ranking.

**Legal Authority:** Section 119, Housing and Community Development Act of 1974 as amended (42 U.S.C. 5318, 5320).

**Administering Office:** Assistant Secretary for Community Planning and Development, Department of Housing and Urban Development, Washington, D.C. 20410-7000.

**Information Source:** HUD Headquarters and Field Offices.

**Current Status:** Inactive.

**Scope of Program:** No appropriated funds requested for FY 90. Currently, programs operating on recaptured funds for FY 89.



## Rental Rehabilitation

Grants to cities and States to encourage rental housing rehabilitation, and rental subsidies to help lower-income tenants remain in the building or relocate to other suitable housing. Designed to minimize displacement and attract private financing to rehabilitation.

**Nature of Program:** Grants are awarded on a formula basis to communities of 50,000 or greater population, urban counties, and States, as well as with additional housing vouchers to the local Public Housing Authority.

Rental Rehab funds (generally not more than an average of $5,000 to $8,500 per unit, depending on the number of bedrooms) may be used for up to one-half the total, eligible, rehabilitation costs of the project. An average minimum rehabilitation of $600 per unit is required to assure that a certain level of rehabilitation is necessary before public subsidies are provided.

Eligible rehabilitation activities are limited by the Act to those necessary to correct substandard conditions, make essential improvements, and repair major systems in danger of failure. Energy-related repairs considered necessary by the grantee, as well as those repairs necessary to make rental units accessible to the handicapped, are also eligible.

After rehabilitation, 70 to 100 percent of the units in the local program must be occupied by low-income families. In addition, an equitable share of grant funds must be used to aid large families. Rents after rehabilitation must be at market rates and not limited by rent controls.

Grants may be used only in neighborhoods where the median income does not exceed 80 percent of the area median, and where rents are not likely to increase more rapidly than the market area.

**Grantee Eligibility:** Metropolitan cities and urban counties if their minimum grant under the HUD formula is at least $50,000. States also receive funds based on the formula for distribution to non-entitled areas.

**Funding Distribution:** For metropolitan cities, urban counties, and States, HUD will award funds based on a formula which considers three specific factors:

- Rental units where the income of rental households is at or below the poverty level;
- Rental units built before 1940, where the income of the household is at or below the poverty level; and
- Rental units with at least one of four housing problems — overcrowding, high rent costs, incomplete kitchen facilities, or incomplete plumbing. This factor is weighted double in the formula.

To allow a reasonable program level, the lowest amount HUD will grant to a city or urban county under the formula is $50,000 each fiscal year. Lesser amounts will be added to the appropriate State's formula amount for distribution to eligible units of general local government.

If a State does not elect to administer its share of Rental Rehab funds, HUD will award funds to eligible grantees through a competitive program.

**Legal Authority:** Section 17, U.S. Housing Act of 1937 (42 U.S.C. 1437o).

**Administering Office:** Assistant Secretary for Community Planning and Development, Department of Housing and Urban Development, Washington, D.C. 20410-7000.

**Information Sources:** HUD local Field Offices and State and local community development agencies.

**Current Status:** Active. Authorized through FY 89. Interim rules implementing the 1987 amendments were published in mid-1988.

**Scope of Program:** $150 million were allocated for FY 89.



## Rehabilitation Loans (Section 312)

Loans to finance rehabilitation in Community Development Block Grant and Urban Homesteading areas.

**Nature of Program:** Direct Federal loans finance rehabilitation of single family and multifamily residential, mixed use, and nonresidential properties in the above areas certified by the local government. By financing rehabilitation to bring the property up to applicable local code, project, or plan standards, the loans prevent unnecessary demolition of basically sound structures. A loan may provide for insulation and installing of weatherization items. Loans may not exceed $33,500 per dwelling unit or $100,000 for nonresidential properties, although the actual amount of a loan may be less, depending on certain factors. Loans are repayable over 20 years, at interest rates of 3 percent for lower-income homeowners or at a Treasury bond rate for multifamily properties or for moderate-income homeowners.

Local governments originate the rehabilitation loans and monitor the construction. HUD approval is required in cities without local loan approval authority.

Legislation establishing this program was enacted in 1964.

**Applicant Eligibility:** Property owners in the aforementioned federally aided areas. The applicant must evidence the capacity to repay the loan. Priority is given to low- and moderate-income applicants.

**Legal Authority:** Section 312, Housing Act of 1964 (42 U.S.C. 1452b).

**Administering Office:** Assistant Secretary for Community Planning and Development, Department of Housing and Urban Development, Washington, D.C. 20410-7000.

**Information Source:** HUD Field Offices and State and local community development agencies.

**Current Status:** Active. Authorized through FY 89.

**Scope of Program:** For FY 88, funding was limited to loan repayment and unspent funds from previous years. Approximately $102 million in loans were made.