UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF MICHAEL CARLUCCI**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Housing and Urban Development ("HUD") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on November 11, 1984, as a GS-13. Prior to being hired at HUD, I had worked from February 1979 until November 1984 as a criminal investigator with the OIG OI at the Department of Health and Human Services ("HHS").

2. My Position Description accurately states that my "primary function" was "to receive, investigate and analyze allegations of misconduct, malfeasance, misfeasance, nonfeasance, fraudulent or other criminal activity on the part of any employee, person or firm directly or indirectly connected with HUD or HUD-financed operations and the preparation of comprehensive, documented reports reflecting allegations and findings." As for training for

this position and at HHS, we were required to complete the criminal investigative training program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.

3. At HUD during the relevant time frame, I worked in the New York Regional Office, which had responsibility for conducting criminal investigations in New York, New Jersey, Puerto Rico and the Virgin Islands. The latter two locations were subsequently removed from the jurisdiction of the New York office in 1992.

4. I filed my case on March 16, 1995, and I was a GS-13 until September 4, 1994, when I was promoted to a GS-14 supervisory position as Acting Special Agent in Charge. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA. On October 30, 1994, HUD criminal investigators were, in any event, removed from coverage under the FLSA and converted to the pay system known as Law Enforcement Availability Pay ("LEAP" or "Availability Pay").

5. During the time period preceding the conversion of HUD criminal investigators to LEAP, the agents received Administratively Uncontrollable Overtime ("AUO"). While most agents worked the number of overtime hours to meet or exceed the hours necessary to qualify for 25 percent Administratively Uncontrollable Overtime ("AUO"), HUD, for budgetary reasons, did not have enough money to pay the otherwise required percentage of AUO.

6. The OIG at HUD during the relevant time frame consisted of four separate entities: the Immediate Office of the Inspector General; the Office of Audit ("OA"), which consisted of a much larger staff of approximately 200 auditors; the Office of Fraud Control and Management Operations ("OMAP"), a staff function that provides administrative support and policy development to the IG; and the Office of Investigations ("OI") to which the criminal

investigators were assigned. The criminal investigators within the HUD OI office worked for the Assistant Inspector General for Investigations.

7. The mission of HUD is to provide safe and affordable housing through various mortgage, grant, assistance, and regulatory programs that it administers. HUD programs include: the single family mortgage insurance program ("FHA"), which encourages lenders to provide low down payment mortgages to homebuyers by insuring and paying off the lender if the mortgage goes into foreclosure; various rental assistance programs, which subsidize the rents of tenants in both private and public housing; and grants to local communities to improve neighborhoods. In addition, HUD enforces the Fair Housing Act (42 USC 3601) and Real Estate Settlement Procedures Act ("RESPA" 12 USC 2601 – 24 CFR 3500, 3800), which standardizes real estate transactions and prohibits the payment of kickbacks.

8. In addition to the many auditors within the HUD IG office who may refer criminal matters to us, the FHA program has a Single Family Quality Assurance Division, which also refers criminal matters to our attention for further investigation. In addition to referrals from these two groups, I frequently obtain referrals from other law enforcement agencies, tips from members of the public, development from my own and other agent's ongoing investigations, and referrals from other HUD program staff.

9. There are several specific criminal statutes uniquely applicable to HUD programs. The first, 18 U.S.C. § 1010, "Department of Housing and Urban Development and Federal Housing Administration Transactions," prohibits the making of false statements or documents in connection with a loan, credit facility or mortgage insured by the Department. The second, 18 U.S.C. § 1012, "Department of Housing and Urban Development transactions," prohibits certain false representations or failure to disclose certain information to the Department. The third, 12

U.S.C. § 1715z-19, "Equity Skimming Penalty," provides a felony penalty for pocketing the funds from certain housing projects when the project is financially distressed or the mortgage in default. In addition, another equity skimming statute, 12 U.S.C. § 1709-2, for single family mortgages, provides criminal penalties for those who collect rents on properties with HUD insured mortgages and then do not use the money to pay the mortgage. The fourth statute, 12 U.S.C. § 2607, an anti-kickback statute, provides criminal penalties for those who pay or accept kickbacks in connection with HUD insured mortgages or any federally backed mortgage.

