12 U.S.C. § 2607, an anti-kickback statute, provides criminal penalties for those who pay or accept kickbacks in connection with HUD insured mortgages or any federally backed mortgage.

5. During the period in question and starting in 1993, I initiated an investigation in Buffalo which became a prototype for what subsequently became the national Operation Safe Home, an ongoing effort by HUD, in cooperation with a number of law enforcement agencies including the FBI, DEA and BATF, to eliminate gangs and drug dealers from public housing projects.

6. This investigation involved a task force consisting of the HUD OIG, FBI and officers of the Department of Public Safety, Buffalo Municipal Housing Authority ("BMHA"). The investigation concerned the theft of BMHA equipment and the sale of drugs and guns in public housing administered by BMHA

7. As a result of this initiative, I began working as part of an FBI Violent Crimes/Career Criminal Task Force in Buffalo. My emphasis was Operation Safe Home, a task force venture consisting of the FBI, Erie County Sheriff's Department, Buffalo Police Department, Department of Public Safety, BMHA and other law enforcement departments, targeting criminal activity in both public and assisted housing projects in the Buffalo area.

8. In addition to the aforementioned investigations, I conducted criminal investigations with the FBI and other federal agencies regarding fraudulent, criminal activity in the Western and Northern Districts of the U.S. Attorney's Office. For example, I worked with the FBI and U.S. Attorney's Office in Buffalo on a flipping scheme regarding numerous properties in poor neighborhoods that were purchased by a company which, after doing little or no work, sold the property to unsophisticated and unqualified buyers utilizing a scheme to defraud the buyers and consequently the FHA program.

9. During the relevant time frame, I also worked with the U.S. Attorney's Office and criminal investigators from the Criminal Investigative Division of the IRS on a criminal investigation concerning numerous properties in Buffalo that again defrauded the FHA program. This scheme involved straw purchasers who obtained the proceeds from HUD insured mortgages that they converted to their personal use. Another scheme involved individuals who formed companies to develop properties with HUD grants and then submitted claims for unjustified amounts of money.

10. During the relevant time period, I also conducted a criminal investigation with the FBI regarding fraud committed utilizing Community Development and Block Grant monies in Niagara Falls. I investigated similar cases with the FBI in the Rochester, Syracuse, and Albany areas.

11. As a HUD criminal investigator during the relevant time period, I carried a Model 19 Smith & Wesson 357 revolver and subsequently a semi-automatic, 9mm Sig Sauer. I was required to qualify with these weapons quarterly, using FBI or FLETC courses. Indeed, I had the same Model 19 weapon and training at USSS.

12. I did not work recall working on a single case involving a HUD employee during the relevant time period.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 3/13/07

Philip Kiefer

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al.,<br>Plaintiffs,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | Case No. 90-162C<br>and consolidated cases<br>(Judge Bush) |

**DECLARATION OF THOMAS J. KNAPSTEIN**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, OPM Series 1811, with the Department of Housing and Urban Development ("HUD") in the Office of Investigations ("OI") within the Office of the Inspector General ("OIG") on December 1, 1991, as a GS-12. Prior to being hired at HUD, I had worked as a GS-12 criminal investigator with the Department of Labor and later with the Department of Energy.

2. At HUD during the relevant time frame, I worked in the Fort Worth Regional Office, which had responsibility for conducting criminal investigations in Texas, Oklahoma, New Mexico and Louisiana.

3. I filed my case on November 25, 1992, when I was a GS-12 criminal investigator at HUD. I was treated by the agency as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA. I became a GS-13 on January 2, 1994, and retired in January 1997. I was hired by the Immigration and Naturalization Service ("INS") in April 1997 as a re-hire annuitant. On October 30, 1994, HUD criminal investigators were removed from coverage under the FLSA and converted to the pay system known as Law Enforcement Availability Pay ("LEAP" or "Availability Pay").

4. During the time period preceding the conversion of HUD criminal investigators to LEAP, the agents received Administratively Uncontrollable Overtime ("AUO").

5. The OIG at HUD during the relevant time frame consisted of four separate entities: the Immediate Office of the Inspector General, the Office of Audit ("OA"), which consisted of a much larger staff of approximately 200 auditors, the Office of Fraud Control and Management Operations ("OMAP"), and the Office of Investigations ("OI") to which the criminal investigators were assigned. The criminal investigators within the HUD OI office worked for the Assistant Inspector General for Investigations.

6. The mission of HUD is to provide safe and affordable housing through various mortgage, grant, assistance, and regulatory programs that it administers. HUD programs include: the single family mortgage insurance program ("FHA"), which encourages lenders to provide low down payment mortgages to homebuyers by insuring and paying off the lender if the mortgage goes into foreclosure; various rental assistance programs, which subsidize the rents of tenants in both private and public housing; and grants to local communities to improve neighborhoods. In addition, HUD enforces the Fair Housing Act and Real Estate Settlement Procedures Act ("RESPA"), which standardizes real estate transactions and prohibits the payment of kickbacks.

7. In addition to the many auditors within the HUD IG office who may refer criminal matters to us, the FHA program has a Single Family Quality Assurance Division, which also refers criminal matters to our attention for further investigation. In addition to referrals from these two groups, I frequently obtained referrals from other law enforcement agencies, tips from members of the public, development from other agent's ongoing investigations, and referrals from other HUD program staff.

