The New York Times
nytimes.com

July 5, 1992

# On the Street: Drug Gangs Thrive as Arsenals Expand

By ANDI RIERDEN

ON a blustery blue-sky day in New Haven recently, a 21-year-old drug boss stood on a street corner and chewed on a meatball sub while praying that it wouldn't rain.

"I guess it really doesn't matter," said the man, as he licked tomato sauce from his fingers. "I've been in this business long enough to know that if people want dope they'll find a way to buy it even if the snow is six feet high."

Soon after, a woman with glassy eyes walked up from a nearby house and asked the man's partner for some p-dope, or heroin, that came in a small yellow packet with the words "mad dog" stamped on the front; it sold for $20 and the transaction took about five seconds.

The drug boss said that he employed 17 lieutenants who sold drugs in key spots of the city and that they made up to $15,000 a day. "We only net around $500 apiece of that though," said the man, adding that he had been arrested several times for selling drugs and was currently out on bond on a murder charge.

Because the corner where he stood was considered one of the profitable drug outlets in the city, he said, his gang armed themselves with handguns and kept an arsenal that included two M-16's and an AK-47, just in case things got too hot. He said he got the assault weapons from a man who exchanged them for drugs and $450. Better Organized, Better Armed

"We pioneered this corner," said the man who was interviewed days before a 6-year-old boy was critically wounded by a gun shot after the schoolbus in which he rode was caught in a gang-related shootout on nearby Frank Street.

"And nobody's going to take it away from us."

As the drug trade maintains a stranglehold in city neighborhoods, street gangs that profit from the sale of narcotics have become better organized and better armed. Federal and local law enforcement officials said that over the last 10 years, many gangs have survived and prospered and some have crossed the threshold into organized criminal groups that have expanded their operations statewide.

The surge in gang activities has spurred an epidemic of gun violence in urban neighborhoods over the last couple of years. Recent shootings include incidents in New Haven where two children were wounded by stray bullets and a gang shootout in a Meriden housing project where children and their parents were gathered.

In response to the increase of drug gang violence in Connecticut, Federal agents are working closely with state and local police to curtail gang activity by surveilling and arresting more gang leaders and their weapon suppliers.

While the Connecticut General Assembly last week was debating gun-control measures intended to stem the flow of guns into the hands of minors, the agents said they were taking advantage of Federal gun control laws passed during the mid-1980's that have expanded their jurisdiction and given them more leverage to arrest violent criminals.

Convictions under the Federal statutes are also likely to result in harsher prison terms for offenders, which may greatly reduce the incidents of gang violence and discourage teen-agers from joining gangs, the officials said.

Though the bulk of the drug business is made up of small-time dealers who act on their own, law enforcement officials said, since the mid-1980's more and more ethnic gangs in Connecticut have emerged, like Los Solidos, based in Hartford; the Rats and the Cats, two Jamaican gangs based in Bridgeport, and the Latin Kings, whose members have surfaced throughout the state.

Other new gangs include those styled after or tied to California organizations, the Crips and the Bloods, which are both under Federal investigation for the looting of 3,000 firearms during the riots in Los Angeles in April.

While the ethnic gangs may require an oath of loyalty, police officials characterize the nonsectarian gangs as loosely organized business organizations that are not allied to any particular leadership beyond the local level. Their common thread, officials said, are drugs and violence. Market 'Made Them Richer'

"The drug market hasn't made these guys rich and powerful yet, but it's made them richer and given them ready cash to purchase better weapons and gain more influence," said Jack Killorin, the director of public information for the Federal Bureau of Alcohol, Tobacco and Firearms in Washington, D.C., who headed the Hartford office during the late 1980's. "And their way of doing business is quite terrible. Remember, these are the people that gave us the drive-by shooting."

Though there are no precise statistics on the number of gang members or gang-related crimes in the state, police officials said that they were tracing an increasing number of assaults and homicides to gang members. While most of the offenses are drug related, they said, a growing number of incidents involve conflicts between members of the same gang. The police attributed the rise in drug-gang membership to the decline in the economy and an increasing array of social and psychological problems faced by young people growing up in urban areas.

"The system has collapsed," said Allan MacDonald, the resident agent in charge of the Federal Bureau of Alcohol, Tobacco and Firearms in New Haven. "Nowadays it just makes good economic sense to deal drugs."

Mr. MacDonald said many drug gangs obtained weapons through drug users who stole the guns from homeowners, drug shops or firearms factories, or through "straw purchasers," people with clean criminal records who buy guns for themselves, then resell them to dealers.

As a result of investigations by the local police and by Federal firearms agents, Charles Hubbard, a New Haven resident, was sentenced in January to 17 months in Federal prison for reselling 130 legally bought guns that were later sold to gangsters.

And earlier this year, agents arrested Robert and Robin Carroll, the owners of a Fairfield gun shop. The couple has since been indicted on charges of knowingly selling 450 guns to a straw purchaser, Felix DeValle, and are awaiting trial. Mr. DeValle has been in prison since his arrest and is awaiting sentencing. Career Criminals

Gun-control laws passed in the 1980's have also given Federal agents more jurisdiction to arrest gang leaders, Mr. MacDonald said. Last year, agents tracked down and arrested Willie Carter Jr., a reputed leader of the Jungle Boys drug gang in New Haven. In January prosecutors used a Federal law aimed at career criminals to convict Mr. Williams, whose fingerprint was found on a gun confiscated by the agents during the arrest. Mr. Williams is currently serving a 19 1/2-year prison term.

Two weeks ago, a team of 150 law enforcement officials, which included agents from the Bureau of Alcohol, Tobacco and Firearms, the Federal Bureau of Investigation, the Drug Enforcement Administration along with state and local police, raided a housing project in New Haven and arrested 14 members of the Jungle Boys and charged them with conspiring to sell cocaine and violating Federal firearms regulations. Undercover Purchases

During the raid, agents confiscated six firearms, including a sawed-off shotgun and a 12-gauge pump shotgun. The investigation leading to the arrest began in February and included undercover purchases of narcotics and electronics surveillance. If convicted of the conspiracy charges, each defendant faces a minimum of 5 to 40 years in prison.

