No. 90-162C
and consolidated cases
(Judge Bush)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STEPHEN S. ADAMS, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION AND RESPONSE TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING PLAINTIFFS EMPLOYED BY THE OFFICE OF INSPECTOR GENERAL IN THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 616-8275
Fax: (202) 305-7643

OF COUNSEL:
Michael J. Dierberg
William P. Rayel
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

May 14, 2007

Attorneys for Defendant

# TABLE OF CONTENTS


ARGUMENT ........................................................................................................ 2

I. The Duties Performed By The Plaintiffs At Issue Here Meet The Definition Of A "Supporting Service Of Substantial Importance" Pursuant To OPM's Regulations And The Definition Set Forth In This Case ..................................... 4

II. Conducting Criminal Investigations For The Purpose Of Improving The Integrity And Efficiency Of HUD Is An Administrative Function, Distinguishable From The Production Function Of Criminal Investigators In Police Departments And Agencies Charged With Enforcing Regulatory Compliance ........................................................................................ 9

III. Plaintiffs' Authorities That Do Not Involve Criminal Investigators Are Inapposite Or Distinguishable ............................................................... 19

IV. The Court Should Consider The Mission Of HUD, Not HUD's OIG, Or One Of Its Subdivisions, In Applying The Administration/Production Dichotomy ........................................................................................ 24

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

Adams v. United States,
178 F.3d 1306 (Fed. Cir. 1998) .......... 4, 5

Adam v. United States,
26 Ct. Cl. 782 (1992) .......... 19

Adams v. United States,
65 Fd. Cl. 195 (2005) .......... 4, 5

Adams v. United States,
27 Fed. Cl. 5 (1992), rev'd in part, 178 F.3d 1306 (Fed. Cir. 1998) .......... 4, 12, 24, 25

Ahern v. New York,
807 F. Supp. 919 (N.D.N.Y. 1992),
aff'd sub. nom., Reich v. New York, 3 F.3d 581 (2d Cir. 1993) .......... 9, 10

Amshey v. United States,
26 Cl. Ct. 582 (1992), vacated by settlement,
35 Fed. Cl. 358 (1993) .......... 10, 24

Auer v. Robbins,
65 F.3d 702 (8th Cir. 1995), aff'd,
519 U.S. 452 (1997) .......... passim

Berg v. United States,
49 Fed. Cl. 459 (2001) .......... 20, 22

Bothell v. Phase Metrics, Inc.,
299 F.3d 1120 (9th Cir. 2002) .......... 7, 20

Bratt v. County of Los Angeles,
912 F.2d 1066 (9th Cir. 1990) .......... 3, 9, 10

Campbell v. United States Air Force,
755 F. Supp. 893 (E.D. Cal. 1990), vacated by settlement,
972 F.2d 1352 (Fed. Cir. 1992) .......... 4, 22, 23

D'Camera v. District of Columbia,
693 F. Supp. 1208 (D.D.C. 1988) .......... 10

Feiler v. Hyatt Corp.,
No. 98-2863-CIV,
1999 U.S. Dist. LEXIS 23407 (S.D. Fla. Dec. 8, 1999) adopted by,
2000 U.S. Dist. LEXIS 22693 (S.D. Fla. Feb. 11, 2000) ............................................ 18

Ferrell v. Gwinnett County Bd. of Educ.,
No. 1:05-cv-2047-TCB,
-- . Supp. 2d. --, 2007 WL 962853 (N.D. Ga. Mar. 30, 2007) ............................... passim

Hickman v. United States,
10 Cl. Ct. 550 (1986) ............................................................................................ 22

Jastremski v. Safeco Insurance Cos.,
243 F. Supp. 2d 743 (N.D. Ohio 2003) .................................................................. 14

Martin v. Cooper Elec. Supply Co.,
940 F.2d 896 (3d Cir. 1991) ............................................................................... 3, 18

Martin v. Indiana Michigan Power Co.,
381 F.3d 574 (6th Cir. 2004) ................................................................................ 20

Mulverhill v. New York,
No. 87-CV-853, 1994 WL 263594 (N.D.N.Y. May 19, 1994) .............................. 3, 9, 11

Palacio v. Progressive Insurance Co.,
244 F. Supp. 2d 1040 (C.D. Cal. 2002) ................................................................ 14

Raper v. Iowa,
688 N.W.2d 29 (Iowa 2004) ........................................................................... passim

Reich v. Haemonetics Corp.,
907 F. Supp. 512 (D. Mass 1995) ...................................................................... 3, 18

Reich v. New York,
3 F.3d 581 (2d Cir. 1993) ................................................................................ passim

Roney v. United States,
790 F. Supp. 23 (D.D.C. 1992) .................................................................... 10, 20, 23

Shockley v. City of Newport News,
997 F.2d 18 (4th Cir. 1993) ............................................................................. passim

Sprague v. United States,
230 Ct. Cl. 492 (1982) .......................................................................................... 19

Statham v. United States,
No. 00-699C, 2002 WL 31292278 (Fed. Cl. 2002) ................................................ 20, 21

**REGULATIONS**

5 C.F.R. 551.104 ........................................................................................... 4, 20, 21

5 C.F.R. § 551.205(a)(2) (1990) ........................................................................................ 4

5 C.F.R. § 551.206(a)(2) ................................................................................ 4, 20, 22

29 C.F.R. § 541.201(b) .................................................................................................... 24

**OTHER ADMINISTRATIVE MATERIALS**

Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees,
69 Fed. Reg. 22122-01, 22130 (Apr. 23, 2004) ............................................................ 17

Inspector General Authority to Conduct Regulatory Investigations,
13 Op. O.L.C. 54, 1989 OLC LEXIS 70 (March 9, 1989) ...................................... 11, 12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STEPHEN S. ADAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 90-162C |
| | ) | and consolidated cases |
| THE UNITED STATES, | ) | (Judge Bush) |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION AND RESPONSE TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING PLAINTIFFS EMPLOYED BY THE OFFICE OF INSPECTOR GENERAL IN THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Defendant, the United States, respectfully replies to plaintiffs' opposition to our motion for partial summary judgment concerning plaintiffs employed as GS-1811-12 and GS-1811-13 criminal investigators in the Office of Inspector General ("OIG"), in the Department of Housing and Urban Development ("HUD"), and responds to plaintiffs' cross-motion for partial summary judgment concerning the same plaintiffs.[1] In its response to our motion for partial summary