10. The choice of criminal statutes to enforce is made by the state and federal prosecutors. Federal prosecutors typically chose to use the general federal conspiracy statute, mail fraud, wire fraud, false statements and other criminal statutes of general applicability. All my cases were federal.

11. The FBI has concurrent jurisdiction over HUD criminal investigations. In the early years, we were routinely required to advise the FBI of all HUD criminal investigations but, over time, the practice became less formal; however, we are now required to once again provide formal notification to the FBI of all criminal investigations by our office.

12. I carried a weapon to execute search and arrest warrants. I was first issued a .38 caliber revolver by HUD, and I was issued a 9 mm semi-automatic pistol in August 1994. We qualified quarterly in the operation of these weapons.

13. I performed the entire range of criminal investigative duties performed by criminal investigators who work for the federal government. For example, at both HHS and HUD, I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. At times I conducted electronic monitoring and other covert surveillance, ran confidential informants and undercover

operatives. I always conducted interviews of witnesses and subjects, obtained signed and sworn statements, and prepared interview reports and comprehensive investigative case reports. I drafted affidavits for arrest and search warrants and executed them. I assisted Federal prosecutors in the drafting of indictments, criminal informations, and grand jury and trial subpoenas which I was also required to serve. I regularly testified as a government witness before grand juries and at trials.

14. During the relevant time period from March 1992 and even while I was a GS-14 temporary supervisor beginning in September 1994, I investigated fraud in various HUD programs. I usually worked with criminal investigators from the FBI, IRS, other IG offices, and state and local law enforcement officers. These fraud investigations involved community development block grants, mortgage insurance issued by HUD, mortgage backed securities programs of the Government National Mortgage Association ("GNMA"), and various other HUD loan, grant and contract programs.

15. During the relevant time period, I participated in several large investigations. I conducted a grand jury investigation, jointly with the FBI, into political corruption involving HUD officials and a United States Senator. I reported to the Deputy United States Attorney for the Eastern District of New York. The investigation resulted in several criminal indictments.

16. During the relevant time period, I also conducted multi-million dollar bank and HUD mortgage fraud investigations involving multiple subjects including real estate agents, speculators, attorneys, appraisers, bank officials and others. These investigations involved the sale and flipping of real estate by persons who had falsified documents for others to obtain mortgages insured by HUD. The fraud involved, among other things, false financial statements, appraisals, and fictitious buyers and sellers. I was the case agent in two criminal trials and

received an Award for Public Service from the Department of Justice for meritorious service and acts in connection with these criminal investigations. I also received awards and commendations from the Department of Justice, the Criminal Investigative Division of the Internal Revenue Service, and the HUD OIG itself. A copy of these awards and commendations is attached as Exhibit A.

17. I have read the Declaration of Patrick Neri in this case and his statement that HUD criminal investigators spent 98 % of their time investigating or leading investigations. I typically worked as the only HUD agent on a case, and it would be more accurate to say that criminal investigators spent 98 % of their time planning and conducting investigations, the language that is used in the GS-12 and GS-13 Position Descriptions. I did not lead investigations in the sense of directing or supervising the conduct of others, and this is true of HUD criminal investigators in general.

18. During the relevant time period, the investigations that I worked on resulted in over 90 convictions as well as fines and restitution totaling over $55 million.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 3/13/07

Michael Carlucci

# EXHIBIT A

# U.S. Department of Justice

## Award for Public Service

### Presented to

Michael Carlucci

*In recognition of meritorious service and acts that have materially contributed to the attainment of the highest standards of cooperative law enforcement and justice in the United States of America.*

United States Attorney

February 19, 1992

Date

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-4500

OFFICE OF INSPECTOR GENERAL

June 22, 1992

MEMORANDUM FOR: Michael Carlucci, Special Agent, 2ZI

FROM: Patrick J. Neri, Assistant Inspector General
for Investigation, ZI

SUBJECT: Letter of Commendation

On behalf of the entire Office of Inspector General, we note with pleasure your award for Exceptional Law Enforcement Service from Mr. Andrew J. Maloney, United States Attorney for the Eastern District of New York, made in recognition of your outstanding efforts in connection with the Long Island Mortgage Fraud Task Force.