8. There are several specific criminal statutes uniquely applicable to HUD programs. The first, 18 U.S.C. § 1010, "Department of Housing and Urban Development and Federal Housing Administration Transactions," prohibits the making of false statements or documents in connection with a loan, credit facility or mortgage insured by the Department. The second, 18

U.S.C. § 1012, "Department of Housing and Urban Development transaction," prohibits certain false representations or failure to disclose certain information to the Department. The third, 12 U.S.C. § 1715z-19, "Equity Skimming Penalty," provides a felony penalty for pocketing the funds from certain housing projects when the project is financially distressed or the mortgage is in default.

9. The choice of criminal statutes to enforce is made by the state and federal prosecutors. Federal prosecutors typically chose to use the general federal conspiracy statute, mail fraud, wire fraud, false statements and other criminal statutes of general applicability.

10. The FBI has concurrent jurisdiction over HUD criminal investigations. In the early years, we were routinely required to advise the FBI of all HUD criminal investigations but, over time, the practice became less formal; however, we are now required to once again provide formal notification to the FBI of all criminal investigations by our office.

11. I was issued a .357 magnum revolver by HUD. We were required to qualify every quarter with our assigned weapon.

12. I performed the entire range of criminal investigative duties performed by criminal investigators for the federal government. I examined documents including invoices, books, records, computer printouts, contracts, financial instruments, and other data of consequence to the investigation. I conducted surveillances, interviews of witnesses and subjects, obtained signed and sworn statements, and prepared interview reports and comprehensive investigative case reports. I assisted Federal prosecutors in the drafting of

indictments, criminal informations, and grand jury subpoenas which I was also required to serve. I regularly testified as a government witness before grand juries.

13. During the relevant time period from December 1991, I investigated fraud in various HUD programs. I usually worked with criminal investigators from HUD, the FBI, other IG offices, and state and local law enforcement officers. These fraud investigations involved community development block grants, mortgage insurance issued by HUD, mortgage backed securities programs of the Government National Mortgage Association ("GNMA"), and various other HUD loan, grant and contract programs.

14. During the relevant time period, I participated in several large investigations requiring Federal grand jury subpoenas for handwriting exemplars and fingerprints to forward to law enforcement criminal laboratories for analysis.

15. One case, in New Orleans, Louisiana, dealt with individuals purchasing HUD repossessed housing for a considerably lesser cost than the fair market value – for example, a three bedroom condominium in a modest neighborhood for $1,500. Another investigation dealt with a city public housing manager embezzling over $10,000 of funds granted through HUD for the care and maintenance of the facility. A joint investigation with the Baton Rouge, Louisiana FBI office concerned false statements to obtain HUD-insured mortgages. The false statements were solicited by officers of the lending institution.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 2/21/07

Thomas J. Knapstein

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF STEPHEN J. McCOOL**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator, series GS-1811, with the Office of Inspector General, Department of Housing and Urban Development ("HUD OIG") on June 14, 1992 as a GS-12, and I am currently a GS-13 criminal investigator with the HUD OIG in the Office of Investigations ("OI").

2. Prior to being employed by HUD, I worked as a criminal investigator, series GS-1811, with the United States Secret Service ("USSS"). Since being employed by HUD, I have always been stationed in Richmond, Virginia, under the direction of the Philadelphia, Pennsylvania Regional Office of Investigations. During the relevant time period for my employment at HUD, from June 1992 until October 30, 1994, when Availability Pay began, I worked alone in the Richmond HUD OIG OI office; however, there were a number of OIG auditors who were also assigned to the Richmond office, but these auditors worked on their separate programs.

3. I filed my case on February 2, 1990, when I was a GS-13 criminal investigator with the USSS, and I am in the process of being paid for that time. I was treated by HUD as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA. During the relevant time period, I was a GS-12 criminal investigator at HUD. I became a GS-13 on December 25, 1994, several months after Availability Pay began and we were removed from coverage under the FLSA.

4. The OIG at HUD during the relevant time frame consisted of four separate entities: the Immediate Office of the Inspector General, the Office of Audit ("OA"), which consisted of a much larger staff of approximately 200 auditors, the Office of Management and Planning ("OMAP"), and the Office of Investigations ("OI") to which the criminal investigators were assigned. The criminal investigators within the HUD OI office worked for the Assistant Inspector General for Investigations.

5. As a criminal investigator, I did not perform audits or reviews of HUD programs. The OIG'S Office of Audit had a large staff of auditors who conducted audits of

HUD programs and the entities that received funding from HUD Offices, and they also reviewed the efficiency and performance of HUD programs. If the auditors in the Richmond district identified possible fraud during the course of one of their audits, they would refer the information to me for possible criminal investigation.

6. HUD has several overall areas into which its various programs fall. The respective missions of these "program areas" include, briefly, the mission to provide safe and affordable housing for lower income families through the funding of public housing complexes, privately-owned apartment complexes, and the providing of rental assistance to individuals; to promote homeownership through the insuring of mortgages for qualified homebuyers; to provide financial assistance to communities for housing and community development needs; and to investigate and prevent discrimination in housing as prohibited by the Fair Housing Act.

7. Each of the various program areas has HUD employees who are responsible for the oversight of their respective programs for and ensuring that the programs are meeting the Department's goals.

8. OIG criminal investigators are primarily responsible for investigating fraud involving HUD programs. If, during the course of an investigation, we identify a programmatic procedure of HUD that may have made the fraud easier to commit or which may make the programs vulnerable to fraud, waste, or abuse, we are expected to prepare a Systemic Implication Report ("SIR") that is sent by OIG Headquarters to the HUD office responsible for oversight of the program for their review and possible action. As OIG investigators we have no authority to

make changes to any of HUD'S programs or to direct HUD staff to make such changes. During the relevant time period, however, I do not believe that I prepared more than 2 or possibly 3 SIR's.