Among their most urgent concerns, said police officials, are the Latin Kings, which began as a Hispanic fraternal organization in Chicago in the 1940's and resurfaced in Connecticut's prison system about two years ago. Since then, the police statewide have attributed dozens of assaults and several killings in prison and on Connecticut streets to the gang, which they said was tightly organized and out to recruit teen-agers and children. Monthly Meetings of Task Force

Since January, a task force of more than 50 local, state and Federal law enforcement agents has met monthly to compare information they have gathered on the gang whose membership is estimated to be 2,000 to 8,000.

In New Haven, three teen-agers were arrested and charged with assault on June 12 after their gunfire hit a school bus the day before wounding a six-year-old passenger, Cesar Sandoval, who remained in fair condition last week at Yale-New Haven Hospital. The police said the suspects were tied to the Latin Kings.

The incident followed a shootout in late April when a faction of the Latin Kings sprayed automatic weapons fire at another faction at a Meriden housing project. 'Serious Public Safety Concern'

"It's become impossible to predict where this violence will erupt," said the Chief State's Attorney and a task force spokesman, Richard Palmer. "Which is why their activities have become such a serious public safety concern."

Last month, Ruperto Vincente, 39 years old, who police said led the shootout, was arrested in New York City after evading the police for three weeks. A former auto mechanic, Mr. Vincente has been charged with three counts of conspiracy to commit assault and three counts of first-degree assault.

Mr. Vincente's arrest warrant, which was made public following his arraignment, stated that the shooting appeared to be ordered by a high-ranking member of the organization, Pedro Millan. A former

Connecticut resident, Mr. Millan told Latin King members in a telephone call from a Federal prison in New York State that he had been seeking to retaliate against the leader of the Latin Kings, Jose Garcia, who wanted to break from the organization. Mr. Millan has been charged with conspiracy in connection with the shooting. Newsletters From Gang Members

At the Narcotics and Vice Division of the Bridgeport Police Department on a recent day, Detective Ralph Villegas flipped through separate newsletters published by members of the Latin Kings and a black prison gang called The Nation, which were obtained by officials of the state's correctional system. Both letters read like promotional material for benevolent fraternal organizations.

But Mr. Villegas, whose office is filled with beaded necklaces from gang members and photographs of guns confiscated in narcotics raids, said the materials were merely propaganda distributed by violent criminals.

"They are an embarrassment to the hard-working Hispanic person," he said about the Latin Kings. He added that a member of the gang recently assaulted a Bridgeport police officer by throwing a rock in his face and that at least four homicides in Bridgeport were linked to the gang.

In comments about the dangers police officers face when confronted by gang members, he said: "Remember the old rule about how you never shoot a cop? Well, with these guys that rule doesn't apply." Reputation and Appearance of Arms

Mr. Villegas, who also teaches at the Police Academy in Bridgeport and briefs suburban police on the characteristics of gangs, said that most gang members carried conventional firearms that were based on reputation and appearance rather than quality. One exception is the Rats and the Tats, who have strong ties to the Shower Posse, an international criminal organization.

"They would never want to be caught with a .22 handgun," he said. "They love high-powered automatics and they're good at using them."

Of the hundreds of illegal guns flooding Bridgeport neighborhoods, Mr. Villegas said, the police may only be able to confiscate about 20 percent. Most guns are found by beat police or through drug raids, he said. Unlike the 1970's when a drug bust required fewer officers and less firepower, today's raids require high-speed dynamics with the assumption that the suspect is armed and dangerous.

"It's like working in a pressure cooker," said Sgt. Joseph Convertito, who supervises narcotics raids for the division. Six to Seven Raids a Week

Narcotics police now average around six to seven raids a week and must respond to all drug cases, from the occasional dealer trying to get money to buy sneakers to the violent career criminal. The followup paperwork involved in each raid can take hours, the sergeant said, noting that while the Police Department tried to adjust to severe layoffs and cutbacks, the drug and gun cases continued to swell.

In some instances, he said, the police come up empty-handed after a raid because dealers often hide drugs or guns outside or in a car. "It's cat-and-mouse all the way," he said. The police must also consider public safety by scheduling raids when few people are outside. At a recent early morning raid in a Bridgeport housing project, the police confiscated crack paraphernalia and residue and arrested two women and four men. Among those arrested was a man Sergeant Convertito said he had picked up two years ago on a gun charge.

"You're too early," the man said to the sergeant, adding that the drug shipment would not be there for three more hours. One of Many Problems

Standing outside the apartment while detectives handcuffed and led suspects to a white police van, Sergeant Convertito said the raid had been one of three planned that day. Neighbors who watched the raid said that while the occupants had been a nuisance, they were simply one of many problems relating to drugs that residents in the projects faced.

The city's drug and gun problem continues to worsen, said the sergeant, and he saw no relief in sight. He added that he found it hard to believe Federal Government studies reporting a decline in drug use in the United States.

"I'd love to know where they got their statistics," he said. "Maybe Iowa."

Other law enforcement officials agreed that the drug trade had become a well-entrenched element of American society with its own set of values and priorities. 'A Bunch of Amateurs

In a separate interview following the accidental shooting of Cesar Sandoval, the 21-year-old drug boss in New Haven said the incident disgusted and angered him.

"Those guys that did that were nothing but a bunch of amateurs who didn't know how to shoot straight," he said. "If you want to get somebody, then you should find your target, then shoot to kill."

Bridgeport Police Chief Thomas Sweeney said fresh ideas were needed to combat the drug war and that he was tired of the arguments, both pro and con, concerning the issue of gun control. He said one of the biggest obstacles in solving the drug violence was the complacency of suburban residents who believed they were immune from the travails of the cities.

"We've got a great big problem on our hands in Connecticut, and everywhere else in this country," he said. "And it's about time we all woke up and stopped dreaming."

Copyright 2006 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Con

The New York Times
nytimes.com

November 29, 1992

# In Cities and Prisons, Hispanic Gang Grows

By RAYMOND HERNANDEZ,

With commando stealth, the Latin Kings, about 50 of them, some in military fatigues, swept into the courtyard of the Mills Street housing complex in this fading industrial city, with guns, bats and knives, bent on bringing a wayward faction into line.