[1] The Government adopts the following convention to clarify and abbreviate its references in this brief:

(a) "Def. HUD Mem." refers to Defendant's Motion for Partial Summary Judgment for the HUD criminal investigators;
(b) "Def. HUD App." refers to the Appendix to Defendant's Motion for Partial Summary Judgment for the HUD criminal investigators;
(c) "Def. Resp. to Pl. HUD PFUF" refers to Defendant's Response to Plaintiffs' Proposed Findings of Uncontroverted Fact to support their Cross-Motion for Partial Summary Judgment for the HUD criminal investigators.
(c) "Pl. HUD Mem." Plaintiffs' Cross-Motion and Opposition To Defendant's Motion For Partial Summary Judgment for the HUD criminal investigators.
(d) "Pl. HUD App." refers to the Appendix to Plaintiffs' Cross-Motion and Opposition To Defendant's Motion For Partial Summary Judgment for the HUD criminal investigators;
(e) "Pl. HUD PFUF" refers to Plaintiffs' Proposed Finding of Uncontroverted Fact to support their Cross-Motion and Opposition To Defendant's Motion for Partial Summary Judgment for the HUD criminal investigators; and
(f) "Pl. Resp. to Def. HUD PFUF" refers to Plaintiffs' Response to Defendant's Proposed

judgment, plaintiffs have failed to prove that the Government is not entitled to partial summary judgment, as a matter of law, with regard to GS-1811-12 and GS-1811-13 criminal investigators employed by HUD's OIG.[2] Therefore, this Court should grant our motion for partial summary judgment with respect to GS-1811-12 and GS-1811-13 criminal investigators employed by HUD's OIG and deny plaintiffs' motion for partial summary judgment regarding the same plaintiffs.

## ARGUMENT

Plaintiffs have conceded, for purposes of these motions, that GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG meet the non-manual work and discretion and independent judgment tests, leaving only the primary duty test at issue. Pl. HUD Mem. 6-7. The difference between plaintiffs' view and our view of the primary duty test is that plaintiffs assert that all criminal investigators perform FLSA non-exempt work, so long as they spend the majority of their time conducting investigations of violations of criminal law, whereas, we argue that the purpose of the criminal investigations matter in whether the plaintiffs are performing the mission of the agency or performing exempt support work. Our view is supported by the case law; plaintiffs' view is not. E.g., Ferrell v. Gwinnett County Bd. of Educ., No. 1:05-cv-2047-TCB, -- F. Supp. 2d. --, 2007 WL 962853 (N.D. Ga. Mar. 30, 2007) ("there is a critical distinction between police officers who work for a law enforcement agency and Plaintiffs, who are employed by the School System, due to the difference in their respective employers'

---

Findings of Uncontroverted Fact to support their Motion for Partial Summary Judgment for the HUD criminal investigators.

[2] In neither their brief nor their response to our proposed finding of uncontroverted fact, did plaintiffs attempt to assert any genuine issues of material fact.

businesses.") (citations omitted) (emphasis added); Reich v. Haemonetics Corp., 907 F. Supp. 512, 517 (D. Mass 1995) ("Haemonetics") (quoting Martin v. Cooper Elec. Supply Co., 940 F.2d 896 (3d Cir. 1991)) ("Cooper") ("'it is important to consider the nature of the employer's business' when deciding whether an employee is an administrative or production worker").

Plaintiffs argue that they are entitled to summary judgment because criminal investigators have traditionally not met the primary duty test under Department of Labor ("DOL") or Office of Personnel Management ("OPM") regulations. E.g., Pl. HUD Mem. 3, 13, 16-19. However, cases in which police officers, criminal investigators, etc., have been held to not meet the primary duty test were cases in which the officers were performing the law enforcement mission of their employer. E.g., Reich v. New York, 3 F.3d 581 (2d Cir. 1993) ("Reich"); Bratt v. County of Los Angeles, 912 F.2d 1066 (9th Cir. 1990); Mulverhill v. New York, No. 87-CV-853, 1994 WL 263594 (N.D.N.Y. May 19, 1994). In contrast, where investigators are performing investigatory work for the purpose of protecting the integrity of the department for which they work, they have consistently been held to meet the primary duty test. Auer v. Robbins, 65 F.3d 702, 720-21 (8th Cir. 1995), aff'd, 519 U.S. 452 (1997); Shockley v. City of Newport News, 997 F.2d 18, 28 (4th Cir. 1993); Raper v. Iowa, 688 N.W.2d 29, 43-44 (Iowa 2004).

When the plain language of OPM's regulations is applied, it becomes evident that, consistent with Auer, Raper, Shockley and Ferrell, GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG perform a support service of substantial importance to HUD because the duties of those investigators are to protect the integrity and efficiency of HUD by

preventing fraud upon HUD and its programs or protecting HUD's public and assisted housing from violent crime.

I. The Duties Performed By The Plaintiffs At Issue Here Meet The Definition Of A "Supporting Service Of Substantial Importance" Pursuant To OPM's Regulations And The Definition Set Forth In This Case

One of the ways to establish that an employee's job meets the primary duty test is to demonstrate that the employee's primary duty consists of work involving "general management or business functions or supporting services of substantial importance to the organization serviced." 5 C.F.R. § 551.205(a)(2) (1990) (currently codified at 5 C.F.R. § 551.206(a)(2) (2006)). The employee's work must also "involve substantial discretion on matters of enough importance that the employee's actions and decisions have a noticeable impact on the effectiveness of the organization . . . serviced." 5 C.F.R. § 551.104 (emphasis added).