I would like to add my congratulations to you for your continued excellent work on this case. Your display of professionalism and technical proficiency is a credit to yourself and in keeping with the highest professional standards of the Office of Inspector General.

Thank you for a job well done.

District
Director

Department of the Treasury
Criminal Investigation Division
P.O. Box 100, Brooklyn, NY 11202

Date: OCT 29 1993

Susan Gaffney
Inspector General
Office of the Inspector General
United States Department of Housing and Urban Development
451 Seventh Street, S.W.
Washington, D.C. 20410

Dear Ms. Gaffney:

I would like to take this opportunity to express my office's appreciation for the exemplary assistance rendered by Special Agent Michael Carlucci in the detection and prosecution of violations of the Internal Revenue Code.

Special Agent Carlucci is responsible for recommending the participation by Special Agents of the Internal Revenue Service in the grand jury investigation of Raymond Claybrook. This investigation developed into the Long Island Mortgage Fraud Task Force and resulted in meritorious recognition of all agents on the task force by the United States Attorney's Office. To date, Special Agent CARLUCCI'S original request for Internal Revenue Service participation has resulted in thirteen successful criminal tax prosecutions for our office.

I particularly would like to stress Special Agent Carlucci's invaluable assistance to our division in his constant support for the inclusion of tax law violations in indictments and informations prepared by the United States Attorney's Office.

In summary, Special Agent Carlucci is to be commended for his ability to recognize potential criminal income tax violations and his aptitude in coordinating joint investigations with the United States Attorney's Office.

Sincerely,

Jerry Algieri
Chief, Criminal Investigation Division
Internal Revenue Service

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-4500

OFFICE OF INSPECTOR GENERAL

November 22, 1993

Mr. Jerry Algieri
Chief, Criminal Investigation
Division
Internal Revenue Service
P.O. Box 100
Brooklyn, NY 11202

Dear Mr. Algieri:

Thank you for your letter of appreciation of October 29, 1993, commending the efforts of Special Agent Michael Carlucci for his work on a number of significant cases in connection with the Long Island Mortgage Fraud Task Force. I have made fraud in the mortgage insurance area a very high priority. I am pleased that you thought so highly of Special Agent Carlucci's efforts.

Sincerely,

Susan Gaffney
Inspector General

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-4500

OFFICE OF INSPECTOR GENERAL

November 22, 1993

MEMORANDUM FOR: Michael Carlucci, Special Agent, 2ZI

FROM: Susan Gaffney, Inspector General, Z

SUBJECT: Commendation

On behalf of the Office of Inspector General, we note with pleasure a letter of appreciation from Mr. Jerry Algieri, Chief, Criminal Investigation Division, Internal Revenue Service, in recognition of your outstanding efforts in connection with the Long Island Mortgage Fraud Task Force.

I would like to add my sincere congratulations to you for your continued excellent work on this case. Your display of professionalism and technical proficiency is a credit to yourself and in keeping with the highest professional standards of the Office of Inspector General.

Thank you for a job well done.

OFFICE OF INSPECTOR GENERAL
DEPARTMENT OF HOUSING & URBAN DEVELOPMENT

**U. S. Department of Housing and Urban Development**

# *Certificate for Superior Accomplishments*

## Michael Carlucci

***For your superior investigative accomplishments as part of the Long Island Fraud Task Force. As a result of your contributions dating back to 1994, fourteen persons have been arrested and charged in multiple separate multimillion dollar FHA fraud and political corruption cases. Over $800,000 in fines, restitutions and recoveries have been assessed.***

Frank J. Di Costanzo

***Special Agent in Charge***
***September 1995***

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF DAVID C. CUNDIFF**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator with the Department of Housing and Urban Development ("HUD") Office of the Inspector General ("OIG") on January 13, 1991, as a GS-13 criminal investigator and I retired at the same grade on February 3, 2005. Previously, I had worked for the IRS as a criminal investigator in its Criminal Investigative Division in 1977 and 1978 and as a criminal investigator for the Department of Health and Human Services ("HHS") OIG from February 17, 1985, until January 13, 1991, when I began working as a GS-13 criminal investigator with the HUD OIG. In all three of these agencies I worked for, the primary objective of the criminal investigator was the investigation and prosecution of crimes against programs of the particular agency and the work was exactly the same in terms of investigative techniques and the day to day work.