9. There are several specific criminal statutes uniquely applicable to HUD programs. The first, 18 U.S.C. § 1010, "Department of Housing and Urban Development and Federal Housing Administration Transactions," prohibits the making of false statements or documents in connection with a loan, credit extension, or mortgage insured by the Department. The second, 18 U.S.C. § 1012, "Department of Housing and Urban Development transaction," prohibits certain false representations or failure to disclose certain information to the Department. The third, 12 U.S.C. § 1715z-19, "Equity Skimming Penalty," provides a felony penalty for misusing the funds from certain housing projects when the project is financially distressed or the mortgage in default. In addition, another equity skimming statute, 12 U.S.C. § 1709-2, for single family mortgages, provides criminal penalties for those who collect rents on properties with HUD insured mortgages and then do not use the money to pay the mortgage. The fourth statute, 12 U.S.C. § 2607, an anti-kickback statute, provides criminal penalties for those who pay or accept kickbacks in connection with HUD insured mortgages or any federally backed mortgage.

10. However, most of my cases that were prosecuted federally were done so using more common criminal statutes such as Wire Fraud (18 USC § 1343), Mail Fraud (18 USC § 1341), False Statements Generally (18 USC § 1001), and conspiracy to defraud the government (18 USC § 371). The use of these more common statutes was the preference of the prosecutors assigned to the cases, despite the applicability of the HUD-specific criminal statutes.

11. After criminal prosecution was completed in a case, I was expected to refer the results of my relevant investigations to the Civil Section of the local US Attorney's Office and/or to HUD'S Departmental attorneys to determine if civil or administrative action against the subject of the investigation was warranted. During the relevant time period, I may have worked 8-10 hours assisting HUD counsel with an administrative case.

12. The criminal work that I have performed with the HUD-OIG is the same as the criminal work that I performed as a criminal investigator with the USSS. Both jobs involve identifying and investigating criminal violations, developing evidence of any such criminal violations, identifying and apprehending the suspects, and assisting prosecutors in the prosecution of the offenders. In fact, both USSS and OIG criminal investigators (as well as those from numerous other federal agencies) undergo the same basic training at the Federal Law Enforcement Training Center ("FLETC") in Georgia. The only difference between the work of the criminal investigators at, for example, USSS and HUD relates to the types of crimes that each agency concentrates on, e.g., counterfeiting investigations by the USSS agents versus mortgage loan fraud investigations by HUD agents. The investigative work is essentially identical.

13. During the relevant time period from June 1992 until October 30, 1994, I investigated fraud in various HUD programs, frequently in concert with agents from the FBI. As the investigative arm of the Justice Department, the FBI has concurrent jurisdiction with the HUD OIG in cases involving fraud against HUD. I also worked occasionally with local police detectives on investigations that were subsequently prosecuted in state court.

14. My fraud investigations involved low-income housing assistance, community development block grants, and mortgage insurance issued by the Federal Housing

Administration ("FHA"). FHA fraud was so prevalent in the Richmond OIG district that I spent the majority of my time on FHA fraud cases. These cases usually involved persons who made false statements to banks, mortgage companies, and HUD to obtain loans that they were not qualified to obtain.

15. I also occasionally investigated alleged misconduct by HUD employees, including violations of Departmental standards of conduct. During the relevant time period, I spent no more than 2 to 3 percent of my time on employee investigations; according to my records, between 1992 and 1994 I worked on just two employee investigations. I was investigating them for criminal violations and I reported my findings to my supervisor who would, in turn, report to the employee's supervisor for whatever administrative action the employee's supervisor wanted to take.

16. Throughout my career with HUD, I have been assigned a handgun and have been required to qualify with its use every three months, as have all OIG criminal investigators. I was initially issued a .357 caliber revolver by the OIG, which was later replaced by the OIG with a 9mm caliber semi-automatic handgun and, most recently, with a .357 caliber semi-automatic handgun.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 2/20/07

Stephen J. McCool

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF NEAL OLDERMAN**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator with the Department of Housing and Urban Development ("HUD") in the Office of Investigations ("OI") of the Office of the Inspector General ("OIG") on December 15, 1991, as a GS-13. From February 1976 until I began at HUD on December 15, 1991, I worked as a criminal investigator with the Bureau of Alcohol, Tobacco and Firearms ("BATF").

2. I was the only criminal investigator in the Connecticut office of HUD, and I worked on criminal and civil cases in Connecticut, western Massachusetts and southern Vermont under the supervision of the Boston field office, which had jurisdiction over New England generally.

3. I filed my case on March 30, 1990, when I was still at BATF as a GS-12 criminal investigator and was paid FLSA for my overtime at BATF. I retired from HUD as a GS-13 criminal investigator in September 2002. I was treated as FLSA exempt by HUD. I regularly worked overtime for which I was not paid pursuant to FLSA. Although I was scheduled to receive full AUO at a rate of 25% which was standard for 1811 criminal investigations, HUD did not have sufficient funding to support a 25% rate. Even though I was working the required 10 AUO hours per week, I was usually paid anywhere from 10% - 15% until the passage of the act in 1994 that required that we be paid at the 25% rate. During the time that I was being paid less than 25% AUO, I was usually working in excess of the mandatory 10 hours per week on criminal investigations.