Three recalcitrant members of the gang were seriously injured in the attack on April 26, which sent children and other bystanders fleeing. It was perhaps the most dramatic incident in the violent growth of the Latin Kings, a highly organized band of Hispanic men and women who, law-enforcement officials say, have rooted themselves in Connecticut's cities and prisons for more than a year, cloaking criminal activity with an appeal to cultural identity.

Spray-painted sketches of a five-pointed crown, the graffiti insignia of the Latin Kings, mar utility poles and burned-out buildings in Connecticut's crumbling inner-city neighborhoods, neglected areas with high unemployment, violence and despair. To many, the very name arouses dread. Shopkeepers in Bridgeport fall silent when the Latin Kings are mentioned. In New Haven, parents worry their children will get caught up with the gang. In Stamford, the Latin Kings have begun selling drugs.

The gang, which traces its name to a cultural organization in Chicago in the 1940's, was founded in the Somers Correctional Institute, a maximum security prison, in early 1989 by two inmates, Pedro Millan and Nelson Millett, who make up the ruling authority known as the Supreme Crown, court records say.

The Latin Kings have carved the state into five regions, with commanders, presidents and soldiers. Its members have been linked to drug sales and scores of assaults, and authorities suspect the gang in at least six homicides, said Richard Palmer, the chief state's attorney.

It is not clear how big the group is. Mr. Millan says there are nearly 2,000 members. Other estimates range from 1,300 to 8,000.

What no one disputes is the Latin Kings' portrayal of the group as an organization for the advancement of Hispanic people. It is an image that the authorities see as insidious, but that Mr. Millan defends as a proper appeal to ethnic pride.

"We have to take care of our own," the fast-talking co-founder of the group said during a recent interview at the Hartford Correctional Center. His co-founder, Nelson Millett, is in prison outside the state.

Invoking Malcolm X, Mr. Millan portrayed his group as locked in a social struggle, saying: "We shall not be deterred in our quest to achieve our goals for our Latin community."

A problem law-enforcement officials face is that the gang seems to thrive within prisons while maintaining contact with members on the streets. Members recruited in prison swell the numbers on the streets as they are released. Chief Philosopher

Indeed, the attack in Meriden, court records charge, was orchestrated by Mr. Millan, who bears the title of chief philosopher, over a telephone from a prison in Ray Brook, N.Y. Imprisoned for assault, he had been transferred out of the Connecticut system after officials found his organization involved in a major prison disturbance stemming from a struggle for control of prison rackets. He is now awaiting trial on conspiracy charges in connection with the Meriden assault.

"In the past, once we got criminals into the prison system, they were removed and we didn't have to deal with them," said Sgt. Frank Rudewicz, the intelligence division commander for the Hartford Police Department.

"But what we're finding is that what is happening in the prisons is affecting what is happening on the streets," he added.

Throughout the pockets of Hispanic neighborhoods in the state, the gang's talk of Latin unity has impressed many young men like 19-year-old Harry Rodriguez.

Mr. Rodriguez has had a troubled life. He lives in Bridgeport's blighted east end alongside aggressive drug dealers. He has no job. He never finished high school. He said he served a year in prison for stealing a car, something he denies doing. Joined Gang in Prison

It was during his prison term, starting in May 1991, that he met and joined the Latin Kings. Mr. Rodriguez calls them brothers and says they protected him from thugs and rival prison gangs. They got him whatever he needed in jail: soap, shampoo, toothpaste, toothbrush, underwear, socks, sneakers and food.

In turn, he has given the gang his loyalty and wears its colors -- bead necklaces of black and gold -- like armor. While Mr. Rodriguez acknowledges that some Latin Kings are involved in crime, he adds: "We're not supposed to be like that. We're not supposed to start trouble."

It is not surprising that some members like Mr. Rodriguez cling to such beliefs about the gang's integrity. In outlining the group's philosophy, Mr. Millan said that he and Mr. Millett drew up a thick charter with a cover page featuring a crude drawing of a crown. Members are admonished to adhere to the principles of honor, sacrifice, obedience, love and respect.

The rambling, ungrammatical text has 57 entries, among them a membership creed, prayers, a funeral arrangement form, a history of the organization, and a goal to have 100,000 members by the year 2000.

The charter lists 10 rules, including prohibitions on drug use, lust for relatives of a member, theft, assaults on members and discussion of the organization with nonmembers. Mr. Millan said he did not approve of violence or lawbreaking and said disobedient members faced expulsion.

But documents seized from gang members portray the Latin Kings as a brutal organization, shrouded in rituals and creeds, that punishes those who cross it. The group has an enforcement arm, a military-style band called Terminators, which exacts harsh penalties, the authorities said.

The worst form of punishment is, in the gang's parlance, termination, which the authorities say has led to

people being "beat down" by five or more members, stabbed or shot. In the Meriden case, the attack was ordered because the local chapter was not complying with the gang's rules, court documents say.

Several crimes demonstrate the group's power in the prison system. One man whose name appeared on a termination list obtained by the authorities was an inmate who died after being set ablaze in his cell at the Somers Correctional Institution in April 1991, court records show.

In March, a Cheshire prison guard was accused of being a regional commander for the Latin Kings and of ordering an assault on an inmate, court documents show. In May, another prison guard was arrested in the delivery of razor blades to an inmate in the Cheshire prison who was a member of the Latin Kings. Both cases are pending, said Stephen Grasso, chief inspector for the Chief State's Attorney's Office.

Given the organized nature of the gang, the authorities recently have shifted tactics in fighting the Latin Kings. Whereas the problem was once largely left to the local police, now officials swap information to track the gang's movements.

"The gang was operating throughout the state," said Mr. Palmer, the chief state's attorney. "We all needed to work together on the law-enforcement problem they posed."

Evidence shows that the gang has spread beyond Connecticut. This summer, gang members moved into Springfield, Mass., flashing their gold-and-black beads. In September, a 17-year-old was shot by a member, the police there say.

In investigating this new, mysterious gang, the Springfield police looked across the border for help. They learned that they were up against a formidable foe.

"We were surprised that a street gang would be that organized," said Sgt. Michael Reid of the Springfield police, adding, "They've got a lot of headaches in Connecticut."