Earlier in this case, the Court defined support service employees "as those employees whose position provided a service ancillary to the primary function of the agency or organization." Adams v. United States, 27 Fed. Cl. 5, 15 (1992) ("Adams I"), rev'd in part, 178 F.3d 1306 (Fed. Cir. 1998) ("Adams II"), on remand, 65 Fed. Cl. 195 (2005) ("Adams IV").[3] In Adams I, the Court also noted that support service employees are "those employees who provide a service which permits the agency to pursue its basic task, while not directly engaging in that task" and provided, as an example, those employees who aid the agency in operating more

[3] In their cross-motion, plaintiffs criticized the Government for "inexplicably ignor[ing] this Court's decision of December 1, 2004." Pl. HUD Mem. 2 n.2. We are aware of the Court's December 1, 2004 decision, but had no occasion to cite it in our motion for summary judgment. Since it was an unpublished opinion, we omitted it from the citation of Adams I, and referred to this Court's April 27, 2005 published decision at 65 Fed. Cl. 195 as Adams III. To maintain consistency with the terminology utilized in previous opinions and briefs in this case, we will refer to the Court's decision at 65 Fed. Cl. 195 as Adams IV in this brief.

"safely, effectively and efficiently." Id. (quoting Campbell v. United States Air Force, 755 F. Supp. 893, 896 (E.D. Cal. 1990), vacated by settlement, 972 F.2d 1352 (Fed. Cir. 1992)). The Federal Circuit did not disturb the Court's definition of support service. Adams II, 178 F.3d 1306; Adams IV, 65 Fed. Cl. at 204-05.

The undisputed facts establish that, based upon OPM regulations and the Court's definition of support services in this case, GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG perform a support service to HUD, as distinguished from a production function. The primary mission of HUD essentially was and is to provide for increased safe and affordable housing for Americans, primarily through loans and grants. Pl. HUD PFUF 1; Pl. HUD App. 86-135. From February 16, 1987 through approximately February 1994, a typical criminal investigator in HUD's OIG spent the vast majority of his or her time investigating fraud upon HUD programs.[4] Pl. Resp. to Def. HUD PFUF 3. From approximately February 1994 through October 1994, some criminal investigators in HUD's OIG spent the majority of their time

[4] At one point in their cross-motion, plaintiffs argue that, rather than performing a support service to HUD, criminal investigators in HUD's OIG were furthering HUD's mission by investigating equity skimming and embezzlement, where loan recipients and grantees divert HUD program money away from its intended purpose of maintaining HUD supported property. Pl. HUD Mem. 21-22. However, this argument is untenable. As Mr. Neri explained in his deposition, equity skimming consists of a landlords who improperly take money that was supposed to go toward their property and use it for personal use, and the "property goes into foreclosure and HUD [has] to pay off the foreclosure." Pl. HUD App. 8-9. Mr. Neri's testimony makes clear that investigations into equity skimming had the main purpose of protecting HUD funds. Similarly, investigations into embezzlement protect the integrity of HUD funds by ensuring that the funds are used for the purpose for which they were intended. Through these investigations, HUD can stop dispersing its funds to people who are not using them properly. In any event, the majority of investigations by criminal investigators in HUD's OIG focused on cases involving false statements for the purpose of obtaining HUD loans and grants, which are clearly designed to protect the integrity of HUD and its programs. E.g., Def. HUD App. 59-60, 92, 111.

investigating violent crime in public and assisted housing while others continued to spend the majority of their time investigating fraud upon HUD programs.[5] A primary result of investigations by HUD's OIG, during the relevant time period, was approximately $200 million dollars in savings, recoveries, fines and cost efficiencies, as well as significant indictments and convictions. Pl. Resp. to Def. HUD PFUF 10.

Criminal investigators in HUD's OIG were performing a support service because they spent the vast majority of their time permitting HUD to "pursue its basic task," providing safe and affordable housing to Americans, "while not directly engaging in that task." By helping to prevent fraud upon HUD programs and violent crime in public and assisted housing, the criminal investigators in HUD's OIG allowed HUD to perform its basic task of providing loans and grants to promote affordable housing "effectively and efficiently." In this way, the criminal investigators in HUD's OIG investigating fraud allowed HUD managers to make more efficient use of their limited funds by providing loans and grants to those who are truly entitled to them and will make proper use of them. Similarly, criminal investigators in HUD's OIG investigating violent crime in public and assisted housing allowed the loans and grants HUD managers disburse to effect HUD's goal of providing safe and affordable housing to Americans. If public

---

[5] Plaintiffs claim that violent crime in public and assisting housing was a focus of HUD's OIG before Operation Safe Home was announced in February 1994. Pl. HUD Mem. 15. However, this is a mischaracterization. Plaintiff has presented evidence of only one criminal investigator, Neil Olderman, who spent the majority of his time investigating violent crime in public or assisted housing prior to February 1994. Pl. HUD App. 224-26. Only three others, Diane Hill-Dechellis, Philip Keifer and Katherine E. Tackas, testified that they spent any time investigating violent crime during the relevant time period, and none of these three testified that they spent the majority of their time doing so before or after Operation Safe Home began. Id. at 200-01, 205, 255-56.

and assisted housing areas are not safe, HUD's loans and grants will not be of much use to their beneficiaries.

GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG also performed work of substantial importance to the "effectiveness of the organization . . . serviced." As noted above, the result of the investigations by HUD's OIG, during the relevant time period, was approximately $200 million dollars in savings, recoveries, fines and cost efficiencies, as well as significant indictments and convictions. Id. Given that GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG conducted the most complex investigations, id. at 4, it follows that they were responsible for a larger share of recoveries and convictions than lower grade investigators. The testimony and evidence presented by certain plaintiffs highlights their importance to HUD. See, e.g., Pl. HUD App. 177 ("During the relevant time period, the investigations that [Michael Carlucci] worked on resulted in over 90 convictions as well as fines and restitution totaling over $55 million); 263 (Phillip Wrona investigated, indicted and convicted 35 criminal targets in Federal District Court during the approximately seven calendar months that he worked in HUD's OIG). Also, the amount of HUD funds saved by GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG through deterrence cannot effectively be quantified. Therefore, the investigative work of GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG had a noticeable impact upon the effectiveness and efficiency of HUD.[6]

---

[6] Plaintiffs' only argument against our assertion that GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG perform work of "substantial importance" to HUD is that the work is not "substantially important to the management or operation" of HUD, as required by DOL's regulations. Pl. HUD Mem. 31 n.24 (citing Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1128 (9th Cir. 2002)). However, there is no effective difference between requiring that the