2. I filed my case on August 3, 1995, while a GS-13 agent with HUD. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA. I worked in the Indianapolis office and reported to an Assistant Special Agent in Charge in the Chicago Regional Office. I worked alone in the Indianapolis office for approximately seven years before a second agent was assigned to my office. All decisions regarding opening, conducting, and closing investigations were made within the HUD OIG Office of Investigation. HUD program management officials had no decision-making authority regarding the opening, closing, or conduct of criminal investigations by HUD OIG Office of Investigation.

3. My investigative duties included primarily the conduct of criminal investigations. Activities included: conducting interviews of subjects of investigation as well as witnesses to alleged criminal activity; serving Federal and State Grand Jury subpoenas for documents and testimony as well as Inspector General Subpoenas for documents; preparing, applying for and conducting search warrants; applying for and executing arrest warrants; conducting surveillance; serving subpoenas for the prosecution; transporting and preparing witnesses for trial testimony; and assisting with trials including testifying when necessary.

4. Most of our investigations involved joint work with other Federal, State, or local law enforcement agencies. Within all of the law enforcement agencies I worked for, IRS Intelligence Division (now known as the Criminal Investigations Division), HHS OIG Office of Investigation, and HUD OIG Office of Investigation, I received similar training with firearms, arrest techniques, raid entries, the serving of search warrants, surveillance, and personal defensive tactics.

5. During this time period, I worked on a number of cases with criminal investigators from the FBI, IRS, BATF, DEA, USSS, as well as IG criminal investigators with HHS, Agriculture, the Department of Labor and the Veterans Administration in addition to state and local police officers and detectives. I worked for prosecutors at various levels from the United States Attorneys' Offices for both the Northern and the Southern Districts of Indiana as well as various state prosecutors within the State of Indiana.

6. During the relevant time period, I worked on: a joint investigation with multiple Federal, State, and local law enforcement agencies in the Gary, Indiana area as part of the Northwest Indiana Violent Crime Task Force which focused on drugs, guns, and gangs in and around public housing or assisted housing areas; an investigation of public corruption by government officials and other persons in the Lake County, Indiana area; FHA mortgage fraud cases; a community development block grant case involving falsified test reports and faulty construction of community elevated water tanks; and investigations of various bribery, theft, and embezzlement cases involving housing inspectors, management officials, tenants, and other individuals conducting counterfeit housing authority check schemes involving HUD program funds administered by public housing authorities. Some of the tenant criminal cases involved drug trafficking.

7. As a HUD criminal investigator, I carried a variety of weapons including a Sig Sauer 9 mm semiautomatic handgun, a Remington Model 870 12 gauge shotgun, as well as a Heckler & Koch MP-5 9 mm machinegun. I also carried pepper spray, a collapsible baton, and handcuffs for arrest purposes. Every three months, I had recurrent training on these weapons with the required qualification scores. I was the only agent in the Indianapolis office trained to use the MP-5 machine gun. Prior to being trained on the machine gun, I had been trained in the

use of the shotgun and continued to be trained in the use of this weapon. Additionally, every three months, training was received in defensive tactics and weapon retention. At various other times, I received other specific criminal investigation training such as: criminal legal update training; raid training; use of force training including use of pepper spray and use of baton; and shooting decision training.