4. The OIG at HUD during the relevant time frame consisted of four separate entities, the Immediate Office of the Inspector General, the Office of Audit ("OA"), which consisted of a much larger staff of approximately 200 auditors, the Office of Fraud Control and Management Operations ("OMAP, and the Office of Investigations ("OI") to which the criminal investigators were assigned. The criminal investigators within the HUD OI office worked for the Assistant Inspector General for Investigations. Approximately 80 criminal investigators worked for OI nationwide.

5. The mission of HUD is to provide safe and affordable housing through various mortgage, grant, assistance, and regulatory programs that it administers. HUD programs include the single family mortgage insurance program ("FHA"), which encourages lenders to provide low down payment mortgages to homebuyers by insuring and paying off the lender if the mortgage goes into foreclosure; various rental assistance programs, which subsidize the rents of tenants in both private and public housing; and grants to local communities to improve

neighborhoods. In addition, HUD enforces the Fair Housing Act and Real Estate Settlement Procedures Act ("RESPA"), which standardizes real estate transactions and prohibits the payment of kickbacks.

6. In addition to the many auditors within the HUD IG office who may refer criminal matters to us, the FHA program has a Single Family Quality Assurance Division, which also refers criminal matters to our attention for further investigation. In addition to referrals from these two groups, I frequently obtained referrals from other law enforcement agencies, tips from members of the public, development from other agent's ongoing investigations, and referrals from other HUD program staff. In particular, I would receive case referrals or complaint letters from the United States Attorney's Office, Connecticut Chief State Attorney's Office, the FBI, and the Connecticut and Vermont State Police. The source of the majority of my criminal caseload would originate from other Federal, State and Local law enforcement agencies.

7. There are several specific criminal statutes uniquely applicable to HUD programs. The first, 18 U.S.C. § 1010, "Department of Housing and Urban Development and Federal Housing Administration Transactions," prohibits the making of false statements or documents in connection with a loan, credit facility or mortgage insured by the Department. The second, 18 U.S.C. § 1012, "Department of Housing and Urban Development transaction," prohibits certain false representations or failure to disclose certain information to the Department. The third, 12 U.S.C. § 1715z-19, "Equity Skimming Penalty," provides a felony penalty for pocketing the funds from certain housing projects when the project is financially distressed or the mortgage in default.

8. The choice of criminal statutes to enforce was made by the state and federal prosecutors. Federal prosecutors typically chose to use the general federal conspiracy statute, mail fraud, wire fraud, false statements and other criminal statutes of general applicability

9. The FBI has concurrent jurisdiction over HUD criminal investigations. In the early years, we were routinely required to advise the FBI of all HUD criminal investigations but, over time, the practice became less formal; however, we are now required to once again provide formal notification to the FBI of all criminal investigations by our office.

10. A principal focus of HUD during my time with the agency was the elimination of violent crime and drugs from HUD housing projects. (Exhibit A – Excerpt from HUD 3/31/94 Semiannual Report to Congress). This focus began in Connecticut as a result of an outbreak of violence at the Mill Street Housing Project in Meriden, Connecticut in 1992, when men in camouflage pulled up in front of the project in U-Haul trucks and shot up the project. The FBI, both in Connecticut and Washington, D.C., and the principal law enforcement officials in Connecticut began an investigation of which I was a part. We began to investigate and document a then little understood violent street gang known as the Latin Kings which had infested the public housing projects in Connecticut. The FBI and the Connecticut State's Attorney's Office ran the investigation. (Exhibit B – newspaper articles on the Latin Kings)

11. I represented the HUD OIG on this matter and worked with other Federal and State law enforcement agencies such as the FBI, DEA, ATF, the Connecticut State Police, the Connecticut Chief State Attorney's Office, the Connecticut Department of Corrections and the Hartford, New Haven, Meriden and Bridgeport, Connecticut Police Departments. Our mission was to identify targets of the criminal investigation and determine the cause of an unusually large

number of violent crimes including murder and narcotics trafficking involving young male subjects in the greater Connecticut area.

12. Our investigative strategy included the use of surveillance, undercover operations, interviews and analysis of records obtained through consent, the issuance of Federal Grand Jury subpoenas and the execution of Federal and State search warrants, and electronic surveillance (ELSUR) authorized by the appropriate United States Attorney's Office. This would range from using electronic surveillance devices on cooperating confidential informants, and undercover officers to preparation of affidavits leading to court ordered wiretaps of phone lines of our criminal targets, in particular those gang members being investigated by our interagency violent gang task force. During the years I spent working as a member of this task force, I was required to qualify with my various firearms and undertake defensive tactics training with both the FBI and HUD OIG. I was given a top secret clearance issued by the FBI which I was required to maintain until my retirement from HUD in September, 2002.

13. The initial phase of this multi-year task force resulted in numerous arrests and convictions in Connecticut Superior Court and the conviction of approximately 17 defendants in the United States District Court for the Judicial District of Connecticut for crimes ranging from possession and sale of narcotics to murder and conspiracy to commit murder.

14. During the relevant time period from my initial employment within the OI of the HUD OIG until October 1994, when LEAP was initiated and we ceased to be covered by the FLSA, I spent about 75 percent of my time working on investigations of violent crime, including drug sales, within housing projects. I spent about 25 percent of my time conducting investigations of fraud in connection with HUD programs.