Copyright 2006 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Con

The New York Times
nytimes.com

September 19, 1993

# State and Cities Join Forces To Fight Gangs

By JACK CAVANAUGH

FOR a graphic reminder of gang violence in Hartford, Tom Hashem, the communications director for the State Department of Public Safety, doesn't have to leave his office.

"We were sitting around talking one afternoon recently when we heard a shot fired," he said in an interview. "It was startling, to say the least."

The shot is believed to have been fired during a gang skirmish in the Frog Hollow section of Hartford, about a block from the Department of Public Safety's offices on Washington Street. Gunfire has become commonplace in the neighborhood because of a feud between two Hispanic gangs, the Latin Kings and Los Solidos. Two people have been killed.

As a result, an undisclosed number of state police officers have been dispatched to the Frog Hollow neighborhood to supplement Hartford's police force. They were ordered to the area by the Public Safety Commissioner, Nicholas A. Cioffi, at the request of city officials, who were themselves responding to pleas from neighborhood residents for help. Such aid will become more common in coming months when a new program of the Public Safety Department called Reclaim Our Cities and Connecticut Youth is put into effect. Under the program, which was established by state statute on July 1, state police officers may be assigned to cities and towns to work with the local police in an effort to curb gang violence.

So far, 37 specially trained state police officers have been assigned to the program, and about 30 municipalities, from the state's largest cities -- Hartford, Bridgeport and New Haven -- to small communities like Berlin, Cheshire, Orange and Waterford, have expressed an interest.

"Gang violence is out of control in the state," said Mr. Cioffi, who as Commissioner of Public Safety is the head of the state police. "People are frightened to death, and the situation is intolerable. It's disconcerting to see the types of weapons being used by gang members."

The vast majority of the homicides in the state in recent years have been ascribed to gang warfare over drugs. Though most of the homicides have been in the larger cities, a number of the gangs have spread into smaller cities and towns, both to expand drug markets and to recruit new gang members. East Hartford and Vernon are among the smaller towns that have reported a surge in gang activity

"The gangs have become a multi-city problem because many have members in a number of cities and many of the gang members cross city and town lines," Mr. Cioffi, a former Superior Court judge, said.

Under the Reclaim Our Cities program, which has been allocated almost $1 million by the State

Legislature, a state police unit composed of several officers could be sent into a municipality, where it would work with at least two local police officers. The overall unit, which would be under the direction of a state police sergeant, would be assigned to patrol high crime areas, with the state troopers in uniform or plainclothes or undercover.

When its mission has been accomplished, the state police unit would be withdrawn and local authorities would monitor street activities, with the cooperation of community groups. However, the state police unit would be available to return if needed. Cooperation Is Emphasized

A number of conditions must be met before state police officers can be sent to a community. For one thing, a city or town must submit a petition to the Public Safety Department asking for help, but at the same time detailing plans for the enforcement of housing and health codes, street-cleaning and graffiti-removal programs and the condemnation or demolition of abandoned buildings.

"The entire program is premised on a comprehensive, united effort involving the state and participating municipalities," said Mr. Cioffi, who when he was named the Commissioner of Public Safety in 1991 by Gov. Lowell P. Weicker Jr. became the first person outside law enforcement to head the state police. "We only get involved if we're asked. It's up to the city. And even at that, we may so no."

Among the cities that have expressed an interest is Stamford, where a 7-year-old girl was shot and killed when caught in gang crossfire during a birthday party on July 3. As in the case of several other municipalities, Stamford officials were at first wary of the program because local police officers would be under outside control. But they reversed their position after Mr. Cioffi, who lives in Norwalk, allayed the fears of Mayor Stanley Esposito and high police officials at a meeting last month.

In Stamford, as in Hartford, Bridgeport and New Haven, most gang warfare has been confined to one neighborhood. In Stamford, that area has been Southfield Village, a low-income housing project near Interstate 95, which has been a gathering place for drug dealers and buyers and the site of several drug-related homicides.

Mr. Cioffi emphasized that community participation, including a strong follow-up effort, was vital to the program's success.

"Enforcement of itself doesn't work when you're dealing with gangs," he said. "We also have to address social problems. In some cases it may involve tearing down crack houses, establishing neighborhood watch programs, coordinating food programs and even getting rid of abandoned cars and graffiti." The Cities Seek Help

In addition to helping the local police cope with gang violence, the program broadens the scope of the state's fight against street gangs, most of which are made up of young men, many in their teens.

"One of the advantages is that state police in the task force can cross city borders in going after gang members, something that local police can't do," Mr. Cioffi said. "And some of the gangs, such as the Latin Kings, have branches around the state. State police in the task force know many of the key gang members and their modus operandi throughout the state. That knowledge is very important."

Mr. Cioffi said Governor Weicker had asked his agency to develop an antigang program after he had received numerous requests from city officials for state help in combating the growth of urban violence.

At first, the Public Safety Department set up a 90-day pilot program called Save Our Streets. Mobile

tactical units made up of state police and local police officers were set up in high-crime areas in Hartford, Bridgeport and New Haven to get criminals off the streets. At the outset, a large number of arrests were made. "But when we withdrew, the criminal element returned with a vengeance," said Renee Bevacqua, who is Mr. Cioffi's chief of staff.

Under the Save Our Streets program, once the mobile units of state police and local officers pulled out, neighborhood groups were expected to work closely with community police representatives to insure that their areas did not revert to their former status. "But the follow-up effort never did take place," Mr. Cioffi said, "and so the plan failed."

Entrusted with the development of a new program, Ms. Bevacqua studied antigang efforts across the country. "One thing I realized we had to do was address social issues and not just make it a law enforcement effort," she said in an interview. The result was the Reclaim Our Cities program, which Ms. Bevacqua and Mr. Cioffi said is the only one of its kind in the nation.