Also, GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG exercised substantial discretion in matters of importance. GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG opened, investigated and closed cases with minimal supervision and were expected to handle nearly every aspect of the case without the help of a supervisor. Pl. Resp. to Def. HUD PFUF 7-9. GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG often generated their own cases through various contacts, see, e.g., Pl. HUD App. 174, 198, 210, 223, and recommended prosecution when they believed a case was worthy of prosecution. See Pl. HUD App. 255 (Katherine E. Tackas "researched the matter and interviewed HUD attorneys and program officials and was able to convince the Assistant United States Attorney ("AUSA") to prosecute."); cf. Pl. HUD App. 262 (Phillip Wrona "located and interviewed witnesses and determined their suitability to testify" while working with then Miami-Dade State Attorney Janet Reno). In the interim, after collecting evidence, they "determined which pieces of evidence would prove a case against a suspect or prove exculpatory for a suspect." Pl. Resp. to Def. HUD PFUF 8. Therefore, GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG had substantial discretion at nearly every step of their cases, which generated significant savings and recoveries for HUD, from opening to closing.

Therefore, by investigating fraud upon HUD and its programs and violent crime in public and assisted housing, GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG performed a support service of substantial importance to HUD.

---

work must be of substantial importance to the operation of HUD (DOL regulations) or the effectiveness of HUD (OPM regulations). As demonstrated above, the work of GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG was substantially important to the operation and effectiveness of HUD.

## II. Conducting Criminal Investigations For The Purpose Of Improving The Integrity And Efficiency Of HUD Is An Administrative Function, Distinguishable From The Production Function Of Criminal Investigators In Police Departments And Agencies Charged With Enforcing Regulatory Compliance

In its cross-motion for partial summary judgment, plaintiffs argue that GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG cannot meet the administrative exemption criteria because they spent the majority of their time performing criminal investigative work such as interviewing witnesses, reviewing evidence and conducting surveillance. E.g., Pl. HUD Mem. 18-19. In support of this argument, plaintiffs cite this Court's earlier decision regarding Federal criminal investigators in this case and several cases involving state criminal investigators. Id. at 19 (citing Reich, 3 F.3d 581; Bratt, 912 F.2d 1066; Mulverhill, 1994 WL 263594; Ahern v. New York, 807 F. Supp. 919 (N.D.N.Y. 1992), aff'd sub. nom., Reich, 3 F.3d 581). Plaintiffs also cite to new DOL regulations that codified the rule of these earlier cases. Id. at 18.

The cases cited by plaintiffs are distinguishable from the instant case because, in those cases, plaintiffs conducted investigations for the purpose of enforcing criminal laws as part of the mission of their agency. However, criminal investigators in HUD's OIG did not conduct criminal investigations for the purpose of enforcing criminal laws as part of the mission of HUD; rather, they conducted their investigations for the purpose of protecting the integrity and efficiency of the agency.[7]

[7] Plaintiffs would have the Court believe that the Government's argument is essentially that the words "law enforcement" are not contained in HUD's mission statement. E.g., Pl. HUD Mem. 19. However, this is an oversimplification. Criminal investigators in HUD's OIG investigated crimes for the purpose of protecting the integrity and efficiency of HUD and its programs, which cannot reasonably be said to fall within HUD's mission, regardless of how

In Reich, 3 F.3d at 585, the primary issue was whether investigators from the New York State Bureau of Criminal Investigations ("BCI") were administratively exempt under the FLSA. The primary duty of the investigators was the "investigation and prevention of serious crimes." Id. As the Second Circuit observed, "the BCI is in the law enforcement 'business.' . . . And, it remains undisputed that the primary function of the investigators within that business is to conduct - or 'produce' - its criminal investigations." Id. at 587. Therefore, the Court of Appeals for the Second Circuit held that the BCI investigators performed "production" functions and, thus, were not administratively exempt.

Similarly, in Bratt, 912 F.2d at 1069-70, the Court of Appeals for the Ninth Circuit held that probation officers, whose "primary responsibility" was to "conduct factual investigations of adult offenders or juvenile detainees and advise the court on their proper sentence or disposition within the system," performed the "courts' day-to-day production process" and, thus, were not administratively exempt. One of the missions of a criminal court is to sentence offenders and the probation officers were directly participating in the fulfillment of that mission.[8]

broadly the mission is defined.

[8] Plaintiffs also cite to Amshey v. United States, 26 Cl. Ct. 582 (1992), vacated by settlement, 35 Fed. Cl. 358 (1993), and D'Camera v. District of Columbia, 693 F. Supp. 1208 (D.D.C. 1988), for the proposition that law enforcement officials are typically non-exempt. Pl. HUD Mem. 38. However, like Reich, Bratt and Ahern, the plaintiffs in Amshey were performing the "law enforcement mission" of the Uniformed Division of the Secret Service. 26 Cl. Ct. at 603. In D'Camera, the United States District Court for the District of Columbia denied defendant's motion for summary judgment, in large part, because the defendant had failed to put forward of any evidence of how much time plaintiffs spent performing police work for the police department, as opposed to administrative tasks. 693 F. Supp. at 1211. Another case cited by plaintiffs, Roney v. United States, 790 F. Supp. 23 (D.D.C. 1992), technically deals with a GS-1811 Deputy United States Marshall, however, the Marshall's functions were more oriented towards the manual labor of courthouse security, rather than criminal investigations. Thus, we distinguish Roney in Section III, below.

In Mulverhill, 1994 WL 263594, a case relied upon heavily by plaintiffs, the United States District Court for the Northern District of New York held that investigators for the New York State Department of Environmental Conservation ("DEC") were administratively non-exempt. In its decision, the court found that the "DEC is in the environmental law and regulation enforcement business" and that the primary function of the investigators "within that business is to enforce the State's environmental laws and regulations." Id. at *4. Therefore, the court held that the investigators performed the production work of the DEC and were, thus, non-exempt. Id. As we have demonstrated, however, unlike the criminal investigators working for the DEC, criminal investigators in HUD's OIG did not perform any law enforcement mission of HUD. The investigators at issue in Mulverhill were enforcing New York's environmental laws "to carry out the environmental policy of the state." Id. at *1 (citing N.Y. Envtl. Conserv. Law § 3-0301(1) (McKinney 1988)).