8. There are several specific criminal statutes uniquely applicable to HUD programs. The first, 18 U.S.C. § 1010, "Department of Housing and Urban Development and Federal Housing Administration Transactions," prohibits the making of false statements or documents in connection with a loan, credit facility or mortgage insured by the Department. The second, 18 U.S.C. § 1012, "Department of Housing and Urban Development transaction," prohibits certain false representations or failure to disclose certain information to the Department. The third, 12 U.S.C. § 1715z-19, "Equity Skimming Penalty," provides a felony penalty for pocketing the funds from certain housing projects when the project is financially distressed or the mortgage in default. In addition, another equity skimming statute, 12 U.S.C. § 1709-2, for single family mortgages, provides criminal penalties for those who collect rents on properties with HUD insured mortgages and then do not use the money to pay the mortgage. The fourth statute, 12 U.S.C. § 2607, an anti-kickback statute, provides criminal penalties for those who pay or accept kickbacks in connection with HUD insured mortgages or any federally backed mortgage.

9. During the relevant time period, I did not work on any cases involving HUD employees.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 12/14/06

David Cundiff

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF MICHAEL K. GROSZKIEWICZ**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator with the Department of Housing and Urban Development ("HUD") in the Office of Investigation ("OI") of the Office of the Inspector General ("OIG") on March 11, 1991, as a GS-12. Prior to starting as a criminal investigator with the HUD OI, I worked as a criminal investigator with the U.S. Army Criminal Investigation Command (USACIDC) after release from active duty on December 28, 1987.

2. I worked for the OI at HUD in the Detroit, Michigan office, which was part of Region 5 headquartered in Chicago, Illinois. The region had responsibility for cases in Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin. I was promoted to GS-13 on May 31, 1992.

3. I filed my case in March 1995. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA. I was a GS-13 during the relevant time period. I became a GS-14 Assistant Special Agent in Charge ("ASAC") on

November 22, 1998. On October 30, 1994, HUD criminal investigators were converted to the pay system known as Law Enforcement Availability Pay ("LEAP" or "Availability Pay").

4. The OIG at HUD during the relevant time frame consisted of four separate entities: the Immediate Office of the Inspector General, the Office of Audit ("OA"), which consisted of a much larger staff of approximately 200 auditors, the Office of Fraud Control and Management Operations ("OMAP"), and the Office of Investigations ("OI") to which the criminal investigators were assigned. The criminal investigators within the HUD OI office worked for the Assistant Inspector General for Investigations.

5. The mission of HUD is to provide safe and affordable housing through various mortgage, grant, assistance, and regulatory programs that it administers. HUD programs include the single family mortgage insurance program ("FHA"), which encourages lenders to provide low down payment mortgages to homebuyers by insuring and paying off the lender if the mortgage goes into foreclosure; various rental assistance programs, which subsidize the rents of tenants in both private and public housing; grants to local communities to improve neighborhoods. In addition, HUD enforces the Fair Housing Act (42 USC § 3601) and Real Estate Settlement Procedures Act ("RESPA" 12 USC § 2601 – 24 CFR 3500, 3800), which standardizes real estate transactions and prohibits the payment of kickbacks.

6. Community Development Block Grants are used by communities to benefit low to moderate-income individuals through the creation of jobs. FHA insured mortgages allowed individuals, who otherwise would not qualify for a conventional mortgage, to obtain a mortgage with as little as a 3% down payment.

7. There are several specific criminal statutes uniquely applicable to HUD programs. The first, 18 U.S.C. § 1010, "Department of Housing and Urban Development and Federal

Housing Administration Transactions," prohibits the making of false statements or documents in connection with a loan, credit facility or mortgage insured by the Department. The second, 18 U.S.C. § 1012, "Department of Housing and Urban Development transaction," prohibits certain false representations or failure to disclose certain information to the Department. The third, 12 U.S.C. § 1715z-19, "Equity Skimming Penalty," provides a felony penalty for pocketing the funds from certain housing projects when the project is financially distressed or the mortgage in default. In addition, another equity skimming statute, 12 U.S.C. § 1709-2, for single family mortgages, provides criminal penalties for those who collect rents on properties with HUD insured mortgages and then do not use the money to pay the mortgage. The fourth statute, 12 U.S.C. § 2607, an anti-kickback statue, provides criminal penalties for those who pay or accept kickbacks in connection with HUD insured mortgages or any federally backed mortgage.