15. In 1992, I worked on a large FBI run investigation with assistance from the IRS Criminal Investigative Division and the New Haven Police Department for 8 to 9 months involving bribery and corruption involving Section 8 housing funds. I prepared and executed search warrants, conducted a lot of surveillance and witness interviews and was part of the government's trial team in preparation for and during the actual trial.

16. When I began with HUD, I was issued a 357 revolver and then a Sig Sauer 9 mm semi-automatic, the same gun that I had used at BATF. I was also given training on and had use of a Remington 12 gauge tactical shotgun and a Heckler & Koch MP-5 submachine gun with a silencer. Because of my work on violent gangs in housing projects, I was trained in the use of concussion grenades, and I had access to an array of non-lethal weapons from the collapsible baton to pepper spray. Indeed, I received much more weapons training in connection with my work in the OI of the HUD OIG than when I worked at BATF. About four times per year, I received weapons training at Ft. Devins, Massachusetts.

17. HUD agents were issued cars with Motorola radios, sirens, police lights, and a long gun roof rack. We used the Customs Service radio network.

18. HUD OIG Special Agents were required to take several courses of training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, consisting of Criminal Investigator's School (CIS) which is required of all 1811 series criminal investigators that take their training at FLETC along with additional schools specific to the HUD IG mission. Selected HUD OIG Special Agents also take advanced training at FLETC in areas including, but not limited to, firearms training, undercover operations, advanced photography, conspiracy and defensive tactics. These classes at FLETC are usually made up of Special Agents from many different federal law enforcement agencies.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 12/13/06

Neal Olderman

# EXHIBIT A

U.S. DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT

OFFICE OF INSPECTOR GENERAL

# SEMIANNUAL REPORT TO THE CONGRESS

*For the Period Ending March 31, 1994*

**31st Report to the Congress**

**As Required by Public Law 95-452**

# 2 Operation Safe Home

*"The overall goal of Operation Safe Home is to stop abuses in HUD programs that are resulting in unacceptable living conditions for the millions of needy people who look to HUD for help"*

*Inspector General Gaffney*

On February 4, 1994, Operation Safe Home, a new anti-crime initiative, was announced by Vice President Gore, HUD Secretary Cisneros, Attorney General Reno, Treasury Secretary Bentsen, and National Drug Control Policy Director Brown. The goal of Operation Safe Home is to stop major abuses in HUD programs that result in unacceptable living conditions for the millions of needy people who look to HUD for help. Facilitated at HUD by the Office of Inspector General, Operation Safe Home brings the coordinated resources and expertise of HUD, the Departments of Justice and Treasury, and the National Drug Control Policy Office, as well as State and local law enforcement agencies and public housing agencies, to bear on violent and white collar crime in public and assisted housing.

## Focus of Operation Safe Home

Within the overall context of violent and white collar crime, Operation Safe Home focuses on three major types of wrongdoing that undermine HUD programs — violent crime in public and assisted housing, fraud in public housing administration, and equity skimming in multifamily insured housing.

Available data indicate that violent crime is undermining the government's commitment to providing decent, safe, and sanitary housing to needy Americans. For example, between 1986 and 1989, violent crimes in Los Angeles public housing were reported at an average rate of 67 per 1,000 people, compared with 22 per 1,000 Citywide; the murder rate in Chicago public housing in 1988 was three times that of Chicago as a whole; and, in Washington, DC, the Police Chief reports that 80 percent of the District's violent crime is occurring within 6 blocks of public housing.

The perception that public housing administration is rife with fraud undermines the viability of a program providing shelter to more than 3.7 million

of America's neediest people. OIG work has consistently demonstrated that this perception has a basis in fact. During the period from October 1, 1993, through March 31, 1994, OIG investigations of public housing officials and contractors resulted in 78 indictments, 73 convictions, and fines and recoveries of over $1.5 million. This fraudulent activity not only means that taxpayer dollars are being wasted; it also means that the living standards of public housing residents are being directly and negatively affected.

FHA insures almost $43 billion in multifamily mortgages, approximately $12 billion of which is at risk of default. Over the past 3 years, OIG audits have identified almost $22 million in equity skimming that is a major factor contributing to defaults and foreclosures. Equity skimming means that project revenues are diverted for the personal use of owners and agents, resulting in substandard living conditions for low-income families, the need for additional financial assistance from HUD, and losses to HUD through the sale of foreclosed properties. Through Operation Safe Home, the OIG is addressing approximately 100 cases of apparent equity skimming.

## How Operation Safe Home Works

Operation Safe Home is a concerted campaign to combat wrongdoing in HUD programs, through collaborative efforts among the OIG; HUD program staff; Federal, State and local law enforcement agencies; and HUD clients and partners.

With respect to violent crime in public and assisted housing, the Operation Safe Home strategy has three components: (1) collaborative law enforcement focused on public and assisted housing, and carried out by task forces comprised of Federal, State, and local law enforcement agencies; (2) collaboration between law enforcement agencies and public/assisted housing mangers and residents in devising methods to prevent violent crime; and (3) HUD programmatic initiatives specifically geared to preventing crime.

With respect to fraud in public housing administration, the Operation Safe Home strategy has two components: a joint OIG, Federal Bureau of Investigation (FBI), and Department of Justice (DOJ) commitment to aggressive investigation and prosecution of existing cases of potential fraud in public housing administration; and a simultaneous series of fraud probes by OIG audit/investigative teams at selected public housing authorities. The fraud probes are designed to result in referrals for additional joint investigations by the OIG and the FBI.