The program will be directed by a statewide cooperative Crime Control Task Force policy board. The board will include a standing state committee and subcommittees in each city and town taking part. The standing committee will be diverse and include Mr. Cioffi as its head; representatives from the Chief Court Administrator's office, the State's Attorney's office, the State Corrections Department and the Municipal Police Training Council, and the commanding officer of the task force. Municipal subcommittees will include mayors or first selectmen, chiefs of police and three representatives from diverse elements of communities taking part. A Shared Responsibility

Mr. Cioffi emphasized that state police officers would rely heavily on the local police for advice about specific neighborhoods. "The state police officers taking part will have to familiarize themselves with an area, since they won't have much knowledge about the neighborhoods they're assigned to," he said. "And as a rule, they'll patrol together with local officers. It could be very dangerous for them to patrol alone.

"This is a cooperative effort in every way, involving coordination between law enforcement and the community as a whole. But the program will not succeed unless there is cooperation between everyone involved and unless there are follow-up efforts by the community.

"The gang problem is out of control, and we believe that law enforcement and the community as a whole has to share the responsibility for making and keeping Connecticut streets safe again."

Copyright 2006 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Con

The New York Times
nytimes.com

June 30, 1994

# 16 Charged As Members Of Drug Ring

By GEORGE JUDSON,

Sixteen people said to be members of the Latin Kings gang were arrested today and charged with conspiring to sell cocaine and heroin in Connecticut's largest cities.

The early morning arrests, centered in Bridgeport and New Haven, included the four highest-ranking Latin Kings in the state, said the United States Attorney for Connecticut, Christopher F. Droney. They and the others charged under Federal drug conspiracy laws face 20 years or more in prison if convicted. Described as Self-Help Group

The Latin Kings, with chapters in Connecticut, New York, Illinois and Florida, describe themselves as a Hispanic self-help organization. But authorities have accused them of drug dealing, and of murders associated with the drug trade and with their internal discipline since the chapters were formed in and then spread through state prisons in the late 1980's. The arrests yesterday were carried out by Federal, state and local authorities.

"Our arrest show that many members of the Latin Kings have engaged in extensive drug dealing, violence and organized gang activities," Mr. Droney said. "We expect that these prosecutions will substantially reduce the ability of the Latin Kings organization to continue its widespread criminal activities."

Mr. Droney said the arrests were not related to an investigation by Federal and New York City authorities that resulted last week in Federal racketeering charges against 20 Latin Kings in the city. Those indictments included the murders of eight people, seven fellow gang members.

Mr. Droney said the case against those arrested today may be expanded into a racketeering indictment, but at this time the charges include only drug conspiracy and weapons counts.

Five other Latin Kings are being prosecuted under the Federal racketeering law. The crimes they are charged with include the death of a 16-year-old bystander in New Haven during a failed attempt at a killing in 1992. Task Force Efforts

The Connecticut investigation, begun more than a year ago, was modeled on Federal, state and local task force operations that broke up violent drug gangs in the state, including the Jungle Boys in New Haven and the Green Top Posse in Bridgeport, said the F.B.I.'s special agent in charge, Milt Ahlerich.

These arrests, Mr. Ahlerich said, were more of the same, involving "a gang calling itself the Latin Kings."

Case 1:90-cv-00162-LJB Document 637-13 Filed 03/29/2007 Page 13 of 32

Mr. Droney identified the four high-ranking Latin Kings as Manuel E. Roman, Richard Morales, Beatrice Codianni and Jose Rodriguez Torres. But he refused to describe their roles in the organization's heirarchy.

Ms. Codianni, a member of the Latin Kings' board of directors, is a well-known spokeswoman for the group, who has defended the organization as one that has violence in its past but now is increasingly committed to community and cultural work.

"The media doesn't want to hear about anything positive," she said in an interview in May 1993, shortly after the task force raided her apartment in New Haven and took Latin King membership lists. "They just want me to tell them where all the dead bodies are."

The Connecticut chapter was formed in the state's maximum-security prison, Somers Correctional Institution, in 1989 by two inmates, Pedro Millan and Nelson Millett. Its growth in the poor neighborhoods of Bridgeport, New Haven, Meriden and Hartford coincided with the spread of crack cocaine through the state. Soon other gangs, including Los Solidas and 20 Love, were also on the streets.
Military-Style Assault

Connecticut authorities began cooperating across town and city lines to combat the Latin Kings in 1992, soon after the gang mounted an assault of military magnitude on a housing project in Middletown to punish three of its members living there, the authorities said.

Mr. Droney said the task force was continuing its investigation and more arrests were expected throughout the state. The task force includes not only the United States Attorney's office and F.B.I. but also the Federal Drug Enforcement Administration, Bureau of Alcohol, Tobacco and Firearms and Department of Housing and Urban Development, and the state's attorney's office, state police, and state Corrections Department and local police in Bridgeport, New Haven, Hartford, Meriden, Norwalk and Fairfield.

"The message is very clear to those who want to join gangs and break either Federal or state law," said Chief State's Attorney John M. Bailey. "You'll find yourself in handcuffs."

"This is our first step," Mr. Bailey said, "I think it's the death knell of our gang problem in the state of Connecticut."

Fourteen of the people arrested today were charged under Federal drug conspiracy laws and one under state laws, and one was charged under Federal gun possession laws. Warrants on state drug charges have been issued for three other Latin Kings, two of whom are currently in jail on other state charges.

Copyright 2006 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Con

HUD 250

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF KATHERINE E. TAKACS**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator with the Department of Housing and Urban Development, Office of Inspector General (HUD-OIG) on May 17, 1992 and left the agency in January of 2003. I was a GS-12 OPM Series 1811 investigator until March 14, 1999, when I became a GS-13.

2. HUD criminal investigators were converted to the pay system known as Law Enforcement Availability Pay ("LEAP" or "Availability Pay") on October 30, 1994 and removed from coverage under the FLSA.

3. I filed my case on October 16, 1990, when I was an 1811 GS-12 with the Defense Criminal Investigative Service ("DCIS"). I was a criminal investigator with DCIS from May of 1989 to May 1992. Just prior to my employment with DCIS, I had been a GS-12 criminal

investigator with the Bureau of Alcohol, Tobacco and Firearms ("BATF"), and I have been paid FLSA for my GS-12 time with BATF. I was treated by HUD as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA.