In contrast, the criminal investigators in HUD's OIG performed investigations for the primary purpose of protecting the integrity and efficiency of HUD and its programs. In fact, criminal investigators in HUD's OIG were legally precluded from performing the types of regulatory enforcement investigations that the DEC investigators performed. Inspector General Authority to Conduct Regulatory Investigations, 13 Op. O.L.C. 54, 1989 OLC LEXIS 70, at *2 n.1 (March 9, 1989) ("Kmiec Letter") (the scope of an OIG's authority does not extend to "regulatory investigations," i.e., investigations that have the objective of "regulatory compliance by private parties," but rather, "investigations properly within the ambit of the Inspector General generally have as their objective the elimination of waste and fraud in governmental

departments, including waste and fraud among its employees, contractors, grantees and other recipients of federal funds.").

Plaintiffs also attempt to analogize criminal investigators in HUD's OIG to criminal investigators in the Internal Revenue Service ("IRS"), who were found to be non-exempt earlier in this case. Pl. HUD Mem. 22-23. The premise of the Court's ruling concerning the IRS criminal investigators, however, was that enforcing Federal tax laws was as much a part of IRS's mission as collecting taxes. Adams I, 27 Fed. Cl. at 21 ("The IRS Criminal Investigative mission is 'to foster voluntary compliance and ensure public confidence through the effective enforcement of criminal statutes relative to tax administration and financial crimes.' All IRS plaintiffs perform duties which effect this mission."). The IRS agents at issue earlier in this case were not protecting the integrity of the IRS itself, but rather, were ensuring that people do not avoid their responsibility to pay taxes into the general treasury of the United States. This was the criminal investigative aspect of the IRS's mission. See id. In contrast, criminal investigators in HUD's OIG specifically protect the integrity and efficiency of HUD itself and its housing programs; they do not perform any independent criminal investigative mission of HUD. See, e.g., Pl. Resp. to Def. HUD PFUF 3, 5; Kmiec Letter, 13 Op. O.L.C. 54, 1989 OLC LEXIS 70, at *2 n.1.

In contrast to the cases cited by plaintiffs that involve criminal investigators, the reasoning in Auer, Raper and Shockley is fully applicable here. In Auer, 65 F.3d at 720-21, the Eighth Circuit affirmed the lower court's decision that sergeants in the Internal Affairs Division of the St. Louis Police Department were administratively exempt. The lower court had concluded that internal affairs sergeants were "administratively exempt because they perform

work ensuring that the department operates in accordance with its stated policy goals and objectives." Id. at 721. On appeal, the plaintiffs in Auer did not challenge the lower court's findings, rather, they argued, based specifically upon Reich, that "because the [internal affairs] sergeants actually performed investigations, they cannot be exempt as administrators" because they performed production work. Id. Rejecting plaintiffs arguments, the Eighth Circuit noted that the internal affairs sergeants did not perform the types of law enforcement investigations at issue in Reich, but rather, performed "internal investigations to ensure that the officers within the department are complying with its policies." Id. The argument that was rejected in Auer is the same argument that plaintiffs are making here. However, the Eighth Circuit made clear that investigative work is not per se FLSA non-exempt and that the purpose of the investigative work is important.

Similarly in Raper, 688 N.W.2d at 43-44, the Supreme Court of Iowa affirmed a lower court's decision that a sergeant in the internal affairs bureau of the Iowa Department of Public Safety was administratively exempt. In Raper, the internal affairs sergeant performed internal investigations, including evidence gathering and analysis of the evidence, and wrote investigation reports recommending appropriate discipline in each case. Id. at 44. Therefore, the Supreme Court of Iowa held that he was administratively exempt.

Criminal investigators in HUD's OIG are similar to internal affairs officers. Although the percentage of time criminal investigators in HUD's OIG spent performing internal investigations may have been small, see, e.g., Pl. Resp. to Def. HUD PFUF 4, these investigations were similar in purpose to the investigations of program participants, grantees and gangs in public and assisted housing. The overarching purpose of the work of criminal

investigators in HUD's OIG was to support HUD's effectiveness and efficiency in carrying out its housing programs. Whether the subject of a criminal investigation was a HUD employee or a program participant, grantee, or person undermining the safety of a HUD housing project, the ultimate purpose of the investigation was the same: to promote the integrity and efficiency of HUD and its programs. Further, as we demonstrated in our moving brief, insurance claims adjusters, who investigate policyholders, not employees, have been held to perform support functions to the insurance companies, not production functions. See Jastremski v. Safeco Insurance Cos., 243 F. Supp. 2d 743 (N.D. Ohio 2003); Palacio v. Progressive Insurance Co., 244 F. Supp. 2d 1040 (C.D. Cal. 2002). This confirms that investigations need not focus upon internal affairs in order to constitute support services rather than production work, if, as here, the investigations are aimed at protecting the employer from fraud or otherwise to promote the integrity of the employer's operations.[9]

Plaintiffs attempt to distinguish Auer and Raper upon the basis that the internal affairs sergeants in those cases analyzed data and made recommendations that affected their departments' policy. Pl. HUD Mem. 36-37 n.28. However, GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG also analyzed data and made recommendations similar to the internal affairs sergeants in Auer and Raper. See also Shockley, 997 F.2d at 28 (holding that an "Ethics and Standards Lieutenant" who "devoted her time to the investigation of complaints against other officers" and forwarded recommendations of "sustained, not sustained, unfounded, or exonerated" to the Chief of Police was an administrative employee because she analyzed data

---

[9] Plaintiffs note various differences between the other activities of insurance adjusters and HUD OIG criminal investigators, but these distinctions are not material to point for which we cite these cases here.

and made recommendations that shaped the police department's policy with regard to internal discipline). GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG certainly analyzed data. It is undisputed that, after collecting evidence, these investigators "determined which pieces of evidence would prove a case against a suspect or prove exculpatory for a suspect." Pl. Resp. to Def. HUD PFUF 8. The evidence often consisted of "invoices, books, records, computer printouts, contracts, financial instruments, bank statements and other data of consequence to the investigation." E.g., Pl. HUD App. 175, 211 (emphasis added); see also Def. HUD App. 53 (GS-1811-12 criminal investigator in HUD's OIG examines "records, books, payrolls, reports, correspondence and other data of consequence"). Therefore, plaintiffs analyzed data in the same way as the plaintiffs in Auer, Raper and Shockley.