8. The choice of criminal statutes to enforce is made by the state and federal prosecutors. Federal prosecutors typically chose to use the general federal conspiracy statute, mail, wire fraud, false statements and other criminal statutes of general applicability.

9. I began with a 38 revolver during the relevant time period, and, at some point, changed to a 357 which was replaced by an agency issued 9 mm pistol but I cannot remember exactly when. I was trained on the pistols and on a shotgun that was available in the office. We also had a machine gun in the office but I was not trained on it.

10. During the relevant time period, I investigated fraud in various HUD programs. I worked in close coordination with the U.S. Attorney's Offices in the Eastern and Western District of Michigan. I have worked successfully with the FBI concerning public corruption investigations involving Community Development Block Grants. One, in particular, resulted in the successful prosecution of a developer and a city's Director for Community Development

involving a kickback. A joint investigation with the Criminal Investigative Division of the IRS, the U.S. Postal Inspection Service, and the FBI resulted in the successful prosecution of a former Detroit mayoral candidate, who partially financed his campaign through the equity skimming of a HUD-insured hospital. The defendant was convicted of tax evasion and bank fraud.

11. During the relevant time period, I worked with local law enforcement to obtain the conviction of an employee of a Public Housing Authority who assisted the Executive Director in embezzling funds through the forgery and negotiation of checks. I also obtained the conviction of another Executive Director for embezzling funds. In support of the Inspector General's goals and priorities, under Operation Safe Home, I worked on law enforcement operations in the Detroit area with the Detroit Police Department, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco and Firearms, the U.S. Secret Service, and the Taylor, Michigan Police Department.

12. I have read the Declaration of Patrick Neri in this case and his statement that HUD criminal investigators spent 98 % of their time investigating or leading investigations. I typically worked as the only HUD agent on a case, and it would be more accurate to say that criminal investigators spent 98 % of their time planning and conducting investigations, the language that is used in the GS-12 and GS-13 Position Descriptions. I did not lead investigations in the sense of directing or supervising the conduct of others, and this is true of HUD criminal investigators in general.

13. I worked on one HUD employee case during the relevant time frame and spent at most two weeks time on the case.

14. I have read the Declaration of Katherine Takacs and I can state that it is an accurate statement of the work that she did.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 3/13/07

Michael K Groszkiewicz
Michael Groszkiewicz

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF DIANE HILL-DECHELLIS**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Housing and Urban Development ("HUD") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on January 7, 1987 as a GS-7. I became a GS-12 criminal investigator on May 20, 1990, and I am currently a GS-14. I am currently the HUD OIG OI Assistant Special Agent in Charge of the New England Region.

2. At HUD during the relevant time frame, I worked in the HUD OIG OI office located in Boston, Massachusetts as a criminal investigator. The office had a Regional Inspector General for Investigation ("RIGI"), later renamed Special Agent in Charge, to whom each of the criminal investigators reported. The RIGI made the investigation assignments for the criminal investigators.

3. I filed my case on September 16, 1994. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA. On October 30, 1994, HUD criminal investigators were removed from coverage under the FLSA and converted to the pay system known as Law Enforcement Availability Pay ("LEAP" or "Availability Pay"). During the time period preceding the conversion of HUD criminal investigators to LEAP, the agents received Administratively Uncontrollable Overtime ("AUO") and were subject to the FLSA.

4. HUD's mission is to provide safe, decent and affordable housing, and to better local communities, all through various mortgage, grant, assistance, and regulatory programs that it administers. HUD programs include: the single family mortgage insurance program ("FHA"), which encourages lenders to provide low down payment mortgages to homebuyers by insuring and paying off the lender if the mortgage goes into foreclosure; various rental assistance programs, which subsidize the rents of tenants in both private and public housing; grants to local communities to improve neighborhoods; enforcing the Fair Housing Act, which prohibits housing discrimination; and the Real Estate Settlement Procedures Act ("RESPA") which standardizes real estate transactions and prohibits the payment of kickbacks in certain real estate transactions; and other programs.