With respect to equity skimming in multifamily insured housing, the Operation Safe Home strategy consists of two parts: affirmative litigation, balancing criminal prosecution, civil suits, and out-of-court settlements; and deterring future equity skimming through better enforcement tools, better communication and cooperation among concerned parties within and outside the government, and publicizing cases of successful litigation.

## Operation Safe Home Progress

Although in place for only about 2 months at the end of this reporting period, Operation Safe Home is producing results. The violent crime initiative has led to 24 arrests and the filing of charges against 14 individuals, as well as recovery of more than 25 weapons and nearly $300,000 in drugs and cash. The fraud in public housing administration effort has yielded six indictments and a guilty plea. The multifamily equity skimming effort has led to five civil settlements, requiring $11.5 million in repayments to multifamily projects and $2.1 million to HUD, a double damages judgment of $1.6 million and one guilty plea.

### Violent Crime

As noted above, the Operation Safe Home violent crime strategy involves task force operations, law enforcement prevention initiatives, and HUD programmatic initiatives.

#### *Task Force Operations*

In the Charlestown section of Boston, OIG and Drug Enforcement Administration (DEA) agents arrested a suspected drug dealer who was subsequently charged/indicted for drug violations. The multi-agency law enforcement effort, which earlier netted the indictment of members of a gang terrorizing public housing

residents, is presently focused on unsolved homicides believed to involve gang members.

A Peoria, IL public housing tenant, identified as a drug carrier for a local gang, was indicted for possession of drugs and firearms. The indictment resulted from an OIG, FBI, Internal Revenue Service (IRS) and local law enforcement task force targeting gang and drug trafficking at four Peoria Housing Authority projects.

A team of 100 agents and police officers from the Bureau of Alcohol, Tobacco, and Firearms (ATF), the New York City Housing Authority Police Department, and the OIG executed search warrants at four public housing projects under "Project Uptown," an ATF nationwide operation focused on combatting drug dealers and illegal firearms activities within the Housing Authority. Heroin, firearms and cash were seized and 11 individuals, believed to be members of an operation that supplied drugs and firearms, were arrested.

As part of a task force effort in New Haven, CT, a team of 60 agents and police officers from DEA, FBI, OIG, and State and local law enforcement agencies, arrested 12 individuals and seized drugs and firearms. The individuals were charged/indicted for drug and weapons violations.

The OIG, local law enforcement agencies, and HUD and City staff in Denver and Aurora, CO, started an initiative to identify crime trends in public and assisted housing. To focus the enforcement activity, police data were compared with HUD project information. A multi-agency task force has been formed to investigate serious criminal activity at selected sites.

OIG staff are working with U.S. Attorneys and Federal, State, and local law enforcement throughout the country to establish additional task forces focused on violent crime in public and assisted housing.

### *Law Enforcement Prevention Initiatives*

Twenty-four Detroit police officers were assigned to targeted daily patrols in public housing developments. The assignment, under discussion for some time, was brought to fruition through the intensified focus of Operation Safe Home.

The Secret Service, OIG, HUD Public Housing officials and Baltimore Housing Authority staff have agreed to conduct a security assessment at a selected Authority development. The assessment will provide the Authority and HUD technical guidance on enhancing physical and environmental security and will become the model for similar efforts throughout the Nation. The Secret Service, having much expertise in this area, performed a similar security assessment on behalf of the Chicago Housing Authority following the sniper slaying of a child at the Cabrini Green development.

Officials of Treasury's Federal Law Enforcement Training Center in Glynco, GA, the HUD OIG, and the Office of Public and Indian Housing, have agreed to develop a training program for public housing police officers. A needs assessment, facilitated by the Director of Police for the Baltimore Housing Authority Police Department, has been prepared to assist in developing a meaningful curriculum targeted specifically at housing authority police.

The OIG, DEA, FBI, ATF and Secret Service have established an Operation Safe Home violent crime steering committee to share information on crime trends in public and assisted housing and plan actions to address these trends.

ATF issued a guide for Federal law enforcement agencies titled "Addressing Crime in Public Housing Developments." The OIG and ATF are collaborating on a similar guide for local law enforcement and public housing authorities with steps for implementing law enforcement operations along with programmatic initiatives to create safer communities. In addition, prevention initiatives will be an integral part of each task force operation focused on violent crime in public and assisted housing.

### *HUD Programmatic Initiatives*

Operation Safe Home will benefit from the announced availability of $69 million to develop

Family Investment Centers for public housing communities. The funds will be used primarily to develop facilities in or near public housing neighborhoods to offer support services such as child care, employment training and counseling, and literacy and computer skills training.

HUD announced the commitment of $6.6 million for anti-violence activities for youth living in public and Indian housing, and awarded a grant of over $1.3 million of Public and Indian Housing Drug Elimination Program Technical Assistance funds to assess the delivery of police services to public and assisted housing and to develop standard measurements of crime elimination for housing authorities.

The Office of Public and Indian Housing announced $1.2 million of Drug Elimination Technical Assistance funds available for public and Indian housing authorities to receive the services of a consultant to develop their anti-drug, anti-crime strategies.

HUD announced $265 million for the Public and Indian Housing Drug Elimination Program which includes provisions for anti-crime efforts such as "Weed and Seed."

In a related issue, the OIG commented on a Notice of Fund Availability (NOFA) to permit funding of PHA police departments prior to accreditation. The OIG recommended the NOFA specify a time period for accreditation and a limit on funding, if the timeframe is not met. The OIG also recommended a provision prohibiting the transfer of Drug Elimination funds to other Federal agencies be deleted because there may be occasions, such as Operation Safe Home, where drug-related services "over and above" normal duties and should be reimbursed.