4. While at HUD-OIG I was assigned to the Detroit Sub-Office, which reported to the Chicago Field Office. For the first several years I worked with one other agent, Michael Groszkiewicz, a non-supervisory GS-13 criminal investigator, who is also a plaintiff in this case. Groszkiewicz and I were supervised by various GS-14 Assistant Special Agents in Charge ("ASAC"), who were located in the Chicago office. I worked in the Detroit office my entire tenure at HUD-OIG. The Detroit office had geographic jurisdiction over the State of Michigan, although I conducted or assisted in investigations throughout the country.

5. When I began with HUD OIG, I was issued a Smith & Wesson Model 19 .357 caliber revolver. I was sent to firearms training at FLETC in April 1993 and again in June 1994 to be specifically certified in 9mm semiautomatic pistol instruction. In October 1994, HUD OIG converted to the Sig Arms 228 9mm caliber semi-automatic pistol. I also assisted in training other criminal investigators in the use of this firearm; however, I only spent about 32 hours per year doing this. In 1995, after the relevant time period, I was issued a shotgun and, in 1998, I was certified on the H & K machine gun.

6. As a HUD OIG Special Agent, I conducted investigations involving all the major HUD programs, including many complex investigations involving procurement and contract fraud. There are several specific criminal statutes uniquely applicable to HUD programs. The first, 18 U.S.C. § 1010, "Department of Housing and Urban Development and Federal Housing

Administration Transactions," prohibits the making of false statements or documents in connection with a loan, credit facility or mortgage insured by the Department. The second, 18 U.S.C. § 1012, "Department of Housing and Urban Development transaction," prohibits certain false representations or failure to disclose certain information to the Department. The third, 12 U.S.C. § 1715z-19, "Equity Skimming Penalty," provides a felony penalty for pocketing the funds from certain housing projects when the project is financially distressed or the mortgage in default. In addition, another equity skimming statute, 12 U.S.C. § 1709-2, for single family mortgages, provides criminal penalties for those who collect rents on properties with HUD insured mortgages and then do not use the money to pay the mortgage. The fourth statute, 12 U.S.C. § 2607, an anti-kickback statue, provides criminal penalties for those who pay or accept kickbacks in connection with HUD insured mortgages or any federally backed mortgage. In 1994, when HUD OIG expanded their mission to include investigating drug and violent crime violation in HUD funded housing, I also investigated Title 21 violations involving drug violations.

7. As a HUD OIG agent, I conducted similar criminal violations to the ones that I conducted as an agent with ATF and DCIS. These violations included Mail Fraud (18 USC 1341) and False Statements (18 USC 1001) violations, which I used to prosecute individuals who provided false information on firearms registration and purchase documents. I also used the same investigative techniques with ATF and DCIS as I did as a HUD OIG agent, such as interviewing, surveillance, undercover operations, informants, document analysis and review of

financial documents. I conducted these investigations with the assistance of other federal, state, and local law enforcement agencies such as the federal Bureau of Investigation ("FBI"), Alcohol Tobacco, and Firearms ("ATF"), Internal revenue service ("IRS") and the Drug Enforcement Agency ("DEA").

8. As a HUD OIG agent during the relevant time frame, I conducted a complex equity skimming investigation involving five family members who illegally assumed FHA and conventional mortgages without the homeowner's knowledge and took all the equity out of the properties. These individuals obtained several additional mortgages against the properties, which were greater than the appraised value. Once the funds were taken from the houses, the perpetrators let the houses go into foreclosure creating a loss of several million dollars to HUD and a number of federally insured banks. During the investigation, I subpoenaed numerous bank accounts and mortgage records in order to trace the flow of illegal proceeds of the defendants. I was required to maintain, track and log all the evidence. This was a high profile investigation that was featured on the front page of The Detroit News. All five subjects of the investigation pled guilty to Bank Fraud (18 USC 1344) and False Claims (18 USC 287) charges. As a result of my investigation, I received a performance award.

9. As a HUD OIG agent during the relevant time period, I also conducted a public corruption investigation involving Detroit Public Housing Authority ("PHA") officials, who forced tenants to pay "kickbacks" to participate in the Section 8 program. I conducted this investigation jointly with an agent from the FBI. The investigation involved contracts between the City of Detroit and HUD and numerous contracts between the City of Detroit and the residents of public housing.

10. The critical issue of the investigation was whether the HUD Annual Contributions Contract ("ACC") prevented the City officials from forcing the tenants to pay additional rent and whether that was a prosecutable violation of federal law. I researched the matter and interviewed HUD Attorneys and program officials and was able to convince the Assistant United States Attorney ("AUSA") to prosecute. The investigation involved thousands of documents that were needed during the grand jury presentation and later at trial.

11. The investigation resulted in the conviction of four city officials and I received letters of Commendation from the United States Attorneys Office and a letter from the Director of the FBI. The case was appealed to the Federal Courts Appeals and the convictions were sustained and the case is now used as a precedent throughout the country.

12. When HUD OIG initiated their drug and violent crime initiative, know as Operation Safe home ("OSH"), HUD OIG and the Department of Justice ("DOJ") selected 13 priority cities, which included Detroit. The investigation required the use of electronic monitoring, narcotic purchases, search warrants and arrest warrants. As a result of our efforts, over 80 persons were arrested. Additionally, seven individuals were federally indicted for violating federal narcotics statutes, including violating continuing criminal enterprise statutes.

13. In addition, I was the HUD OIG agent assigned to the Ypsilanti Task Force that consisted of HUD OIG, FBI, ATF, Michigan State Police, U.S. Marshals Service and Ypsilanti Police Department. I conducted and participated in the initial undercover operation that included

obtaining an undercover apartment and meeting with members of the notorious Bloods Street Gangs, as well as making narcotics and firearms purchases. I conducted the undercover activities with an agent from the ATF.

14. This resulted in the indictment of over 30 individuals on federal RICO charges. This investigation resulted in solving several homicides and the arrest of the perpetrators involved in the shooting of five Washtenaw Sheriff's Department Deputies. I received an award from the Washtenaw Sheriff's Department for my undercover efforts in this investigation. As a result of this investigation I received an outstanding evaluation and a sustained superior performance award in 1998.