Plaintiffs also "made recommendations" similar to those involved in Auer, Raper and Shockley. In Shockley, 997 F.2d at 28, the Ethics and Standards Lieutenant essentially recommended whether an employee was guilty or not guilty of the infraction. The internal affairs plaintiffs in Auer performed the "same job duties" as the Ethics and Standards Lieutenant in Shockley. 65 F.3d at 721 In Raper, the internal affairs sergeant "recommend[ed] appropriate discipline" for violations of department policies. 688 N.W.2d at 44. Similarly, GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG made recommendations to prosecute people who had defrauded HUD programs. See Pl. HUD App. 255 (Katherine E. Tackas "researched the matter and interviewed HUD attorneys and program officials and was able to convince the Assistant United States Attorney ("AUSA") to prosecute.").

Furthermore, even if the phrase "recommendations that ensure that the [department] 'operates in accordance with its stated goals and objectives,'" Raper, 688 N.W.2d at 44 (quoting

Auer, 65 F.3d at 721), is interpreted more narrowly than in Auer and Raper, to include only recommendations to management regarding ways to improve departmental compliance, GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG still performed those duties. GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG sometimes prepared and submitted Systematic Implication Reports, which reported upon programmatic weaknesses identified during investigations. Pl. HUD App. 216; see also id. at 82 (one of the duties of the Office of Investigations is to recommend "procedures to [HUD] officials for the use of information developed through investigation of Field operations and alerting HUD management to matters that are in need of their attention"). While the actual preparation of Systematic Implication Reports took up a small amount of the time of a typical GS-1811-12 or GS-1811-13 criminal investigator in HUD's OIG, the preparation of these reports was consistent with the primary duty of most of the criminal investigators at issue, to prevent fraud upon HUD and its programs through criminal investigations. Nothing in Auer, Raper or Shockley suggests that the internal affairs plaintiffs spent the majority of their time actually preparing reports and making recommendations, rather it appears that they were primarily investigators in the same sense as GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG, in that they primarily performed investigations, including evidentiary analysis. The internal affairs plaintiffs in Auer, Raper and Shockley primarily investigated department employees to protect the integrity of their respective departments, while the plaintiffs at issue here primarily investigated grantees,

program participants and persons who commit crimes at HUD housing projects to protect the integrity of HUD and its programs.[10]

Similar to Auer, Raper, Shockley and the plaintiffs at issue here, in Ferrell, 2007 WL 962853, the Northern District of Georgia recently held that police officers working for a school system are administratively exempt, even though police officers are normally non-exempt production workers. In Ferrell, the plaintiffs were School Resource Officers ("SROs") in the Gwinnett County School System. Id. at *1. The SROs were "sworn police officers who [were] charged with proactively preventing and responding to safety and security problems within the School System." Id. (emphasis added). Their "most important duty was to provide for the safety and security of the students, employees, and property so that the School System could carry out its purpose of educating students." Id.

Plaintiffs in Ferrell argued that the SROs spent 85-90% of their time performing "patrol officer" or "crime prevention" duties. Id. at *2. The SROs performed duties such as: (1) conducting investigations, including interviewing witnesses, collecting evidence, etc.; (2) responding to dispatched calls; (3) making arrests; (4) writing reports of the incidents;

---

[10] Plaintiffs also argue that internal affairs investigators were "addressed" in the commentary to new DOL regulations, because the commentary stated that "only 'high level' employees whose primary duty is 'handling community complaints, including determining whether to refer such complaints to internal affairs for further investigation' may satisfy the primary duty test." Id. at 37 n.30 (quoting Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122-01, 22130 (Apr. 23, 2004)). From plaintiffs' quotation alone, however, it is evident that DOL was not defining whether and which internal affairs officers would be exempt or non-exempt, but rather stating that high level community liaisons would be exempt (assuming they met other conditions). The commentary refers to employees that "refer such complaints to internal affairs," but is silent on internal affairs officers who perform the investigations. Thus, plaintiffs' citation to the new DOL regulations is inapposite.

(5) reporting matters to the local district attorney; (6) patrolling the school halls to detect and deter criminal activity and detect safety and security issues; (7) coordinating security for extra curricular events; (8) training school staff; (9) providing advice to school administrators upon safety issues; (10) participating in school safety drills and security surveys; and (11) acting as liasons between the School System, law enforcement agencies and others in the community. Id. Although the SROs had offices, "they were expected to spend a majority of their time out of the offices performing other duties." Id. at 3.

In spite of the primarily law enforcement nature of the duties of the SROs, the Ferrell court held that "there is a critical distinction between police officers who work for a law enforcement agency and Plaintiffs, who are employed by the school system, due to a difference in the nature of their respective employers' businesses." Id. at *7 (citations omitted) (emphasis added); see also Haemonetics, 907 F. Supp. at 517 (quoting Cooper, 940 F.2d 896) ("'it is important to consider the nature of the employer's business' when deciding whether an employee is an administrative or production worker."); Feiler v. Hyatt Corp., No. 98-2863-CIV, 1999 U.S. Dist. LEXIS 23407, at *17-19 (S.D. Fla. Dec. 8, 1999), adopted by, 2000 U.S. Dist. LEXIS 22693 (S.D. Fla. Feb 11, 2000) (same as Haemonetics). Analogizing to Auer, the Ferrell court went on to hold:

> Stated another way, because law enforcement agencies are in the business of providing protection and security to the public, police officers are the line workers of the police department. By contrast, the School System is in the business of educating students, not providing law enforcement. Thus, rather than producing the School System's end product of education, Plaintiffs are servicing the School System's business of education.

2007 WL 962853, at *8 (emphasis added).

Much like the Claims Court in Adam v. United States, 26 Ct. Cl. 782, 791 (1992), the Ferrell court made reference to the Claims Court decision in Sprague v. United States, 230 Ct. Cl. 492, 499 (1982), which noted that even postal inspectors engaged in "'pure' law enforcement," are administratively exempt. 2007 WL 962853, at *8 (emphasis added). Like the Claims Court in Adam, the Ferrell court noted that "unlike a law enforcement agency, the United States Postal Service is not in the business of fighting crime. Rather, the Postal Service delivers mail, and postal inspectors provide a safety and security function related to that mission." Id.