5. Criminal investigations I initiated were predicated upon the receipt of information from various sources, including from other law enforcement agencies and the general public; referrals from my supervisors and auditors within the OIG's Office of Audit ("OA") offshoots of ongoing criminal investigations; my own initiatives; and from various personnel within HUD's program components.

6. There are several specific criminal statutes uniquely applicable to HUD programs. The first, 18 U.S.C. § 1010, "Department of Housing and Urban Development and Federal Housing Administration Transactions," prohibits the making of false statements or documents in connection with a loan, credit facility or mortgage insured by the Department. The second, 18 U.S.C. § 1012, "Department of Housing and Urban Development transaction," prohibits certain false representations or failure to disclose certain information to the Department. The third, 12 U.S.C. § 1715z-19, "Equity Skimming Penalty," provides a felony penalty for pocketing the funds from certain housing projects when the project is financially distressed or the mortgage in default. In addition, another equity skimming statute, 12 U.S.C. § 1709-2, for single family mortgages, provides criminal penalties for those who collect rents on properties with HUD insured mortgages and then do not use the money to pay the mortgage. The fourth statute, 12 U.S.C. § 2607, an anti-kickback statue, provides criminal penalties for those who pay or accept kickbacks in connection with HUD insured mortgages or any federally backed mortgage.

7. The choice of criminal statutes to enforce is made by the state and federal prosecutors. Federal prosecutors typically chose to use the general federal conspiracy statute, mail fraud, wire fraud, false statements and other criminal statutes of general applicability.

8. I was responsible for planning and conducting complex and sensitive criminal investigations into alleged violations of laws and regulations pertaining to various HUD programs and functions. I investigated allegations of corruption and fraud involving HUD's Office of Public Housing and HUD's Community Planning and Development block grant programs, the FHA's single and multi family insurance programs, and various other loan, grant, and contract programs administered by HUD. I conducted investigations that required extensive knowledge and application of US criminal statues, Federal Rules of Criminal Procedure, Federal Rules of Evidence, Search and Seizure Laws, and changing court decisions.

9. The investigations that I worked on during the relevant time period centered on allegations of fraud against HUD in the areas of grants, contracts, political corruption, computer fraud, loan fraud by banks, mortgage companies and individuals, and various other crimes. These investigations involved violations of Federal law involving bribery, kickbacks, false claims and statements, conspiracy, bank, mail and wire fraud, and numerous other Federal criminal statutes.

10. During the relevant time period and during my work as a criminal investigator in general, I drafted and served subpoenas and complaints for arrest warrants. I assisted Federal prosecutors in the drafting of indictments, criminal informations, and grand jury subpoenas. In the course of investigations, I interviewed witnesses and subjects, obtained signed sworn statements, handwriting exemplars, photographs, fingerprints and other evidence pertinent to the investigation. I used electronic monitoring equipment and surveillance techniques in obtaining evidence. I executed arrest and search warrants. I testified as a government witness at trials and at grand jury and suppression hearings, and I located witnesses to testify before the grand jury

and at trial. I worked closely with Assistant United States Attorneys ("AUSAs") during grand jury hearings, trial preparation, and at trial.

11. I worked closely with AUSAs during criminal investigations and kept them apprised of the results of my investigations. I frequently conducted joint investigations with other Federal, State and local law enforcement agencies, including the FBI, Postal Inspectors, other Offices of Inspectors General, local district attorney offices and others.

12. I also assisted other agents in our "violent crime" initiative here at HUD/OIG, known as Operation Safe Home. On several occasions, I assisted the HUD/OIG Connecticut staff, specifically Special Agent Neal Olderman, in the Latin Kings investigation in Connecticut. This investigation, conducted by various law enforcement partners including the FBI, DEA, BATF, local and state police, as well as HUD/OIG who were part of the "FBI Gang Task Force", addressed gang and drug related activity within HUD-subsidized sites in various major cities throughout Connecticut, including New Haven, Bridgeport and Hartford.