The Office of Public and Indian Housing has distributed to the DC Department of Public and Assisted Housing an options paper outlining how it can use existing HUD regulations and program dollars to relocate public housing residents willing to serve as witnesses for the prosecution, but who need to be relocated because of threats on their lives.

A proposed bill has been included in HUD's legislative package that would allow designated public housing and law enforcement staff access to data from the National Crime Information Center (NCIC) when screening applications for public housing.

The Office of General Counsel is finalizing a public housing occupancy rule that will allow law enforcement officers to reside in public housing.

The Office of Public and Indian Housing is about to announce two new grant opportunities for organizations to provide technical assistance and training to public housing authorities interested in developing resident patrols and in implementing elements of crime prevention through environmental design.

The U. S. Conference of Mayors, HUD and the National Assisted Housing Management Association have asked the mayors of 12 large cities to participate in a demonstration program, as part of Operation Safe Home, designed to address crime and criminal activities in privately owned government assisted housing.

The Office of Public and Indian Housing and the Office of Policy Development and Research are conducting a public opinion survey of public housing residents to determine their views on proposed elements of Operation Safe Home such as gun buys, gun bans, and identity cards. Results of the survey are expected by early summer.

Two directives were placed into Departmental clearance during February and March related to special rent adjustments for Section 8 subsidized units to reflect increased security costs resulting from criminal activity. The OIG commented:

- The rule on Section 8 Moderate Rehabilitation allows PHAs to request rent and special adjustments to reflect substantial general increases in security expenses, operating maintenance and capital repair costs resulting from drug-related criminal activity. The OIG recommended the regulation be strengthened by defining "substantial general increases" in drug-related activity and distinguishing

between substantial and non-substantial as well as general versus specific security expenses. In addition, the OIG encouraged the Department to broaden the adjustment to include criminal activities which may not be drug-related but may threaten tenants.

- The HUD Notice on special adjustments to Section 8 rents sets eligibility for special rent adjustments conditional on evidence of general non drug-related crime problem in the community that results in increased general security costs. This was a change from the requirement that cost increases be substantial and general to the project area. The OIG commented that dropping *substantial* was a significant relaxation of the former requirement and could result in windfall rent increases, especially since the Notice neither defined *general* crime nor required an authoritative certification that a general crime problem exists. Without those elements, it would be difficult to verify that a community has such a crime problem.

On February 4, HUD published a proposed rule in the Federal Register regarding the termination of tenancy of Section 8 families for engaging in criminal activity.

## Fraud in Public Housing Administration

As noted above, the Operation Safe Home strategy for combatting fraud in public housing involves a joint OIG, FBI and DOJ commitment to investigate and prosecute existing cases of potential fraud and a simultaneous series of fraud probes by OIG audit/investigative teams at select public housing authorities.

### *Investigation and Prosecution of Existing Cases of Potential Fraud* *(* indicates investigative results that occurred prior to the announcement of Operation Safe Home)*

In a joint investigation conducted by the OIG, Lake County Prosecutor's Office and Waukegan, IL Police Department, the executive director and another employee of the North Chicago Housing Authority were arrested and charged with converting Section 8 funds for personal use.

As a result of a joint investigation conducted by the HUD and FEMA OIGs and the Florida Department of Law Enforcement, a Dade County construction company and its president were indicted for allegedly submitting inflated claims for public housing construction and renovation. A second company and its president were indicted for inflated insurance and bonding claims.

A former Cincinnati Metropolitan Housing Authority management specialist pled guilty to accepting money from a landscape contractor in return for work at the PHA. The investigation was conducted jointly by the OIG and the FBI.

The former executive director of the Pine City, MN Housing and Redevelopment Authority was sentenced to 45 days in prison and 7 years probation and ordered to pay over $5,000 in restitution for obtaining unauthorized salary advances and personal goods and failing to deposit rent receipts. This resulted from an OIG investigation with audit assistance.

As a result of an OIG investigation, a former PHA inspector in Midland County, TX, was indicted for embezzling $15,000 obtained by cashing checks intended for tenants in payment of damage claims.

The executive director of the Harlem, NY Housing Authority repaid $20,000 to HUD for misappropriated funds, equipment and services. A temporary denial of participation has been initiated and the case developed by the OIG will be prosecuted by the local district attorney.

An OIG investigation led to the arrest of a former PHA employee in Irvington, NJ, for embezzling over $400,000 in PHA funds. The scheme involved bogus landlords and kickbacks. A landlord/contractor was previously indicted in the case.*

An investigation conducted by the FBI and the OIG led to the sentencing of five former Philadelphia Housing Authority employees and two contractors, as a result of their participation

in a bid rigging and bribery scheme. The corruption investigation, which involved 15 former PHA employees and contractors, has to date resulted in the sentencing of all the defendants and has yielded over $1 million in court-ordered restitution and $183,000 in fines.*

A former real estate services director and a landlord in New Haven, CT, were convicted of conspiracy and bribery. The investigation conducted by the OIG found that the landlord gave a car to his co-conspirator in exchange for his support in the purchase of a $1.1 million development by the local PHA. The real estate services director then directed the payment of over $12,000 in Federal funds to the landlord under a temporary housing relocation program.*

A joint OIG/FBI investigation led to a PHA engineer in Baltimore, MD, being charged with accepting over $25,000 in illegal gratuities from various contractors to influence renovation contracts for public housing projects.*

As a result of an OIG investigation, the former executive director of a PHA in Salyersville, KY, pled guilty to embezzling over $13,000 from the PHA.*

The OIG and the FBI are jointly investigating another 28 cases of potential fraud in public housing administration, with the expectation that these investigations will, within the next 6 months, result in law enforcement actions such as searches, arrests, and indictments.