15. During the relevant time period, I did not conduct or work on any cases involving HUD employees, and I do not recall ever investigating any administrative investigation involving HUD employees. In 2001 and 2002, I did participate in two employee investigations that resulted in criminal investigations. One involved a HUD employee, who used his position to sell a HUD owned house to family members at a reduced price and the other involved an employee who made false statements on a loan application.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 2/27/07

Katherine E. Takacs

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STEPHEN S. ADAMS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 90-162C and consolidated cases (Judge Bush) |

**DECLARATION OF PHILIP WRONA**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct:

1. I began work as a criminal investigator with the Department of Housing and Urban Development ("HUD") Office of Inspector General ("OIG") in the Office of Investigations ("OI") on January 12, 1992. Due to my extensive experience as a criminal investigator, my initial appointment was as a GS-12 criminal investigator, also known as a Special Agent. Prior to my employment by the HUD OIG OI, I was a criminal investigator with the Immigration and Naturalization Service ("INS"). Prior to INS, I was a sworn police officer, strike force detective sergeant, sector supervisor and officer-in-charge for a large city police department.

2. I left HUD on September 4, 1993, because the Department was not paying agents proper percentages of Administratively Uncontrollable Overtime ("AUO"). I frequently worked

many hours of AUO that HUD would not pay for because the Department imposed a budget cap on the Special Agent's In Charge budget for Special Agent's AUO compensation. The budgetary cap dictated how many Special Agents could receive AUO and in what percentage, regardless of the amount of overtime that an agent had to work to complete an investigation.

3. Each fiscal quarter, management would rotate the agents receiving accurate compensation. Because of this artificial rotation, I was compensated at a 15% AUO rate for quarters during which pressing criminal caseloads caused me to work an average 13 and 17 hours of AUO per week, which should have been compensated at 25% AUO. However, with obligations to the Department and to Assistant United States Attorneys on my open criminal investigations, I worked the hours necessary to be successful and obtain criminal convictions.

4. The Performance Appraisal that the Department used to judge my performance stated, "Case planning and management is done independently and produces exceptional results." It also required: "Demonstrates a high level of resourcefulness in case presentations, trials, and administrative proceedings." While I never participated in an administrative proceeding, I did participate in a number of criminal investigative proceedings that required work to be performed outside of normal business hours that should have been compensated by the proper percentage of AUO. I felt that the Department placed me in a catch-22 situation. Do well and keep the position by working without compensation; or perform minimal work by not working as the Department and prosecutors required and risk losing my job. I chose to do well and keep my position – until I could secure another criminal investigator position. I expressly recall a conversation I brought up with HUD management. I told management that I had averaged over 17 hours AUO per week, but that I was not paid proper AUO. Management explained to me that the office only had so much AUO money and that to be fair they rotated

each quarter which agents would be paid proper AUO. After several calendar quarters of not being legally, accurately and fairly compensated, I decided to leave the Department. During my tenure with HUD, the first quarter was paid at 10% AUO, the second quarter at 10% AUO, the third quarter at 25% AUO, the fourth quarter at 20% AUO, the fifth quarter at 15% AUO, the sixth quarter at 15% AUO and the seventh quarter at 25% AUO.

5. I began work as a GS-7 criminal investigator with INS in May 1988, and worked at INS as a GS-12 until I transferred to HUD. I left HUD to work as a GS-12 criminal investigator at the IRS from September 5, 1993, until October 25, 1997, and I went back to INS as a GS-13 and GS-14 criminal investigator from October 26, 1997, until March 8, 2003. I am currently a GS-14 criminal investigator, Assistant Special Agent in Charge ("ASAC"), with the Department of Homeland Security ("DHS") in Tucson, Arizona.

6. I filed my case on March 4, 1994, while a GS-12 criminal investigator with the IRS. (I have been paid FLSA for my time at IRS.) I was treated by HUD as FLSA exempt. I regularly worked overtime for which I was not paid pursuant to FLSA. At HUD, I worked alone out of an office in Coral Gables, Florida, under the supervision of the Assistant Special Agent in Charge ("ASAIC") in the Atlanta, Georgia office. I spent most of my time, however, in Fort Lauderdale in Broward County on a large investigation known as HUD Busters. Ironically, I was doing the same substantive work for HUD on HUD Busters that I had been doing previously at INS, investigating illegal aliens and fraud.

7. There are several specific criminal statutes uniquely applicable to HUD programs. The first, 18 U.S.C. § 1010, "Department of Housing and Urban Development and Federal Housing Administration Transactions," prohibits the making of false statements or documents in connection with a loan, credit facility or mortgage insured by the Department. The second, 18

U.S.C. § 1012, "Department of Housing and Urban Development transaction," prohibits certain false representations or failure to disclose certain information to the Department. The third, 12 U.S.C. § 1715z-19, "Equity Skimming Penalty," provides a felony penalty for pocketing the funds from certain housing projects when the project is financially distressed or the mortgage in default. In addition, another equity skimming statute, 12 U.S.C. § 1709-2, for single family mortgages, provides criminal penalties for those who collect rents on properties with HUD insured mortgages and then do not use the money to pay the mortgage. The fourth statute, 12 U.S.C. § 2607, an anti-kickback statue, provides criminal penalties for those who pay or accept kickbacks in connection with HUD insured mortgages or any federally backed mortgage.

8. HUD Busters was a program that began when the head of the Broward County Housing Authority began to suspect fraud was being committed by a large group of Nigerians in connection with a HUD subsidized housing program known as Section 8. In connection with this case, I performed the exact same type of work that I had performed at INS and later at IRS: I investigated leads, developed and controlled confidential informants, interviewed witnesses, conducted covert surveillance, used body wires, and examined documents including records, computer printouts, contracts and financial documents. I prepared, applied for, received and executed federal arrest warrants. Pursuant to Grand Jury Secrecy Requirements found under Fed. R. Crim. P. 6(e), I testified before the Grand Jury and later at federal trials. Numerous other Federal, state and local agents worked with me during this investigation, including Border Patrol agents. When the targets were arrested on Federal arrest warrants, Border Patrol also arrested them for immigration violations. During the second phase of Operation HUD Buster, I worked with 96 federal agents from several federal agencies, including but not limited to the U.S. Secret

Service and INS, in simultaneous arrests in three different federal court divisions of the Southern District of Florida: Miami, Fort Lauderdale and West Palm Beach.