Similar to SROs in Ferrell, who patrolled the schools and investigated crimes for the purpose of providing for school safety and security, criminal investigators in HUD's OIG investigated crimes for the purpose of providing for the operational security of HUD and its programs. The reasons supporting the conclusion that the plaintiffs in Ferrell were exempt equally support the conclusion that the plaintiffs here were exempt.

In sum, the cases that plaintiffs cite regarding non-exempt criminal investigators are distinguishable from the criminal investigators at issue here, who conduct investigations for the purpose of protecting the integrity and efficiency of HUD and its programs. Auer, Raper, Shockley and Ferrell demonstrate that such investigators perform an administrative function.

## III. Plaintiffs' Authorities That Do Not Involve Criminal Investigators Are Inapposite Or Distinguishable

Throughout its brief, plaintiffs rely upon other cases not involving criminal investigators to argue that our formulation of the administration/production dichotomy is incorrect. However, these cases are also inapposite or distinguishable.

First, plaintiffs' citation to Bothell, 299 F.3d 1120, and Martin v. Indiana Michigan Power Co., 381 F.3d 574 (6th Cir. 2004) ("Martin") are inapposite. Plaintiffs cite these cases for

the proposition that a plaintiff who does not perform the "production" function of the agency is not automatically an "administrative" employee. Pl. HUD Mem. 28-33. We do not disagree.[11] In order to be considered an administrative employee, in addition to performing a support service, the employee must also: (1) perform work of substantial importance, meaning work involving "substantial discretion on matters of enough importance that the employee's actions and decisions have a noticeable impact on the effectiveness of the organization . . . serviced," 5 C.F.R. 551.104; (2) pass the nonmanual work test; and (3) pass the discretion and independent judgment test. 5 C.F.R. § 551.206(a)(2). Plaintiffs have conceded the second and third requirement, and we have demonstrated that plaintiffs perform a support service of substantial importance.

Statham v. United States, No. 00-699C, 2002 WL 31292278 (Fed. Cl. 2002), Berg v. United States, 49 Fed. Cl. 459 (2001), and Roney, 790 F. Supp. 23, are also distinguishable. In Statham, 2002 WL 31292278, the Court held that a plaintiff, who spent 70 percent of his time standing on protective duty for the Secretary of Energy, was non-exempt. Plaintiffs rely upon Statham to argue that only "persons performing management or business functions" can be

[11] In this regard, OPM Decision No. F-1810-12-02 (Pl. HUD App. 146-55) is also inapposite. In its decision, OPM determined that the employee at issue, who performed factual investigations for background checks for the Department of Defense did not meet the primary duty, nonmanual work or independent discretion tests. With regard to the primary duty test, OPM acknowledged that security is a staff support function, but that not all staff functions, such as clerical, technician and blue collar supply work, meet the administrative exemption. Pl. HUD App. 151-52. OPM determined that the claimant merely investigated facts, "but did not draw conclusions or recommend actions." Id. at 151. In contrast, GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG investigators "determined which pieces of evidence would prove a case against a suspect or prove exculpatory for a suspect," Pl. Resp. to Def. HUD PFUF 8, and recommended when cases should be prosecuted. See Pl. HUD App. 255 (Katherine E. Tackas "researched the matter and interviewed HUD attorneys and program officials and was able to convince the Assistant United States Attorney ("AUSA") to prosecute.").

exempt. Pl. HUD Mem. at 34. However, Statham is distinguishable. In Statham, the parties agreed that the plaintiff spent at least 70 percent of his time "physically standing next to or nearby the Secretary [of Energy] as a last line of defense against any threats to the Secretary" and spent "much less than 50% of [his] work time . . . identifying threats, planning advance travel work and making recommendations based on that advance work." 2002 WL 31292278, at *7. While noting that OPM's regulations were meant to encompass managerial and business functions, the Court held that the plaintiff's executive protection work did not fall within the definition of a supporting service.[12]

However, the work of criminal investigators in HUD's OIG was much more of a management or business function than standing next to a cabinet member. The primary duty of GS-1811-12 and GS-1811-13 criminal investigators in HUD's OIG was to protect the integrity and efficiency of HUD and its programs. Most of the plaintiffs at issue served the same purpose as auditors in HUD's OIG, who plaintiffs admit are administrative employees, Pl. HUD PFUF 4, except that the criminal investigators served the efficiency and effectiveness of HUD by detecting and deterring fraud against HUD programs through criminal investigations, rather than through audits of specific programs. In any event, OIG investigators performed no less of a

[12] To the extent that Statham can be read to say that supporting services are limited to the three miscellaneous examples listed in 5 C.F.R. § 551.104 (automated data processing, communications, or procurement and distribution of supplies), id. at *8, the Statham Court's definition contradicts the plain language of the regulation, which reads that "employees performing supporting services provide such support by . . . [p]roviding supporting services, **such as**, automated data processing, communications, or procurement and distribution of supplies." 5 C.F.R. § 551.104 (emphasis added).

management or business function than the air traffic controllers who were held to be administratively exempt in Campbell, 755 F. Supp. 893.[13]

Berg is distinguishable upon similar grounds. In Berg, the Court held that civilian electronic technicians who worked at Edwards Air Force Base were non-exempt production workers. In so holding, the Court's analysis was clearly influenced by the manual "blue collar" nature of the technicians' jobs and their lack of discretion. In distinguishing Hickman v. United States, 10 Cl. Ct. 550 (1986), the Court noted that the Hickman Court relied, in part, "on the exercise of independent discretion and independent judgment by the plaintiffs and the nonmanual nature of the [data processing] work." Berg, 49 Fed. Cl. at 471. Similarly, the Berg Court distinguished Campbell, 755 F. Supp. 893, in part, upon the basis that the air traffic controllers in Campbell were "white collar office worker[s]." Berg, 49 Fed. Cl. at 471. In contrast to Hickman and Campbell, the Berg Court went on to find that plaintiffs did not meet the nonmanual work test or the discretion and independent judgment test. Id. at 473-78. However, for the GS-1811-12 and GS-1811-13 criminal investigators at issue here, the record amply demonstrates, and plaintiffs have in fact conceded for purposes of these motions, that they meet the nonmanual work test and discretion and independent judgment test. Pl. HUD Mem. 6-7.