13. My assistance with this effort involved surveillance and executing search warrants as well as assisting in the covert operations. In addition, I would be involved in the eventual "take down" of the operations that consisted of a major "sweep" in which pre-dawn arrests of all subjects were conducted. These people were known to be heavily armed and this was an especially dangerous assignment. I specifically recall assisting in the takedown and arrest of the "Queen" of the Latin King gang in New Haven. This individual was responsible for the entire Latin King gang operation in New Haven and when it came time to arrest her, I had to assist, being one of only a few female agents working in this area at the time. With these violent crime

arrests, totaling approximately 200 in just the "Operation Clean Sweep" effort alone, I assisted in making HUD's housing sites decent and safe for its residents.

14. In 1994, following long preparation with various law enforcement partners from the Boston, Massachusetts Police Department ("BPD"), specifically BPD's Youth Violence Strike Force ("YVSF"), the Boston, Massachusetts Housing Authority Police Department ("BHA PD"), Massachusetts State Police ("MSP"), Massachusetts Department of Corrections ("DOC"), Massachusetts Department of Parole and Massachusetts Department of Probation, I participated in a three day "round the clock" effort as part of "Operation Clean Sweep" to reduce the crime within one of Boston's most notorious drug infested areas, Mission Hill. Mission Hill, which also houses one of BHA's Federal housing developments known as Mission Main, was known at that time to have the largest traffic of heroin in the Boston, Massachusetts area. As a result of this effort, we arrested 130 individuals, many were known gang members, several were arrested on outstanding violent crime warrants, and some were individuals of noted criminal histories of continually trespassing on Mission Main property. During this operation we confiscated numerous weapons and an array of drugs and drug paraphernalia. By February, 1995, we would conduct five more such efforts in various BHA housing development sites, but this is after we were removed from coverage under the FLSA.

15. I was first issued a .38 caliber revolver by HUD, and I was later issued a 9 mm. semi-automatic pistol. I had other weapons available to me such as a 12 gauge shotgun and machine gun, and I was regularly trained in the operation of all of these weapons.

16. I investigated a number of HUD employee cases during the relevant time period and I estimate that I spent approximately 10 percent of my time on such cases.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 12/15/06

Diane Hill-Dechellis

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

## DECLARATION OF PHILIP E. KIEFER

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator with the Department of Housing and Urban Development ("HUD") in the Office of Investigations ("OI") of the Office of the Inspector General ("OIG") on June 2, 1991, as a GS-13 criminal investigator. Previously, I had worked for the United States Secret Service ("USSS") for many years as a GS-13 criminal investigator.

2. I filed my case on March 3, 1990, while a GS-13 agent with the USSS, and I am about to be paid FLSA for my time as a GS-13 criminal investigator with the USSS as a result of

this court's decision. I was treated by HUD as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

3. During the relevant time period when I was at HUD, from the beginning of my employment with the agency in June 1991 until the criminal investigators were removed from FLSA and put under an entirely new pay system known as Law Enforcement Availability Pay ("LEAP") on October 30, 1994, I worked out of the Buffalo, New York office. I covered the geographical area from Albany west in New York which included the Northern and Western Districts of the U.S. Attorney's Office. I worked under the direction of the New York Special Agent in Charge ("SAC"). I was the only agent in Buffalo in an office with five OIG auditors.

4. There are several specific criminal statutes uniquely applicable to HUD programs. The first, 18 U.S.C. § 1010, "Department of Housing and Urban Development and Federal Housing Administration Transactions," prohibits the making of false statements or documents in connection with a loan, credit facility or mortgage insured by the Department. The second, 18 U.S.C. § 1012, "Department of Housing and Urban Development transaction," prohibits certain false representations or failure to disclose certain information to the Department. The third, 12 U.S.C. § 1715z-19, "Equity Skimming Penalty," provides a felony penalty for pocketing the funds from certain housing projects when the project is financially distressed or the mortgage in default. In addition, another equity skimming statute, 12 U.S.C. § 1709-2, for single family mortgages, provides criminal penalties for those who collect rents on properties with HUD insured mortgages and then do not use the money to pay the mortgage. The fourth statute,