### *Additional Targeted Probes*

The OIG has met with HUD Public Housing officials and Offices of the U.S. Attorney relative to the vulnerability of public housing programs to fraud and abuse. Based on these meetings and historical OIG data, a plan was developed to proactively review selected housing authorities.

The OIG has identified eight PHAs throughout the country for a first series of targeted probes; and teams of OIG auditors and special agents have been trained to commence these on-site reviews in April 1994. The probes, designed to look for indicators of serious fraud and corruption by housing authority officials and contractors, will result in referrals for investigation by the OIG and the FBI. The OIG expects to follow this same approach in subsequent series of probes, which are expected to occur on a continuing basis.

## Multifamily Equity Skimming

The multifamily equity skimming aspect of Operation Safe Home combines aggressive, affirmative litigation with proactive initiatives to deter owners and management agents from diverting much needed funds away from rental housing projects for their personal use.

With the assistance of Housing and the HUD Office of General Counsel, the OIG has identified 101 potential cases of equity skimming which have resulted in harm to tenants and/or HUD. These cases are being developed by OIG and presented to U.S. Attorneys for affirmative litigation, balancing the most effective combination of criminal prosecution, civil suits, and out-of-court settlements, and keeping in mind the best interests of tenants and HUD.

To date, a judgment of $1.6 million has been awarded to HUD and a HUD insured project for equity skimming violations, while another $13.6 million in settlements have been agreed to between six project owners and HUD. Of the additional 53 cases already presented to Assistant U.S. Attorneys for criminal and/or civil prosecution under the Safe Home effort, 24 cases have been accepted by the AUSAs for affirmative litigation. A description of the cases brought to a conclusion follows.

- Through the combined efforts of the HUD Offices of Housing and General Counsel, Carabetta Management will pay HUD $1.3 million and will reimburse HUD insured projects $9.7 million for project violations identified in an OIG audit of the firm's management of projects in Connecticut and Massachusetts.
- HUD was awarded a $1.6 million double damages judgment against A & P Arora, Ltd., a management agent operating in Kansas City, KS. The management agent's diversion of funds contributed to serious health and safety hazards. The general manager/partner pled guilty to Federal program fraud and faces a maximum

Federal prison sentence of 5 years and a $250,000 fine.

- HUD's Office of Housing has settled with the owners of First Hartford Realty Corporation, Manchester, CT, to repay HUD $500,000 and to agree upon other amounts owed the project or HUD, based on an OIG audit that identified $4 million in possible diverted project funds.
- The HUD Ft. Worth, TX Office ordered Lake Como Community of Hope, Inc., the owner of an elderly project, to reimburse the project $248,000 after an OIG audit disclosed the improper diversion of funds to other businesses.
- Lorenzo Pitts, Inc., a project owner in Boston, MA, has agreed to repay HUD $277,000 as the result of an OIG audit that identified the diversion of project funds.
- An OIG audit disclosed that the owner of Southcrest Apartments, Sacramento, CA, improperly used $160,000 in project funds for ineligible distributions to the owner and for unsupported disbursements. The owner has repaid $123,560 to the project and has agreed to repay an additional $31,045 to the project.
- After lengthy negotiations to resolve equity skimming violations reported in an OIG audit of J & B Management Company, manager of over 80 HUD insured projects located primarily in the Southwest, $1.3 million has been repaid to HUD and the projects.

More will need to be done to create an effective deterrent for equity skimming and to elevate the program integrity in HUD's Multifamily Housing Programs to minimize hardships upon families living in government assisted housing. With this in mind, the OIG is initiating actions that will go beyond the current efforts to prosecute cases. Such actions will include improving enforcement tools, and fostering a coordinated enforcement strategy among HUD program staff, DOJ, U.S. Attorneys, housing industry groups, and the OIG, which will entail training, improved liaison, revised legislation, joint strategy sessions, and publicizing successful litigation.

The OIG has already held working sessions and individual meetings with the majority of the 94 U.S. Attorneys, Assistant U.S. Attorneys making up DOJ's Affirmative Civil Enforcement Program, DOJ's Subcommittee on Financial Litigation, housing industry groups, and HUD program staff. These meetings have facilitated the cooperation of all parties involved in combatting equity skimming. Also, OIG work with HUD's Offices of Housing and General Counsel has resulted in identification of legislative changes needed to remove obstacles preventing or hampering the criminal and civil prosecution of equity skimming. Improved legislation will also increase the deterrent effect and the likelihood of reaching more timely settlements prior to court proceedings.

## Direction for the Future

Operation Safe Home is a multi-year commitment on the part of the OIG. On a priority basis, the OIG will devote resources to identifying and supporting prosecution of violent crime in public and assisted housing, fraud in public housing administration, and equity skimming in multifamily insured housing. Further, as a deterrent measure, the OIG will widely publicize the investigative and prosecutive results obtained. Finally, in each area, the OIG will be working closely with Federal, State, and local law enforcement, HUD program officials, and HUD clients and partners to ensure that appropriate measures are in place to deter future wrongdoing.

# EXHIBIT B