9. During my time with HUD, I also worked on a number of other investigations. One involved fraud allegations in connection with Hurricane Andrew. I was the only federal agent that I know of who worked closely with then Miami-Dade State Attorney Janet Reno's staff on the Dade County Grand Jury Spring Term A.D. 1992 and Fall Term A.D. 1992. I located and interviewed witnesses and determined their suitability to testify. I then prepped the witnesses for their grand jury appearance. The grand jury findings provided impetus for dramatic changes in the South Florida building code and exposed the cronyism and fraud that was prevalent in Dade County. Coincidently, based upon this work, HUD Headquarters offered me a non-competitive promotion to a GS-13 to continue to work for HUD, after I had accepted a job offer from IRS.

10. Other investigations I conducted for HUD during the relevant time period were on violations of Federal criminal code involving allegations of equity skimming, entitlement fraud, bankruptcy fraud and mortgage fraud. (I have attached a discussion of equity skimming as Exhibit A.) These investigations targeted public figures and private citizens defrauding the United States. Some of these investigations were worked independently, while others were conducted as joint investigations with the FBI, Secret Service, Veterans Administration OIG and others. During these investigations, I did the same work as the FBI agents and the other federal agents: obtained and served subpoenas, reviewed bankruptcy, tax and financial records as well as contracts, invoices and business documents, conducted interviews, prepped witnesses, wrote reports, met with prosecutors, obtained and executed search and arrest warrants, conducted

surveillance and applied my knowledge and expertise to investigate violations of the criminal statutes of the United States.

11. As a HUD criminal investigator, I was issued a firearm. I qualified with the firearm quarterly and carried it daily. There was good reason to be armed, as I worked independently and alongside FBI, Secret Service, INS, state and local police and other law enforcement officers. The Position Description that HUD provided me prior to being hired indicated the need for a weapon. The Position Description states, "The investigations conducted by the incumbent also require him from time to time to contact individuals who have been associated with underworld characters, and frequently these contacts or interviews are made at night in neighborhoods where, if the true identity and objective of the investigator were known, reprisals involving serious physical injury could result." My investigations required me to meet "underworld characters" in neighborhoods at night where law enforcement was at risk, and I was armed to protect myself while conducting these investigations.

12. During my tenure with HUD, I do not recall being trained in the investigation of HUD employees; however, that kind of training was never needed since I cannot recall a single case being worked against a HUD employee during my tenure with the Department.

13. I did investigate, indict and convict thirty-five criminal targets in Federal District Court during the approximately seven calendar quarters that I worked with HUD.

Declaration Pursuant to 28 U.S.C. § 1746

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 3/10/07

Philip Wrona
Philip Wrona

# EXHIBIT A

Chris Swecker, Assistant Director, Criminal Investigative Division
Federal Bureau of Investigation, Before the House Financial Services Subcommittee on Housing and Community Opportunity October 7, 2004:

> Although there are many mortgage fraud schemes, the FBI is focusing its efforts on those perpetrated by industry insiders. The FBI is engaged with the mortgage industry in identifying fraud trends and educating the public. Some of the current rising mortgage fraud trends include: equity skimming, property flipping and mortgage identity related theft. **Equity skimming is a tried and true method of committing mortgage fraud and criminals continue to devise new schemes. Today's common equity skimming schemes involve the use of corporate shell companies, corporate identity theft and the use or threat of bankruptcy/foreclosure to dupe homeowners and investors.**

"Inspector General at HUD and USDA," Journal of Real Estate Finance (Spring 2003):

> Equity skimming is another abusive practice that comes in various forms. The most common practice and scenario involve one where the property is in foreclosure. The homeowner the property is in foreclosure. The homeowner is approached by B who promises to help him/her out of the foreclosure. B asks homeowner to convey the property to B as security for his/her loan to be used to payoff the existing mortgage. B promises that when the homeowner pays off B, B will convey the property back to homeowner. Invariably, what happens is that B gets the title in his/her name and refinances the property, taking out all of the equity in the property. Once B refinances, he skips out, does not pay the new mortgage leaving homeowner with a new foreclosure suit. The other scenario is that B takes out the new mortgage and once the homeowner fails to pay B, B evicts the tenant from his home. Hence, the coined term equity skimming: The homeowner's equity has been skimming.

From HUD OIG's 4/1/06 – 9/30/06 Semi-Annual Report to Congress:

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STEPHEN S. ADAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 90-162C |
| | ) | and consolidated cases |
| THE UNITED STATES, | ) | (Judge Bush) |
| | ) | |
| Defendant. | ) | |

STIPULATION BY THE PARTIES REGARDING THE
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

In lieu of plaintiffs taking a deposition pursuant to Rule 30(b)(6) of the Rules of the United States Court of Federal Claims on the issue of criminal investigators in the Office of Inspector General ("OIG") of the Department of Housing and Urban Development ("HUD") leading investigations and a deposition of Raymond A. Carolan, the parties stipulate to the following facts: HUD has not stated how much time a typical criminal investigator in its OIG spent leading an investigation during the time period relevant to this litigation. During the period February 16, 1987 through October 30, 1994, HUD's OIG's criminal investigators spent the majority of their time planning and conducting investigations. During the period February 16, 1987 through October 30, 1994, HUD's OIG's criminal investigators typically worked as the sole HUD OIG criminal investigator on an investigation.

Respectfully submitted,

/s/ Jules Bernstein

OF COUNSEL:

Linda Lipsett

Jules Bernstein
Bernstein & Lipsett, P.C.
1920 L Street, N.W., Suite 303
Washington, D.C. 20036
(202) 296-1798
(202) 296-7220 facsimile

Counsel of Record

/s/ Edgar James

Edgar James

James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036
(202) 496-0500
(202) 496-0555 facsimile

Attorneys for Plaintiffs

PETER D. KEISLER
Assistant Attorney General

/s/ Jeanne E. Davidson

JEANNE E. DAVIDSON
Director

/s/ Shalom Brilliant

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-7561

Attorneys for Defendant

OF COUNSEL:
Michael J. Dierberg
William P. Rayel
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

March 21, 2007