---

[13] Additionally, OPM's regulation states that the administrative exemption may apply to an employee who performs "general management or business functions or supporting services of substantial importance to the organization serviced." 5 C.F.R. § 551.206(a)(2) (emphasis added). Although they may all have some management or business flavor, some of the examples of support services, i.e., communications, cannot readily be classified as a "management" or "business" function under narrow definitions of those terms. Therefore, the terms "management and business functions" should not be defined so narrowly as too exclude all employees who do not supervise employees or sit in an office and crunch numbers.

Roney, 790 F. Supp. 23, is distinguishable upon similar grounds. Although the plaintiff in Roney was technically a GS-1811 Deputy United States Marshall, he performed a courthouse security role, rather than a criminal investigatory role. In Roney, the United States District Court for the District of Columbia held that the plaintiff, who was assigned to that court, applied "security measures to the day-to-day production process of a working courtroom." Id. at 27. In so holding, the court noted that "a Marshall in this position is subject to detailed direction by his superiors with respect to the scope, time, area, and resources available for him to complete a specific task." Id. The court also distinguished Campbell solely upon the grounds that the air traffic controllers in Campbell performed predominantly nonmanual work, while the plaintiff performed a significant amount of manual work. In contrast, plaintiffs at issue here preformed nonmanual work and frequently exercised discretion and independent judgment, while investigating fraud upon HUD and its programs and violent crime in public and assisted housing.[14]

Therefore, the authorities upon which plaintiffs rely outside of the criminal investigator context are inapposite or distinguishable.

---

[14] The result in Roney may be justified based upon manual nature of the plaintiff's work and the absence of discretion and independent judgement. To the extent, however, that Roney may be construed to hold that work supporting the day-to-day production processes of an employer is itself "production" work, the Roney court erred. Such a broad interpretation of "production" work would virtually eliminate the administrative exemption, by limiting it to support services that are somehow important to the employer without supporting the actual achievement of the employer's mission.

IV. The Court Should Consider The Mission Of HUD, Not HUD's OIG, Or One Of Its Subdivisions, In Applying The Administration/Production Dichotomy

In their cross-motion, plaintiffs argue that this Court should consider the missions of HUD's OIG, or one of the subdivisions of HUD's OIG, instead of HUD, when applying the administration/production dichotomy. Pl. HUD Mem. 27-28. This argument is untenable. Under plaintiffs' theory, human resources employees in the human resources department of an agency or business would all be "production" workers because they produce the end product of the department, human resources services. As indicated by DOL's regulations, this would clearly violate the intent of the statute. See 29 C.F.R. § 541.201(b) ("Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as . . . human resources").

Plaintiffs rely upon cases regarding the Secret Service to support their theory, but these cases are inapposite. Pl. HUD Mem. 27-28 (citing Amshey, 26 Ct. Cl. at 603; Adams I, 27 Fed. Cl. at 23). During the periods relevant to Amshey and Adams I, the Secret Service was a distinct subdivision of the Department of the Treasury ("Treasury") that had, among its functions, providing protective services to the President of the United States and others and investigating violations of law related to currency and securities, such as counterfeiting. Adams I, 27 Fed. Cl. at 23. The Secret Service did not "service" Treasury in the sense of protecting the integrity and efficiency of Treasury, but rather, directly performed specific missions of Treasury. Therefore, it makes sense to consider the mission of the Secret Service in applying the administration/production dichotomy. Furthermore, in Amshey, 26 Ct. Cl. at 603, it was appropriate to consider the mission of the Uniformed Division of Secret Service because the Uniformed Division performed a part of the mission of the Secret Service, i.e., providing

protection and security for the President and others. The Uniformed Division did not service the Secret Service or Treasury, but rather, carried out an important part of the parent-agency's mission.[15]

Here, the OIG is a part of HUD that is tasked not with carrying out HUD's mission of providing safe and affordable housing to Americans, but rather, with protecting the integrity, efficiency and effectiveness of HUD itself and its programs. Therefore, when applying the administration/production dichotomy, this Court must consider the mission of HUD, not HUD's OIG or a subdivision of HUD's OIG. Such an approach is consistent with what other courts have done in similar cases. See Auer, 65 F.3d at 721 (considering the mission of the Police Department, not the Internal Affairs Division); Ferrell, 2007 WL 962853 (considering the mission of the school system, not the school system's Department of Safety and Security).[16]

CONCLUSION

For the reasons stated above, and the reasons stated in our motion for partial summary judgment regarding the plaintiffs at issue, we respectfully request that the Court enter partial summary judgment in favor of the United States dismissing all of plaintiffs' remaining FLSA

---

[15] Additionally, regarding the IRS criminal investigators in Adams I, the Court did not consider the mission of a distinct unit of the IRS, but rather, the criminal investigative mission of IRS as a whole, which was performed by the IRS criminal investigators at issue in Adams I. 27 Fed. Cl. at 21.

[16] In a footnote in their brief, plaintiffs appear to suggest that this Court should consider the United States Government to be the employer of criminal investigators in HUD's OIG for purposes of applying the administration/production dichotomy. Pl. HUD Mem. 28 n.22. Plaintiffs provide no precedent for such an application of the dichotomy, nor are we aware of any. Such an approach would contradict the established case law in this area, including all the cases cited by plaintiffs where the United States is a defendant. In any event, the mission of the United States Government cannot reasonably said to be protecting the integrity and efficiency of itself and its own programs.

claims arising out of their employment as G2-1811-12 and GS-1811-13 criminal investigators in HUD's OIG and deny plaintiffs motion for partial summary judgment regarding the same claims.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s/ Jeanne E. Davidson

JEANNE E. DAVIDSON
Director

/s/ Shalom Brilliant

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 616-8275
Fax: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:
Michael J. Dierberg
William P. Rayel
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

May 14, 2007